## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Richard Aslin, | ) | |
| Keturah Bixby, | ) | |
| Jessica Cantlon, | ) | |
| Benjamin Hayden, | ) | |
| Sarah Heilbronner, | ) | |
| Celeste Kidd, | ) | Case No: 6:17-cv-06847 |
| Bradford Mahon, | ) | |
| Elissa Newport, and | ) | |
| Steven Piantadosi, | ) | |
| | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| University of Rochester, | ) | |
| Joel Seligman, and | ) | |
| Robert Clark, | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs RICHARD ASLIN ("Aslin"), KETURAH BIXBY ("Bixby"), JESSICA CANTLON ("Cantlon"), BENJAMIN HAYDEN ("Hayden"), SARAH HEILBRONNER ("Heilbronner"), CELESTE KIDD ("Kidd"), BRADFORD MAHON ("Mahon"), ELISSA NEWPORT ("Newport"), and STEVEN PIANTADOSI ("Piantadosi") by and through their undersigned attorneys, complain of Defendants UNIVERSITY OF ROCHESTER ("UR" or the "University"), JOEL SELIGMAN ("Seligman") and ROBERT CLARK ("Clark") and in support respectfully allege the following:

1

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in this civil matter arising under Title VII, 42 U.S.C. § 2000e, *et seq.*, and Title IX, 20 U.S.C. § 1681, *et seq.*  This Court further possesses supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367(a).

2.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because UR resides in this district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

3.      Aslin is an individual and a citizen of Massachusetts. During the relevant period, and at all material times, Aslin was employed by UR or was a former employee of UR.

4.      Bixby is an individual and a citizen of New York. During the relevant period, and at all material times, Bixby was a Ph.D. student, or former Ph.D. student, at UR.

5.      Cantlon is an individual and a citizen of New York. During the relevant period, and at all material times, Cantlon was employed by UR.

6.      Hayden is an individual and a citizen of Minnesota. During the relevant period, and at all material times, Hayden was employed by UR, or was a former employee of UR.

7.      Heilbronner is an individual and a citizen of Minnesota. During the relevant period, and at all material times, Heilbronner was employed by UR, or was a former employee of UR.

8.      Kidd, is an individual and a citizen of New York. During the relevant period, and at all material times, Kidd was employed by UR.

9.      Mahon is an individual and a citizen of New York. During the relevant period, and at all material times, Mahon was employed by UR.

10.     Newport is an individual and a citizen of Washington D.C. During the relevant period, and at all material times, Newport was a former employee of UR.

11.     Piantadosi is an individual and a citizen of New York. During the relevant period, and at all material times, Piantadosi was employed by UR.

12.      UR is a private educational institution and non-profit corporation with its principal place of business at 500 Joseph C. Wilson Boulevard, Rochester, New York 14627.

13.     UR operates in an industry that affects commerce and employs 15 or more employees, qualifying as an employer for the purposes of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

14.     UR carries out one or more education programs or activities receiving Federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681(a).

15.     Seligman is an individual and a citizen of New York. During the relevant period, and at all material times, Seligman was employed by UR.

16.     Clark is an individual and a citizen of New York. During the relevant period, and at all material times, Clark was employed by UR.

## **ADMINISTRATIVE PROCEDURES**

17.     On August 31, 2017, Aslin timely filed a charge of retaliation with the Equal Employment Opportunity Commission ("EEOC").

18.     Notice of a right to sue letter was issued by the EEOC to Aslin on November 14, 2017, and this Complaint is filed within 90 days of said notice.

19.     On September 1, 2017, Cantlon timely filed a charge of employment discrimination and retaliation with the EEOC.

20.     Notice of a right to sue letter was issued by the EEOC to Cantlon on November 20, 2017, and this Complaint is filed within 90 days of said notice.

21.     On September 1, 2017, Hayden timely filed a charge of retaliation with the EEOC.

22.     Notice of a right to sue letter was issued by the EEOC to Hayden on November 20, 2017, and this Complaint is filed within 90 days of said notice.

23.     On November 2, 2017, Heilbronner timely filed a charge of retaliation with the EEOC.

24.     Notice of right to sue letter was issued by the EEOC to Heilbronner on November 17, 2017, and this Complaint is filed within 90 days of said notice.

25.     On August 31, 2017, Kidd timely filed a charge of retaliation with the EEOC.

26.     Notice of a right to sue letter was issued by the EEOC to Kidd on November 20, 2017, and this Complaint is filed within 90 days of said notice.

27.     On September 1, 2017, Mahon timely filed a charge of retaliation with the EEOC.

28.     Notice of a right to sue letter was issued by the EEOC to Mahon on November 20, 2017, and this Complaint is filed within 90 days of said notice.

29. On August 30, 2017, Newport timely filed a charge of retaliation with the EEOC.

30. Notice of a right to sue letter was issued by the EEOC to Newport on September 11, 2017, and this Complaint is filed within 90 days of said notice.

31. On August 31, 2017, Piantadosi timely filed a charge of retaliation with the EEOC.

32. Notice of a right to sue letter was issued by the EEOC to Piantadosi on November 20, 2017, and this Complaint is filed within 90 days of said notice.

## STATEMENT OF FACTS

### A.    Introduction

33. In August and September 2017, Plaintiffs, all of whom have worked or studied at the University of Rochester's ("UR") Department of Brain and Cognitive Sciences ("BCS"), filed materially identical complaints with the EEOC detailing a lengthy campaign of retaliation they endured after they alerted the University's administration to a sustained pattern of sexual harassment of students, creating a hostile environment at BCS, by BCS professor Dr. Florian Jaeger ("Jaeger").

34. Among other things, Jaeger had slept with graduate students, pressed others for sex, took them to hot tub retreats where drugs were used, asked graduate students to procure sexual partners for him, and made frequent overtly sexual remarks in professional settings. Jaeger made the environment for women at BCS threatening and hostile. As a result at least 16 women altered their academic course to avoid Jaeger, including by not taking classes taught by him, not approaching him for help in his

speciality of statistical methods, deciding to leave BCS, the fields of cognitive science or neuroscience, or academia altogether.  Jaeger told graduate students that his UR superiors knew about his sexual liaisons with graduate students and approved.

35.     But Jaeger's BCS superiors did not know of Jaeger's misconduct, let alone approve.  When Aslin and Newport, internationally distinguished scientists who had founded BCS and hired Jaeger in 2006 for an official start of January 2007, found out about his long pattern of misconduct in 2016, they were horrified, and reported it promptly to University authorities.  In this they had support from a younger generation of highly regarded professors and graduate students at BCS, including the remaining Plaintiffs, who felt Jaeger's misconduct was dangerous for students and bad for departmental cohesion, a deep stain on the reputations of BCS and UR, and just plain wrong.

36.     Aslin, joined by Cantlon, the most senior of the younger professors, filed a complaint detailing what they had discovered about Jaeger's misconduct with the University in March 2016.[1]   The University assigned its Associate Counsel for Employment and Labor Relations Issues, Catherine Nearpass ("Nearpass"), to investigate.  Nearpass issued a report in June 2016 (the "Nearpass Report") clearing Jaeger from violations of University HR Policy 106.  Nearpass focused predominantly on whether Jaeger had violated Policy 106's section on student/faculty relationships, sidestepping a major focus of the Aslin/Cantlon complaint: that Jaeger, through a slew of actions and statements that women students found sexually aggressive and threatening,

---

[1] Cantlon submitted an additional complaint in April 2016.

had created a *hostile working environment* at BCS.  That too was prohibited by Policy 106 (and federal law) but largely ignored in her Report.

37.     UR refused to give Aslin and Cantlon a copy of the Nearpass Report, but they were allowed to read it in the counsel's office.  After their review, they had serious doubts about Nearpass' choice of witnesses, conduct of interviews, and some of her conclusions.  They were particularly troubled by Nearpass's decision to entirely discount the detailed testimony of Kidd, a highly respected BCS professor and Aslin's former advisee.  Aslin and Cantlon could only conclude that Nearpass's report was a whitewash designed to avoid liability for the University.  Nevertheless, University officials promptly ratified it, and rejected Aslin and Cantlon's subsequent appeal.

38.     While Jaeger was under investigation, the University made him full Professor ahead of schedule.  No reason existed to accelerate his promotion.  Aslin suggested to the Chair of BCS, Greg DeAngelis ("DeAngelis"), that the promotion be put on hold until the inquiry was over, but Jaeger was promoted anyway.  Jaeger believed he had been completely exonerated, told people to contact the University counsel's office for confirmation and said his critics had just been looking for retribution because he had spoken up at BCS in support of a faculty right to engage in sexual relationships with graduate students.

39.     Plaintiffs continued to press University officials, including President Joel Seligman ("Seligman"), in emails, letters, phone calls and personal meetings to take Jaeger's misconduct seriously and to thoroughly examine current policies and practices, but nothing was done.  Instead, Plaintiffs themselves became the targets of a sustained retaliation campaign in BCS.  Their University emails and phone records were searched

without their knowledge or consent to find material to use against them.   DeAngelis

denounced Plaintiffs, falsely, at a BCS faculty meeting as liars and schemers.   For raising

well-founded concerns about a colleague's serious misconduct, Plaintiffs were excluded

from departmental meetings, denied the chance to interview or vote on new personnel,

excluded from department committees, given burdensome and unusual workloads,

excluded from faculty dinners, generally shunned by colleagues and made to feel so

unwelcome that Aslin and Hayden have left UR for another university and others are in

the process of leaving.   Just a few days ago, the Plaintiffs were barred from serving as

ombudspersons at BCS because, according to DeAngelis and Dean of Arts and Sciences

Gloria Culver, they may be "biased" – meaning that those who shielded Jaeger and

helped retaliate against Plaintiffs, and who can run for the role, are officially "unbiased."

Aslin was so distressed by the University's failure to come to grips with Jaeger's

misconduct and obstructionism that he resigned two years before his planned retirement

and moved away from UR after 33 years there, including highly regarded terms as Dean

of the College of Arts and Sciences and Vice Provost of the University.

40.   Highly productive research collaborations and substantial grant money for

UR have been lost as BCS imploded and its reputation has declined, but DeAngelis said

he did not care, even if rebuilding took him a decade.   When Plaintiffs, concerned about

the serious harm to BCS, sought intercession from University administrators, some were

told the decision to force out the troublesome Plaintiffs came from the top – meaning

Seligman and Clark.[2]

---

[2] See paragraphs 329 and 333 below for more detail.

41.     Plaintiffs were surprised at the University's tight embrace and protection of Jaeger and the intense retaliation campaign against them.  They could not figure out why UR was so determined to support a serial sexual predator who had caused misery to students and colleagues.

42.     Over time, however, it has become clear that the University's approach to Jaeger and Plaintiffs fits into a broader pattern of University behavior.  UR is a major force in Rochester, the largest private employer in upstate New York, and used to getting its way.  Its president is a powerful figure, and after 12 years in office, Seligman has restructured the University to his liking.  Faculty and administrators describe him as thin-skinned, "someone who always thinks he's the smartest person in the room," and, as his tenure has extended, increasingly imperious.   He has expanded the ranks of administrators and appointed people to top positions (many times without a search process) who, according to many faculty, will no longer stand up to him or tell him when he is making a mistake.[3]

43.     Under Seligman's direction, it has become commonplace for the University to search the UR emails of faculty, staff and students who are perceived as potential threats to the University, very broadly defined, without their knowledge or consent.  This includes (1) the Plaintiffs; (2) employees who file complaints against the University for sexual harassment or other employment issues, or are even thinking about doing so; (3) undergraduate sexual assault victims who are seeking help from the Title IX Office; and (4) on information and belief, at least one Board member, who Seligman was concerned might pose a threat to him.  Searches of employee emails are generally legal,

---

[3] See discussion starting at paragraph 338 for more on this subject.

but the scope of them at UR is unusual and chilling, especially in a research university committed to free inquiry, and when deployed against professors engaging in legally protected activity.[4]

44.     One of the reasons that senior UR administrators may have been slow to perceive any problem in Jaeger's sexual relationships with subordinates is their own histories.  No later than 2012, Seligman began an intimate relationship with Delores Conway, then an associate dean at the Simon Business School, whom he married in 2013.  Conway reported to Seligman's direct report, the business school dean.  There were widespread concerns among faculty and staff about the potential for conflict of interest this created, but convinced of his own rectitude, Seligman did not wish to acknowledge that his relationship with a subordinate might cause difficulties to others who had to work with them.  When the next dean of the business school was appointed, the Board insisted on putting a management plan in place to address the nepotism conflict, and when Seligman himself, very unusually, led the search for the new dean in 2013-2014, it was stipulated that Conway step away from her senior role.

45.     The Provost, Rob Clark, a particular favorite of Seligman's,[5] is now intimately involved with one of his direct reports, the Executive Director for External Relations in the Provost's Office.  She began as Assistant Director for Advancement at the School of Arts and Sciences in June 2013, transferred to the same role in Hajim School for Engineering and Applied Science where Clark was Dean in 2014, and was

---

[4] See discussion at paragraph 308 and starting at paragraph 339 for more on this subject.

[5] One example of this is that Seligman has allowed Clark to keep his previous title as Senior Vice President for Research despite having very substantial jobs as Dean of the engineering school and now Provost, and contrary to recommendations from faculty who believe the Vice President for Research post needs full-time attention.

promoted rapidly to Associate Director and then into her current job in June, despite other candidates having more relevant experience.  She regularly travels around the world with Clark on fundraising and other trips; she also reports to him.  Clark is reportedly trying to find another position for her to mitigate the nepotism conflict, but their relationship has been common knowledge on campus for some time.[6]

46.     Romantic and sexual relationships between work colleagues are part of modern life, but the fact that Seligman and Clark were sleeping with their subordinates may have dulled their sensitivity to the perils Jaeger's behavior posed to students and UR's reputation.  It is not surprising that such men would wish to believe that their conduct is beyond criticism and sympathize with other men who believe the same when they sleep with subordinates.  The University repeatedly refused to intervene with Jaeger despite his multiple escapades with graduate students and the ensuing hostile environment this created throughout BCS.  The administration's default position, set at the top, was to find a way to minimize Jaeger's infraction – and when Plaintiffs, very unusually, kept making an issue of Jaeger's misbehavior after the University's inadequate investigation, Seligman, Clark and the Counsel's office simply insisted the University was right and circled the wagons. [7]

47.     UR's persistence in doing nothing about Jaeger and the hostile work environment he created, and its retaliation against Plaintiffs, compelled Plaintiffs to conclude that their only recourse was to file a complaint with the EEOC, preparatory to filing this Complaint.  Plaintiffs are all distinguished scientists with active careers and did

---

[6] Plaintiffs do not yet know whether a management plan (which Seligman would have to approve) has been put in place to keep Clark from having influence on his partner's compensation and evaluations.

[7]  See discussion starting at Paragraph 343 for more on this subject.

not want to take on the onerous time, financial or emotional commitments of legal action. Nevertheless they reasonably concluded that unless they sought the law's protections, UR would continue to protect Jaeger over female students, to do nothing effective to fix the hostile environment at BCS, and to retaliate against them.

48.      In response to the EEOC filing, Seligman at first angrily denied any error in the University investigations that had cleared Jaeger, claimed the EEOC filing was "based largely on hearsay" and "not…a legal document," and essentially dared Plaintiffs to bring suit, otherwise the University "viewed the incidents related to it as closed."[8]  In fact, the complaint was well-founded and relayed abundant direct evidence collected after a year's intensive research and discussions with more than 200 people involved.  Student, alumni and press reactions to Seligman's dismissive approach were hostile,[9] prompting an emergency decision by the Board on September 19, 2017 to appoint a Special Committee to conduct a "comprehensive investigation of the EEOC Complaint" using a New York corporate law firm, Debevoise & Plimpton LLP ("Debevoise"), that is paid by the University.  Its investigative report, directed by Mary Jo White ("White"), former Chair of the Securities and Exchange Commission, is due in January.  A reasonable estimate of the cost of the inquiry is at $5 million.[10]  As a non-profit University, UR must

---

[8] The University has since removed this statement from its website.

[9] http://www.democratandchronicle.com/story/news/2017/09/13/ur-president-joel-seligman-apology-sexual-harassment-claims/660545001/  ;https://jezebel.com/university-of-rochester-compares-sexual-misconduct-comp-1803135808;          http://www.campustimes.org/2017/09/13/seligman-faces-          town-hall-sexual-harassment/.  In addition, an online petition calling for Jaeger to be fired now has over 39,000 signatures, there have been angry student protests, and charitable donations have reportedly sharply declined.  More than 400 professors around the country have signed an open letter saying they will not recommend that their students work or study at UR until it addresses the problems raised in the EEOC complaint.

[10] A four-month investigation Ms. White ran into the Diocese of Albany in 2004 cost $2.2 million. http://www.bishop-accountability.org/news2004_07_12/2004_08_06_AP_InvestigationClearing.htm.   The average profits per partner at Debevoise were $2.41 million, and $1.2 million per lawyer in 2016, according to *American Lawyer*. The average hourly rate for a partner at Debevoise & Plimpton in 2013 was $1055, according to the *National Law Journal*. Similar investigations of scandals at universities have cost

pay Debevoise out of income derived mainly from charitable donations, tuition fees and government grants.

49.     The mandate given to White, a "comprehensive investigation into all matters involving the EEOC Complaint," is structurally impossible.   As a very experienced lawyer, White knew from the outset of her assignment that the Plaintiffs could not allow themselves to be subjected to open-ended interviews by her firm's lawyers, who are paid by the University, reporting to its Board members, and operating under no disclosed rules, while Plaintiffs are advancing legal claims against the University that would soon involve depositions and discovery conducted under the Federal Rules of Evidence and Civil Procedure.[11]   The Special Committee recently said that Debevoise's lawyers have interviewed 115 witnesses.[12]   Some of these witnesses have told Plaintiffs that they were surprised to be contacted, because they are so remote from the events being examined that they do not understand how they can be relevant. But in any event, the Debevoise lawyers have not spoken to Plaintiffs, who are vital to answering the Special Committee's central questions.   In particular, assessing Plaintiffs' retaliation claims without their testimony is beyond what any prudent lawyer could promise.   The Plaintiffs are the key actors, and more knowledgeable about crucial areas under White's microscope than scores or hundreds of other witnesses she might consult.

---

many millions: $8.1 million for Penn State's investigation into the Sandusky scandal; $2.5 million for Michigan State University's internal investigation of allegations against Dr Larry Nassar; $12 million on UNC-Chapel Hill's legal, investigative and public relations costs related to fake classes.

[11] The Special Committee has not disclosed whether it has entered into a Common Interest or Joint Defense Agreement with the University.

[12] http://www.rochester.edu/newscenter/update-independent-investigation-trustee-special-committee-284842/ One of UR's central defenses to the flawed Nearpass Report was that Neaprass had spoken to "31 witnesses."   Of course it is not just the quantity of witnesses that matters, but the quality: what they know, the kinds of questions they are asked, under what conditions – and whether the answers are handled fairly. Nearpass, too, did not contact some of the most knowledgable witnesses available to her.

Undersigned counsel have previously suggested to White that the "comprehensive report" she agreed to produce is so clearly impossible until the legal conflict between the University and Plaintiffs is resolved that she should admit this and postpone her report until the University permits this; otherwise it will be woefully incomplete, even fraudulent.

50.     If the Special Committee validates any significant claim the Plaintiffs have asserted in this Complaint, such a finding will undercut the University's legal position in this lawsuit.  The Special Committee may be "independent" in some sense, but UR did not authorize it to hand Plaintiffs a loaded weapon.  It is thus questionable how objective the Debevoise investigation can possibly be.

51.     In addition, while Debevoise is a highly-regarded firm, it has "defense DNA."  Debevoise has great expertise in corporate malfeasance, but virtually none in working with victims of sexual harassment.  Its website cites as a success story its work defending Syracuse University after allegations of sexual abuse against a former basketball coach.  "These investigations ended without any charges being brought," it declares – a win from the institution's viewpoint, but unlikely from the victims'.[13] Debevoise is a top-tier corporate firm hired to defend institutions in crisis, not upend them.  Moreover, while the Special Committee is ostensibly independent from UR and Seligman, it has a majority of senior UR trustees who have been working with Seligman for years. They are alarmed by the decline in reputation and donations UR has suffered because of publicity about its treatment of Jaeger and Plaintiffs, and are paying Debevoise handsomely to right the ship.

---

[13]https://www.debevoise.com/capabilities/practice-areas/white-collar-regulatory-defense/internal-investigations/?tab=experience

52.    In the three months since the EEOC complaint was filed, little has improved at BCS for women.  Jaeger, on paid leave, continues to work at BCS, move around campus and interact with students and faculty apparently as if nothing has happened.  The professors who complained about his campaign of sexual harassment are still being retaliated against.  Some have been forced out of BCS.  Others, knowing they have no future there, are seeking to leave.  A once flourishing, nationally recognized department full of productive collaborations has lost stellar young researchers and millions in grants, but is still being run by someone who falsely denounced Plaintiffs as liars and schemers based on a secret inspection of their emails (which he nevertheless misread) – a privacy intrusion that the Seligman administration appears to have made routine for students, faculty, employees and others it views as possible threats.  On top of the 11 students described in the EEOC complaint as having altered their education at UR to their detriment to deal with Jaeger's harassment, five more women have come forward with similar accounts (set out later in this Complaint).  Multiple criticisms have been registered against the University's Title IX office for insensitivity and for slow-walking student complaints.[14]

53.    After the tidal wave of recent revelations about the prevalence of sexual harassment in national life, other universities have moved quickly to adopt new policies, procedures and training without requiring multi-million dollar inquiries by Wall Street lawyers.  In late November, for example, the President of MIT announced multiple new initiatives in a letter that made a persuasive case for how universities must take sexual

---

[14] https://www.commercialappeal.com/story/news/2017/09/13/florian-jaeger-joel-seligman-ur-target-of-student-protest/662408001/; http://www.campustimes.org/2017/10/23/222592/

harassment extremely seriously as a blight on academic enterprise.[15]  UR, however, has been inert.  It has announced some reviews but taken few tangible new steps to improve the environment for women.

54.    Accordingly, Plaintiffs concluded that they have no choice but to file this lawsuit.  It was only their EEOC complaint and ensuing public scrutiny that prompted the University to reopen attention to problems that Seligman insisted were "closed."  The Special Committee's private inquiry into Plaintiffs' EEOC complaint, operating under its own undisclosed rules, will no doubt discover things beyond those the complaint sets out, but cannot be the "comprehensive" inquiry the Special Committee has promised because Plaintiffs, central actors in the case, have been excluded.  As much as Plaintiffs would love to return to their normal lives of teaching and research, they have decided that this lawsuit – conducted under federal rules of procedure and evidence, where the parties can ultimately put their case to the test in court, in front of an impartial judge and jury who are not employed by the University – must go forward.

## B.    *Significant Figures*

55.    To make this Complaint easier to follow, brief biographies of Plaintiffs, Defendants and other significant figures are set out below.

---

[15]On November 29, 2017, MIT President Rafael Reif wrote "I am deeply disturbed by the revelations of misconduct elsewhere – and I know it also happens at MIT. I want to use this moment of heightened attention to be clear about why this abuse of power is so disturbing in the context of our community — and to highlight what we must do and are doing about it. I expect we do not yet know the full extent of the problem at MIT. But the fact it exists here at all demands our serious attention."  Reif took an important step by acknowledging the reality that sexual misconduct exists at MIT, sending a clear message to victims that they will be believed. Reif went on to highlight some of the concrete changes MIT will make including expanding rules regarding consensual relations among community members across the lines of authority. Every member of the MIT community will receive training. http://news.mit.edu/2017/letter-regarding-mits-progress-efforts-combat-sexual-assault-1130

*Richard Aslin*

56.     Aslin graduated from Michigan State University with high honors in Psychology in 1971 and received his Ph.D. in Child Psychology from the University of Minnesota in 1975. The outstanding quality of Aslin's work was immediately recognized. He received a National Science Foundation Graduate Research Fellowship in 1970 and went on to receive support from a Predoctoral Traineeship in Child Psychology from the National Institute of Mental Health, a Research Career Development Award from the National Institute of Child Health and Human Development, the Boyd R. McCandless Young Scientist Award from the American Psychological Association, and the Early Career Award in Developmental Psychology from the American Psychological Association. Aslin has continued to receive international recognition throughout his career. He has taught at Indiana University, the University of Washington, the University of Minnesota, MIT, and Birkbeck College, University of London. Aslin joined the University of Rochester in 1984 and since then he has served as Chair of the Department of Psychology; Dean of the College of Arts and Sciences; Vice Provost of Arts, Sciences & Engineering; Director of the Center for Language Sciences; Director of the Center for Brain Imaging; and Director of Graduate Studies for the Department of Brain and Cognitive Sciences (BCS).  Recently he has received national recognition for his long career of outstanding scientific contributions.  He received the Lifetime Achievement Award in Graduate Education from UR, the Distinguished Scientific Contributions Award from the American Psychological Association, the Outstanding Achievement Award from the University of Minnesota, the Mentor Award for Lifetime Achievement from the Association for Psychological Science, is a member of the American Academy of Arts and Sciences, and was inducted into the National Academy of Sciences in 2014.

Aslin is invited to give numerous colloquia and keynote addresses across the nation each year. He has an extraordinary publication record and has served on the editorial or advisory boards of the most prestigious journals in cognitive science. Aslin is considered a major public intellectual and leading scholar in his field.

***Elissa Newport***

57.     Newport is a professor of Neurology and the Director of the Center for Brain Plasticity and Recovery at Georgetown University. She attended Wellesley College and then graduated from Barnard College of Columbia University in 1969 *magna cum laude*; she received her Ph.D. from the University of Pennsylvania in 1975. Newport has been elected as a fellow of the Association for Psychological Science, the Society of Experimental Psychologists, the Cognitive Science Society, and the American Association for the Advancement of Science, and is an elected member of the American Academy of Arts and Sciences, the American Philosophical Society, and the National Academy of Sciences. She has received grants from the National Institutes of Health, the National Science Foundation, the James S. McDonnell Foundation, the Packard Foundation, and the American Heart Association. She has received the Benjamin Franklin Medal in Computer and Cognitive Sciences, the Claude Pepper Award for Excellence from the National Institutes of Health, and the William James Lifetime Achievement Award for Basic Research from the Association for Psychological Sciences. Newport has taught at the University of California, San Diego; the University of Illinois; and UR, where she helped found BCS and served as the department chair for 12 years, leading the department to ranking 4th in the nation in its field within ten years of its inception. At UR she also served for many years as the Chair of the College

Curriculum Committee and a member of the Faculty Senate Executive Committee, as well as serving on the search committees for the Dean, the Provost, and the President and on the President's Task Force on Diversity. At Georgetown University, where she has been on the faculty since 2012, she has also served in many important roles, including chairing the Faculty Philanthropy Committee and serving on the University Research Integrity Committee as well as founding and directing the Interdepartmental Concentration in Cognitive Science.  Her research is globally recognized, and she lectures at conferences and universities throughout the U.S. as well as Europe.

### *Jessica Cantlon*

58.    Cantlon was recently named by *Science News* as one of the ten scientists slated to "make the next big discoveries" and "transform their research fields over the coming decades." She graduated from Indiana University in 1999 where she was a Ronald E. McNair Scholar and received her Ph.D. in psychology from Duke University in 2007 where she won a National Science Foundation Graduate Research Fellowship and the Elizabeth Munsterberg Koppitz Child Psychology fellowship from the American Psychological Foundation. She is currently Associate Professor of Brain & Cognitive Sciences and Associate Director of the Rochester Center for Brain Imaging at the University of Rochester. Cantlon has a significant number of highly regarded publications for a scholar at this stage in her career. She continues to bring in substantial federal grant money to UR, having received funding from the National Institute of Health, National Science Foundation, Alfred P. Sloan Foundation, and James S. McDonnell Foundation, among other organizations. Cantlon is a widely-known and respected scholar in her field and is invited to give keynote talks at universities and

conferences across the nation each year. Her work has been featured in *Science News*, *National Geographic*, *Time*, *CNN*, *US News & World Report*, *The Scientist*, and *NPR*. Earlier this week, she and Celeste Kidd were included in the 2017 "Persons of the Year" chosen by TIME Magazine, based on their work that led to the filing of the EEOC complaint against UR.

### Celeste Kidd

59.    Kidd graduated from the University of Southern California in 2007 with two BA degrees, in Linguistics and Print Journalism, with honors in both.  She received her Ph.D. from UR in 2013. As an undergraduate, she received numerous awards, including the Dean's Award for Excellence in Undergraduate Research.  Aslin actively recruited Kidd to UR as a Ph.D. student. She was such an impressive undergraduate that Aslin invited her to come to UR early to begin work in his lab, and considered Kidd to be the best young scholar in developmental science in her cohort. Kidd continued to impress as a graduate student, receiving the National Science Foundation Graduate Research Fellowship and the Glushko Dissertation Prize in Cognitive Science from the Cognitive Science Society. For such a scientist so early in her career, Kidd's publication and presentation records are outstanding. As a faculty member, she has received funding from the Human Frontier Science Program, the Google Faculty Research Award and the Jacobs Foundation Early Career Research Fellowship. Her work has been featured in *Discover* magazine in the "Top 100 Science Stories of 2012" and more recently in *Forbes,* the *New Yorker,* and the *Economist.* Her work features prominently in dozens of popular books on development and human cognition, and she gives regular radio interviews as an expert on developmental topics for NPR, the BBC, and the CBC. She

accepted invitations to be a visiting scientist at Stanford University and MIT before joining UR as an Assistant Professor in 2014.  Earlier this week, she and Cantlon were included in the 2017 "Persons of the Year" chosen by TIME Magazine, based on their work that led to the filing of the EEOC complaint against UR.

**Bradford Mahon**

60.     Mahon graduated *magna cum laude* with a BS in Cognitive Neuroscience from Harvard in 2002 and received a Fulbright Scholarship to study in Barcelona. He received his Ph.D. in Psychology from Harvard in 2009. Mahon's research has been supported by a number of organizations including the National Institute of Neurological Disorders and Stroke, the National Science Foundation, and the Schmitt Program on Integrative Brain Research. Mahon joined the faculty at UR in 2011 as an Assistant Professor of Brain and Cognitive Sciences and is jointly appointed in the Department of Neurosurgery.   He is Co-Editor-in-Chief of *Cognitive Neuropsychology*. He has a significant number of publications in prestigious journals such as *Neuron*, *Science Translational Medicine*, and *Current Biology*. He is well-known in the field for his theoretical contributions to understanding the organization of conceptual knowledge. His peers consider him a rising leader of his discipline.

**Steven Piantadosi**

61.     Piantadosi graduated from the University of North Carolina at Chapel Hill in 2006 with a BA in Linguistics and a BS in Mathematics, where he received highest departmental awards in both majors. He received his Ph.D. from MIT in 2011, where he received an NSF Graduate Research Fellowship Award; his dissertation received the coveted Glushko Dissertation Prize. In 2012 he came to UR to work with Aslin as a

postdoctoral researcher after receiving funding from NIH.   In 2012, Piantadosi was featured in *Forbes* magazine's "Top 30 Under 30 in Science and Innovation." Since being hired as faculty at UR, Piantadosi has continued to produce excellent, cutting-edge work and was recently named a "rising star" by the Association for Psychological Science. This award recognizes outstanding psychological scientists in the early stages of their career whose innovative research has already advanced the field. His work has been featured in the *New Yorker*, *Scientific American*, the *Economist* and *Nature*.

### Ben Hayden

62.     Hayden is a young leader in the field of neuroeconomics. After graduating from Rice University in 2000 and receiving his Ph.D. from the University of California, Berkeley in 2005, he worked as a post-doctoral fellow at Duke University until 2011. He joined UR as an Assistant Professor of Brain and Cognitive Sciences in 2011 and was promoted to Associate Professor with tenure in 2016, a year earlier than usual. He won the Young Investigator award from the Society for Neuroeconomics the first year it was offered. He has published an extraordinary number of articles in such journals as *Neuron*, *Science*, *Nature Neuroscience, Annual Reviews of Neuroscience,* and *Proceedings of the National Academy of Sciences.* His work is supported by grants from the National Institute on Drug Abuse (including three active R01 awards), National Science Foundation (including the prestigious CAREER Award), the Klingenstein-Simons Foundation, the Templeton Foundation, the Brain and Behavior Research Foundation, and the Tourette Syndrome Association. His work has received considerable attention in the popular press as well, and has been featured in several media outlets, including *New*

*York Times* and *Wired.* In 2012, he was named a Sloan Research Fellow; in 2013 he was named as a NARSAD fellow and Klingenstein-Simons fellow.

### Keturah Bixby

63.     Bixby graduated with a B.M. in Harp from the University of Illinois at Urbana-Champaign, where she won the Thomas J. Smith Scholarship, the School of Music String Division Award and was a Bronze Tablet Recipient. She received an M.M. in Harp from Yale University. She recently defended her Ph.D. from BCS at UR.  Bixby has worked as a researcher at the University of Illinois at Urbana-Champaign, Yale University, and Haskins Laboratories. She is currently a Senior Data Scientist at Measures for Justice.

### Sarah Heilbronner

64.     Heilbronner is an Assistant Professor of Neuroscience at the University of Minnesota. She studies the brain connectivity associated with decision-making. Between 2012 and summer 2017, Heilbronner was a postdoctoral fellow in Pharmacology and Physiology at the University of Rochester. Heilbronner received her Ph.D. in Neurobiology in 2012 from Duke University and her A.B. in Psychology *magna cum laude* with highest honors (field) from Harvard University in 2007. For such a young scholar, Heilbronner's publication record is impressive, with 23 papers and chapters published (including in such prestigious journals as Neuron, Biological Psychiatry, and Journal of Neuroscience) and 3 pending. Her research has been supported by both predoctoral and postdoctoral National Research Service Awards from the National Institutes of Health and a postdoctoral fellowship from the Tourette Syndrome Assocation.   In 2016, she received the University of Rochester's Outstanding

Postdoctoral Research Award and the Psychonomic Society Best Article Award. In 2017, Heilbronner won a Young Investigator award from the Brain and Behavior Research Foundation, which is commonly known as the NARSAD. This highly prestigious prize is awarded to rising stars and is a recognition of the importance and quality of Heilbronner's research.

### University of Rochester

65.     UR is a private university in Rochester, New York, founded in 1850. UR has approximately 6,000 undergraduates and 5,000 graduate students, and more than 20,000 faculty and staff (2,300 tenure-track faculty members).  In the fiscal year ending June 30, 2016, its revenues were $3,231,905,703.

### Joel Seligman

66.     Seligman is the current President and CEO of the University of Rochester. He has been President since 2005 and CEO since 2015. Seligman is a leading authority on securities law.  He co-wrote the 11-volume *Securities Regulation*, which is considered the leading treatise in the field, and is the author of the *Transformation of Wall Street: A History of the Securities Exchange Commission.* Seligman received his B.A. in political science from the University of California at Los Angeles in 1971 and his J.D. from Harvard Law School in 1974. He was formerly Dean of Washington University Law School and the University of Arizona College of Law.

### Robert Clark

67.     Clark is currently the Provost of UR and Senior Vice President for Research.  He was previously the Dean of the Hajim School of Engineering and Applied

Science and Senior Vice President for Research. Before joining UR, Clark spent 16 years at Duke University where he was a Senior Associate Dean of the Engineering School. Clark received his B.S. in Mechanical Engineering from Virginia Polytechnic Institute, as well as his M.S. in 1988 and his Ph.D. in 1992.

### Florian Jaeger

68.     Jaeger received his M.A. in Computer Science and Linguistics from Humboldt University and Technical University in Berlin in 2000 and his Ph.D. in Linguistics with a Cognitive Sciences designation from Stanford University in 2006. Jaeger was hired by UR as an Assistant Professor in 2006 and officially started in January 2007.  He was promoted to Associate Professor in 2013 and full Professor in 2016.  From 2014 until late 2016, Jaeger acted as the Director of the Center for Language Sciences at UR.

### Catherine Nearpass

69.     Nearpass is Associate Counsel for Employment and Labor Relations Issues at UR.  She is a graduate of Mt. Holyoke College and a *magna cum laude* graduate of Albany Law School. Her specialties include discrimination and harassment complaints, disability and Family Medical Leave issues, affirmative action, and general employment matters.

### Greg DeAngelis

70.     DeAngelis has been the Chair of BCS since 2010 and a Professor of Brain and Cognitive Sciences since 2007.  He is Associate Director of the Center for Visual Science and is an editor of the *Journal of Neuroscience*. DeAngelis received his Ph.D.

from the University of California Berkeley/San Francisco in 1992. His research has been
continuously funded by the National Eye Institute.

## C.   _Florian Jaeger's misconduct as a UR professor_

### _Newport and Aslin build the Department of Brain and Cognitive Sciences at UR_

71.     The department of Brain and Cognitive Sciences ("BCS") at UR was
founded in 1996 and during its first decade, under the leadership of Newport and Aslin, it
flourished.   BCS started its own Ph.D. program focused on interdisciplinary and
collaborative work. Its grant applications to the National Institutes of Health (NIH)
stressed its collaborative environment, and funding models were structured to allow
graduate students to move easily between labs which allowed for more dynamic projects
and for students to benefit from the expertise and close instruction of multiple professors.
The number of its jointly authored papers at this time was impressive, possibly
unmatched by any other comparable program in the world. Under the guidance of
Newport and Aslin, in ten years, BCS went from nothing to ranking 4th in the nation on a
comprehensive review of graduate programs conducted by the National Research Council
(an arm of the National Academy of Sciences) in psychology/brain and cognitive
sciences.

72.     Newport and Aslin were strongly committed to recruiting and mentoring
women scientists and ensuring that BCS was an inclusive working and learning
environment for both male and female researchers.  BCS professors mentored students
through rigorous scientific training and gave career advice. When professors socialized
with graduate students, they hosted barbeques, dinners or bowling parties.  It was a close
community.

*BCS hires Dr. Florian Jaeger*

73.     Dr. Florian Jaeger ("Jaeger") was hired in BCS in 2006 and joined the Department as an Assistant Professor in January 2007.[16] BCS had high hopes for him. He came to the Department from an interdisciplinary background after training at Stanford University, with advisors who are internationally distinguished in computational and formal linguistics. His fields of expertise included formal linguistics and also in sentence processing and production, cross-linguistic comparisons, and advanced statistical and computational methods. For a department with signature programs in language and visual perception with a focus on interdisciplinary training, Jaeger was a good fit.

*Jaeger immediately behaves inappropriately with prospective students*

74.     In March 2007, when Celeste Kidd (now an assistant professor at BCS) was applying to the Ph.D. program at BCS from her undergraduate program at the University of Southern California, she attended an interview at UR. She was drawn to UR by Aslin's work in particular, but Aslin was on a sabbatical in London during her interview. Although Jaeger was not yet teaching at UR (he had no teaching responsibilities during his first semester and was completing a visiting fellowship at another university), he had accepted and begun his position at BCS, people in the field knew he had joined BCS, and he was already involved in graduate student recruitment. He interviewed Kidd, and flirted with her during the interview. During the interview weekend, Jaeger attended a graduate student party. After the party, past midnight, he sent

---

[16] UR claims that Jaeger did not start his position as a professor at UR until the fall semester of 2007. This is false. Jaeger was offered the position of assistant professor by Newport in April 2006. He has been based at UR with a title and facilities to conduct research at UR since January 1, 2007.

Kidd a Facebook message indicating that she should treat him like a friend, not a professor.  Jaeger was already crossing a professional line.

75.    In late March 2007, Jaeger attended a conference in San Diego.  At the conference, Jaeger interacted with two prospective UR Ph.D. students, Kidd and Olivia Owens ("Owens").[17] Owens was a Ph.D. student at another University, who had been a visiting student at UR and had become became sexually involved with Jaeger. Kidd was an undergraduate at USC, and like Owens, had an offer from UR to begin her Ph.D. the following fall. Jaeger spoke to both of them at the conference and was recruiting both of them to work in his lab, though Kidd wanted to work with Aslin.  Jaeger told Kidd that if she wanted to learn certain statistical skills, she had to work for him since only he could provide training in cutting-edge statistical techniques.

76.    One night at the conference, Jaeger invited Kidd to a party where he said they could talk more about why she should choose UR for her Ph.D. There he introduced Kidd and Owens to each other as potential classmates. Shortly after, Kidd saw Jaeger groping Owens. He had his hand under her shirt and was kissing her.  To avoid interrupting them, Kidd left the room and soon sent Jaeger a message saying that she was uncomfortable with the situation. She believed having a relationship with a recruit was unethical due to the conflict of interest. She said that as a result, she would not be coming to Rochester. In fact, she immediately left the conference and drove home to Los Angeles.

---

[17] All third parties who were graduate students during the relevant period have been listed anonymously, to protect their privacy. Plaintiffs will disclose their identities during discovery subject to appropriate protections.

77.     The next morning, Jaeger sent Kidd a flurry of messages stating that they needed to talk in person and pleading with her to return to San Diego. The next day, Jaeger assured her that the relationship was cleared by UR authorities. In a Facebook message, he said "I asked the Rochester authorities today about certain student-faculty relations and I am in no danger." In fact Jaeger had never asked Newport (then BCS Chair) or Aslin (then Director of Graduate Studies) about whether he could conduct such relationships. They would not have approved. The Faculty Handbook rules then in force stipulated that any sexual relationship with graduate students was "strongly discouraged." Such relationships had consequences not just for the individuals involved, but could lead to a hostile environment in the department.

78.     Jaeger continued to sexually harass Kidd during the remainder of her recruitment process. For example, he said that once she had accepted the Ph.D. offer at BCS, he hoped she would read a manuscript to him while he would "lie lazily on the couch" and she "paced around occasionally in front of the fire." Kidd was uncomfortable with this blatantly romantic description of their future working relationship. Jaeger also told Kidd that sex was his favorite reading topic. He told her that she would enjoy nude hot tub parties that he attended with students. These sexual advances were unwelcome and Kidd verbally expressed her discomfort to Jaeger, but he persisted.

79.     Primarily to work with Aslin, Kidd ultimately decided to accept UR's offer, at the urging of one of her USC advisors who told her that there would be sexual harassment risks wherever she went. She felt that UR was the best option for her research goals, particularly because she would have the opportunity to work with Aslin.

80.    In summer 2007, between her undergraduate studies and beginning her Ph.D. at UR, Kidd attended the Linguistics Society of America ("LSA") Institute at Stanford University on a scholarship.   Jaeger also attended and taught one of her workshops. Jaeger repeatedly sought Kidd out to point out faculty-student sexual partners in attendance. Kidd began to doubt her own views on faculty-student relationships. She was not even yet a graduate student and her soon-to-be professor, who surely knew more about the field and its norms, was assuring her that the UR faculty approved of such relationships and perhaps they were even enthusiastic about them. Kidd was less apprehensive about Jaeger for this reason, but was still uncomfortable with him.

**Jaeger pressures Kidd to live with him**

81.    Jaeger sought out Kidd's friends at the LSA institute and asked them about her personal life.  He learned from them that she was having financial difficulties because she was providing support to family members while also having funded her own undergraduate degrees. They also told him that Kidd had been invited to come to UR early to begin working with Aslin, which she considered a big opportunity, but she did not know how she could afford to move to UR before she received her Ph.D. stipend in the fall. Jaeger then approached Kidd with an offer to stay in his spare room at minimal expense while he was away at the end of the summer. Kidd accepted his offer and moved to Rochester in August.  He told her he would not be there very often that month, but in fact he was there frequently.

82.    At the end of summer, Jaeger pressed Kidd to rent the room at an advantageous rate for the year.  He told Kidd that he couldn't afford to rent his place on his own, though he was a tenure-track faculty member, and also that he did not want to

live alone. Jaeger also told Kidd that his professional opinion of her would inevitably be tied to his personal opinion of her. He said that when people asked about her, he would have to be honest. Kidd interpreted this as a not-so-subtle threat to keep him happy or she would suffer consequences.  She agreed to rent the room from him.

83.     As time went on, this same concern about the costs of antagonizing Jaeger led Kidd to tolerate persistent unprofessional behavior, defamation and sexual harassment from him.

84.     For example, Jaeger portrayed Kidd's arrangement in renting a room from him as them "living together" as a couple. He gave this impression to individuals in the brain science field outside of Rochester, including a professor at Cornell and Jaeger's former postdoctoral advisor at MIT. He spoke with other graduate students about their watching movies together on the couch late at night. The impression he gave was so persuasive that Piantadosi, then a Ph.D. student at MIT, initially thought that Kidd and Jaeger were married.

85.     Jaeger would violate Kidd's personal boundaries by entering her room without knocking. He would demand to use her computer even when she was trying to work on it. On one occasion when she objected, he stated that she was supported by his grant money so the computer was partially his and he had rights to it whenever he wanted. In fact, the computer was her own personal computer and had not been purchased with any University funds. Jaeger would go through her personal belongings and flip through her unopened mail. On one occasion he came into Kidd's room while she had a friend visiting to announce that he had stuck his hand in the beans she had been preparing. He remarked, "Your beans feel really weird, Celeste."

86.     Jaeger clearly thrived on exerting power over Kidd. He knew that she feared professional consequences from enforcing boundaries with him. He would remind her that he wouldn't be able to give a favorable professional opinion of her if they did not also have a personal relationship. He said his job as a mentor was to mentor her personally and professionally. For him, he explained, the two were connected.  He even said "I only want friends in my lab. Are we not friends?" This connection between his professional attention and close personal relations was not genuine friendship, but a method of coercing her (as he did with others) to tolerate his aggressive and transgressive behavior, including repeated sexual harassment.

***Jaeger uses his position to influence and then control graduate student social life***

87.     Jaeger regularly attended graduate student parties and social gatherings, whether or not he was invited. Sometimes he would call or text Kidd to ask where she was and then just show up.  A number of students noted that Jaeger was the only faculty member at what were explicitly graduate student events. When Kidd told him that he shouldn't come to events he was not invited to, Jaeger replied that if she had been invited, they must have meant to invite him, too, because it would be rude to invite one housemate and not the other.

88.     Jaeger regularly crashed a weekly graduate student get-together at a bar called Lux where he was usually the only faculty member present. Many graduate students timed their departure from this event to coincide with Jaeger's arrival, because his presence made them uncomfortable.

89.     Additionally, Jaeger hosted parties at his house. These parties differed from other BCS faculty parties or barbeques. Jaeger was usually the only faculty member

present, and he and students would often binge drink and use illegal drugs. In fact, when Jaeger first arrived at BCS, he organized a movie night at his house. When he emailed the department about it, he suggested that people bring their own alcohol or "herbs," referring to marijuana.

90.     Socializing with work colleagues always straddles the line between the professional and personal, but Jaeger took this to a more intense level.  As he had made clear to Kidd, for him there was no boundary between his social and professional worlds. In order to obtain the teaching and other benefits that should have been automatic for BCS students, they had to participate in Jaeger's social life, and humor him.

91.     At Lux, students would "talk shop" with Jaeger. These talks could often lead to informal collaborations and result in papers or projects. Jaeger also organized "lab retreats" which differed markedly from any other lab retreat Ph.D. students attended or heard of. They often took place in the Adirondacks and involved drinking, drugs, music and soaking in a hot tub together.  Jaeger's entire lab was not invited – the attendees were people with whom he was socially close and students in whom he had a sexual interest. At one such retreat, marijuana was used. Jaeger's current partner, Chigusa Kurumada, who was a graduate student at Stanford at the time, received emergency medical attention after ingesting brownies made with marijuana. Another witness who was present at one lab retreat reports that hallucinogens were used.

92.     Jaeger invited visiting professors and speakers to the UR Center for Language Sciences. Jaeger had had undisclosed sexual relationships with some of these

speakers, including Frances Fisher[18] and Becky Billings[19] in advance of their invitations. He arranged dinners and social events following these lectures and typically invited specific BCS students to attend, which was considered an honor.  Students had an opportunity to talk to leaders of their field in a more intimate setting. The invitations usually went to people who were socially close to Jaeger or who had something he wanted.

93.     Several students state that Jaeger had developed a "cult-like" following of Ph.D. students. His lab consequently had a "cool boys, cut-throat, insider" culture. Students who did not conform to this group felt isolated and ostracized.

### Students fear Jaeger's bullying

94.     Jaeger's following did not coalesce merely out of students' desire for the professional benefits he saved for his friends.  It also stemmed from their fear of harsh criticism and isolation.

95.     Jaeger could be cruel. He critiqued graduate students' and post-docs' performances to other graduate students and post-docs in ridiculing ways. He told Dr. Polly Patterson,[20] for example, who has published in top notch journals and whose teaching was then and continues to be highly regarded, that her ideas were terrible and that she would never have a career in science.

96.     Jaeger told Kidd and other graduate students that other BCS faculty considered one female graduate student (not being named here) unintelligent and

---

[18] Pseudonym
[19] Pseudonym
[20] Pseudonym

unmotivated. He said she exhibited a general lack of self-control that was evident in her being overweight.

97.    Jaeger told one female post-doc, who had graduated from her undergraduate university with a 4.0 and is now a tenure-track faculty member at an excellent university, that she was learning too slowly and was too stubborn. That, he maintained, was the reason that they were not working well together. He asked her, "How can you expect me to ever write you a letter of recommendation?" Jaeger told other graduate students and post-docs that this student was terrible, which corroded her confidence and entire experience of UR. Jaeger's graduate students, who had previously treated her with normal due respect, began to act as if she was stupid. If she gave a presentation, they would say, "Why do we even need to know this?" in front of her peers and colleagues. This is just one example of how Jaeger used his significant influence over students to punish and isolate others, women in particular, creating a hostile environment in BCS.

98.    He behaved in this arrogant way to female faculty too, at least those whom he deemed less powerful. Dr. Laurie Lockwood[21] ("Lockwood") is a linguistics professor at UR. BCS and Linguistics collaborated and BCS graduate students could earn dual qualifications in Linguistics. Lockwood and Jaeger both studied speech. Jaeger and another BCS faculty member, who was close to Jaeger, admitted graduate students through BCS and would connect them with Lockwood or another linguistics professor if appropriate.

---

[21] Pseudonym

99.     Once, Lockwood witnessed Jaeger aggressively question one of her female post-docs. She objected to his behavior on the grounds that it was rude and unprofessional.  He began screaming at Lockwood aggressively and towering over her, gesticulating angrily.  Lockwood immediately removed herself from the situation, but Jaeger followed her down a hallway, continuing to shout and wave his arms.  After this, he stopped sending graduate students to her lab.  Every student was sent instead to one of her male colleagues. Since she was dependent upon Jaeger for graduate students, this was a serious blow to her lab and career.  Lockwood also noticed a distinct shift in the attitudes of BCS students in her classes.  They began questioning her and speaking disrespectfully in class, and ignoring her at public events and lectures.

100.     On one occasion, Jaeger found out that he and one of his former collaborators, then a graduate student at Stanford, had jointly won an award for a project they did together. Jaeger was incensed that he had to share recognition with this student. He called members of the awarding body and told them that the ideas and most of the work were not the student's but his. The student was on the job market at the time. Kidd witnessed Jaeger call the institutions that the student was applying to and tell them his contributions to the project had been insignificant. As Jaeger was a tenure-track faculty member at a respected institution, his badmouthing carried weight.  The student failed to get a job.  But apparently Jaeger did not think as poorly of him as his calls led the student's potential employers to believe.  Jaeger promptly hired the student as a post-doc at UR, where his considerable talents continued to reflect well on Jaeger.

101.     Jaeger badmouthed his students publicly to control them better. For example, after faculty review meetings, Jaeger told Kidd that the BCS faculty did not

think that Jessica Jackson,[22] a Ph.D. student, was smart. He also told Kidd that the faculty thought that Kidd was really struggling and might not make it through the program. In fact, no one on the BCS faculty said this in review meetings. Jaeger made it up to demoralize Kidd.

102. Even among his favorites, Jaeger would rank his students publicly. He would jokingly insult them in ways that were cutting. If anyone took offense, he would tell them that they were just too sensitive to take a joke — that any discomfort they felt was due to their own problems, not him. Some students recognized this as "gaslighting."

*Jaeger uses his power and influence to take advantage of students, creating a pervasive hostile environment*

103. At least four witnesses reported that Jaeger would garner favors from students such as rides or meals, in quantities very unusual for faculty. He would change the times or locations of meetings at the last minute and demand that students come to him. The students acquiesced. Jaeger was their "friend," but he was also their professor whom they feared and wanted to please.

104. Jaeger had Kidd drive him to and from what turned out to be sexual liaisons when they were at professional conferences. Jaeger had his own car, but he insisted that she drive because he did not want to put miles on his car. On one such occasion, Jaeger told her that the graduate student he had been intimate with appeared to have oral herpes, which he hadn't noticed until after they had been making out for a while. Immediately afterwards, Jaeger picked up Kidd's water bottle and began to drink from it. When she protested, he accused her of being a "germophobe."

---

[22] Pseudonym

105.     Jaeger also insisted on sharing accommodation with Kidd at professional conferences, even though she was often staying with other graduate students in dorm rooms and he was a salaried, tenure-track professor who could certainly afford his own accommodation. On one occasion, he insisted on staying in the same room with Kidd and her friend, a student who had also interviewed at UR with Jaeger, despite the small size of the room and the availability of a couch in the next room.

106.     Georgia Gordon,[23] a BCS Ph.D. student, won a scholarship to attend an LSA Institute in summer 2009, which Jaeger also planned to attend. He knew that Gordon was financially pinched.  He suggested that she and the other UR students attending LSA share a house with him. He offered to pay half, with the four students splitting the remaining half.  Gordon had been going out of her way to avoid Jaeger socially because his overly familiar behavior toward her made her uncomfortable. However, she was in a financial bind and did not want to pass up the professional opportunity to attend LSA, and there would be three other graduate students in the house. A few days before the Institute began, Jaeger told her that he would not pay for half the house. He said he had not realized that by not staying in the free faculty accommodation he would also not have the free faculty meals, so he changed his mind and would only commit to paying the same amount as the other lodgers, who were all students. It was too late for the students to cancel the house reservation. With no other option, Gordon and the other students had to scrape the extra money together.

---

[23] Pseudonym

*Jaeger uses different tactics to intimidate male and female students*

107.    Jaeger was emotionally intense with students. He was skilled at sensing their vulnerabilities, what made them uncomfortable, and used that knowledge to push boundaries and intimidate them. For female students, this often involved prying into their sexual lives, being overly familiar and flirtatious, repeatedly using sexual language and innuendos, or forcing them to meet with him alone.

108.    Several female students reported that Jaeger used overtly sexual language so often that it made them uncomfortable to be around him. It is not uncommon for professionals who socialize together to make some inappropriate jokes, but Jaeger's use of sexualized language was pervasive and constant. At least two students felt he used the language on purpose specifically to make women students feel uncomfortable. In Kidd's experience, Jaeger did this in order to make her uncomfortable and humiliate her, for example once telling Kidd that the medication one of his graduate student sex partners was taking made her vagina taste bad. One witness, Dawn Dexter,[24] a female Ph.D. student at another university, recalled that Jaeger frequently spoke about sex. She recalls Jaeger and one of his female advisees speaking about the number of their sexual partners. Jaeger spoke openly about numerous sexual relationships he had had with women in their field.

109.    Jaeger questioned Kidd about her past relationships and sex life, which she did not wish to disclose.  In order to goad her into sharing information, Jaeger made jokes about her ex-partner's ethnicity and suggested that his ethnicity correlated to his penis size.  Jaeger asked Kidd how many sexual partners she had been with. He told her

---

[24] Pseudonym.

that "blowjobs count" and that "American girls never count blowjobs." These invasions into her private life were unwelcome.

110.   Jaeger frequently evaluated the sexual appeal of other women students in Kidd's presence, putting particular emphasis on their weight. He commented when female graduate students gained weight and warned Kidd against gaining weight and "spoiling her physique." He would scold her if she ate what he considered to be too much. For example, if she served herself a second helping in her own apartment and he happened to be there, he would chastise her. On another occasion, he threw away cheese she had purchased for herself. When she confronted him, he said that he had tasted it, thought it was gross, and she shouldn't be eating it because she had been gaining weight.

111.   Jaeger told Kidd that he wanted to pull one BCS student's hair (because he was having sexual thoughts about her).  During a recruitment weekend, he told Kidd that one prospective student had nice lips that he wanted to "suck and bite." Jaeger asked Kidd to arrange for him to meet with a prospective graduate student that she was hosting, alone and outside of the department. He suggested that Kidd invite the student to their house and then leave them alone. He said he sensed a connection with the student. Kidd refused. Jaeger told her that she had a professional obligation to comply since he was the faculty member whose research related to the prospective student's research interests. This incident encapsulates how Jaeger employed his status and his power as a UR professor, to whom both Kidd and the prospective student were subordinate, to advance his sex life.

112.   On another occasion, Jaeger asked Kidd to facilitate a meeting between himself and the girlfriend (now wife) of another faculty member. He told Kidd that he

sensed a connection with her and desired her. He suggested that Kidd invite the woman out to do "girl things" like shop and tell him where they planned to go so he could run into her without her boyfriend present. Kidd refused. He repeated this instruction several times for weeks and grew increasingly agitated and hostile toward Kidd each time she refused. At some point, Jaeger managed to arrange a meeting with the woman without Kidd's help and made an unwelcome pass at her.

113. Jaeger did not talk about women students' sex appeal only in private. In 2008, he attended a small holiday party at the home of another faculty member. A visiting professor, some BCS faculty and a number of graduate students were present, including Georgia Gordon,[25] who was in the first year of her Ph.D. at BCS. Gordon had hoped to meet the visiting professor and speak to him and her colleagues about her research interests. Instead, in front of her colleagues, Jaeger announced that another faculty member had told Jaeger that he found Gordon sexually attractive. She was mortified that her professors had spoken of her in such a way, and was further embarrassed that Jaeger had announced this publicly, and to a group of important people in her field. She excused herself to the bathroom where she cried. She worried that everyone at the party would only remember her as the woman BCS professors found sexually appealing, whereas she wanted them to remember her for her scientific interests, intellectual capacity and accomplishments. It would be inconceivable for Jaeger or other BCS professors to speak about their male Ph.D. students in this way.

114. Jaeger sexually objectified Gordon to other BCS faculty too. At a different faculty dinner party in 2010, at the dinner table in the presence of other faculty, including

---

[25] Pseudonym.

Cantlon, Jaeger asked a senior BCS faculty member, who sat across from him, "So, what part of Georgia really does it for you?" Cantlon remembers thinking that they discussed Gordon as if she were a piece of meat. At that moment, the host of the party set a plate of chicken pieces, breasts and thighs, onto the table. Jaeger laughed.

115.   Jaeger pressed one female post-doc to come to his home for a work meeting.  She said she would prefer to meet in his office and asked if he could meet her there. He said no.  She said this would make her uncomfortable and asked to meet at the coffee shop down the street from his house. He still refused and demanded that she come to his house. This student felt that Jaeger was giving her an impossible choice: she could have a professional interaction with him only at the cost of succumbing to his bullying her into a situation where she felt uncomfortable and unsafe. Indeed, she felt he took particular interest and pleasure in making her uncomfortable as a woman, to make her feel subordinate. She agreed to go to his house, but was so unnerved by Jaeger's creepy behavior that she told her partner Jaeger's address and requested she be picked up if she did not call within an hour.

116.   On one occasion, Jaeger showed up uninvited to a date that Kidd was on. Jaeger sat down and ordered wine for himself and for Kidd's date. Jaeger told the date that Kidd needed to have sex because she was so tightly wound. He encouraged the date to drink, heavily. At the end of the meal, Jaeger invited the date back to their apartment. When Kidd suggested that the date go home because he was very intoxicated, Jaeger forcefully encouraged him to come to the apartment despite Kidd's protests. The date did come back to the apartment where, after attempting to remove his pants despite Kidd telling him not to, he passed out in her room. Throughout the night the date vomited in

her trash can and on her bed. Kidd did not engage in any sexual activity with the man, instead sleeping in a nearby chair. The next day Jaeger made incessant requests for details on "the sex" even when Kidd told him that nothing had happened.

### Jaeger uses his influence to sleep with female graduate students

117.    In 2008, Jaeger began a sexual relationship with a Ph.D. student, Molly Marshall.[26] Jaeger told Marshall that their relationship had to be "open," meaning that he would continue to sleep with other women.

118.    When they were together, Jaeger was very demanding of Marshall.  He would make her feel guilty for spending time with friends instead of him. When she did or said things that did not please him, he would withhold affection from her as punishment. She felt that her happiness depended largely on his mood and whims, and got to the point where she would break down frequently from the stress of the relationship. Eventually all of her friends outside Jaeger's close social group who knew of the relationship disapproved because it was unhealthy.  But because Marshall was spending most of her time with Jaeger and Ph.D. students in his "in-group," she worried that ending the relationship would cause them all to turn against her. He controlled the group; she and the others both sought his approval and feared his retribution. She did not want to be even more isolated than she already felt, so she stayed.

119.    Eventually, Marshall learned that Jaeger had slept with a graduate student from another university, Billings, without using protection. Marshall felt betrayed and used. Jaeger had not only broken the rules of an open relationship by humiliating her in front of her peers, he had now also put her health at risk.

---

[26] Pseudonym.

120. Jaeger had little concern for the health of the students he slept with. For example, one of his partners (not being named here) was injured during a sexual encounter with Jaeger and sought medical attention. She did not have insurance at the time and asked Jaeger for financial help. He refused, despite the cause of the injury.

121. Marshall repeatedly broke things off with Jaeger and told him that she needed space. However, each time he continued to pursue her. He showed up at her house late at night. She asked him to leave, but he would continue to demand that she speak to him until she was sobbing. He continued to send her emails, texts and call her. He sent her unwanted photographs of his penis.  He pursued Marshall relentlessly until she gave the relationship another chance.

122. In summer 2009, Marshall learned that Jaeger had continued to see Billings regularly. Specifically she learned that Billings had visited Jaeger in Rochester when Marshall was out of town.  The two of them had socialized with Marshall's peers and colleagues at Rochester, all of whom knew that Jaeger and Marshall were dating. They knew that Billings was staying with Jaeger and that the two were sexually intimate. She was the only person Jaeger had kept in the dark.  Marshall was completely humiliated in front of her professional colleagues.

123. During and after his relationship with Marshall, students were aware of Jaeger's sexual relationship with Billings. He would fly her in for working weekends during which they would have sex and socialize with graduate students. He invited her to lectures and to his lab retreats. She was a highly capable scientist, but their relationship added to the sense for women students at UR that working with Jaeger was a potentially

dangerous experience, where they would always have to be navigating unacceptable demands to blur professional lines, or succumb to him.

124.    At the LSA institute in summer 2009, Jaeger met Chigusa Kurumada who was a graduate student at Stanford and one of his students at the Institute. The same week that his relationship with Marshall ended, Jaeger began a sexual relationship with Kurumada. He brought her back to the house he was sharing with a number of UR students near Stanford and had loud sex with her.  Gordon could hear them. She felt embarrassed and that it would not be possible to have a professional relationship with him after she had been forced to hear his exhibitionist sex. Jaeger and Kurumada continued dating. Several witnesses reported seeing Jaeger and Kurumada making out in a Starbucks on campus in 2011. They report that Jaeger was kissing Kurumada sensually, with their tongues visible, and groping her. They were partially on top of one another. One witness was shocked to see a professor behaving so inappropriately, especially in a building that houses the office of the Dean of Students and where other students, faculty and administrators could easily see him. Another witness, who happened to also be a BCS student, remembers thinking, "Men in this department can just do whatever they want, wherever they want. There are no boundaries for them." Eventually Kurumada came to UR as a "partner hire" based on her relationship with Jaeger.  The two of them are still involved.

125.    In 2011, Jaeger began a sexual relationship with Denise Darlington ("Darlington").[27] Darlington had worked in Jaeger's lab for two years as an undergraduate and had graduated in May 2010. When Darlington was an undergraduate

---

[27] Pseudonym.

she attended parties at Jaeger's house. At one such party, a BCS professor (later fired for sexual harassment at the insistence of Newport over objections from the UR Counsel's office, see paragraph 348) encountered her in the hallway and tried to kiss her, which she found upsetting. Jaeger saw this and did nothing. Some students close to Jaeger convinced Darlington not to report the incident because they feared Jaeger would get in trouble, since she was an undergraduate and the party happened at his house.

126.    For a year after graduation, from 2010-2011, Darlington worked as a lab manager with Newport and Aslin. During this period, Jaeger sent letters of recommendation for Darlington's graduate school applications and they were publishing together. At least one sexual encounter with Darlington involved a threesome with Kurumada. Jaeger frequently treated Darlington poorly. She would often come to the office of Dr. Rachel Rogers[28] upset. According to Rogers, Jaeger would do something Darlington considered objectionable, but then call and apologize and convince her to carry on the relationship. Rogers believed that Darlington wanted to end the relationship, but also wanted to remain on good terms with Jaeger and feared he would retaliate against her if she left. After the relationship ended, Jaeger continued to pursue Darlington.  On one occasion he sent her a pornographic image to get her attention.

127.    Students at UR were also aware of Jaeger's previous relationship with Owens. They understood that he had been on the admissions committee when her application to BCS was reviewed, that she had worked in his lab afterward, and that they had published together.

---

[28] Pseudonym.

128.    Jaeger slept with so many students at UR or other institutions, and made passes at so many others, that his penchant for having sex with graduate students became well known among Ph.D.s and post-docs in the cognitive sciences.  One witness recalls her colleague asking her at the start of an academic year whether Jaeger was "banging any graduate students yet." He told her such information would allow him to "make a lot of money," because he and a colleague had a bet about who Jaeger would sleep with first. One of the men had bet on the three female graduate students he thought were most sexually attractive, while his colleague had picked the three women whose offices were closest to Jaeger.

129.    Many students thought Jaeger showed professional favoritism to the women he slept with. For example, Billings was invited to collaborate with his lab and attend conferences and lab retreats. Jaeger included her in these professional opportunities and secured prestigious speaking engagements for her despite the fact that he told Kidd that Billings was obviously unintelligent and was not highly thought of by her own advisor, with whom Jaeger said he was well acquainted. He said, at least she has an incredible set of breasts, and that it was too bad that she did not have a brain in each of them.  Another example is Fisher, who was a post-doc at UC San Diego when Jaeger initiated a relationship with her during the 2007 LSA Institute at Stanford, which she attended as a student and him as an instructor. The following academic year, Jaeger pulled for Fisher to be invited to fly in and speak as part of the prestigious Center for Language Sciences Colloquium Series in the department. Jaeger told Kidd to support her candidacy because he wanted to try to reinitiate their relationship during her visit.

130.    Kurumada was given a tenure-track position largely because she was Jaeger's partner. UR has a history of making spousal hires and so Kurumada's professional accomplishments, although some faculty believed they were below the level of typical BCS hires, seemed satisfactory to senior faculty in BCS at the time. They were unaware that she had been well-known to the graduate students in the department for years as a fellow graduate student who had been having a sexual relationship with a UR professor.

131.    To many students and post-docs, it was clear that one had to have a close personal relationship with Jaeger in order to work with him successfully. For women, that meant sleeping with him, or at a minimum tolerating sexually explicit behavior and power plays that made them feel vulnerable as women, which they felt he did for that purpose.

132.    Indeed, based on their experience with him, many students who worked on graduate recruitment were concerned about Jaeger interacting with prospective students because of sexual harassment and inappropriate behavior that would reflect badly on UR.  He was a constantly broadcasting advertisement for the fact that BCS had a hostile working environment.  They had no similar concerns about any other faculty member.

### Female students avoid Jaeger at the cost of their education

133.    At least sixteen female students and post-docs at UR actively avoided working with Jaeger because of his constant sexual innuendos, pressure to sleep with students, power plays and other unprofessional behavior, which created a taxing, strange

and unequal environment in which to pursue their education. Their experiences with Jaeger are detailed below (and for clarity, each one is given a number, 1-16).

**1. Celeste Kidd**

134. By winter 2008, Kidd desperately wanted to change her living situation and escape Jaeger. She had started sleeping in Aslin's lab instead of coming home. She knew that the lab entrance was locked and that Jaeger did not have a key.

135. When the lease was up on Jaeger's apartment he began looking for a house. He told Kidd that he wanted her to move to his new house with him. Afraid to tell him no, she helped him house-hunt even as she sorted out alternative housing for herself for the following year. When the time came to move, she asked him to meet her at a cafe, where she told him that she would not be living with him. She told him she would no longer be working in his lab and that she wanted no further association with any of the work she had been a part of for the past year, including two projects. This was a significant professional sacrifice, but she felt breaking off with him comprehensively was her only option; otherwise he would continue to sexually harass and manipulate her.

136. Unable to gain access to Kidd, Jaeger instead spread rumors that she was a liar and in love with him.[29] Jaeger's defamation has harmed Kidd's reputation and followed her for years. Years later, one witness heard from one of Jaeger's undergraduate students that Kidd and Jaeger had had a sexual relationship, which was untrue. Jaeger told Cantlon in 2010 that he and Kidd used to work together but they no longer interact because Kidd could not handle his criticism and was unstable. Cantlon also heard a rumor from students that Kidd was unreliable but was not told why they thought this.

---

[29] Contrary to one such rumor, Kidd never slept with Jaeger.

When Heilbronner came to UR as a post-doc years later, she heard from a number of people that Kidd was a liar and unreliable, repeating what Jaeger had said. Bixby also heard this about Kidd when she came to UR.  In fact, it was these stories that were lies, originally propagated by Jaeger.

### 2.    Molly Marshall

137.    After Marshall ended her relationship with Jaeger, she struggled to remain in BCS. She would often avoid lectures, workshops, department dinners and socials if she knew Jaeger was going to be there. On one occasion, she needed help with a statistical method. Her advisor suggested that she work with Jaeger. Without disclosing her previous relationship, Marshall told her advisor that she was not comfortable working with Jaeger. Instead she sought help from another student. Marshall continued to spend mental and emotional energy on avoiding Jaeger and on worrying about whether she would have to interact with him when she came into her office to work or when she would attend departmental events.

### 3.    Emily Evans

138.    In 2010-2011, a female undergraduate, Emily Evans,[30] who worked in Jaeger's lab and was taking an independent study from him, approached Patterson to complain about Jaeger's behavior toward her. The student told Patterson that Jaeger would invite her to his house, then make inappropriate comments about her attractiveness and stand too close to her. Patterson told the student that she did not have to work with Jaeger if she felt uncomfortable. The student left Jaeger's lab and did not list any of the work she had done with him on her CV because she was too afraid of what he would say

---

[30] Pseudonym

if anyone contacted him as a reference. When the student applied to graduate school she only got into one program, which would require her to work with a friend of Jaeger's. She did not accept the offer of admission and instead waited to apply to graduate school again the following year.

### 4.      Eva Edwards

139.      A second female undergraduate, Eva Edwards,[31] approached Patterson to complain about Jaeger. She appeared upset. She told Patterson that something inappropriate happened to her at a party at Jaeger's house, to which she had obviously not consented. Patterson tried to get the student to tell her more about what happened, but she was too uncomfortable to give details. Again, Patterson told the student that she did not have to tolerate Jaeger's treatment and could find someone else to work with.

### 5.      Hailey Hanson

140.      Hailey Hanson,[32] a Ph.D. student at BCS from 2007 to 2012, observed that Jaeger spoke inappropriately, particularly to female students. She felt like women had to put up with "consistent unsavory, sexual commentary" in order to be around him. Hanson felt that Jaeger was condescending and demeaning to women students. She attended an end-of-week drinks gathering at Lux during her first semester at UR. Jaeger approached her and made an unwelcome pass at her, even though she was a Ph.D. student who had come specifically to work under his supervision, and he knew she was in a committed, monogamous relationship.  She knew Jaeger had slept with a number of other female graduate students and she watched as he hit on other Ph.D. students at Lux.

---

[31] Pseudonym
[32] Pseudonym

Hanson quickly became uncomfortable working with Jaeger because of his blatant misbehavior toward women, so although his research program had played a major role in her decision to come to UR in the first place, she began avoiding him. When she first arrived, she had sought Jaeger's input on her NSF Graduate Research Fellowship, which greatly improved the proposal and reflected ideas that required collaboration with him. However, because of his behavior she did not pursue that line of research until her dissertation, several years later. A chapter of Hanson's dissertation would have benefited from Jaeger's input. However, when she needed computational modelling or data analysis support she sought advice from another faculty member or student, who lacked Jaeger's level of expertise in these particular subjects.  She did not include Jaeger on her comprehensive exam committee and so did not have the benefit of his knowledge while preparing for exams. She stopped attending events at Lux, though the opportunity to socialize and talk shop with her colleagues could have resulted not only in friendship, but in potential collaborations. She sometimes avoided departmental events if she knew Jaeger would be there. She avoided social events at conferences because Jaeger would be present even though this meant missing out on the chance to network, which is typically important in the job market.  She gave up all these opportunities to avoid the hostile environment Jaeger had created.

### 6.    Kristi Kramer

141.    Kristi Kramer,[33] a female BCS Ph.D. student from 2005 to 2010 and post-doc until 2013, knew of Jaeger's sexually aggressive reputation with female students. As soon as Jaeger arrived, she found his behavior to be highly unprofessional. He was

---

[33] Pseudonym

flirtatious, vulgar and often used language with sexual innuendos. For this reason she avoided him as much as possible. She would have liked to have received instruction from him on computational methods, but she deliberately did not seek his assistance; it came with too much baggage and danger. Additionally, when she was preparing to apply for jobs, Jaeger was the faculty member who had most recently been on the market and would have been best poised to give her professional advice. However, she did not feel comfortable interacting with him.

### 7.    Rachel Rogers

142.    Rogers, who was a female post-doc in BCS, also avoided Jaeger. She was doing research that was similar to Jaeger's and he would have been a natural collaborator. He was well known in her sub-field and it would have helped her education, and her career, to work with him. Indeed, several people have later asked Rogers why she did not work with him. Though she has given vague answers to that question, the truth is that Rogers felt uncomfortable working with Jaeger because of the way he interacted with female students. She worried that he would try to cross a professional boundary and she would find herself in a situation in which she would have to reject him, which would make him an enemy.  She therefore avoided him at social and professional events.

### 8.    Georgia Gordon

143.    Georgia Gordon[34] came to UR in part to work with Jaeger and did work with him for the first year, but after the first year she intentionally started working more with her other advisor, a senior BCS professor.  She sought to escape Jaeger's offensive, sexually charged language and crude comments about women's body parts and sexual

---

[34] Pseudonym

attractiveness, including her own (and she had also had to listen to him having loud sex with a graduate student when she rented a house with Jaeger and other students during a conference).   Gordon felt that women already have a hard enough time being taken seriously in science. She thought Jaeger's treatment of her and other women undermined her purpose in coming to UR: to do scientific research and complete an original Ph.D. Gordon would have benefited from Jaeger's instruction on computational methods which were complementary to her research, but avoided him to protect her own safety and well-being. She frequently avoided events she knew Jaeger was going to attend, reducing her educational and networking opportunities.   Gordon would also have had much more mental and emotional energy to devote to her work, and to developing professional relationships with her peers, if she did not have to focus on avoiding Jaeger and maintaining firm boundaries with him. She felt she had to be constantly vigilant against his predatory actions.

### 9.     Keturah Bixby

144.    Keturah Bixby, who received her UR Ph.D. in 2017, has also avoided working with Jaeger. Bixby was immediately put off by Jaeger's boundary-pushing, which included standing close behind her without speaking and taking her photograph after she told him not to.   She feels the way he speaks is designed to exert power over people, women in particular, by making them uncomfortable.   She has observed him regularly talking about sex in front of students and post-docs. For example, on one occasion, Jaeger asked a table full of students and post-docs at Lux how to use a cock ring.   Bixby actively avoids Jaeger. She has left social events if Jaeger arrives and asked a fellow graduate student to disinvite him to parties so that she and other graduate

students would feel comfortable attending. She has not taken any statistical workshops that he runs, collaborated with him or sought his instruction. She continues to find his presence to be deeply unsettling, so much so that she has spent a significant amount of mental energy worrying about whether he will turn up in her office or at talks she gives in the department.

### 10.   Jessica Jackson

145.   Jessica Jackson,[35] another former Ph.D. student, has also avoided Jaeger. When she first met him, he was relentlessly flirtatious with her. His tone and body language was overly familiar. He would touch her arm and stand close to her, as if he were already her sexual partner. He once told her that he was a hedonist and that he was "always seeking pleasure." Jackson witnessed Jaeger flirt similarly with several other female Ph.D. students. Jaeger's behavior, particularly his sleeping with numerous students and flaunting it, flirting with her and other students, and constantly using sexual language, made Jackson so uncomfortable that she avoided him. This meant not attending conference events or lectures that he attended.   Initially, Jackson was interested in Jaeger's work and would have been interested in working with him or in seeking computational advice from him, but she became too uncomfortable in his presence to take this normal professional step.

### 11.   Theresa Thomas

146.   Theresa Thomas,[36] a female visiting researcher, ceased working on a project with Jaeger because of his unprofessional behavior toward her. When she asked

---

[35] Pseudonym
[36] Pseudonym.

him how she should prepare for the interview to get onto the project, Jaeger said that he would wear a suit, and she should wear a swimsuit. Thomas brushed this off and hoped things would get better.  However, as they began to work together, they disagreed about how to approach their collaborative work. He was dismissive of her ideas. He was flirtatious, crossed professional boundaries and on occasion requested that they hold lab meetings late at night in a bar, just the two of them. Thomas requested that Jaeger meet her during office hours on campus, but he refused. When she stopped working with him, he threatened her. He stated that if she ever said anything negative about him, no one would believe her and that people in the field would not want to work with her. Jaeger's actions influenced Thomas's decision to leave her Ph.D. program and the field of neuroscience altogether.

### 12.    Victoria Vaughn

147.    Victoria Vaughn,[37] another female Ph.D. student, avoided Jaeger because of his reputation for sleeping with graduate students and his lack of professional boundaries. She avoided social situations involving Jaeger such as parties or nights at Lux with other graduate students, which resulted in the loss of opportunities to collaborate. Vaughn also never sought guidance from Jaeger on statistical problems. She would instead ask Jaeger's graduate students questions. Vaughn originally had an interest in research on language which would have made Jaeger a natural co-advisor or collaborator. However, she did not want to ever find herself in a position where she had to assert boundaries with Jaeger, which she feared would happen if she worked with him

---

[37] Pseudonym.

in any capacity. This influenced her decision to turn away from language as a research focus.

### 13.     Abigail Adams

148.    Dr. Abigail Adams[38] was another female Ph.D. student in BCS who avoided Jaeger. Jaeger's sexual relationships with students, his use of drugs with students, and his regular use of sexually explicit language made Adams feel uncomfortable. Adams also recalls Jaeger flaunting relationships with visiting scholars and referencing one scholar's "nice pair of attributes," clearly referring to her breasts. Adams felt that Jaeger took advantage of students using his position of power. She felt his actions were harmful to female students because as scientists, these women wanted and deserved to be taken seriously. Jaeger's actions and the environment that they created added to their anxieties because they had to worry about being seen as potential sex partners in addition to all the other insecurities and difficulties of graduate students making their way.  Additionally, it bothered her that the young women's reputations as scientists were always called into question while Jaeger seemed immune to any consequences for his unprofessional behavior. Adams worried that even if she was able to assert boundaries while working with him, others in the field would assume she was another of his conquests simply because of her association with him. Adams therefore avoided working with Jaeger even though he would have been a natural advisor or co-advisor. She avoided social situations where Jaeger was present, therefore missing out on collaborative opportunities. She did not have him on her committees and she did not seek his guidance on her dissertation. As a result, she avoided doing certain kinds of research

---

[38] Pseudonym.

for her dissertation that would have strengthened it, instead postponing that research until afterwards.

### 14.    Caroline Cooper

149.    Caroline Cooper[39] was a female student in BCS. Cooper heard from two female BCS graduate students that they had had sexual relationships with Jaeger, which Cooper felt was inappropriate. Cooper was warned away from Jaeger by a "whisper network" of women who alert other women about men who are sexually aggressive. Cooper attended one party where she witnessed Jaeger behaving inappropriately and using drugs with students. Cooper also witnessed Jaeger flirting with female BCS students at the bar Lux. Cooper would often leave Lux or graduate student parties when Jaeger arrived because of his predatory behavior.  She also avoided his statistics workshops and did not associate with him at conferences.

### 15.    Bethany Bennett

150.    Bethany Bennett[40] was an undergraduate at UR who took a class from Jaeger.  Bennett and Jaeger discussed her working in his lab which would have provided her valuable experience and strengthen her graduate school applications. However, when she talked to him about the application process, his tone and body language were overly familiar and flirtatious. This made Bennett feel uncomfortable and that he was not genuinely interested in her education. She therefore decided not to apply to his lab.

---

[39] Pseudonym
[40] Pseudonym

### 16.    Anna Andrews

151.    Dr. Anna Andrews[41] avoided Jaeger because she did not feel safe around him due to his boundary-pushing and sexualized behavior. She also abandoned a project she had started in order to avoid working with him.

152.    These accounts demonstrate not only multiple acts of sexual harassment towards the individuals involved, but the existence of a pervasive hostile environment created by Jaeger at BCS.

***It is not surprising that students who feared Jaeger did not report him***

153.    Jaeger has a reputation for cruelty and retribution, so it is not surprising that students who were afraid of interacting with him were afraid to report him. As stated above, one student who left Jaeger's lab did not even list the work she did there on her CV out of fear that potential graduate programs or employers would contact him. Other than Kidd, who had to announce that she was cutting ties to him because she was then renting a room in his house, every female student who avoided Jaeger did so without telling him so. They wanted to escape him, not draw his attention their way by filing a complaint. Nevertheless, their educations suffered from having repeatedly to avoid and navigate around him.

154.    Several witnesses said that they now finally feel free to state what they have long felt about Jaeger because they have faculty positions outside UR or have left academia and so are not as vulnerable to retaliation from Jaeger or UR. However, many witnesses who are still in junior positions in the same or related fields express fear that he

---

[41] Pseudonym

will learn they have criticized him and will use his influence to disparage them to others in the field or that he will give negative reviews of their grant proposals or scientific papers.

155.    Some students harassed by Jaeger did not realize until later, when they worked at other universities with effective sexual harassment systems (unlike UR), that Jaeger's behavior was unlawful. One witness stated that she and other former BCS female graduate students have recently discussed why they never reported Jaeger when they were students. She states that at the time, they were new to academia and that part of the purpose of graduate school was to "socialize" the students into the academy. In other words, they were learning for the first time what was normal academic practice, guided by their professors, including Jaeger, who told people UR approved his sexual promiscuity with students and that any discomfort they felt was due to their own prudishness.  This is why instead of encouraging students to report Jaeger when he made them uncomfortable, for example, Patterson advised students to navigate around him.

156.    Jaeger actively created the perception that his sexual misconduct was normal and accepted. An example of this can be seen in his assurance to Kidd when she was a prospective graduate student that his superiors at UR knew all about it and approved.  Although Kidd nearly did not attend UR because of Jaeger, his telling her that his behavior was normal – and her USC advisor's statement that there was some risk from sexual harassment in any academic department – eventually convinced her that his actions were so commonplace that she would face the same reality no matter where she studied.

157.   Kramer did not report Jaeger when she was a student, but now that she is a faculty member elsewhere and better understands the power that faculty have over students, she is sure that if she behaved at her current institution the way Jaeger did at UR, she would unquestionably be fired for sexual misconduct.  Several Plaintiffs agree with this assessment.  Kidd and Piantadosi were disgusted with Jaeger's misconduct when they were graduate students, but they became even more aware of the importance of respecting boundaries in faculty student relationships when they became UR faculty members themselves.

158.   One witness, a friend of Marshall, said he wishes he had reported Jaeger years ago. At the time, he felt that Marshall wanted to extricate herself from a sexual relationship with Jaeger but was afraid to do so largely due to the power and influence Jaeger wielded in the department. He was disgusted by Jaeger's pursuit of Marshall after she attempted to end the relationship the first time. However, he knew that Marshall was embarrassed by the relationship and did not want senior faculty to learn of it. Out of loyalty to her wishes, he stayed quiet.

## D.   _UR is notified of Jaeger's misconduct but does nothing_

_Bixby formally puts UR on notice of Jaeger's behavior by complaining to the Chair of BCS, who handles the complaint quietly, privately and without evident result, leaving the hostile environment at BCS intact_

159.   In 2013, Bixby had finally had enough of Jaeger's harassment, constant pushing of normal professional boundaries, and efforts to humiliate students.  Bixby generally tried to avoid Jaeger so she would not have to deal with his constant predatory behavior; but she could not avoid him at all department events.  At one such department

event, where graduate students were required to help run a graduate student recruiting weekend, he took her picture after she refused permission.  The next month, after she gave a required lunch talk, he took up most of the question period with his own rambling. Finally, at a conference, a potential post-doctoral student told Bixby that she wanted to come to UR, but had seen Jaeger's predatory behavior at a Language Studies Association conference she attended and was concerned she would have to work with him. Bixby assured the prospective student that she could come to UR and not have to work with Jaeger, and that it was not uncommon for women to avoid him professionally. Bixby wanted to promote UR, but was now seeing proof that the hostile environment Jaeger had created at BCS was common knowledge outside Rochester, making strong candidates reluctant to apply.  Bixby had been considering reporting Jaeger's misconduct for some time, and over the past several months had learned that other women were uncomfortable with his conduct too, so she now decided to report Jaeger's mistreatment of graduate students, and women in particular, to DeAngelis.

160.    In November 2013, Bixby formally advised DeAngelis of the names of a number of students who had had toxic experiences with Jaeger, including Kidd, Hanson, Sally Sanders, and Andrews.  Kidd then provided DeAngelis with additional names. This is the first formal complaint about Jaeger to UR known to the Plaintiffs.  It put the University on notice that his regular pattern of behavior was causing major problems for female students and BCS generally.

161.    Three months after Bixby reported Jaeger's harassment to DeAngelis, he replied with a single email.  Although Bixby had given DeAngelis the names and contact information for  Kidd,  Hanson,  Sanders,  and  Andrews  –  with  their  permission  –

DeAngelis chose to speak only with Andrews and Kidd. He acknowledged that his conversations with them showed a pattern of undesirable behavior by Jaeger. However, he said he had "spent some time reviewing the University's policies, and concluded that none of the stories that [he] was told were in violation of the university's policies on harassment, etc." In fact, this was not true.

162.    UR's sexual harassment policy at the time of Bixby's notification to DeAngelis, Policy 106, had been in force since November 2012 and stated that:

    a.   "Discrimination is (1) any conduct (2) that adversely affects or impacts an individual's or group's ability to function and participate as a member of the University community (3) because of their age, color, disability, ethnicity, marital status, military status, national origin, race, religion, sex, sexual orientation, veteran status, or other status protected by law;"

    b.   "Harassment is (1) any unwanted conduct (2) that is intended to cause or could reasonably be expected to cause an individual or group to feel intimidated, demeaned, abused or fear or have concern for their personal safety (3) because of their age, color, disability, ethnicity, marital status, military status, national origin, religion, sex, sexual orientation, veteran status, or other status protected by law or because of their perceived or actual affiliation or association with individuals or groups identified by such characteristics and (4) that could reasonably be regarded as so severe, persistent, or pervasive as to disrupt the living, learning and/or working environment of the individual or group;"

    c.   "Sexual harassment is harassment as defined above that involves unwelcome conduct of a sexual nature. Depending on the circumstances, the following types of behavior may constitute Sexual Harassment:

- Unwanted comments about an individual's body, clothing or lifestyle that have sexual implications or demean the individual's sexuality or gender;

- Unwanted sexual flirtations, leering or ogling;

- Unwanted sexual advances and propositions;

- Unwanted display of sexually demeaning objects, pictures or cartoons in areas visible to other members of the University community;

- Threats or insinuations that an individual's refusal or willingness to submit to sexual advances will affect the

individual's status, evaluation, grades, wages, advancement, duties or career development;

- Stalking, telephone or computer harassment, dating violence, sexual assault or date rape."

163.   The conclusion DeAngelis reached, after consulting only two of the women Bixby reported as having been victimized by Jaeger, was that Jaeger had not violated relevant University policies.   This was manifestly contradicted by even the limited facts he had chosen to discover.

164.   For example, Andrews told him about Jaeger forcing her to come to his house to meet even though she had repeatedly said she did not feel comfortable doing so and had suggested convenient alternatives. Even if Jaeger had required all students, including men, to meet him alone at his residence, such a policy would discriminate against women students, who are more likely to feel unsafe meeting their male professor in his home. In any case, Andrews had told DeAngelis that she felt this was an example of Jaeger exerting power over her specifically to make her feel uncomfortable – that Jaeger knew she would feel uncomfortable with the arrangement because she was a woman and insisted on it anyway.   Andrews had made clear, both to Jaeger at the time and later to DeAngelis, that Jaeger's conduct was unwanted and disturbing. Jaeger's treatment of Andrews led her to eventually drop a project she had been working on with him and to forego asking him for any professional support or letters of recommendation, a clear example of disruption to her education.

165.   Kidd reported to DeAngelis that Jaeger had intrusively and repeatedly probed into her sex life, constantly used sexual language, and had often spoken about female students and prospective students in sexual terms. She told DeAngelis that she

had made it clear to Jaeger that his treatment was deeply bothersome. She also reported to DeAngelis that Jaeger's harassment became so severe and pervasive that she slept in Aslin's locked lab because she did not feel safe enough to sleep in her own bed where Jaeger could gain access to her. She told DeAngelis that she eventually left Jaeger's lab, abandoning a year's worth of work on two projects, in order to escape him. These were clear examples of disruption to her education and her working environment.   Kidd offered to provide additional information, and gave DeAngelis the names of **ten** other students who had been similarly affected.  But DeAngelis declined to contact them or to investigate further.

166.    Had DeAngelis spoken to (1) the two other students Bixby identified by name, (2) the ten students identified by Kidd, as well as (3) many others who had bad experiences with Jaeger (in fact Bixby had told him that she knew *nine* other women had avoided working with Jaeger), he would have easily discovered the numerous examples of Jaeger's sexually harassing behavior described above and how his behavior corroded women's educations in his department.  As far as the record reveals, DeAngelis did not contact any of them.

167.    Noticeably absent from DeAngelis's email to Bixby explaining his decision not to pursue Jaeger further is any mention whatsoever of sex or gender, despite several students or former students providing him with evidence of sexual harassment by Jaeger.  It was as if he was deliberately trying to avoid acknowledging this elephant in the room.  DeAngelis's email refers to Jaeger exhibiting "undesirable behavior" and says that he raised "the general nature of these issues" with Jaeger.  DeAngelis also concludes that Jaeger now had greater sensitivity to "such things." DeAngelis says he spoke to

"other people" – who in fact were all women – and that he had told Jaeger to be careful when trying to "be social with students." Although Bixby categorized her interactions with Jaeger as "weird" rather than "sexual," she made clear to DeAngelis that she felt sexually harassed and that other women had felt sexually harassed.  She suggested that DeAngelis speak to other *women* in the department about Jaeger's inappropriate behavior and stated that at least nine other *women* had avoided working with him. Bixby's statements, amplified by the testimony DeAngelis heard from Andrews and Kidd, and the corroborators and victims they recommended to him, all focused on Jaeger's predatory treatment of women.

168.    But DeAngelis sidestepped this.   Indeed, his email demonstrates more concern for Jaeger than for Bixby or the other women affected by Jaeger's sexual pursuits and boundary pushing. He wrote that "Florian took this news pretty hard, even though I tried to present it in a constructive manner." He went on to say "We actually had a second meeting today because he was still bothered and wanted to talk more." He said, "I think it is fair to say that [Jaeger] was unaware about the impact that he had on other people in most of these situations" and "I do think that [Jaeger] learned some things about himself and that he will go forward with a heightened sensitivity to such things." DeAngelis' prediction was overly optimistic.

169.    In her written statement to DeAngelis, Bixby specifically asked for his intervention on two points. She said that she never wanted to have to interact with Jaeger again, and asked how she should respond to students concerned about working with him. DeAngelis did not meaningfully address either of these requests for help.  He simply told Bixby that she could say whatever she wanted to prospective students about Jaeger, that

he could not stop her from warning them away. He also told her that she could not prevent Jaeger from interacting with her or attending her talks. In short, he took no action to protect Bixby or other women.

170.    In fact, DeAngelis himself had a duty to report Bixby's allegations to Human Resources or to the appropriate administrator.  Policy 106, issued in 2013, states that "a supervisor or person with managerial authority who observes or learns of alleged unlawful harassment, discrimination or retaliation must inform Human Resources and the relevant administrator..." At the time, Bixby did not know whether DeAngelis took such action.  She was later told by Title IX Coordinator Morgan Levy that DeAngelis had sought advice from the University Counsel's office. If true, then the UR administration generally (beyond DeAngelis) has been on notice of Jaeger's misconduct since 2013, and must have advised him that Jaeger's behavior was acceptable.

171.    Additionally, DeAngelis did not provide support to Bixby to help her deal with the obviously disruptive and traumatic circumstance she was facing in trying to coexist with a serial harasser, Jaeger, such as telling her about counseling available through the University or to approach the Title IX coordinator.

172.    DeAngelis later told BCS faculty that he had never heard any complaint of unwanted sexual behavior by Jaeger before Aslin and Cantlon's 2016 complaint.  He did not mention Bixby's complaint in 2013. When the Plaintiffs recently confronted DeAngelis about the 2013 complaint, he insisted that her complaint was not sexual in nature.  If he truly believes this, it would be another indication of the low level of sexual harassment awareness among UR administrators in the Seligman era.

***After Bixby's complaint, UR is put on repeated further notice of Jaeger's misconduct but does nothing to stop it; neither does Jaeger***

173.    When DeAngelis consulted Kidd in response to Bixby's complaint in 2013, Kidd was very surprised to learn that he was just now hearing of Jaeger's repeated sexually predatory behavior toward women students. Nevertheless, the fact that he met with her to learn about it gave her hope that BCS might finally do something about this persistent blight on the department.  But Jaeger was not publicly admonished.  In fact, there was no public acknowledgment of the problem.

174.    The conclusion thus reached by Kidd (who by then was a faculty member) and other junior faculty who knew of Jaeger's misconduct, including Cantlon, was that BCS leadership and other University administrators condoned it. Kidd was deeply hurt that DeAngelis had heard all of the harassment she had experienced, culminating in having to sleep in Aslin's locked lab to avoid Jaeger, and Jaeger still got a "free pass."

175.    DeAngelis's inaction set the stage for years of Kidd and Cantlon suffering a hostile work environment. They did not feel that they could complain when other colleagues made sexist remarks or silenced their views. After all, Kidd had already complained about far worse treatment and BCS decided to do nothing.

176.    In June 2014, Cantlon attended a small dinner party with Mahon, Jaeger, and other BCS colleagues at DeAngelis's house. A documentary film about her Ph.D. advisor, Dr. Herbert Terrace, had recently aired which depicted him as someone who slept with his students. At the dinner table, a senior professor said to his colleagues, "How many sexual favors has Jessica done to get here?" Cantlon heard this comment and felt humiliated and objectified, but given the dinner party context and her junior status,

did not want to upbraid the professor publicly.  Mahon, Cantlon's partner, was also shocked that his more powerful colleagues did not know how hurtful and out of line this kind of talk was.  But at BCS, this kind of attitude had become normalized.  It reflected the hostile environment that Jaeger both generated and took advantage of for a decade, which has helped render women students and faculty second class citizens, to their detriment and to the detriment of male students as well.  DeAngelis had already been put on formal notice of Jaeger's sexual harassment by Bixby, and here, in his own home, a senior faculty member was denigrating Cantlon publicly using intimations about her sex life, which he should have taken as further notice of a hostile environment in BCS; again, he did nothing.

177.    In fact, Cantlon never slept with Terrace nor any of her professors or mentors. But given the prevailing mores in BCS, Cantlon's success was attributed by BCS's senior male figures not to the quality of her scientific research or her work ethic, but to her feminine wiles.  It is noteworthy that senior BCS faculty could readily understand that Terrace's (fictional) sexual involvement with Cantlon would burden her academic reputation, but were oblivious to how Jaeger's practice of and reputation for sleeping with numerous students would do the same for female BCS students, even those who did not in fact sleep with him.

178.    In February 2011, Jaeger made the inappropriate comments about Dr. Gordon's sexual desirability to senior faculty in front of many of his senior colleagues (see paragraph 113 above). At the same dinner, Jaeger bragged to Cantlon and Mahon that he accepted a position at UR because of its "legendary" nude hot tub parties with students.

179.    In May 2011, a male BCS faculty member asserted in front of DeAngelis, Cantlon, and a visiting faculty member, that "most cases of rape aren't really rape."  He contended that many cases of rape occurred between people who were in romantic relationships at some point and alluded to some statistics he had read in the news. His implication was that the victims are confused or lying. DeAngelis was present for this conversation but did nothing.

180.    In November 2015, after the "man to man" conversation that DeAngelis thought had brought about a change of heart in Jaeger (see paragraph 168), Jaeger attended a "BCS dinner talk," when the whole department eats in a lecture hall and then hears a professional talk. The BCS faculty member who was the ombudsperson and Director of Graduate Studies was also present. While sitting at a table with Bixby and this faculty member, Jaeger said that he thought the mandatory sexual harassment training the department had recently taken online was "stupid."  He said that anyone could just say anything about anybody, meaning that people who complained about sexual harassment were likely to be making things up.  Bixby was upset by Jaeger's dismissive attitude about sexual harassment, which she thought was typical for him and proved that her complaint about him to DeAngelis and DeAngelis's subsequent "man to man" talk with him had changed nothing, contrary to DeAngelis' positive spin. She was also upset that the department's ombudsperson and Director of Graduate Studies did not contradict Jaeger or at least tell him that it was wrong to disparage sexual harassment training or question the integrity of victims, especially in front of students.  Bixby left the dinner to get away from Jaeger and the other faculty member and only returned later for the talk.  If Jaeger had felt chastened by his talk with DeAngelis, he was not showing it;

on the contrary, he continued to give BCS management further indications that he was an unrepentant sexual harasser.

181.    Bixby later wrote to this BCS Director of Graduate Studies ahead of a graduate student "check-in" meeting to suggest that faculty members should communicate to students that sexual harassment is taken seriously in BCS. She suggested that faculty should not joke about sexual harassment training, especially in front of students or with Jaeger, specifically referring to Jaeger's statements in front of Bixby and himself.  The DGS wrote back to Bixby saying "Yes of course you're right. Message received and understood. Thanks for alerting me to this."  If any actions resulted from this, they were not revealed to Bixby.

182.    In early 2016, BCS was hiring a new faculty member. It made an offer to a candidate who would accept only if his spouse could also find a position at UR.  This led to discussion about the appropriateness of relationships between students and professors, because the spouse had also been the candidate's student. Jaeger endorsed the idea of sexual relationships between professors and students and backed this candidate. Aslin, Cantlon, Mahon, Kidd, Piantadosi and Hayden disagreed and worried that Jaeger's attitude would reinforce the message created by his unchecked misconduct that professors were entitled to sleep with their graduate students.

183.    Jaeger became very angry with Aslin, Cantlon, Hayden, Piantadosi, Kidd and Mahon. When Aslin raised the issue of professors sleeping with students in a faculty meeting, Jaeger stood up and threatened to leave if this particular discussion of professional ethics continued.

**E.      _Aslin and Newport learn about Jaeger's misconduct, and decide to take action_**

184.    It was in the course of discussing this new faculty appointment at BCS that Aslin learned of Jaeger's long history of sexual relationships with various former BCS students, and that Jaeger had harassed, humiliated, and pressed to have sex with multiple former students and post-docs. He was horrified that Jaeger had been behaving this way. Aslin had been the Director of Graduate Studies during some of this period. He contacted Newport, who had been BCS Chair at the time but in 2012 had moved to another university. She, too, had been unaware of Jaeger's manifold sexual escapades with students. Both felt a responsibility to address the detriments and illegalities that students had experienced, and the ongoing threat Jaeger's behavior posed to female students, the reputation of BCS and UR, and its ability to recruit the best students. As a result, Aslin and Newport worked with the younger BCS faculty, both men and women, who were aware of and had suffered from Jaeger's behavior – Cantlon, Kidd, Piantadosi, Mahon and Hayden – to find a solution.

185.    Most of the Plaintiffs had no personal grievance against Jaeger. For example, Aslin and Newport had both actively recruited him as a solid candidate to BCS in 2006. Before Aslin learned of Jaeger pressuring women for sex and otherwise harassing them, he voted in 2016 to support Jaeger's early advancement to the rank of full professor, and both Aslin and Newport had nominated him for a number of awards and had collaborated with him on research. Even the Plaintiffs who knew and disapproved of Jaeger's treatment of students and post-docs as it was happening had always acted in a respectful professional way towards him. Nevertheless, all the Plaintiffs

felt duty bound to ensure that BCS students were safe and had equal access to the educational opportunities it offered.  The allegations against Jaeger were deeply troubling and, if true, he had seriously hurt the education of both men and women at BCS and sullied its reputation, and would continue to. The Plaintiffs felt that any students who had been sexually harassed, lost educational opportunities or felt unsafe in BCS because of Jaeger and the hostile environment that he was pivotal in creating deserved redress, and that current and future students should be protected.

186.    Ultimately the group decided that Jaeger's behavior needed to be formally brought to the attention, once again, of UR administrators so that it could be properly investigated and dealt with. As its most senior members still at UR, Aslin and Cantlon decided to bring the complaint forward in their names. As the former chair of BCS and still greatly concerned for its reputation and its treatment of graduate students, Newport assisted with the complaint as much as she could from a distance, while junior faculty present at Rochester also contributed.

### *Aslin and Cantlon file the second formal complaint about Jaeger's behavior with UR, but it conducts an inadequate and biased investigation*

187.    On March 10, 2016, Aslin emailed UR's Senior Counsel Richard Crummins stating: "Over the past few days, I have become aware of some very serious allegations about sexual harassment by a faculty member. I feel obligated to tell you what I know and to initiate a formal investigation."

188.    On March 11, 2016, Aslin was told that Crummins had passed the complaint to Catherine Nearpass, Associate Counsel for Employment and Labor

Relations. Aslin and Nearpass spoke that same day for an hour. Aslin shared the allegations he had heard:

    a.   A number of former graduate students had been intimately involved with Jaeger.

    b.   Jaeger had sexually harassed Kidd when she was a graduate student.

    c.   Jaeger had sexually harassed Gordon.

    d.   Illegal drugs had been used at least once during Jaeger's lab retreats in the Adirondacks.

    e.   Jaeger had solicited sex with a visiting graduate student, visiting Ph.D. students, and visiting faculty.

    f.   Jaeger had made demeaning comments of a sexual nature about women in front of students.

189.   Aslin was not asserting that these allegations were true. They were what he had collected from colleagues using reasonable diligence, and he felt obliged to report them to University officials charged with conducting investigations about such matters. Similarly, Aslin shared a list of people that Nearpass could contact to begin her inquiries. The list included the names of every female student and post-doc that he thought may have interacted with Jaeger. Aslin was not asserting that all of these individuals had engaged in sexual relationships with Jaeger or experienced sexual harassment. Having heard that Jaeger had engaged in predatory behavior toward female students and post-docs systematically and continuously over many years, he simply wanted to be sure that anyone who might have had a bad experience was spoken to and given an opportunity to tell their story, suggest other witnesses, and, if appropriate, receive support from the University.

190.   On March 15, 2016, Aslin met with Kidd.  Kidd had been Aslin's Ph.D. student.  He was concerned that she had thought for many years that he had known all along about what Jaeger had done to her and other women but done nothing, whereas he

had been ignorant of Jaeger's misconduct. During this conversation, Kidd for the first time gave Aslin a full account of her experiences with Jaeger including:

    a.   Jaeger had repeatedly made sexual comments and inquiries;

    b.   She repeatedly made it clear to Jaeger these comments were unwelcome;

    c.   Jaeger would show up at the house she shared with Gordon (after she escaped from living in Jaeger's spare room) in a way she found relentless and oppressive;

    d.   Jaeger had had a sexual relationship with Owens when she was a masters student at UCLA and then encouraged her to apply to UR's Ph.D. program;

    e.   Jaeger's retreats involved illegal drug use;

    f.   Jaeger tried to use Kidd to arrange encounters with women he was sexually interested in, including a prospective student and a faculty member's spouse; and

    g.   Jaeger had engaged in sexual relationships with non-UR graduate students in ways that filtered back to BCS and caused difficulties for BCS graduate students.

191.   Aslin subsequently shared this information, which constituted a vivid portrait of a sexually hostile work environment at BCS, with Nearpass.

192.   Aslin notified Nearpass that he was meeting with Kidd and that he had liaised with potential witnesses to aid in the investigation.  He also told her that he had contacted Newport (as former department chair) who also had names to provide. Nearpass gave no indication that this was not permissible or constituted a violation of confidentiality.

***Aslin receives little information about Nearpass' investigation***

193.   Aslin received very little information about the complaint process.  While UR has several different complaint processes that might be invoked, involving different offices and policies, he was not told about them or how they differed.  He was not told

that witnesses, many of whom were possible victims of sexual harassment by Jaeger, would have no right to be informed of the scope of the investigation or its outcome. He was not told what his rights were as a complainant. He was not told that he and witnesses were supposed to be protected from retaliation. Still, through his own persistence, Aslin was better informed than an average complainant because of his own knowledge of the system as a former Vice Provost and Dean of the College of Arts and Sciences.   His status also allowed him to secure meetings with UR lawyers, administrators and the current BCS Chair to discuss the investigation. He wondered how an average complainant with less influence and power could possibly navigate a sexual harassment complaint system as opaque as UR's.

### UR claims to complete a "thorough investigation" in two weeks

194.    Aslin met with Nearpass on March 22, 2016 to talk about her investigation.  Though it had started just a week earlier, she told Aslin that she would be finished within the next few days. She told him she only had a few more witnesses to speak to. This surprised him.   He had given Nearpass a long list of witnesses and expected that some of them would surely suggest additional people with knowledge of Jaeger's behavior. Aslin asked Nearpass why she thought the allegations could be addressed so quickly. She replied that all of the harassment presented to her for review had happened years ago.  Aslin told Nearpass that victims often do not report harassment until much later, so there was no basis to conclude Jaeger had changed his ways. Nearpass did not respond to this point, but promised a full investigation.

195.    Aslin met with Crummins, the University's Senior Counsel, the following day to clarify the investigative process and to reinforce that he felt a comprehensive

investigation was needed. He said he was worried that if Jaeger's behavior ever became public, UR, and BCS in particular, would suffer greatly. He expressed concern that Nearpass's role meant she had to protect the institutional interests of the University, her employer and client, while also having to elicit difficult testimony from women who felt the University had let them down, and at the same time protect the rights of Jaeger, a University employee – a tangle of conflicting interests.  Aslin left the meeting still unclear about how the process worked and which policies would be considered during the investigation.

*Cantlon meets with the Title IX coordinator*

196.   Because of how the investigation proceeded, in particular the interview questions Nearpass was asking, the Plaintiffs became concerned that she was keeping her focus artificially narrow – solely on whether Jaeger warranted discipline under the portion of Policy 106 that governed faculty-student relationships, to the exclusion of other aspects of the Policy barring sexual harassment and a hostile environment. Although students' experiences considered together showed a clear pattern of Jaeger using his University position to abuse women, which had broader consequences for BCS, Nearpass seemed to want to shut down lines of inquiry that could implicate Jaeger, and by extension the University. She seemed to concentrate almost entirely on whether or not Jaeger had slept recently with one of his direct supervisees, not the hostile environment he was creating for many students in the program.

197.   While this was a narrow concern, it was still an important one; but Nearpass clearly wanted the answer to be "no."  For example, Newport spoke at length with Nearpass about disturbing information she had learned from former BCS students

about Jaeger. She urged Nearpass to interview Darlington who had worked with Jaeger closely as an undergraduate, and whom Newport learned had had sex with him shortly after graduation, including a threesome with Kurumada.   Nearpass responded dismissively, stating that Jaeger's relationship with Darlington was fine since she had just graduated when the sexual relationship began and was thus no longer covered by the University's prohibition on professor-undergraduate sex.   Nearpass did not seem concerned with whether the relationship had affected the educational or working environment of Darlington or other women and thus violated Title IX, or the fact that Jaeger published with Darlington and provided references for her when they were having sex.  Nor did she indicate an interest in pursuing whether Darlington's information could contribute to a fuller picture of Jaeger's behavior.

198.    Nearpass also declined to interview visiting students and faculty from other universities who Jaeger had invited to stay at his house over the years, telling Newport that sexual relationships with them would not violate any University policies. Her approach seemed to be confined to considering each potential relationship individually and not to examine any pattern or hostile environment created if taken together.

199.    By contrast, Aslin, Cantlon and the other Plaintiffs wanted to be sure a complete account of Jaeger's possible contributions to a hostile environment and sexual harassment at BCS was considered by the University, whether or not he also merited discipline for the specific nature of the sex he had with students.

***The Title IX office also downplays Jaeger's misconduct***

200.    On March 25, 2016, Cantlon asked UR Title IX Coordinator Morgan Levy whether she could file a complaint separate from Aslin's with the Title IX office based on the hostile environment that she and other junior faculty, post-docs and students had endured under Jaeger. Levy discouraged this. She told Cantlon that the report Nearpass was producing (the "Nearpass Report") would weigh violations of all relevant policies by Jaeger. Cantlon replied that the investigation into Aslin's complaint seemed to be focusing on sexual relationships between Jaeger and his direct students only, instead of the totality of his actions – his relationships with graduate students he did not directly supervise, with recent students, with students from other universities, his flirtations and constant sexual commentary and grooming students for sex.  Levy said that Jaeger's relationships with non-UR students would probably not be found to be in violation because the policy "doesn't have any teeth."

201.    Moreover, Levy told Cantlon that in reference to Jaeger sleeping with students, it was not uncommon for less powerful women to seek out more powerful men for sexual relationships. Levy said it was similar to how poor women sometimes enter into a relationship with a rich man for economic benefit. Cantlon was surprised that the person designated to handle sexual harassment complaints at UR was so blasé about these sorts of power imbalances, which in a university context would lead to the sexual harassment of students, and also viewed less powerful women as the primary cause or initiator of such relationships.

202.    Levy's strange and offensive comment about women to Cantlon was not an isolated incident. In September 2016, when Levy met with Bixby, and then again in

November 2016 when Levy met with graduate students in BCS, Levy said that not letting students sleep with their professors would be to deny the students' agency. Levy was unconcerned about the power differential inherent in a relationship between student and professor.

203.    Cantlon told Levy that she was concerned about women at BCS having equal access to an education free from discrimination and harassment based on sex or gender, and asked whether she should file a federal Title IX complaint. Levy replied, "If you do that, I will be on the other side." Cantlon perceived this statement as a threat. It was certainly not supportive of her legal rights. Cantlon wondered how uncomfortable students must feel complaining to Levy if a tenured faculty member like herself felt uneasy making a complaint.

204.    Cantlon asked Levy if she could instead file an internal complaint to ensure that her concerns about sexual harassment and hostile environment were in writing. Levy was indifferent. She told Cantlon that she could file a complaint if she wanted, and if she did, to focus on the demeaning and objectifying statements Jaeger made to women. Cantlon and Piantadosi submitted a written complaint to Levy and Nearpass a few days later.

205.    They never received a response. Perhaps the Title IX office believed the Nearpass Report subsumed the answer due to Cantlon, but the Report does not say this, and Piantadosi never received any response.

206.    The Plaintiffs have since learned of many other cases where Levy has shown insensitive behavior that alienates rather than supports victims of sexual violence and harassment. For example, witnesses have said that they struggled to get a response

from Levy when they reached out to her, consistent with Bixby's experience. Several have said that Levy did not offer counselling, other resources, or take action to keep victims from having to regularly face their rapists or live in the rooms where they were assaulted. One victim of a sexual assault met to share her story with Levy. While this student described her violent assault, Levy ate a burrito from Chipotle. These examples together show a person insensitive to dealing with victims of sexual violence.

### *Jaeger is promoted to full professor while he is under investigation*

207.    Two months before Aslin had learned of Jaeger's long pattern of predatory behavior in BCS, he had voted in favor of Jaeger's promotion to full professor. However, he assumed that Jaeger's promotion process would be put on hold during the University investigation into his misconduct, since the allegations against him involved violations of law as well as important University policies. When Aslin learned that this would not happen, he wrote to DeAngelis on March 23, 2016 to revoke his affirmative vote.

208.    Aslin asked DeAngelis to request that Dean Culver delay a final decision on Jaeger's promotion until the investigation had finished.  UR ignored Aslin's request. Jaeger's case for promotion went forward and was approved by the President and Board of Trustees in May 2016, six weeks before the final ruling by the Dean assigned to handle the Aslin-Cantlon complaint against Jaeger.

209.    Jaeger announced his promotion on social media shortly after.  Kidd, Gordon, Cantlon and other witnesses believed this to be an official University seal of approval for Jaeger's lifetime employment and meant the Nearpass investigation would have to be a whitewash.  As discussed in detail below, that prediction was right.

210.    It was unclear to Aslin and Cantlon why Jaeger's promotion case could not be postponed pending the outcome of their complaint. Jaeger had already been granted tenure in 2014, so there was no contractual pressure to promote him early (faculty are typically advanced to full professor 5-10 years after achieving tenure). Jaeger's pattern of illegal misconduct was simply of no consequence to senior UR administrators.

## F.    *The Nearpass Report*

### *Nearpass avoids securing crucial evidence*

211.    Kidd offered Nearpass documentary evidence backing up her allegations in the form of Facebook messages that she received from Jaeger. These messages documented sexual and inappropriate comments he made to her as a prospective student. Nearpass declined to even consider them in her investigation because they were allegedly "not necessary." Later, UR's most senior lawyer, Vice President and General Counsel Gail Norris, justified Nearpass's actions, telling BCS faculty that it was normal in the course of UR investigations to refuse to look at documentation such as messages and emails if the defendant had denied they did anything wrong (see paragraph 302 below).

212.    Nearpass did not interview a number of significant witnesses to Jaeger's behavior, including a student who had visited UR during a recruitment weekend in 2015 and stayed with Jaeger and Kurumada at their home, unlike any other prospective student that year. This student, Cathy Crawford,[42] had cried several times during the weekend and behaved strangely.  Aslin told Nearpass he thought this unusual behavior meant she

---

[42] Pseudonym

should be interviewed, but Nearpass did not do so.  Crawford herself considers it strange that DeAngelis approved her staying at Jaeger's house during the recruitment weekend given the complaints he had already received, and also that Nearpass never contacted her.[43]

213.    Additionally, Nearpass did not interview Hanson, Kramer or Jackson, all of whom Aslin and Cantlon had suggested to Nearpass, and had lost educational opportunities because they had steered clear of Jaeger due to his disturbing behavior toward female students and post-docs.

214.    Nor did Nearpass interview any students who had not attended UR but had relationships with Jaeger that also involved UR, such as Billings, a graduate student from another university who collaborated with Jaeger, was brought to speak at UR by Jaeger and had a sexual relationship with him that was known to UR students; or Thomas, a visiting student who had abandoned work in order to escape Jaeger.  Nearpass had been given the names of these students and others relevant to Jaeger's misconduct by at least Cantlon, Kidd, Aslin, and Piantadosi.

215.    Each omission matters. Jaeger's misconduct can only be "pervasive" if there is a pattern. The more evidence Nearpass omitted, the greater the likelihood that no pattern would be found.

---

[43] This is an example of Nearpass failing to collect evidence even when it was presented to her. According to Crawford, she did not experience any sexual misconduct by Jaeger during the recruitment weekend, but nevertheless believes UR should have cared enough to check with her given his track record.

***Nearpass does not approach the investigation with the necessary sensitivity to victims, resulting in witnesses saying less than they knew***

216.    Nearpass is an experienced lawyer and investigator familiar with sexual harassment, but she gave the impression to some of her interview subjects that she was seeking to elicit particular limited answers rather than all relevant information.   For example, when she interviewed Marshall, she asked very pointed questions such as "So you were in a relationship willingly?" "He wasn't your dissertation advisor?" and "He had no direct effect on your education?"   Victims of sexual harassment and assault often feel self-doubt, guilt and embarrassment, and need encouragement to open up. Nearpass's questions instead reinforced negative feelings in Marshall, and focused only on whether Jaeger had violated the University's policy on sexual relationships between students and professors, not the broader hostile environment. She answered the questions asked, but left the interview feeling badly and believing that Nearpass had drawn them narrowly to avoid many important points – so much so that after thinking it over, she called to request another interview.

217.    During that call, Marshall provided additional information that Nearpass had failed to elicit in their first session, including:

    a.    Jaeger would evaluate women students' looks and whether or not he thought they were "hot;"

    b.    Jaeger created a division among graduate students by establishing an "in" and "out" group;

    c.    Jaeger pressured Marshall to communicate with him even when she had asked him to leave her alone;

    d.    Marshall wasn't sure whether she felt pressure to continue her sexual relationship with Jaeger because of his academic power, but definitely felt pressure because of the social group he had created;

    e.    When they were no longer sexually or romantically involved, Jaeger still sent her unwanted pictures of his penis;

f.  Marshall believed Jaeger had a manipulative personality and had used his role as a professor to manipulate her.

218.  When Gordon told Nearpass that Jaeger had publicly humiliated her by announcing at a BCS dinner that a male BCS professor found her sexually attractive, Nearpass gave the impression of being unconcerned. She did not pursue how deeply that interaction affected Gordon, who in fact had found it deeply humiliating.  Gordon felt that Jaeger had undermined her as a serious scientist by painting her as a sexual object in front of important professors and other people with whom she wanted to collaborate. In Nearpass' Report, that incident was not described accurately and was ultimately dismissed.

**Other disturbing aspects of the Nearpass Report**

219.  On June 2, 2016, Dean of the School of Engineering and Applied Sciences (and shortly thereafter, Provost) Robert Clark, who handled the complaint in lieu of Dean Culver who recused herself to deal with Jaeger's promotion case, sent a formal disposition letter to Aslin and Cantlon.  That letter concluded that Jaeger had not violated any aspects of the UR's Policy 106 on "romantic relationships between faculty and students." The letter also offered Aslin and Cantlon the opportunity to read the 19-page summary report by Nearpass upon which Dean Clark based his decision, but only in the office of UR Senior Counsel Richard Crummins, monitored by employees of the counsel's office; they could not have a copy.  When Aslin and Cantlon requested a copy so they could prepare an appeal, UR refused.  While confidentiality was the ostensible reason, this approach made it harder for them to assess the quality of the investigation and analysis that lay behind its exoneration of Jaeger. They retained a lawyer who

requested a copy of the report and still UR refused. Nevertheless, they were able to take notes during their reading sessions.   The report had multiple inaccuracies and mischaracterizations.

***Nearpass justifies, denies, or excludes all of Jaeger's sexual relationships***

220.   The Nearpass Report states that Jaeger only had one relationship with a UR student, Marshall; that the relationship was consensual; and that Marshall stated that Jaeger had no direct effect on her education. Nearpass omitted to say, however, that Marshall felt pressured to stay in the relationship; that she would have left it sooner had Jaeger not been a professor in her department who exercised control over a larger network of graduate students that were significant for her education; and that after leaving Jaeger, he continued to pursue and pressure her (even sending her unsolicited photos of his genitals), Marshall had given up educational opportunities and avoided instruction from him, despite her supervisor's suggestion, in order to avoid interacting with him.   Instead of reporting what was in fact a complex relationship based on an imbalance in power that did have a harmful effect on Marshall's education, Nearpass presented a tidy oversimplification that allowed her to find no technical violations of the student-faculty relationships policy by Jaeger.   This is a pattern found elsewhere in the Report.   The following paragraphs set out multiple examples.

221.   One is the Report's handling of Jaeger's role in the admission of Olivia Owens to BCS.   They were sleeping together when she was admitted, which Jaeger did not tell the BCS admissions committee.   Nearpass simply states that Jaeger could not have been on Owens's admissions committee because he was not yet a BCS professor at the time that she applied.   But this is untrue.   Jaeger had not moved to Rochester yet, but

he was employed by UR, interacting with prospective students, representing the University, and recruiting students to work in his new lab after he officially accepted his position in July 2006.

222.    While recognizing it was difficult for Nearpass to get to the bottom of whether two people engaged in a sexual relationship if neither of them wished to speak about it, the Nearpass Report acts as if her failure to confirm that such a relationship occurred was proof that it did *not* occur.  For example, Aslin expressed concern about the visiting graduate student, Crawford, who had stayed with Jaeger and his partner, Kurumada, in 2015, discussed in paragraph 212 above, who was clearly upset and frequently crying during her visit. Jaeger and Kurumada denied that anything inappropriate happened with the student.  Satisfied with a denial from the accused, Nearpass did not bother to contact Crawford.

223.    Similarly, Nearpass sidestepped the fact that when Jaeger first started his relationship with Kurumada, she was herself a graduate student. She was taking classes from Jaeger at an LSA institute at UC Berkeley alongside his own UR graduate students. As mentioned above, his UR graduate students had to listen to Jaeger and Kurumada having loud sex in a shared house shortly after they first met. Nearpass did not recognize that although BCS senior faculty and UR administration saw Kurumada as a "partner hire" when she joined BCS, graduate students saw her as a recent peer and Jaeger's latest conquest, not a leading academic.

224.    Nearpass's claim that Gordon did not experience a hostile environment is undercut by her own interview notes, which state that Gordon "knew about [Jaeger's] relationships with graduate students (she knew this coming into the department) and that

made her want to establish firm boundaries with him from the outset," and that she had to switch advisors because "[Jaeger] was giving her way too much anxiety due to lack of boundaries." This was absent from the Report.

225.   The Nearpass Report acknowledged that Rogers avoided working with Jaeger because of his sexual misconduct with students. It concludes, however, that "the vast majority of current and former students and post-docs interviewed did not support the suggestion that Jaeger's past sexual relationships with [Marshall] and [Owens] created an environment that was hostile, or even off-putting, to women." But the Report did not say how many "current and former students" Nearpass had interviewed to assess what constituted a "vast majority." Moreover, this conclusion (1) assumes that Jaeger's past sexual relationships with Marshall and Owens were the *only* causes of the hostile environment he created at BCS and (2) glosses over the accounts of at least six women who told Nearpass that Jaeger's sexually predatory behavior had indeed caused them to avoid him in BCS, including Kidd, Andrews, Rogers, Gordon, Bixby and Evans.

226.   Had Nearpass interviewed all witnesses readily available to her and suggested by Aslin, she would have known that three additional women – Hanson, Kramer and Jackson – also avoided Jaeger due to his repeated harassment. In fact she chastised Aslin for providing her with multiple potential witness names, which he had learned from various members of BCS and conveyed to her so she could properly investigate. Nearpass's report turned this upside down, stating that these names were the result of "widespread speculation by Aslin, Cantlon and others..." It was Aslin's duty to provide Nearpass with the full range of reports he had received about Jaeger so she could do her job properly, which was not "speculation" on his part. Because Nearpass did not

interview all the people whose names he had relayed to her, she was not in a position to dismiss the reports as "speculation" in any event.

227.   The Nearpass Report states that some students noted non-sexual reasons they did not want to interact with Jaeger including that he made fun of people and was "a jerk, crass and [had] cruel sense of humor..." It concludes that Jaeger simply pushed boundaries with everyone and this was why so many students were uncomfortable around him. This is another oversimplification that leaves out his especially crass and prurient behavior towards women.  Several witnesses told Nearpass that Jaeger liked to make inferiors feel uncomfortable and was skilled at pinpointing students' vulnerabilities so he could pick on these vulnerabilities.  With women, he would use sexually explicit language, discuss their bodies, and behave in an overly familiar manner, which did indeed make them uncomfortable. That Jaeger also behaved badly toward some male students does not excuse the fact that he identified and preyed upon women's vulnerabilities based on their sex.

228.   Finally, the Nearpass Report did not acknowledge several incidents reported to Nearpass by Kidd in which Jaeger had Kidd pick him up from his sexual liaisons at conferences or pressed her to pimp for him by arranging meetings between him and other women he wished to have sex with, including a prospective student and a colleague's partner. It also did not acknowledge that Jaeger told Kidd about the taste of her fellow student's vagina and wanting to pull the hair and suck the lips of some other fellow students.  It also tried to contend that Jaeger's misconduct was all in the past. Until the EEOC complaint was filed in September, however, and possibly beyond, Jaeger

was still crashing graduate student parties at conferences and smoking marijuana with students.

***Nearpass shows bias in dismissing Kidd's testimony as unreliable***

229.    When interviewing Newport, Nearpass said that she had not found convincing evidence that Jaeger had broken University policies. Newport was surprised and asked how Kidd's testimony, which stated that Jaeger pried into Kidd's sex life, talked about sex constantly and even invited men to stay the night with Kidd against her wishes, did not prove that Jaeger had harassed her contrary to UR policy. Nearpass said that Kidd's testimony had been largely discarded because she was reported by others to be "unreliable." Newport replied that she had always found Kidd to be reliable and trustworthy.

230.    Kidd is now an Assistant Professor at UR and a highly respected member of BCS.  That a UR lawyer would dismiss Kidd's testimony so readily and indeed "throw her under the bus" by bluntly describing her as "unreliable" shows the lengths to which UR was prepared to go to insist on a version of reality where Jaeger was blameless and the hostile environment women complained about at BCS was a fiction.

231.    To explain her determined disregard for Kidd's information, Nearpass describes it as not credible for the following reasons:

    a.    Jaeger denied every incident Kidd had alleged;

    b.    Other witnesses, whom she does not name (even by anonymous witness number), called Kidd's credibility into question;

    c.    Kidd only complained about the alleged incidents eight years later;

    d.    Several witnesses noted that Kidd "participated freely in the group conversations where Jaeger said things she now objects to"; and

e.   Jaeger had not started as a professor at UR when Kidd was interviewing at UR and so the events she described about her interview could not have happened.

232.   These reasons collapse upon inspection, and are a striking example of bias or incompetence in Nearpass's investigation.

233.   With respect to (a), of course Jaeger would deny that he sexually harassed Kidd and others. The incidents Kidd alleged are egregious and he would do whatever he could to frame them in an acceptable way.  Kidd offered tangible proof, Facebook messages with Jaeger, to confirm her account of his behavior; Nearpass refused to see them.

234.   With respect to (b), the origin of the claim that Kidd is not credible was Jaeger himself, who spread this defamatory portrait of her throughout BCS and more widely after she cut off contact with him.  At a conference in 2009-2010, for example, a student from another university who knew the BCS group noticed that Kidd was not socializing with Jaeger or BCS students and asked Jaeger about it. Jaeger replied that Kidd was bitter over their past relationship. This student left with the impression that Kidd had been romantically interested in Jaeger, that he had rejected her and she was upset about it.  In reality, Kidd avoided Jaeger because he had sexually harassed her for years and then undermined her reputation to cover his tracks.

235.   With respect to (c), Kidd had in fact complained to many people about Jaeger throughout her time at BCS.  Jaeger had told her that the department's leadership knew and approved of his activities, so it is not surprising she did not keep complaining to them.

236.   With respect to (d), Kidd never expressed approval of sexual harassment or a hostile working environment.

237.   With respect to (e), Nearpass was flat wrong to assert that Jaeger had not started at UR and so could not have interviewed Kidd or participated in recruiting during summer 2007.  It is incontestable (and easily proven in UR records) that Jaeger was hired in July 2006 and had been working as an Assistant Professor in Rochester from January 2007.

238.   Nearpass's Report thus became just one more vehicle for advancing Jaeger's "gaslightling" strategy against Kidd, with the happy result for the University that both Jaeger's misconduct was obscured and the University's liability for it was diminished.

239.   Although the most detailed evidence to Nearpass of Jaeger's predatory behavior came from Kidd, she was far from the only former student or post-doc to complain that Jaeger had persistently overstepped sexual boundaries with women in a way that created a hostile environment widely recognized as such at BCS.   See paragraphs 220, 224, and 225 above.

**The Nearpass Report's main conclusions were knowingly or recklessly false**

240.   In concluding that many of Aslin and Cantlon's concerns about Jaeger's behavior were unfounded, Nearpass made multiple false or misleading statements:

   a.   *There have been no previous complaints about Jaeger engaging in sexual harassment.*
        This is false. Bixby, Andrews, and Kidd had all complained of behavior amounting to sexual harassment in 2013 to DeAngelis.  He knew at the time that other witnesses were willing to speak to him

about their own experiences but he did not contact them.  DeAngelis
and other BCS professors witnessed sexually harassing behavior by
Jaeger themselves and did nothing about it.

b.  *Jaeger's sexual behavior in the field appears to have been vastly
overstated.*

Remarkably, Nearpass concluded that there was not enough evidence
to corroborate Jaeger's sexual relationships outside of UR – after
refusing to collect such evidence. The Report states "Whether or not
these relationships/encounters occurred with non-UR students or
faculty is well outside the scope of this investigation and, indeed,
whether or not these relationships/encounters even occurred is
questionable." Nearpass simply cannot claim that the relationships did
not occur or have been overstated while simultaneously admitting that
she did not investigate them. That she makes such an assertion without
any evidentiary basis is proof of pro-Jaeger bias.

c.  *There is no evidence that Jaeger had a sexual relationship with an
undergraduate advisee in his lab.*

This refers to Darlington, and it skews the evidence to make Jaeger
less culpable.  Although Darlington was not an undergraduate student
when they had sexual intercourse, she had just recently ceased being
an undergraduate, was still receiving Jaeger's advice, working with
him on projects, and seeking letters of recommendation from him.
Nearpass did not question whether Darlington struggled to end the
relationship or whether that relationship affected the environment for
other students.

241.    Additionally, another undergraduate advisee left Jaeger's lab due to sexual

harassment, which Nearpass does not mention.

242.    Nearpass told Newport that while some graduate students said they had

refused to work with Jaeger because of his behavior, others did not, which she took as

evidence in his favor. It is unclear to Newport why the fact that *some* students did not avoid Jaeger negated the hostile environment that other students experienced. Indeed, as described above, at least sixteen women associated with BCS have suffered explicit educational harm because of Jaeger's misconduct. Nearpass' faulty logic asserts that if Jaeger was not harassing *every* student, then he must not be harassing *any* students.

243.    Even if Nearpass was right that Jaeger's sexual relationships did not technically run afoul of the section of Policy 106 that governs student-faculty sexual relationships, he still created a hostile environment in BCS, in violation of other sections of that policy (and state and federal law).  His level of sexual promiscuity with UR students and students from other universities with whom UR students regularly worked or socialized, and his constant prowling for sex with UR students and sexual comments, seriously harmed women's access to education at UR and the work life of his female colleagues.  Nearpass tries to excuse this by describing Jaeger's treatment of students as merely "colorful" and concludes that he merely had a reputation for not maintaining clear personal and professional boundaries, which caused some female students to feel "uncomfortable." She ignores that the behavior which caused so many women, and some men, to avoid him was largely, if not exclusively, sexual in nature.

244.    Nearpass's report was sent to Clark, then the Dean of the School of Engineering and Applied Sciences and Senior Vice President for Research, now Provost and Senior Vice President for Research. On June 2, 2016, Aslin and Cantlon received a two-page decision letter from Clark endorsing and reiterating the main points of the Nearpass Report, including several false statements.

*Aslin and Cantlon appeal Provost Clark's decision*

245.    On July 15, 2016, Aslin and Cantlon appealed Clark's decision on all three available grounds: Nearpass did not consider all evidence available to her; she excluded relevant evidence from the report; and she mischaracterized evidence to obscure Jaeger's patterns of misconduct. The appeal was due to be decided by Dr. Mark B. Taubman, the Dean of the School of Medicine and Dentistry, because Dr. Peter Lennie, then Provost, recused himself at Aslin's request due to Lennie's past involvement in BCS and his friendship with Aslin.

246.    After Jaeger received Clark's outcome letter conveying the verdict of the Nearpass Report, he began telling people in BCS that he had been exonerated and that the allegations against him were lies that had been made up by witnesses, in particular by Kidd, defaming her once more to her colleagues in BCS and the wider science community.  No UR administrators intervened.

247.    Cantlon and Aslin knew Jaeger's claim that he had been totally exonerated and that Kidd had invented the allegations against him mischaracterized Nearpass's findings. However inadequate Aslin and Cantlon felt the Nearpass Report to be, they knew it had verified a number of allegations against Jaeger – that he had had a sexual relationship with at least one BCS graduate student, that he had an undisclosed sexual relationship with a graduate student just prior to her admission to BCS, that he liked to push boundaries with students, and that some aspects of his behavior had been found to be inappropriate. Furthermore, they had decided to appeal the outcome because they knew that important evidence had been excluded or mischaracterized. The Plaintiffs felt that BCS faculty should be aware that an appeal was underway on this basis.

248.    On July 17, 2016, Bradford Mahon, a Plaintiff and at the time an Assistant Professor at BCS, spoke with another BCS faculty member.  This faculty member had already heard about the investigation and had been told, on information and belief (Fed. R. Civ. P. 11(b)(3)) by his friend Jaeger, or another friend of Jaeger's, that the complaint had been "all about Kidd," that she was unreliable, and that her attack could be explained because she had been in love with Jaeger. This faculty member had also been told that the BCS faculty who had complained about Jaeger did so not out of genuine concern for students but out of retribution because they had not prevailed in a recent hiring decision where he was on the other side.  These claims, which originated with Jaeger, were false.

**Nearpass defames Kidd, arming Jaeger with a tool to continue his own defamation of Kidd**

249.    When Nearpass interviewed Newport as a witness, Nearpass said that several witnesses, whose names she did not disclose, had questioned Kidd's credibility. In doing so, Nearpass revealed the identity of a witness (Kidd) to another witness (Newport) and also disclosed that Kidd's credibility had been questioned.  As discussed above, her Report formally described Kidd as not credible.

250.    That Nearpass characterized Kidd as either a liar or essentially unhinged damaged Kidd's reputation, and was also retaliation for Kidd's participation in making a protected disclosure to UR.  Neither Kidd nor the complainants, Aslin and Cantlon, had shared Kidd's testimony to Nearpass with other faculty members.  Nevertheless, there were now stories circulating in the department that Nearpass had judged Kidd to be not credible. Any repetition or escalation of this false trope was wrong and defamatory, and the end product of Jaeger's long campaign to diminish her.  But now this defamation was

receiving the imprimatur of a senior University lawyer. Jaeger was one of the few people in BCS who had been allowed to see the Nearpass Report, and these stories about its contents started shortly afterwards.  Jaeger's obvious motivation to discredit Kidd's testimony made him the prime candidate for the source of these harmful rumors.

251.    The Nearpass Report referred to every witness anonymously except for Kidd, who was named expressly. Consequently, Kidd's involvement was revealed to anyone who has read it, and has obvious harsh implications for her reputation among the UR administrators making decisions about her tenure and career.  By naming Kidd and calling her unreliable in an official report, with no proper basis, Nearpass defamed Kidd, gave Jaeger ammunition to defame her further with her colleagues, which he did, and retaliated against her for complaining about Jaeger.   Because of this, Kidd filed a complaint with Dean Culver on July 20, 2016.  An outside lawyer, Cynthia Curtin, was hired to investigate (see Paragraph 262 *et seq*. below).

## G.    *Retaliation against plaintiffs*

### *The July 26, 2016 memo by Deans Lennie and Culver gives official support to Jaeger and retaliates against Plaintiffs*

252.    After Cantlon and Aslin had filed an appeal and Kidd had filed her retaliation complaint, Plaintiffs were concerned that the hostile environment at BCS might even get worse, and were disappointed that the General Counsel's office seemed to prioritize keeping a lid on a potential scandal over protecting students at BCS.  Plaintiffs therefore discussed with their colleagues how to counter Jaeger's accusations that the complaint was only about Kidd and that Kidd was a liar, while still keeping the contents of the Nearpass Report confidential. The subset of Plaintiffs who had originally

collaborated with Aslin and Cantlon (Kidd, Piantadosi, Mahon, Hayden, Newport) on how to address Jaeger's sexually aggressive behavior and its consequences in BCS already knew a lot about Jaeger's illegal conduct. Indeed, they had provided Aslin and Cantlon with witness names and specific incidents for Nearpass to investigate. This group only discussed the investigation with other BCS colleagues when it was clear that UR would take no action to rein Jaeger in, or to protect witnesses, including Kidd.

253.   University administrators did not like that Plaintiffs were continuing to act as if the Nearpass Report's conclusions had not resolved the Jaeger matter for good.  On July 26, 2016, Deans Lennie and Culver sent a memo to all BCS faculty, ostensibly to assert the importance of confidentiality in the face of the kind of concerns raised by Plaintiffs.   In reality, the memo chastised Jaeger's critics and praised the Nearpass Report.  It stated that the Jaeger investigation had been conducted by experienced and impartial personnel and criticized the faculty for "gossiping" and said they should not "spread rumors or information that they have heard from others," which on its face sounds reasonable, but in effect was an attempt to shore up Jaeger's position.  The memo, like Nearpass's report, dismissed Cantlon's and Aslin's complaint as mere hearsay. But it was precisely because Aslin and Cantlon had not themselves been directly harassed by Jaeger themselves that they asked the University to conduct a serious investigation.

254.   The July 26 memo was aimed at silencing and retaliating against Aslin, Cantlon, Kidd and those who agreed with them that Jaeger was hurting BCS.  It did not criticize Jaeger, who had been spreading the idea advanced by Nearpass that Kidd was not credible.

255.    Indeed, Jaeger had been told by DeAngelis and by Susan Wormer from the UR Counsel's Office that he *would* be able to discuss the case to "clear his name" after the Nearpass Report was issued, the opposite of what Plaintiffs were told.  Jaeger seized the opportunity to boast to his students and lab that he had been cleared of any wrongdoing, and that the complainants had simply made a big deal out of nothing.

256.    If BCS faculty were unsure whom to believe, the July 26 memo showed that the administration supported Jaeger, not the Plaintiffs. They were portrayed as hypocritical gossips and troublemakers. This harmed the Plaintiffs' reputations and also demonstrated that the outcome of their appeal was predetermined.

257.    On August 15, 2016, Aslin and Cantlon received a response from Dean Taubman to their appeal of Dean Clark's decision letter upholding the Nearpass Report. Taubman's letter stated that "the purpose of the appeal...is not to have a complete re-review of the facts and conclusions. It is not my role to second-guess the investigator's conclusions or Provost Clark's findings."  In effect, he washed his hands of responsibility for assuring the accuracy of the Nearpass Report.  Later in a BCS faculty meeting to discuss the complaint, UR General Counsel Gail Norris stated that the entire purpose of the appeal process is to catch errors, but Taubman's letter made clear he did not even try to do that.

258.    Taubman appears to have relied entirely on Nearpass's judgments. He did not deal with Nearpass' strange decision to exclude Kidd's testimony.  He cited with approval that Nearpass interviewed 31 witnesses, but there is no way to know how many

of them were Jaeger's supporters, whether they were relevant or credible.[44]  He could not have known whether Nearpass spoke to the women who were most affected by Jaeger such as Hanson and Jackson, whom she did not contact.  Nor could Taubman know the way Nearpass asked questions of the witnesses, which several portrayed as biased in favor of exonerating Jaeger.

259.    Taubman's cursory response made clear that the appeal process, like the original investigation, was not a serious engagement with how Jaeger's long course of sexually predatory behavior had hurt female students and the learning environment in BCS, but a fundamentally political effort to find Jaeger and the University blameless.

260.    By the time of the appeal, Clark (who as Dean made the original decision endorsing the Nearpass Report) had become Provost. As Chief Academic Officer for the University, the Provost was in important respects Taubman's supervisor, so for Taubman to endorse Aslin and Cantlon's appeal would have meant contradicting the conclusions of his new boss. This is one of many conflicts of interest among the parties handling this complaint.  Indeed, the entire harassment investigation was conducted within the Office of University Counsel, whose interest in protecting the reputation of the University and their ultimate superior, President Seligman, is self-evident.

261.    The Plaintiffs worried that the University's decision to be inert in the face of Jaeger's pervasive misconduct sent a message to students that harassment was the norm and complaining about it was perilous. Plaintiffs feared that the only result of their efforts was that the environment in BCS was even more hostile to women, because now Jaeger's actions had been officially endorsed.  Kidd and Piantadosi met with DeAngelis

---

[44] The Special Committee recently stated that its lawyers had spoken to over 150 witnesses, but of course their relevance and quality is known only to them.

on August 19, 2016, to encourage him to investigate Jaeger's potential abuse not just of the section of Policy 106 that regulated faculty-student sexual relationships, but all relevant policies and laws, including those governing sexual harassment and hostile environment, and to publicly support those who had the courage to complain about Jaeger.   DeAngelis said that UR counsel had prevented him from making a public statement about Jaeger's behavior.

**The Curtin Report**

262.    In July 2016, UR hired outside counsel Cynthia Maxwell Curtin, a former Title IX Officer for Syracuse University who specializes in conducting sexual harassment investigations on behalf of universities, to investigate the retaliation complaint Kidd brought after discovering that Nearpass's report had "named and shamed" her.   Curtin issued her report on September 26, 2016 ("the Curtin Report"). Similar to the Nearpass Report, Kidd was not provided a copy of the report nor was she allowed to provide a copy to her lawyers.   Nevertheless, she was allowed to inspect a copy and take notes.

263.    During Curtin's investigation, Kidd wrote to Deans Culver and Lennie and BCS Chair DeAngelis to express her concerns about whether Curtin was truly independent. She was, after all, being paid by the UR administration to investigate the actions of the UR administration. As someone who has worked for universities and whose livelihood is representing universities in sexual harassment investigations, Curtin has an obvious incentive not to find against universities if she wants to get further business.   Lennie replied on August 29, 2016 dismissing each of Kidd's concerns and assuring her that he had every confidence not only in Nearpass, an experienced

investigator, but the objectivity of Curtin, and UR's investigative and disciplinary procedures.

264.   But Kidd's concern was borne out by Curtin's report.   Curtin used wordplay to skirt a central aspect of Kidd's complaint: that Nearpass had portrayed her as "not credible" with no proper basis.   Curtin fudged the question by focusing on whether the witnesses Nearpass consulted had used the precise term "unreliable" (the term Kidd used in her retaliation complaint), rather than the phrase "not credible" Nearpass used. The phrases are essentially synonymous.   Both effectively dismiss Kidd, a highly regarded professor in BCS, as a liar or disturbed.   Before issuing her Report, Nearpass did not give Kidd a chance to rebut this devastating conclusion.   Curtin avoided engaging with Kidd's complaint about this outrageous result by taking refuge in an artificial distinction of her own creation between "unreliable" and "not credible."   Either way, Nearpass defamed Kidd without any rigorous engagement with the facts, and Curtin took no action either to prove or correct this.

265.   Figuring out how Nearpass had reached her conclusion that Kidd was not credible – who gave Nearpass this idea, when, on the basis of what evidence, and how she tested that evidence – should have been an obvious priority for Curtin.   But Curtin, while acknowledging the negative rumors about Kidd's honesty, seemed determined not to chase them back to their source.   For example, her report says one witness "speculated" about Kidd's lack of credibility, but Curtin apparently did not ask this witness where he got his information or why he thought it was true.   On information and belief (Fed. R. Civ. P. 11(b)(3)), this witness was a confidant of Jaeger and a faculty member.   He did not "speculate" about Kidd to Curtin; he spoke as though he had *been*

*told*, by someone with first-hand knowledge, that Kidd was not credible and had been in love with Jaeger.  On this central aspect of Kidd's retaliation complaint, Curtin's report was silent.

266.    Curtin also claimed that although Jaeger had said that the charges against him were "all made up," there was insufficient evidence to show that he meant *Kidd* was their source. However, faculty members – such as the one referred to in the previous paragraph – had been given the impression, almost certainly by Jaeger or a close friend, that most of Aslin and Cantlon's complaint had stemmed from Kidd's testimony. If faculty believed that (1) the complaints against Jaeger were "all made up," and (2) they mostly originated with Kidd, they would have to logically conclude that Kidd was a liar. But Curtin sidestepped this by defining the problem as one of dueling *perceptions* about Jaeger rather than ascertainable truth, which insulated Jaeger, Nearpass and the University from criticism.

267.    However, the Curtin Report did recognize that Kidd and other witnesses had warned Nearpass that they expected complaining about Jaeger would prompt retaliation – and that Nearpass had neither done anything to mitigate this risk, nor followed up with Kidd to explore what kind of retaliation she expected.  Remarkably, in her decision letter adopting the Curtin Report dated October 4, 2016, Dean Culver rejected this aspect of Curtin's findings, but gave no justification or explanation. Curtin also confirmed that Kidd's name was not known to University administrators as a critic of Jaeger and BCS's handling of him until they read her unredacted name in the Nearpass Report – meaning that any reputational damage she suffered in its wake was due to Nearpass and UR putting her name into circulation.

268.    Otherwise, Dean Culver's decision letter reiterated Curtin's strange conclusions – that that the "unreliable" label Nearpass had given to those who complained about Jaeger was somehow not aimed at Kidd; and that there was not enough evidence to conclude that Jaeger had retaliated against Kidd. It also stated that if Jaeger had spoken to other faculty about the Aslin/Cantlon complaint and its outcome (breaching the confidentiality the administration had been seeking to enforce on the Plaintiffs), it was in defense of his own reputation, not out of a desire to retaliate against Kidd, and was thus acceptable.  Kidd could not believe that Jaeger was allowed to call Kidd a liar in order to advance his own reputation and that UR would support him; and additionally, that she was supposed to maintain silence while Jaeger did not have to.

269.    Kidd appealed this decision on October 31, 2016, expressing concern that UR's handling of the Jaeger investigation and her subsequent retaliation complaint would deter future victims from coming forward. The University rejected this appeal too.

## H.    *Plaintiffs seek help from multiple University officials*

### *A group of students complains about Jaeger, and the University is again unresponsive*

270.    On July 12, 2016, Bixby met with Dean of Graduate Studies Wendi Heinzelman ("Heinzelman"). Bixby expressed concern about how the investigation into Jaeger was handled. Heinzelman recommended that Bixby meet with Dean Culver who would be better positioned to incorporate the criticisms into University policy. Bixby emailed Dean Culver five times in August, September and October trying to arrange a meeting.  Culver's office was either nonresponsive or cancelled meetings. Bixby was unable to meet with Culver until October 25. During that meeting, Culver told Bixby that

she did not want to hear what Bixby had experienced with Jaeger because she had to remain neutral, and provided no support.

271.    On July 23, 2016, Bixby wrote to Title IX Coordinator Levy expressing concerns about UR's policies for dealing with student-faculty relationships and sexual harassment training.  Levy did not respond.

272.    After the University's investigation of Jaeger ended with the Nearpass and Curtin reports which essentially ratified his actions, some women were provoked to action. On August 23, 2016, five current and former students and post-docs, including Bixby, sent a letter to DeAngelis and Deans Lennie, Culver and Heinzelman, which stated:

> Dear University of Rochester Administration,
>
> I experienced and/or witnessed harassment and inappropriate sexual comments from Florian Jaeger during my time in the BCS department. His behavior created an environment that adversely affected my professional development, including missed educational opportunities at courses/workshops he led, missed networking with my peers at social events he attended, and/or missed academic collaborations with his advisees.

273.    In response, the University yet again worked to minimize the seriousness of the multiple complaints being lodged against Jaeger.

274.    First, UR effectively ignored the letter. No one formally responded for a month until Bixby followed up with UR's Title IX Coordinator, Morgan Levy, who then sought to confirm with Bixby that she did not intend it to be a formal Title IX complaint, which she discouraged Bixby from filing. She had previously told Bixby that for UR to agree that the environment Jaeger created was bad enough to meet the definition of

"hostile," graduate students would have to be leaving BCS in order to escape him – which is not the proper legal standard.

275.    Levy then emailed the other signatories of the letter. Andrews received Levy's email during a very busy time and it got lost in the fray; Levy did not contact her again.   Levy told Hanson that her complaint was unlikely to change Nearpass's conclusions – essentially a warning that she would waste her time by coming forward. UR did not formally respond to any of the other signatories of the August 2016 letter.

276.    Bixby then attempted to meet with UR administrators to raise her concerns not only about Jaeger, but also the obstacles she had encountered while navigating UR's complaints processes.  Bixby eventually met with Deans Lennie, Sturge-Apple and Culver, who each listened but took no action and offered no support.

277.    Bixby thereafter confided in Piantadosi that she was upset about how UR had handled her complaint.  Piantadosi wrote Culver, Lennie, and University General Counsel Gail Norris on January 5, 2017, criticizing Levy's handling of Bixby's complaint. Piantadosi and the other Plaintiffs pressed the administration to take some genuine action to support the students and not hide behind what they considered superficial and defensive responses from UR's attorneys.  Norris responded that she would coordinate with DeAngelis about scheduling another meeting to discuss the issues, but a meeting was never scheduled.

### *Faculty reach out repeatedly to UR administrators for help in fixing a broken system*

278.    On August 26, 2016, Newport spoke to Dean of Faculty (former Provost) Lennie.  She shared what her former students had told her about Jaeger's sexual

misconduct and unprofessional behavior. Lennie told Newport that he took six pages of notes during their call. He promised to get back to her.   After receiving no reply, Newport followed up with Lennie on September 9, 2016. On September 12, 2016 he replied that he had not yet found a way forward. Again he said he would be back in touch, but never was. When Newport followed up a few months later, he did not respond.

279.    On September 5, 2016 Aslin wrote to Lennie expressing concern about the effect that UR's inaction about Jaeger would have on BCS and UR more broadly. Aslin told Lennie that he would not be able to stay at UR if it continued to ignore the problem. Lennie told Aslin he would speak to the Faculty Senate but gave no response to the main topics of the letter.

280.    On September 7, 2016, Bixby met with Dean Lennie and Dean Sturge-Apple. Lennie asked Bixby not to tell him any of the details of what happened in BCS. When Bixby raised concerns about conflicts of interest in the investigative process, Lennie dismissed this concern outright.

281.    On September 12, 2016 and October 12, 2016 Aslin and Cantlon wrote to President Seligman asking to meet. They did so on October 26, 2016.  Aslin and Cantlon expressed detailed concerns about how Jaeger had been handled. Among other things, they told him that they believed Nearpass's investigation was too narrow and ignored the hostile environment Jaeger had created, for example that students were trying to learn statistics on their own rather than deal with him. They also thought the Counsel's Office had an inbuilt conflict of interest when it investigates wrongdoing that might embarrass the University.  During this meeting, Seligman teared up, told them about his graduate student daughter and said he would be horrified if sexual harassment happened to her.

He vowed to make a statement to the department to address the consequences of Jaeger's misconduct, either himself or by surrogate, and to get back to them with a response to their concerns.  He never did.

282.    On November 1, 2016, Aslin met with University Intercessor Lynnett Van Slyke, who is a kind of ombudsperson responsible for promoting good community relations for the University.  Van Slyke told Aslin that the only reason the Jaeger investigation had gone on as long as it had was because of Aslin's stature as a member of the National Academy and former Dean.  She asked Aslin if they could "cut a deal" that would satisfy Aslin so that everyone could move on.  Van Slyke's admission and request indicated that UR was approaching this matter not fundamentally on its merits or out of concern about how women were being treated in BCS, but to solve a political problem with an important faculty member and minimize controversy. That the Intercessor had said out loud that Aslin had received special treatment reinforced his concern that UR's system for handling sexual harassment complaints was not fit for purpose, since by definition most complainants would not be senior male professors with international reputations.  Aslin told Van Slyke her deal-making strategy was morally bankrupt and emphasized that the first step to solving this impasse was for Jaeger to admit what he did was wrong.

283.    Apparently hoping the whole problem would go away, the University pressed the Plaintiffs to reach an accommodation with Jaeger rather than the other way around.  In late fall 2016, DeAngelis recommended to Aslin that he take the initiative to reconcile with Jaeger because they were colleagues in the same department and it was time to get back to normal.  UR no doubt hoped that the Plaintiffs had grown tired of

voicing their opinions to no avail and would relent. However, as Aslin told Jaeger directly, he was unwilling to condone Jaeger's predatory and illegal behavior toward students even if UR believed Jaeger had not technically violated its HR policies, and even if UR was willing to attack Aslin's own reputation for taking such a firm stance. Aslin believed that Jaeger's misconduct was persistent, unethical, had prevented female students from having equal access to educational opportunities, and sullied the reputation of a department he had spent two decades building. He believed that UR's failure to do anything about Jaeger's misconduct was a grossly unethical mistake; but that Jaeger himself could still put matters partly right by apologizing.  If not, Aslin told him in a letter dated October 29, 2016, they would not be able to maintain a relationship.

284.    When Jaeger finally sent a form of apology to BCS in December 2016, he sent it only to faculty, not to any students, and did not acknowledge that he had harassed or bullied women. He only apologized for his part in "what [the] department has been going through." The students who had complained or come forward as witnesses were left unsupported and in the dark.

## I.     *Further retaliation against Plaintiffs*

285.    In fall 2016, Kidd and Piantadosi (who were married) met with DeAngelis to discuss the prospect of leaving UR because of the retaliation Kidd had faced – specifically that Nearpass had named her in her report and to other witnesses, and that Jaeger had spread lies about her that were now widely believed in BCS. They expressed concern that the University had not done enough to guard against future retaliation, just as Curtin had concluded that UR had not done enough initially. They told DeAngelis that

they feared Jaeger would be involved in their future performance evaluations and that he might become chair of BCS. DeAngelis promised them that Jaeger would not be involved in either of their evaluations and that he was never going to become chair.

286.    Contrary to this promise, DeAngelis permitted Jaeger to participate in Kidd's and Piantadosi's spring 2017 performance reviews.  He kept Jaeger's participation secret from them, however, even after Cantlon suggested he had an obligation to tell them based on his previous promise and Jaeger's obvious conflict of interest.

287.    Jaeger used the reviews as a further opportunity to retaliate. He spoke in support of a suggestion from another faculty member that Kidd's evaluation should contain a criticism that most of her publications so far were collaborative which detracted from her independence as a researcher.  Kidd had achieved many successes in a diverse set of collaborations including a large joint grant on children, primates, and robots, and prestigious collaborative publications including recent ones in the *Proceedings of the National Academy of Sciences* and *Neuron*. DeAngelis warned Kidd that her letter would contain this criticism, but did not tell her that Jaeger spoke in support of it. Kidd asked whether she should change her approach and collaborate less, because she saw her ability to work across disciplines as one of her primary strengths. DeAngelis said no, she should ignore the comment. Jaeger was thus allowed to introduce a nonsensical criticism of Kidd into her official record—one with which even the department chair did not agree.

### Clark's November 29, 2016 letter to BCS backing Jaeger and criticizing Plaintiffs

288.    Not only did UR refuse to publicly denounce Jaeger's sexual misconduct, it publicly backed him. On November 29, 2016, Provost Clark sent a memo in support of Jaeger and the UR investigative process that had cleared Jaeger. The memo condemned

the Plaintiffs, saying that Jaeger had been the target of a "wealth of rumors" and "in some instances *misinformation*" (emphasis added), which suggested that the Plaintiffs had deliberately spread false information.   It stated that Jaeger had wanted to share the Nearpass findings with the faculty months ago, suggesting that he was the honest and transparent party, not his detractors.

289.   Clark's letter went out of its way to praise and defer to Jaeger, stating:

> I affirm that Jaeger is a valued member of our faculty. He has achieved tremendous academic success since his arrival in 2007, including being promoted with tenure in 2013 and his promotion to full professor in 2016. We look forward to continuing to support Jaeger, as we do all of our faculty, and to Jaeger's continued success as teacher, researcher and scholar here at the University of Rochester.

290.   Any reasonable person reading this memo would conclude that Jaeger was innocent and that the Plaintiffs had been lying or seriously delusional. This memo harmed the Plaintiffs' reputations in the eyes of the entire BCS faculty and turned senior faculty in particular against the Plaintiffs.

291.   The memo also stated that the University, with Jaeger's consent, would make a summary of the Nearpass Report available to any faculty members who signed a confidentiality agreement.

292.   When interested faculty members did view the summary, they were given a packet of materials. The packets differed for different recipients, according to a system decided secretly.   Some also received the private letter that Aslin had written to Jaeger in response to DeAngelis' suggestion that the two reconcile.   Aslin wrote this letter as a last ditch effort to get Jaeger to take responsibility for his actions and to explain why he did not feel he could ethically reconcile with Jaeger otherwise.   The letter was the

culmination of a long process, and was in no way a threat to Jaeger, but simply a statement of why Aslin could not let everything "go back to normal." Yet the University provided this private letter, to some faculty but not all, in support of a narrative that Aslin was a bully and Jaeger his victim.

293.    Aslin's letter to Jaeger was sent well after the investigation and appeal process had concluded and was irrelevant to the University's findings about Jaeger. The University did not ask Aslin's permission to give it to others in this way, or even notify him that it was doing so. There is no other fair interpretation but that the University included it in the packet with the Nearpass Report, given only to specially chosen faculty, to discredit Aslin and his analysis of Jaeger's misconduct. This was retaliation against Aslin, who in good faith had brought a serious sexual harassment complaint.

294.    UR's decision to back Jaeger and cast doubt on the credibility of the Plaintiffs came from the top. President Joel Seligman called Dr. Jeffrey Runner, then Chair of Linguistics, now Dean of the College (responsible for undergraduate education), into his office. Bixby had told Runner in 2013 that Jaeger's behavior was limiting UR's ability to attract the highest quality female graduate students, and when Aslin and Cantlon filed their complaint in 2016, he seemed concerned about their allegations. But Seligman assured Runner that Jaeger was fine and that the graduate students who had complained about him had witnessed nothing. This is consistent with UR's insistence that its own policies and investigations were faultless.

295.    While travelling together for a fundraising trip in early April 2017, Seligman also told the Chair of the Department of Neuroscience, Dr. John Foxe ("Foxe"), that the case against Jaeger was all hearsay and that Aslin had overreacted. Seligman

personally disparaged Aslin and the other Plaintiffs to at least two department heads, Foxe (Neuroscience) and Runner (Linguistics).

### *Aslin resigns*

296.    By early December 2016, Aslin felt he had exhausted all routes within the University to address his concerns about Jaeger's serial sexual misconduct, the University's failure to come to grips with it, and the likelihood that as a result, students experiencing harassment would be reluctant to come forward. The administration's failure to publicly condemn Jaeger's unlawful actions was one thing, but its overt support of Jaeger after so many witnesses had shared their toxic experiences made it impossible for Aslin to remain in an institution that he thought had become complicit in Jaeger's predatory behavior and its cover-up. Aslin made a last attempt to explain his views in a letter to President Seligman and Provost Clark on November 30, 2016, responding to Provost Clark's memo that extolled Jaeger and denounced the Plaintiffs. Aslin's letter described his concerns about Title IX and Title VII violations by UR during Jaeger's years-long sexual escapades as well as the current hostile environment in BCS. He also described his fears for the reputation of UR, to which he had devoted most of his career.

297.    At a meeting with BCS faculty on December 2, 2016, Deans Lennie and Culver dismissed Aslin's concerns, defended Nearpass and UR's sexual harassment policies, and side-stepped the Plaintiffs' challenging questions.   At the end of the meeting, Aslin announced his resignation from BCS, after 32 years of highly regarded

service at UR. He confirmed his resignation in writing in a letter to Dean Culver and BCS Chair DeAngelis.[45]

### *Other attempts by Plaintiffs to find common ground with administration are ignored or dismissed*

298.    Cantlon wrote to Provost Clark on December 6, 2016 to express her disappointment with how the complaints against Jaeger had been handled. She knew the disciplinary procedures against Jaeger had ended, but her concerns about the climate in BCS and at UR more broadly remained. In particular, Cantlon raised concerns that she would no longer know what to do if a student came to her with a sexual harassment complaint. She could not in good faith recommend they report it to the administration. She feared that students would be subjected to biased, victim-blaming procedures designed to sweep problems under the rug and might even face retaliation from the perpetrator and UR.  Provost Clark merely replied "I am acknowledging receipt of your letter." He offered no substantive reply.

299.    On January 3, 2017, Kidd and Piantadosi wrote to Deans Lennie and Culver outlining problems they had experienced in the university investigative process and how its policies are implemented. Neither Dean replied.

300.    Cantlon, Mahon, Kidd, Hayden, and Piantadosi wrote to Seligman on January 5, 2017 to (1) express their frustration with how the University had handled the investigation of Jaeger and Aslin's resignation, (2) highlight how this had unsettled the women who had come forward to share their experiences with Jaeger, and (3) promote dialogue about how to do better. They asked Seligman for a statement by the University

---

[45] Aslin had been planning to retire at age 70, in 2019.  His disgust and frustration with the way UR handled the Jaeger matter and retaliated against the complainants caused him to resign two years early.

supporting the efforts of Aslin and others to protect students, and for a review of University policies that had been found wanting. Seligman replied on January 10, 2017 stating that he looked forward to meeting with BCS faculty to discuss the future of BCS. No such meeting took place.

### The University steps up its retaliation campaign against the Plaintiffs

301.    Aslin's resignation raised the stakes for UR.  He is an internationally respected scientist, the leading scholar at BCS, who had devoted much of his professional life to UR and is widely known as its devoted booster.  For him to depart in this way was a serious rebuke, with dangerous possible ramifications for UR's reputation. Its response was to double down on its strategy of backing Jaeger and undermining his critics, including Aslin.

302.    Dean Culver, Dean Lennie and University Vice President and General Counsel Gail Norris met with BCS faculty on December 16, 2016 to discuss UR's sexual harassment policies and its handling of Jaeger.  For many faculty present, Norris's presentation backfired.  Determined to defend UR's conduct in Jaeger's case, Norris instead cast into question whether UR knew how to conduct any fair investigation.  For example, she said in the meeting that if an investigator can speak directly to someone who allegedly sent an inappropriate email, there is no need to see the actual email.  This nonsensical statement appeared to be in defense of Nearpass's refusal to look at Facebook messages Kidd offered to substantiate her claims about Jaeger's inappropriate conduct.  Norris also falsely claimed that the University had provided support to all of Jaeger's victims, yet no support was provided to Bixby or Kidd.  Norris, Culver, and Lennie also attempted to mislead the faculty, saying that Jaeger had no role in crafting

the University's public message about his exoneration.  DeAngelis later admitted that Jaeger had been involved.

303.    The actions taken by the University to affirm Jaeger's innocence and to condemn the allegations against him as "rumors" and "misinformation" damaged the Plaintiffs' reputations. One faculty member who had seen the summary of the Nearpass findings which included Aslin's letter to Jaeger told Piantadosi that Aslin was "crazy." Another senior faculty member who had been provided with Aslin's letter to Jaeger expressed similar sentiments to Kidd.  Several BCS faculty members told Piantadosi that the Plaintiffs were "crazy." Another BCS researcher told Bixby that Aslin's behavior was "ridiculous."

304.    Jaeger was so certain of the University's backing that he gave out contact information for the University counsel to people who wanted to confirm that he was blameless. He also contacted Dr. William Badecker, Program Director at the National Science Foundation, to say that he had been unfairly persecuted and that the person behind this (Aslin) had resigned from UR because he was wrong. This was false. Aslin resigned because of Jaeger's sexual misconduct, UR's refusal to condemn that misconduct and indeed support of Jaeger's gross mistreatment of students, the ensuing hostile environment, and UR's retaliation against the Plaintiffs.  Aslin heard from several faculty members that Jaeger was meeting with anyone who would sit down with him to complain that Aslin and the other Plaintiffs were bullying him by making false allegations against him.

305.    Jaeger is not the only one who has mischaracterized Aslin's resignation in order to undermine the credibility of Plaintiffs.  After Aslin confided in Neuroscience

Chair Foxe about his intention to leave, Foxe tried to persuade Aslin to stay, telling Cantlon, Mahon and Hayden that he had tried to retain Aslin in the Neuroscience Department instead of BCS but that his attempts were shut down by central UR administration.  Aslin told Foxe that he would not move to Neuroscience anyway despite Foxe's kind offer because he would still be working under a corrupt administration with broken policies.   Since Aslin resigned from UR, however, Foxe has repeatedly told others, including Cantlon, Mahon, and a group of BCS and Neuroscience graduate students, that Aslin did not really resign because of the Jaeger case since Aslin was slated to retire anyway. Aslin had indeed planned to retire, but in 2019, not 2017. Foxe told others that Aslin was planning to move to Massachusetts anyway. Again, Aslin did plan to move to Massachusetts years later – after he retired – to be nearer his family.  Instead Aslin left two years early, costing him lost earnings and, due to the short notice, substantially increased moving expenses.   These misstatements have harmed Aslin's reputation.

### *UR searches the Plaintiffs' private emails seeking to discredit them*

306.    In late 2016, three senior faculty members wrote to Provost Clark to complain about his November 29, 2016 memo, which, despite superficial bows to even-handedness, had backed Jaeger as blameless and disapproved of the Plaintiffs for raising complaints about him.  They thought the memo had accentuated divisions in BCS rather than reducing them and had been tone-deaf.

307.    Before their meeting with Provost Clark, DeAngelis met with the three senior professors. DeAnglis told the professors that UR administrators had given him a stack of emails from the Plaintiffs' UR email accounts proving they had acted

inappropriately in raising the alarm about Jaeger, which he wanted them to know about before they met with Provost Clark.

308.    The University was apparently so angry that the Plaintiffs remained unconvinced by its exoneration of Jaeger that its senior officials decided to trawl through professors' emails stored on the UR server, seeking information to undermine them.  This was done without their knowledge or consent. It is extremely unusual for a university to secretly scan the email accounts of academics seeking "dirt" to use against them in an internal dispute.[46]

309.    The three professors notified about the clandestine email trawl met with the Provost in late 2016 and became convinced that the Plaintiffs, in particular Aslin, had acted inappropriately. They came to this conclusion without having seen any of the allegedly damning emails.   One of the professors said that despite not seeing the evidence, the very fact the University had seen fit to investigate the Plaintiffs' emails persuaded her that they were suspect.  She wrote Cantlon on January 16, 2017, "I was hours away from going to talk with the Provost when I learned of the emails: obviously the administration felt they were of sufficient concern to call Greg's attention to them, and that caused me to feel that the whole faculty should be called on them so that WHOEVER was responsible would just stop.  I can't deny that I was angry and felt that an end had to be put to any efforts at deception and/or vague characterizations that

---

[46] The University's Information Technology Policy permits essentially unlimited searches of faculty emails.  "All…emails, documents, and correspondence prepared by a faculty member, student or employee in connection with his or her job responsibilities are defined as "University Communications" and may be accessed as needed for the purpose of carrying out University Business without seeking prior approval." This definition covers virtually all Plaintiffs' emails relating to sexual harassment by Jaeger and their efforts to get University officials to take it seriously, and to and improve UR policies.  Personal emails may also be searched, subject to approval from senior officers, for various reasons, including "to investigate or prevent a violation of law or University policy," This is a very expansive license to surveil. http://tech.rochester.edu/policies/information-technology-policy/

created inaccurate perceptions." The emails had apparently convinced DeAngelis, wrongly, that he had been "played" by the Plaintiffs.

310. On January 10, 2017, DeAngelis called a BCS faculty meeting and announced that he had in front of him a stack of emails showing "manipulation and deception of faculty members" and the "smearing" of Jaeger. He said the emails showed "definitive proof" that there had been widespread lying, deceit, and manipulation in the complaints against Jaeger. It was clear to everyone present whom he considered responsible: Aslin and Cantlon, who brought the formal complaint, Kidd who was widely believed to be a primary witness in the investigation, plus their supporters who were widely known to be Piantadosi, Mahon and Hayden.

311. In fact, DeAngelis' outburst was completely off-beam. Nothing in any of the Plaintiffs' emails shows manipulation, deceit or smearing. In follow-up meetings, DeAngelis was completely unable to substantiate his accusations. Instead, the emails show that the group regularly discussed the problems created by Jaeger and how they could help the University investigate and solve them. Since the complaint was not brought by Jaeger's student victims themselves, the Plaintiffs had to do research and cross-check in order to bring serious information forward and to avoid inaccurate allegations. When the University gave Jaeger a clean bill of health, the Plaintiffs discussed – among each other, not with outsiders — what they could do to support women and victims in the face of the University's unwillingness to do so. The emails contained criticisms of DeAngelis's passivity in the face of Jaeger's harassing and predatory behavior, but while DeAngelis may have found that personally upsetting, there was nothing underhanded or inappropriate in such criticism.

312.    On a day to day basis, DeAngelis' hostility was largely directed at Cantlon, who was an active presence in the department, rather than at Aslin, whose resignation and physical move out of his BCS office made him a less overt target.

313.    For example, in a meeting on December 13, 2016 to discuss BCS retaining Hayden and hiring Heilbronner (his spouse), DeAngelis chastised Cantlon for her tone – shortly after a senior BCS faculty member had *slammed his fist on the table, shouted at Cantlon, exited the room and slammed the door*.   This faculty member received no reprimand for his tone or behavior.

314.    In a meeting on April 24, 2017, DeAngelis walked over to Cantlon from across the room, stood over her as she sat in a chair and stuck his finger in her face while demanding that Cantlon take responsibility for and apologize to the department for the damage she – not Jaeger – had caused.

315.    The Plaintiffs were excluded from meetings to discuss hiring decisions in BCS. For example, BCS faculty held secret meetings, excluding Kidd, Piantadosi, Cantlon and Mahon, to discuss Heilbronner's candidacy. Later, when another candidate for a role at BCS was visiting, BCS did not grant Mahon a meeting with the candidate even though Mahon had requested one, his research aligned with the candidate's, and he knew the candidate's work extremely well through service on a search committee that had considered him the previous year.

### UR falsely accuses Aslin of bullying Jaeger in the wider science community

316.    At a meeting on March 31, 2017 with Cantlon, Mahon, Kidd and Piantadosi, Deans Culver and Lennie falsely accused Aslin of badmouthing Jaeger to the

organizer of the 2017 Georgetown University Round Table (GURT).  Jaeger had been invited to speak at the conference. However, when several conference participants approached the organizer with concerns about Jaeger's reputation for inappropriate behavior toward female students, the organizer reached out to Aslin (whom he had met once before) by email to collect more information.  Aslin agreed to speak with him by phone out of courtesy.  The organizer explained that conference participants had requested that he disinvite Jaeger. Aslin told the organizer that he could not discuss any details of the case against Jaeger.  He did not discourage a disinvitation, but neither did he encourage it.

317.    UR administrators once more decided to search Aslin's emails to prove their suspicions.  They found the brief emails between Lightfoot and Aslin setting up their phone call and assumed that Aslin had been responsible for Jaeger's disinvitation, whereas Jaeger's own reputation for lewd misconduct had been responsible, and Aslin had been extremely circumspect in what he told the conference organizer.  Once more, UR administrators in their fury to prove Jaeger blameless and punish his accusers, made reckless accusations unsupported by the facts.  This was both retaliatory and defamatory.

318.    An additional aspect of how DeAngelis handled this conference disinvitation with BCS faculty was also retaliatory.  At the January 10, 2017 faculty meeting, he accused the Plaintiffs of harming BCS students' careers because, he alleged, Jaeger's students had their abstracts for the GURT conference rejected at a high rate in response to the Plaintiffs' hostility toward Jaeger.  In fact, Jaeger's students had an average or above average acceptance rate compared to other applicants; and in any event, the abstracts were blindly reviewed, so that the reviewers did not know the identity of the

authors. Nonetheless, one senior faculty member was convinced by DeAngelis' denunciation of the Plaintiffs, saying in the meeting that because their behavior had damaged students' submissions, Plaintiffs' behavior had "crossed the line," and another urged that the Plaintiffs apologize for the "consequences of their actions." DeAngelis either did not check how the abstracts were accepted for the conference before falsely accusing the Plaintiffs of harming student's careers or did so recklessly, thereby causing significant damage to their professional reputations.

319. In reality, students at Georgetown who knew about Jaeger's misconduct approached the conference organizer. One of those students was a former BCS student who was aware of Jaeger's pursuit of young, vulnerable women at conferences and who had personally witnessed Jaeger's inappropriate behavior toward female students when she was at BCS. She told the conference organizers that if Jaeger attended, she would not attend his talk. She expressed concern that Jaeger's presence at the conference would give him access to Georgetown's students. Several other Georgetown students who either knew of Jaeger's behavior personally or who had heard about his misconduct at conferences through informal networks also approached the conference organizer raising similar objections. Supported by a university that took their concerns seriously, unlike UR, these women were able to raise the alarm and were not forced to simply give up educational opportunities in order to shield themselves.

320. After a number of meetings with the Plaintiffs (excluding Aslin) in which they requested to see emails that proved manipulation and lying, DeAngelis was unable to produce any. He told Cantlon, Kidd, and Piantadosi that he was mainly referring to Aslin in his claims of deception, manipulation, and smearing because he said that Aslin

had forwarded DeAngelis's emails to others without permission. He ultimately admitted that he damaged the Plaintiffs' reputations, apologized to them (except Aslin) for his attack on their integrity at the faculty meeting, and wrote in an email that he recognized that some of his statements, which he did not specify, had been unfair.

321.    However, DeAngelis' apology did not extend to Aslin who had been forced to resign from BCS. DeAngelis' angry (but false) accusation against Aslin, which he claimed was proven by email evidence, was persuasive and deeply disturbing to several BCS faculty who had been on the fence in the dispute between Jaeger and the Plaintiffs.   After this incident, the collective attitude in BCS towards the Plaintiffs became much more hostile.

### BCS retaliates against Hayden and Heilbronner for complaining about Jaeger

322.    Hayden joined BCS in July 2011 as an Assistant Professor.  Heilbronner came to UR as a post-doc in Pharmacology and Physiology in March 2012 with the aim of eventually moving to BCS as a faculty member. Because of BCS's history of supporting spousal hires, Heilbronner and Hayden believed that her chances of getting hired at BCS once she finished her post-doc were good. One faculty member told her she just needed to get the right number of publications and the department would back her case.  DeAngelis told Cantlon on several occasions, including by email, that the faculty search in neuroscience was being scheduled around Heilbronner.  DeAngelis had even told Kidd, before she was hired as faculty, that he was confident a position could be arranged for Heilbronner in the future, since Kidd wanted to stay as faculty at UR in part so she could collaborate with Hayden, Heilbronner's spouse.

323.    BCS has a long history of spousal hires.  For example, as part of its effort to retain Jaeger, it hired Kurumada as an assistant professor, even though she had relatively few publications at the time.

324.    In 2015, BCS needed to hire for two positions, one in neuroscience and another in cognitive science. DeAngelis wanted to make sure that the search was well-timed for Heilbronner to apply, so asked her which position BCS should try to fill first. Heilbronner asked him to recruit for the cognitive position first.  That would allow her to spend more time in her current post-doc and finish some publications by the following year, and recover from the birth of her first child by the time the second position opened, in neuroscience, which would be highly suited to her work.  As of early 2016, BCS gave every indication that it planned to hire Heilbronner and retain Hayden. In his annual meeting with DeAngelis in March 2015, Hayden made clear that he would have to leave UR if Heilbronner was not hired.

325.    However, by the time BCS recruited for the neuroscience position in 2016, Hayden and Heilbronner had been associated with the complaint against Jaeger, and DeAngelis and other responsible figures reconfigured the rules to block Heilbronner from getting a job.  First, the search committee was designed to include only faculty members who supported Jaeger rather than include even one of his critics. Second, the search criteria were changed to prefer an area of research that Heilbronner did not do, despite earlier explicit advice to Hayden, communicated to Heilbronner, which she followed, about how to tailor her research to suit the department's interests.

326.    By every other standard, Heilbronner's CV was impressive, and her quantitative metrics (e.g. h-index, number of paper citations) exceeded not only the other

candidates, but four of BCS's junior faculty.  Nevertheless, Heilbronner was not hired. The reason given was that she did not match the area of the search, but this was false.  In the summer of 2017, DeAngelis and other neuroscience faculty sought out and offered a position to a new candidate, whose research did *not* fall into the area Heilbronner was told it had to when she was excluded.  The candidate was a man who had worse quantitative publication metrics than Heilbronner.  For example, he had 10 first or last author publications while Heilbronner had 14 despite being a year younger. Despite this, Jaeger actively campaigned against Heilbronner's hiring and at least five BCS faculty members claimed that Heilbronner was "below threshold" even though she had better quantitative statistics.

327.    The high quality of Heilbronner's work was recognized in August 2017 with a Young Investigator award from the Brain and Behavior Research Foundation, given only to genuine rising stars in the field.

328.    In February 2017, DeAngelis told Hayden (not Heilbronner directly) that Heilbronner did not get the job but that another position might become available to her. However, on March 24, 2017, DeAngelis told Heilbronner that there were no positions of any type available to her in BCS because there was no longer the support for it. DeAngelis told Mahon, "I am dealing with this search the way I have been told to deal with it by my Deans. There is no other way to deal with this outside of this search.... there might be other options after the search but there aren't now." This strongly implied that after their involvement in protected activity, high-level support for Heilbronner's hiring evaporated.

329.     BCS faculty made the following admissions which show that Heilbronner was rejected in retaliation for her association with the Plaintiffs' attempts to address the hostile environment created by Jaeger:

a.   In January 2017, DeAngelis asked Cantlon and Mahon whether hiring Heilbronner would promote "departmental healing."  He asked the same question of Kidd and Piantadosi in March 2017.

b.   On March 24, 2017, DeAngelis told Heilbronner that he could not hire her for an alternative position because she "did not promote department healing," in clear reference to the complaints against Jaeger that the University had decided to contain.

c.   On April 20, 2017, Neuroscience Chair Foxe told Cantlon and Mahon that they should back off complaining because it would help him hire Heilbronner in Neuroscience (as an alternative to BCS) suggesting he would face obstacles with the administration to hiring Heilbronner if Plaintiffs were still actively engaging in protected activity.

d.   On April 24, 2017, a senior BCS professor told Cantlon and Mahon that other BCS faculty were upset about the situation with Jaeger and they "don't want six of you," meaning BCS did not want six "troublemakers" – so evidently some or all would have to be made to leave.

e.   Foxe told Heilbronner that they should let the complaint go. He said that in his wife's field (film/television), men are investigated all the time for sexual harassment but "nothing ever happens to these guys."

f.   In the same meeting, DeAngelis said "That's what happens when you use the department as a political football and break confidentiality. Even if it's legal to talk about your experiences it is going to cause damage and you should expect that." As a senior university administrator, DeAngelis should know that it is illegal to retaliate against people who make protected disclosures.

g.   In an April 26, 2017 meeting, DeAngelis said to Mahon and Cantlon, referring to the private emails he had read from Hayden and Heilbronner about Jaeger, "I think it was really stupid for Ben [Hayden] and Sarah [Heilbronner] to get involved in this stuff while Sarah needed a job."

h.   In the same meeting, DeAngelis told Mahon and Cantlon that he previously had planned on hiring Heilbronner – he "had this," he said – implying that it was the complaints raised about Jaeger's sexist and predatory behavior that cost her the job.

i.   When Heilbronner was considering accepting an alternative offer from the Neuroscience Department in May 2017, Hayden met with DeAngelis to ask what DeAngelis would do to prevent the BCS faculty from retaliating against him further if he stayed at BCS.  DeAngelis said that Hayden and

Heilbronner were "collateral damage," and he should have no expectation of protection.  Hayden and Heilbronner decided they had no future at UR and had to leave.

330.     Aside from Heilbronner's own widely recognized merits as a scientist, the logic of spousal hires made BCS's unwillingness to hire her extremely unusual, confirming that its motive was retaliatory. Over the years, BCS had previously hired seven faculty pairs (a striking number in a relatively small department). Heilbronner's husband, Hayden, was highly valuable to BCS.  He received three NIH Research Grants (R01s), an impressive number for a scientist at this stage in his career and also by UR standards.  He had several high profile publications. He received tenure early. By all accounts, Hayden is someone UR should be trying hard to keep and promote – which is precisely what it did until his involvement with the Plaintiffs.  Then it refused to hire his partner who was a formidable, first-rate candidate in her own right.  This was an obvious signal that he was no longer wanted.  Hayden and Heilbronner necessarily searched for new jobs and secured appointments at the University of Minnesota.

331.     Normally, when faculty members receive outside job offers, UR will attempt to retain them by raising their compensation either in research funding or salary. Hayden announced his Minnesota offer to DeAngelis in November 2016 and provided details in January 2017, but was not offered any retention until May 2017, at the 11th hour. Hayden received an unusually low retention offer of only $150,000 in research funding plus 1.5 years of postdoctoral salary funding, compared to his offer from Minnesota of over $1 million.  This lowball retention offer was retaliatory.  Hayden and Heilbronner have now left UR for the University of Minnesota.

332. Cantlon, Mahon, Kidd and Piantadosi met with Deans Lennie and Culver in March 2017 to discuss their concern that DeAngelis was driving Hayden and Heilbronner out of BCS. They asked Culver and Lennie to intervene, but they both refused. Culver and Lennie said that all of the Plaintiffs needed to "mend fences" in the department – that is, to stop making a fuss about Jaeger or the hostile environment he created – and Culver told Plaintiffs that it was up to them to show the others in BCS that they were not liars – a notion that presumably had emerged from DeAngelis' false claims about the secretly searched emails.

333. In fact, DeAngelis, backed by his superiors, appears to be pushing all of Jaeger's critics out of BCS. In June 2017, Dean Lennie told Mahon and Cantlon that some people in the administration thought the best way to solve the problem was for the Plaintiffs to leave Rochester.

334. Hayden collaborates with both Kidd and Piantadosi, who are married; thus, his departure from UR has made it nearly certain they will leave (a fact they shared with DeAngelis several times before Hayden left for Minnesota). Piantadosi collaborates with Cantlon who is married to Mahon. Hayden's departure from UR will by itself have a negative effect on BCS's productivity, and beyond that will hurt all of the research being done jointly through the easy collaboration the group has established, which DeAngelis, backed by his superiors, has upended. Piantadosi and Cantlon both raised this concern to DeAngelis, who took no serious steps to retain Hayden.

***UR quashes a possibility for multiple Plaintiffs to move to RIT to continue their research collaboration***

335.    Moreover, in May 2017, Cantlon, Hayden, Heilbronner, Kidd, Mahon and

Piantadosi interviewed at the Rochester Institute of Technology with the goal of starting

their own Center for the Origins of Cognition, which RIT officials had encouraged. This

would have allowed all of them to stay together to continue their collaborative research,

and for Mahon to continue research he had spent many years building up at the UR

Medical School.  However, it would have required the continued use of the scanner at the

UR MRI center (which until June 30, 2017 Aslin directed for 14 years). Because it was

purchased with federal funds, the scanner is required to be open to all legitimate

researchers. When RIT officials raised with their UR counterparts the possibility of

needing access to this equipment on behalf of this new center that would employ some of

the Plaintiffs, senior UR administrators said they would charge the Plaintiffs at a rate 2.5

times higher than UR researchers.

336.    Tradition and common practice at UR about MRI access, use, and hourly

fees paid by faculty from outside UR has been to treat them like UR faculty.  That is,

they could schedule time when the scanner was available, pay hourly fees comparable to

what UR faculty paid, and use any of the staff and space of the MRI center, as long as

they did not disadvantage any UR faculty who used it.  The refusal by Dean Lennie to

continue this tradition, which was in force for 14 years, was vindictive and retaliatory:

clearly designed to prevent Plaintiffs from continuing their collaboration at a nearby

competing institution, and to make it harder for them to find other jobs as UR bore down

on them.

## J.     *The problems at BCS are part of a bigger picture*

*UR's blasé approach toward Jaeger's misconduct, its determination to sweep criticism under the rug and then to retaliate against those who dissented from the "party line" reflect the culture established by President Seligman and his inner circle*

337.    The Plaintiffs had brought the misdeeds of Jaeger and the ensuing hostile environment at BCS to the attention of University officials in 2016 believing that those officials were honorably motivated and would want to tackle the problem and protect women students.   After being repeatedly stonewalled, and then having their reputations publicly attacked, the Plaintiffs had to reassess their fundamental understanding of how the University operated.

338.    Joel Seligman has been President of UR for 12 years and has thoroughly put his stamp on the institution.   He is described as extremely ambitious and having "corporatized" UR, expanding fundraising and adding new layers of administrators.   A lawyer and legal scholar (he wrote *The Transformation of Wall Street: A History of the Securities and Exchange Commission and Modern Corporate Finance* and, along with Louis Loss and Troy Parades, the 11-volume *Securities Regulation*, the leading treatise about the SEC), he has sometimes claimed a photographic memory.   He is described by one colleague as "believing he is always the smartest person in the room"; by another as able but arrogant, both unaware and unreflective about his own shortcomings.   Seligman is now making at least $1.3 million a year,[47] approximately double what he was making even just five years ago.   He arranged for the Board to give him the additional title of CEO.   He is an extremely able bureaucratic operator.   One UR employee with extensive experience of working with him says, "he is the type who knows how to stack the

---

[47] University of Rochester 2016 Form 990.

committee to get a majority, and then calls the vote."  For example, when Peter Lennie was up for reappointment as Provost, many faculty and other administrators sent in criticisms, but Seligman falsely insisted that Lennie was overwhelmingly well regarded by his colleagues and reappointed him anyway.  A senior professor says "he has surrounded himself with an entourage of sycophants." He also seeks to control closely the information the Board receives about the University.  For example, he has refused permission for Faculty Senate members to meet the Board unsupervised.

339.    Under Seligman's direction, the University has come to regularly search the emails of people using the UR system without the targets' knowledge or consent. Several years ago, the system was changed at the expense of several hundred thousand dollars.  There were other advantages for the University, but the new system also made it technically easier for administrators to search through emails of UR employees and students.  The targets have included not only the Plaintiffs (whose emails appear to have been reviewed not only by the Counsel's office and BCS Chair DeAngelis in the wake of the Nearpass Report, but also recently by Debevoise & Plimpton lawyers working for the allegedly independent Special Committee), but on information and belief: (1) other UR staff making or thinking of making employment claims; (2) female undergraduates who have notified University authorities they were sexually assaulted,[48] and (3) on information and belief, at least one Board member President Seligman thought might be turning against him.

---

[48] One such student, a junior who reported a sexual assault, was surprised when University investigators asked her about a small disagreement she had had with a hallmate during freshman year, which was of no relevance to her sexual assault but had been recorded in her emails two years previously.

340.   Since issuing their EEOC complaint, Plaintiffs have been contacted by several victims of assault, harassment or retaliation at UR who have evidence to suspect that their emails had been searched.  Like Plaintiffs, these victims suddenly had emails they had already read reappear in their inboxes as unread, or reappear in drafts folders. Long-lost friends whom the Plaintiffs had not been in touch with for years have heard from the Special Committee's lawyers at Debevoise & Plimpton, who reached the friends using old email addresses that Plaintiffs had used in their UR emails many years ago, but not since.

341.   Like other employers in New York the University has the legal right to examine emails on its servers, but at academic institutions especially, where freedom of speech and inquiry is an important value, it is very unusual to do so as routinely and secretly as UR is apparently now doing.  At a Faculty Senate meeting on September 19, 2017, Seligman said he had been unaware of the email screening used against Plaintiffs until he read the EEOC complaint, but the practice appears to be commonplace, since University policy permits inspection of professors' emails without requiring high-level approval.   He said that the Plaintiffs' emails were accessed by Susan Wormer, an attorney in the Counsel's office, and that select emails were provided to DeAngelis "because of leadership challenges that he faced related to divisiveness in the department." He went on to say, "the emails were communications among faculty in the department that demonstrated the extent and nature of the division in the department so that he could manage and resolve the turmoil."   In fact, the emails were largely among the Plaintiffs and showed them engaging in legally protected activity to devise an effective response to Jaeger's sexual harassment and the hostile environment at BCS.

DeAngelis never discussed or revealed the emails of anyone else who might have been contributing to the "division in the department" to BCS faculty – just those who had engaged in trying to curb Jaeger's excesses.  Further, the use of private emails as a supposed management tool in this way without the knowledge or consent of those being surveilled is highly unusual, and was never notified to the UR community.

342.    Seligman announced at this meeting that henceforth his permission would be needed to access University email accounts, but that provides no effective check on searches if he wants to conduct them, or provide any basis to think he will put new restrictions on requests from subordinates.  Moreover, long-standing UR employees familiar with the University's IT practices find it hard to believe that any email searches could have been conducted without Seligman's approval of the overall system that has permitted expansive searches by others.

343.    The way Seligman and Clark have handled intimate relationships with their own subordinates, and the role this may have played in dulling their sensitivity to Jaeger's misconduct, have been discussed above (see paragraphs 44 to 46).

344.    While criticism is an occupational hazard for all university leaders, at UR particular criticism has been directed at the lavish spending of Seligman and Clark and the many people they have hired as administrators and fundraisers, which in Clark's case is accentuated by the fact that his sexual partner accompanies him to foreign locations, flying business class and using limousines at University expense.  When he first became Dean, for example, Clark spent some $15,000 to move a door in his office a few feet, while refusing the expenditure of $600 for a new server needed by dozens of faculty.  Expenses for his recent trip to Asia (with his intimate partner) have caused particular

criticism, but he reportedly has directed accounting staff to find a way to pay them regardless. When Seligman had to make a presentation to the Board in New York City, he was sufficiently worried about his PowerPoint presentation that he flew multiple IT staff members to New York to make sure it worked. Some staff suggest Seligman now lives in a kind of bubble, tone-deaf to the impression his corporate-CEO lifestyle creates for academics and donors, in ways that are parallel to UR's refusal to recognize any error in its handling of Jaeger or the retaliation campaign against Plaintiffs.

345.    In other recent cases of sexual harassment, senior UR administrators have also been tone-deaf, slow off the mark or unwilling to recognize any problem. When one professor was reported to be sleeping with one of his students, Seligman said he would take care of the problem; he was popular, however, and nothing happened. UR is fiercely resisting the legal claims of Dr. Joseph Irrera, a former graduate student at the Eastman School of Music, whose supervisor Dr. Douglas Humphreys retaliated against him after Irrera rejected his sexual advances. Irrera is a brilliant pianist who had already played at Carnegie Hall, but Humphreys failed two of his final recitals, and subsequently Irrera did not obtain a single phone interview after applying to 28 faculty positions, unheard of for graduates from Eastman, one of the best programs in the nation. Yet UR is doggedly continuing to litigate against him. Instead of supporting Irrera when he confided about Humphreys' abuse of him, Eastman Dean Marie Rolf said she could do nothing to stop Humphreys from being on juries judging his playing, and the School even awarded Humphreys the Eisenhart Award for Excellent Teaching in 2015-2016.

346.    Thus although Seligman has now admitted that promoting Jaeger amidst the allegations of sexual harassment was a mistake, this turns out not to be an isolated

occurrence.  The modus operandi of UR's Counsel's office, based on long practice, is to use its power to shut down complaints that might embarrass the University rather than take them seriously and learn from them.

347.    On at least 29 occasions before filing their EEOC complaint, the Plaintiffs sought out University leaders to draw their attention to the problems being caused by Jaeger and the University's retaliation against them.  There were six such encounters with Seligman himself; at one, as described above in paragraph 281, Seligman teared up, told Aslin and Cantlon how he would not want his daughter to be sexually harassed, and vowed to make a statement addressing the consequences of Jaeger's misconduct,  either himself or by surrogate.   He did nothing.  None of these 29 encounters with UR leadership produced any result.  Instead, the University continued to circle the wagons.

348.    Newport had encountered a similar unwillingness to sanction sexual harassers when she was department chair of BCS.  In 2010, an undergraduate reported that a professor had sexually harassed her.  It was the second complaint against him. Newport had investigated the first one and found it credible, requiring the professor to attend sexual harassment training and also to sign a letter, which she held in his file, agreeing that he would be terminated if he ever had another inappropriate interaction with a student.  In this second case, Newport consulted the University counsel's office. Nearpass, the Associate Counsel responsible, told Newport that she did not believe the student because the student had not saved all of the text messages the professor had sent her.  UR Senior Counsel Richard Crummins recommended that Newport not fire the professor and instead keep him on and pay out the remainder of his contract, in order to avoid a possible lawsuit against the University. So despite this professor's clear history

of sexual misconduct toward students, Crummins recommended to Newport to take no punitive action. However, Newport had been clear with the professor that she would not tolerate such behavior and terminated his employment.

349.    This same fired professor is still tutoring students in the UR medical center via a third-party service.

350.    The Counsel's office has shown reluctance to punish sexual harassers in other contexts.  In March 2017, a committee on faculty-student intimate relations created by the Faculty Senate tried to rework the UR policies on consensual sexual relationships between faculty and students, seeking to provide greater protections to students and vulnerable employees. However, when presented with a draft policy by the committee, Vice President and General Counsel Gail Norris reacted angrily, saying that the new policy would be like "throwing a firebomb" at a BCS faculty member – clearly implying Jaeger.  Her office had already endorsed him to anyone making inquiries after the Nearpass Report.  The idea that any new policy covering future behavior would implicate Jaeger or the University about past behavior was nonsensical, but like the rest of the UR administration, Norris was dogged in her defense of Jaeger and everything the University had done to protect him.  She had already twisted logic to exonerate him when she told BCS faculty that the Counsel's office had been right to refuse to look at text messages offered by Kidd to substantiate his harassment (see paragraph 302).

351.    Another indication of ignorance or lack of concern among senior administrators about the reality of sexual harassment at UR appeared at a small dinner for major donors on May 19, 2016 at The River Club in New York City with President Seligman, an event hosted by Ed and Barbara Hajim.  A dinner attendee asked a question

during the Q&A session about whether UR has had any problems with sexual harassment or sexual assault on campus. Mr. Hajim, outgoing chair of UR's Board of Trustees, responded in a somewhat joking and cavalier manner that the only real incident they had dealt with was a case of a female student who had sent what he described as inappropriate, sexually provocative emails to several male students. There was chuckling in response. President Seligman smiled approvingly at Hajim's answer and offered no additional comments about what UR might be doing to address the serious issue of sexual harassment, either in terms of training, prevention or protocols for responding to incidents, nor did he share any incidents of genuine concern. The distinct impression given at the donor dinner was that allegations that sexual harassment and sexual assault are happening at UR were not concerns to be taken seriously.

## K.    *The EEOC Complaint*

352.    After their many unsuccessful attempts to get UR administration to take their complaints and warnings seriously, the Plaintiffs felt stymied. UR had shown that starting at the top, it was unwilling to hold itself accountable, so that outside scrutiny was the only possible solution. Plaintiffs accordingly instructed the undersigned law firm to pursue legal remedies, which included an investigation of Jaeger's conduct and the University's retaliation against Plaintiffs, in preparation for filing a charge with the EEOC. More than a dozen witnesses came forward to see they had changed their educational path to avoid Jaeger in BCS because of his sexual misconduct, or knew other women who had done so.

353.     On or around September 1, 2017, the Plaintiffs filed materially identical complaints with the EEOC.[49] To make sure the University would not yet again sweep their concerns under the rug, they also spoke to reporters from various news outlets who published stories about the complaint.

354.     UR's immediate response was a further dose of retaliation.   Seligman wrote in an email to the Rochester community: "Allegations are not facts, and as we saw in *Rolling Stone*'s withdrawn story about sexual assault at the University of Virginia, even established media outlets can get it wrong." By comparing the EEOC complaint to the *Rolling Stone* article, Seligman suggested that the multiple victims described and quoted in the complaint, given pseudonyms to protect them from retaliation, were either invented or lying, which was false. Seligman also stated, "We are confident in the integrity of our investigations, and we stand by our findings...Two comprehensive and careful investigations involving many hours of inquiry and many dedicated University leaders' efforts resulted in findings of no substantiation of the complainants' allegations. It is unfortunate that individuals who disagree with these findings have now chosen to assert as facts their unsubstantiated allegations in such a public way."  This ignored the many times the Plaintiffs had raised the allegations privately with UR officials without result, and that their allegations were in fact robustly substantiated.

## L.     *The Special Committee: déjà vu all over again?*

355.     On September 19, 2017, under pressure to stem the bad publicity the University had been receiving following the EEOC complaint, the UR Board of Trustees

---

[49] Bixby, who was not an employee of UR, did not file with the EEOC. Heilbronner filed later, on November 2, 2017.

appointed a Special Committee "to oversee an independent, comprehensive investigation into all matters involving the EEOC Complaint."   The Special Committee, chaired by Board Finance Chair Richard Handler, appointed Mary Jo White, Senior Chair of Debevoise & Plimpton LLP, to lead the investigation. The Special Committee promised a report by December 31, 2017, which has now been postponed to January 12, 2018.

356.   This appointment stanched the University's immediate PR crisis, but the design and conduct of the investigation raise a serious concern that it will not be a "comprehensive investigation" but a whitewash.  This concern has been described above at paragraphs 49 to 51.

357.   Mary Jo White is a financial specialist with no special expertise in sexual harassment cases.   President Seligman, the leading historian of the SEC, has been friendly with and publicly praised White, the former chair of the SEC.[50]  He served on the board of governors of FINRA, which is overseen by the SEC.

358.   The Special Committee is aware of the flaw built into its work, namely that Plaintiffs cannot be interrogated by its lawyers, paid by the University, operating under private rules, while they have a case pending against the University.  The Special Committee has tried to get around this in ways that raise concerns that it is treating Plaintiffs as enemies to vanquish or at least subdue rather than partners in fixing the serious problems Plaintiffs have brought to light.  On October 11, 2017, the Committee issued a public statement, emailed to all UR students, employees and alumni, falsely claiming it had received a letter from the Plaintiffs "declining to participate" in the

---

[50] President Seligman said in 2013 in the *Financial Times* that Ms. White has a "consistent record of success as an effective leader, making quick decisions and learning on the job." https://www.ft.com/content/be709c72-6663-11e2-919b-00144feab49a

investigation.  In fact, the Plaintiffs have stated from the outset their sincere desire to cooperate with the Special Committee, but under conditions that do not negate their ability to pursue the legal claims set out herein that were the reason the Special Committee had to be created in the first place. Portraying Plaintiffs as uncooperative and uninterested in UR's well-being is an example of further retaliation against Plaintiffs by UR for having advanced their protected claims.

359.    Another concern about the Special Committee is how Debevoise lawyers are conducting the investigation.  Some witnesses who appeared before it have said its lawyers appear determined to discredit the Plaintiffs.  One witness summed up her experience in a conversation to a Plaintiff, "They really seem to want to go after you guys." This witness thought the thrust of the questions was trying to establish a technical basis for discrediting the Plaintiffs based on a breach of (supposed) confidentiality obligations concerning the University's inquiry into Jaeger rather than focus on the core question of how the University handled the sexually hostile environment Jaeger was allowed to create and then retaliated against Plaintiffs.

360.    It also appears that Debevoise lawyers, while supposedly independent from the University's counsel's office, are relying on it to provide the results of email searches of Plaintiff's accounts and to pick old associates of Plaintiffs to suggest as possible witnesses (see paragraph 340).

361.    The Special Committee also stated that any witnesses who refuse to speak with Debevoise's lawyers, but already gave testimony to Nearpass, should expect that testimony to be reused.  The Special Committee knows from the EEOC complaint that the Plaintiffs challenge the quality of Nearpass's interviews, which seemed designed to

cover up the Jaeger problem rather than probe it.  To the witnesses (and to the Plaintiffs interviewed by Nearpass), many of whom find it emotionally difficult to talk about their harassment by Jaeger, and are not sure whether to trust the integrity of the Special Committee, this heavy-handed threat to recycle their earlier testimony to Nearpass unless they succumb to its request feels like being treated as "the enemy" – as if White were still a prosecutor able to compel testimony, rather than recognizing them as victims of sexual harassment who warrant support and respect. This is additional retaliation.

362.    Meanwhile, the hostile environment at UR continues to fester. Victims of sexual assault and harassment continue to reach out to Plaintiffs because they have not been able to find support through UR.  Jaeger has been placed on administrative leave, but continues to access the campus and engage with colleagues and students around Rochester.  Plaintiffs are still treated with hostility in their department, less favorably than faculty who ignored Jaeger's harassment or found it unobjectionable. Just a few days ago, DeAngelis told Plaintiffs that he and Dean Culver agreed that none of them could become BCS ombudsman because they might be "too biased." Meanwhile faculty who have shielded or endorsed Jaeger or retaliated against Plaintiffs can run for the position.  The UR administration continues to malign the Plaintiffs publicly, by (1) releasing statements affirming the Nearpass investigation and dismissing the Plaintiffs' valid concerns, and (2) placing them in an untenable position by criticizing them for not fully participating in the Special Committee process while knowing their pending lawsuit against UR effectively precludes this.

363.    More than 400 professors across the world have signed a petition stating that they cannot in good conscience advise their students to study or work at UR because

of the hostile environment created by Jaeger and the UR administration. Sadly, this unhappy state of affairs has deep roots. Several witnesses have stated that even before Plaintiffs filed their EEOC complaint, they were warning students away from Rochester because of Jaeger. Others have reported that when the Plaintiffs' case became public, their academic colleagues expressed relief that someone was finally doing something about Jaeger – meaning they had known about the problem a long time.

## L.    *Conclusion*

364.    Newport and Aslin worked to build one of the nation's best brain and cognitive science departments and in ten years took BCS from nothing to ranking fourth in the nation. They created a highly collaborative and inclusive environment in which male and female students both thrived. They worked to build the strongest team possible and based on Jaeger's application, believed he would be a good fit. Unfortunately, Jaeger at first showed his true colors – those of a serial sexual harasser and abuser– only to students, post-docs, and junior faculty. He convinced his victims that BCS leadership knew about and endorsed his sexually charged behavior toward students. This was a lie. Aslin and Newport knew nothing of Jaeger's sexually harassing and predatory behavior. Had either of them known, they would have put a stop to it immediately, as Newport's track record with sexual harassers clearly demonstrates.

365.    For years Jaeger exerted power over graduate students and post-docs in BCS. He charmed, manipulated, and sometimes threatened them, becoming gatekeeper to important social and professional opportunities. He flaunted numerous sexual relationships in front of graduate students, used constant and overt sexual language, and

behaved flirtatiously and overly familiarly with women students, including when he knew he was making them feel unsafe. He may have avoided breaking specific HR rules, like sleeping with undergraduates, but pushed past multiple boundaries and sought to humiliate his students, so much so that at least 16 women students distorted their educations at BCS to escape him. His misconduct created a clear pattern of sexually harassing and abusive behavior that continues to infect the educational environment at BCS, and to cast BCS in a negative light because of his inappropriate behavior at events outside UR, as recently as July 2017.

366. Some junior BCS faculty members were aware of Jaeger's behavior, in particular Kidd and Piantadosi, who had themselves been graduate students or post-docs at BCS and suffered directly from its hostile environment. Kidd spent a decade in a department where she feared for her students and for herself, and was systematically defamed by Jaeger with no one stopping him. She was concerned, based on her own experience and that of others, that if she reported him, BCS and UR would not take effective action or protect her from retaliation. UR has since proven those fears were valid.

367. In 2016, prodded by Jaeger's spirited public support for faculty-student sexual relationships, the junior faculty revealed to Aslin what they had known about Jaeger. Aslin contacted Newport to ask if she had known too. She had not. They decided that the best course of action to address the toxic environment was to bring Jaeger's actions to the attention of the administration. Aslin accordingly filed a complaint, later joined by Cantlon.

368.    UR went through the motions of an investigation and appeals process to satisfy Aslin, who is a well-respected scholar. UR was careful not to "find" anything that would condemn Jaeger and require actual action on UR's part, even though that required strenuous efforts to ignore relevant evidence and consigning Kidd, a BCS professor, to ignominy as "not credible." UR thought that would end the matter. It evidently did not anticipate that Aslin and the other Plaintiffs would persist in trying to get UR to uphold women's rights and the law while pointing out the evasions and logical flaws of the Nearpass Report.

369.    UR escalated, and retaliated. It accused the Plaintiffs of spreading rumors and misinformation and bullying Jaeger.   UR repackaged the Plaintiffs' protected activities – notifying UR about behavior that violated Title IX and Title VII – as a breach of confidentiality.  But this was a straw man.  Aslin had told University administrators himself that he was consulting with others to provide information for their investigation, to which they had not objected.   UR itself had repeatedly breached confidentiality.   It made selective aspects of the investigation public – by providing Kidd with the Nearpass Report when she was not an official complainant, by naming Kidd in the Nearpass Report and verbally to third parties (defaming her in the process), by inviting Jaeger to defend himself publicly based on the Nearpass Report, and by disclosing select information from the investigation to key UR faculty members such as Dr. Runner.   UR even read the private emails and checked the phone logs of the Plaintiffs, without their knowledge or consent, upending the usual expectation of e-mail confidentiality to intervene in an internal dispute, publicly claiming as a result that the Plaintiffs had lied when they had done no such thing – proven when DeAngelis could not provide any

evidence.  The truth is that UR only cared about confidentiality when it could use it as a shield, to protect itself from scrutiny, or as a sword, to attack the Plaintiffs' reputations.

370.    UR's campaign against the Plaintiffs has created a hostile environment for them so toxic that they are no longer welcome in their own department. They are treated as pariahs, troublemakers and liars. Cantlon and Kidd, in particular, suffer on a daily basis. Cantlon is treated with constant derision and as the spokesperson for the "six of them."[51] Kidd's reputation and credibility have been regularly undermined. Bixby felt even more unsafe in BCS than before her complaint and took two extra years to finish her Ph.D.  UR has made clear that it welcomed Aslin's departure and wants the remaining Plaintiffs to disappear.  It refused to hire Heilbronner against all historical norms, its promises to her and the merits of her application, and as a result drove out her husband, Hayden, who is already a leading scientist of his generation in his field. It has actively prevented the Plaintiffs from pursuing opportunities that would allow them to stay together and continue their collaborative research at RIT – blocking rather than promoting scholarship as a university is supposed to do.  Morale, reputation, output, recruitment, and grant money at BCS are all suffering as a result of the University's insistent support for the cause of Florian Jaeger.

371.    Aslin and Cantlon, knowing they had the support of a larger group of BCS professors and students, brought their initial complaint to protect the rights of women (indeed everyone) in BCS and uphold the law because they believed it was the right thing to do. They have acted out of care for students and to strengthen a department and university in which they have been profoundly invested both professionally and

---

[51] See Paragraph 329.d above.

personally. BCS has tried to sweep its problem with sexual misconduct and abuse of women under the rug. The Plaintiffs do not want to contribute to sexual harassment being acceptable in academic science by sitting by quietly and obediently as their students are harassed and their colleagues are ignored and silenced. They are acting sincerely in UR's best interests at considerable cost to themselves.  Instead of showing respect or even gratitude, UR has made sure the Plaintiffs are paying for their temerity in insisting on compliance with the law and basic human decency.

372.   The many students around the country who have suffered from Jaeger directly and the hostile environment to which he contributed at BCS, many of whom gave testimony to Nearpass, now feel justifiably threatened by the prospect that he will retaliate against them for the rest of their careers.  He might be asked to review their papers, their grants, their promotions, many of which involve anonymous voting processes where they may not even be aware of his involvement. UR has not only refused to support and protect these alumni who came forward in good faith, it has supported Jaeger in every attempt to discredit them and the BCS faculty who did support them.

373.   Undeterred by Bixby's complaint and DeAngelis's man-to-man talk (see paragraph 168), Jaeger, who is now 42, was still crashing student parties at conferences in 2017, still drinking late into the night with students and making passes at female students.  In the summer of 2017, a graduate student at a summer institute where Jaeger was teaching contacted Piantadosi by email to say that Jaeger was making her and others "uncomfortable" because he was attending parties in the students' dorms, staying until the early morning. He was the only faculty member to do so. She said that she felt obligated to avoid drinking because she needed to be on guard against him.  In the wake

of the EEOC complaint, Jaeger was put on paid leave and is not teaching any classes. But he still operates freely at BCS and at UR. His leave is more like a paid sabbatical than a sanction.

374. Plaintiffs have turned to the courts because they see no practical alternative. UR, an institution they have all loved, has gone seriously astray, and despite their proper requests for constructive action, has simply dug in deeper to protect wrongdoing by Jaeger that has hurt a decade's worth of students. What should have been a simple problem to solve has metastasized into a long campaign of retaliation by UR administrators, led by Seligman and Clark, who have circled the wagons against the polite entreaties of distinguished faculty who are no longer willing to turn a blind eye to endemic sex discrimination. The result is that a once proud and leading department has been ruined by those in charge of it. Good people and excellent scientists are being driven out, for no better reason than to protect a serial sexual harasser. "Groupthink" and defensiveness have replaced clear analysis from UR administrators. The damage they have done to BCS and the Plaintiffs is regrettable, and unnecessary, but it is also real, and must now be redressed.

375. Under public pressure, the University established the Special Committee, which is conducting a private inquiry under the Committee's control, setting its own agenda and rules, using a corporate defense firm at great expense to write a report on topics far from its areas of expertise. Like other aspects of what Plaintiffs have experienced from UR in the last two years, the inquiry excludes them and treats them not as public spirited professors with valuable knowledge about how sexual harassment

actually works or as potential contributors to improving the University, which has been their sole aim, but as a threat to the existing order that must be contained.

376.     Plaintiffs will rejoice if UR is able to reshape its policies, culture and personnel so it becomes a leader in deterring sexual harassment.  Meanwhile they will trust in the legal system.

## CLAIMS FOR RELIEF

### COUNT I

**TITLE VII and NYSHRL – RETALIATION AGAINST ASLIN
BY DEFENDANT UNIVERSITY OF ROCHESTER**

377.     Aslin re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

378.     UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

379.     At all pertinent times, Aslin was an employee or former employee of UR.

380.     Since March 2016, when he learned of Jaeger's longstanding pattern of harassing and discriminatory behavior towards University students, prospective students and employees, Aslin has continuously engaged in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, including without limitation:

> a.   Reporting Jaeger's inappropriate sexual behavior to University counsel Crummins and University investigator Nearpass in March 2016.

b.  Assisting in identifying witnesses and providing information, including information about discrimination and harassment of women employed by the University, to University officials to encourage and assist in their investigation of Jaeger's misconduct.

c.  Directly encouraging Nearpass and other officials to conduct a thorough investigation and following up on the investigation process.

d.  Expressing disapproval of Jaeger's misconduct and its detrimental impact on the University's professional and educational environments to UR administration and BCS faculty.

e.  Collaborating with colleagues about how to ensure that Jaeger's misconduct was properly investigated, to help those harmed by his actions, and to prevent additional harm from occurring.

f.  Appealing Dean Robert Clark's June 2016 decision regarding Jaeger's conduct.

g.  Refusing Intercessor Van Slyke's request in October 2016 to "cut a deal" under which Aslin would stop opposing Jaeger's misconduct and the University's failure to take appropriate action.

h.  Meeting with Seligman on October 26, 2016, to put him personally on notice of the severity of the problem facing BCS, the misdeeds of the UR legal team and urge him to protect the University from Jaeger's misconduct.

i.  On December 2, 2016, resigning from BCS in protest against the University's failure to properly handle the complaints about Jaeger's harassment and the hostile environment that ensued.

j.  Filing a complaint with the EEOC.

k.  Continuing to speak out against policies and practices that promote a hostile environment and retaliation.

381.  Since March 2016, when Aslin began to continuously engage in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Aslin's engagement in protected activities.

382.  As a direct result of and as retaliation for his engagement in protected activities, UR engaged in a series of ongoing materially adverse employment actions

focused on harming Aslin's professional reputation and status in BCS and the greater academic community. Notable examples of retaliatory actions taken against Aslin include:

a.  Deans Lennie and Culver writing a memo on July 26, 2016, wrongly portraying the complaints against Jaeger as rumors and gossip.

b.  The November 29, 2016, letter from Provost Clark to BCS faculty that praised Jaeger and characterized the complaints against him as "rumors" and "misinformation."  At the time of the letter, department faculty knew that Aslin was a principal figure among the faculty who had complained against Jaeger.

c.  The January 2017 faculty meeting where DeAngelis announced that some faculty had been bullying Jaeger and that he had a stack of private emails proving that they had spread rumors, deceived and manipulated people. At the time of the meeting, department faculty knew that Aslin was one of the individuals to whom DeAngelis was referring.

d.  Disclosing Aslin's private letter to Jaeger, without Aslin's knowledge or consent, to select BCS faculty members to give the wrong impression that Aslin bullied Jaeger.

e.  Falsely and publicly blaming Aslin for Jaeger's disinvitation from a conference at Georgetown University, hurting Aslin's relationship with his colleagues.  This false characterization continued at least until March 31, 2017, when the deans wrongly condemned Aslin for contacting the conference organizer.

f.  Creating and, to date, maintaining the narrative that Aslin and other Plaintiffs have violated confidentiality by engaging in protected activity.

g.  Violating Aslin's confidentiality by giving at least Kidd, and perhaps others, a copy of the original Nearpass Report.

h.  Defending Jaeger to members of the scientific community and supporting Jaeger's narrative that Aslin had resigned because he was wrong to bring a complaint forward.

i.  In June 2017, Dean Lennie told Mahon and Cantlon that some people in the administration thought the best way to solve the problem was for the Plaintiffs to leave Rochester.

j.   Statements by Seligman in Spring 2017 to at least three heads of departments stating that Aslin's complaints were hearsay and that Aslin had overreacted.

k.   Statements by Seligman comparing Aslin's complaints to a fabricated story in *Rolling Stone*, suggesting that he and the other Plaintiffs fabricated witness testimony.

l.   Instructing a law firm to conduct an independent investigation that requires Aslin's participation to complete properly, knowing that he could not participate while his legal claims against the University are pending, and refusing to resolve those claims.

m.   Framing Aslin's inability to participate in the Special Committee's investigation as a failure of cooperation by him, with the result that his character in the UR community has been impugned.

383.   As a direct consequence of his legally protected activities, Aslin resigned on December 2, 2016, when UR intentionally made Aslin's work environment so hostile and intolerable that any reasonable person in his position would have resigned.

384.   Aslin has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.

## COUNT II

### BREACH OF CONTRACT AGAINST ASLIN BY DEFENDANT UNIVERSITY OF ROCHESTER

385.   Aslin re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

386.   Until December 2, 2016, and at all pertinent times, Aslin was employed by UR under an employment contract granting him permanent tenure with a reasonable

expectation of continued employment with UR, though Aslin had planned retirement in 2019.

387.    Beginning in March 2016 and continuing through December 2, 2016, UR intentionally engaged in a series of ongoing actions that made Aslin's employment environment so intolerable that any reasonable person would resign.   Notable examples of intentional actions taken by UR and its agents against Aslin include:

a.   Deans Lennie and Culver writing a memo on July 26, 2016, wrongly portraying the complaints against Jaeger as rumors and gossip.

b.   The November 29, 2016, letter from Provost Clark to BCS faculty that praised Jaeger and characterized the complaints against him as "rumors" and "misinformation."   At the time of the letter, department faculty knew that Aslin was a principal figure among the faculty who had complained against Jaeger.

c.   Disclosing Aslin's private letter to Jaeger, without Aslin's knowledge or consent, to select BCS faculty members to give the wrong impression that Aslin bullied Jaeger.

d.   Creating and, to date, maintaining the narrative that Aslin and other Plaintiffs have violated confidentiality by engaging in protected activity.

e.   Violating Aslin's confidentiality by giving at least Kidd, and perhaps others, a copy of the original Nearpass Report.

f.   Defending Jaeger to members of the scientific community and supporting Jaeger's narrative that Aslin had resigned because he was wrong to bring a complaint forward.

388.    As a result of the intolerable work environment intentionally created by UR, Aslin resigned on December 2, 2016.

389.    By intentionally engaging in actions that created an intolerable work environment, UR constructively discharged Aslin in breach of its employment contract.

390.    As a result of UR's breach of contract, Aslin has suffered loss of income, including two years of lost salary, and other pecuniary damages.

## COUNT III

### TITLE VII and NYSHRL – RETALIATION AGAINST NEWPORT
### BY DEFENDANT UNIVERSITY OF ROCHESTER

391.    Newport re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

392.    UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

393.    Newport was an employee of UR from 1988 until 2012, when she retired as a UR faculty member. As a former UR employee, Newport participated in UR's investigation into Jaeger, collaborated with Aslin, Cantlon and others on the EEOC Complaint, and spoke publicly against UR's Title IX and Title VII violations.

394.    Since at least March 2016, Newport has continuously engaged in an interconnected set of protected activities, including without limitation:

   a.   Participating in the investigation of Jaeger as a witness.

   b.   Collaborating with colleagues about how to ensure that Jaeger's misconduct was properly investigated, help those harmed by his actions, and prevent additional harm from occurring.

   c.   Identifying potential witnesses to the Plaintiffs and to Nearpass.

   d.   Testifying to Curtin.

   e.   Filing with the EEOC.

   f.   Continuing to speak out against UR policies and practices that promote a hostile environment and retaliation.

395.    Since March 2016, when Newport began to continuously engage in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Newport's engagement in protected activities.

396.    As a direct result of and as retaliation for her engagement in protected activities, UR engaged in a series of ongoing materially adverse actions focused on harming Newport's professional reputation and status in BCS and the greater academic community.  The retaliatory efforts were continuous and included, without limitation:

    a.  The January 2017 faculty meeting where DeAngelis announced that some faculty, including someone no longer in the department (clearly referring to Newport) had been bullying Jaeger and that he had a stack of emails in his hand proving that they had spread rumors, deceived and manipulated people. At the time of the meeting, department faculty knew that Newport was one of the individuals to whom DeAngelis was referring.

    b.  Creating and maintaining the narrative that Newport and other Plaintiffs have violated confidentiality in the course of engaging in legally protected behavior.

    c.  Statements made by Seligman in Spring 2017 to at least three heads of departments stating that Newport's complaints were hearsay.

    d.  Statements made by Seligman comparing Newport's complaints to a fabricated story in *Rolling Stone*, suggesting that she and the other Plaintiffs fabricated witness testimony.

    e.  Instructing a law firm to conduct an independent investigation that requires Newport's participation to complete properly, knowing that she could not participate while her legal claims against the University are pending, and refusing to resolve those claims.

    f.  Framing Newport's inability to participate in the Special Committee's investigation as a failure of cooperation by her, with the result that her character in the UR community has been impugned.

397.    Newport has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.

## COUNT IV

### TITLE VII and NYSHRL – RETALIATION AGAINST CANTLON
### BY DEFENDANT UNIVERSITY OF ROCHESTER

398.     Cantlon re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

399.     UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

400.     Cantlon is and, at all pertinent times, was an employee of UR.

401.     Since March 2016, when she learned of Jaeger's longstanding pattern of harassing and discriminatory behavior towards University students, prospective students and employees, Cantlon has continuously engaged in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, including without limitation:

   a.   Sharing her personal experiences and knowledge of Jaeger's inappropriate liaisons with graduate students and post-docs, his lewd comments, and the detrimental impact his sexual misconduct had on its victims.

   b.   Suggesting witnesses and providing information and evidence (like Jaeger's Facebook posts), including information about discrimination and harassment of female employees, to UR officials to encourage and assist in their investigation of Jaeger's misconduct.

   c.   Expressing disapproval and concern about Jaeger's misconduct and its detrimental impact on UR's professional and educational environments.

   d.   Meeting with Levy on March 25, 2016, to express concerns about the sexual harassment and hostile environment prevailing in BCS and to seek Levy's direction about how to proceed.

e.   Filing a written complaint to Nearpass and Levy about Jaeger's behavior, focused on his demeaning and objectifying statements about women.

f.   Appealing then-Dean (now Provost) Robert Clark's June 2016 decision condoning Jaeger's conduct.

g.   Collaborating with colleagues about how to ensure that Jaeger's misconduct was properly investigated, help those harmed by his actions, and prevent additional harm from occurring.

h.   Writing to Clark on December 6, 2016, to express her frustration with the case, highlight the harmful impact UR's handling of it had on the women who had come forward to share their experiences, and promote dialogue about how to do better so that current and future students could be protected.

i.   Writing to Seligman (along with fellow Plaintiffs) to encourage him to listen to Aslin's concerns about how UR had handled complaints about Jaeger and the deleterious effect thereof on BCS.

j.   Expressing concerns to DeAngelis about Jaeger being permitted to participate in the evaluations of Piantadosi and Kidd in February and March 2017 when both had opposed Jaeger's conduct, Kidd had been sexually harassed by him as a student, and DeAngelis promised them that Jaeger would not be allowed to participate.

k.   Expressing concerns to DeAngelis that the decisions not to hire Heilbronner and to not take reasonable and customary steps to retain Hayden would hurt the reputation and vitality of BCS and were retaliatory toward them both and, by extension (via truncated research collaborations), toward Cantlon, Kidd, Piantadosi, and Mahon.

l.   Filing with the EEOC.

m.   Continuing to speak out against policies and practices that promote a hostile environment and retaliation.

402.   Since March 2016, when Cantlon began to continuously engage in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Cantlon's engagement in protected activities.

403.     As a direct result of and as retaliation for her engagement in protected activities, UR engaged in a series of ongoing materially adverse employment actions focused on harming Cantlon's professional reputation and status in BCS and the greater academic community.   Notable examples of retaliatory actions taken against Cantlon include:

  a.   Violating Cantlon's confidentiality by giving at least Kidd a copy of the original Nearpass Report.

  b.   Deans Culver and Lennie writing a memo on July 26, 2016, wrongly portraying the complaints against Jaeger as rumors and gossip.

  c.   The November 29, 2016, letter from Provost Clark to department faculty that praised Jaeger and characterized the complaints against him as "rumors" and "misinformation."   At the time of the letter, department faculty knew that Cantlon was one of the people who had complained against Jaeger.

  d.   The January 2017 faculty meeting where DeAngelis wrongly announced that some faculty had been bullying Jaeger and that he had a stack of emails proving that they had spread rumors, deceived and manipulated people. At the time of the meeting, department faculty knew that Cantlon was one of the individuals to whom DeAngelis was referring.

  e.   Creating and maintaining the narrative that Cantlon and other Plaintiffs have violated confidentiality by engaging in legally protected behavior.

  f.   Statements made by the President of the University in Spring 2017 to at least one senior faculty member in other departments that described the complaints against Jaeger as a smear campaign run by faculty, and accused the faculty Plaintiffs (which included Cantlon) of wrongdoing in their emails.

  g.   DeAngelis, in the course and scope of his employment, telling Cantlon, in front of other BCS faculty, that she should "take responsibility for her actions" – meaning her complaint against Jaeger and complaints of retaliation - and aggressively demanding that she apologize to BCS for the trouble she had caused.

  h.   Excluding Cantlon from BCS meetings to discuss whether to hire Heilbronner.

i.   Refusing to retain Hayden despite his clear talent and suitability, knowing that this would hurt the research of Cantlon and others, and damage the vitality and reputation of BCS and the University.

j.   In June 2017, Dean Lennie told Mahon and Cantlon that some people in the administration thought the best way to solve the problem was for the Plaintiffs to leave Rochester.

k.   Sabotaging Cantlon and the other Plaintiffs' opportunity to move to RIT in order to continue their collaborative research.

l.   One BCS faculty member telling Cantlon that he did not care if Cantlon and the other Plaintiffs left BCS in the wake of their complaints about Jaeger and UR's response to them, and that BCS would be fine without her.

m.   General Counsel Gail Norris telling the Faculty Senate that the changes Cantlon suggested to Policy 106 would be "throwing a firebomb" at a BCS faculty member, who by clear implication was Jaeger.

n.   Statements made by Seligman in Spring 2017 to at least three heads of departments stating that Cantlon's complaints were hearsay.

o.   Statements made by Seligman comparing Cantlon's complaint to a fabricated story in *Rolling Stone*, suggesting that she and the other Plaintiffs fabricated witness testimony.

p.   Instructing a law firm to conduct an independent investigation that requires Cantlon's participation to complete properly, knowing that she could not participate while her legal claims against the University are pending, and refusing to resolve those claims.

q.   Framing Cantlon's inability to participate in the Special Committee's investigation as a failure of cooperation by her, with the result that her character in the UR community has been impugned.

404.   Cantlon has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.

## COUNT V

### TITLE VII and NYSHRL – RETALIATION AGAINST KIDD
### BY DEFENDANT UNIVERSITY OF ROCHESTER

405.     Kidd re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

406.     UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

407.     Kidd is and, at all pertinent times, was an employee of UR.

408.     Since at least March 2016, when she learned of Jaeger's longstanding pattern of harassing and discriminatory behavior towards University students, prospective students and employees, Kidd has continuously engaged in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, including without limitation:

   a.   Participating in the investigation of Jaeger by sharing her very personal experience of being sexually harassed by Jaeger as a graduate student.

   b.   Openly expressing disapproval and concern about Jaeger's illegal conduct and its detrimental impact on the University's educational environment.

   c.   Collaborating with colleagues about how to ensure that Jaeger's misconduct was properly investigated, help those harmed by his actions, and prevent additional harm from occurring.

   d.   Filing a retaliation complaint with Dean Culver on July 21, 2016, and a follow-up letter on August 19, 2016.

   e.   Participating in the investigation into her retaliation complaint.

   f.   Appealing the outcome of her retaliation complaint on October 4, 2016.

g.  Sending an e-mail, with Piantadosi, to DeAngelis in August 2016 directly encouraging him to investigate Jaeger's abuse of all relevant UR policies, including human resources policies, and to publicly support those who had the courage to complain about Jaeger and encourage UR to behave lawfully;

h.  Along with Piantadosi, meeting with DeAngelis in Fall 2016 to discuss (1) the prospect of leaving UR because the Nearpass Report identified and attacked Kidd by name, (2) the possibility of continuing retaliation against them, (3) Curtin's finding that UR did not do enough to guard against retaliation, and (4) concern that Jaeger would be involved in future evaluations.

i.  Writing, with Piantadosi, an e-mail to Deans Lennie and Culver on January 3, 2017, with suggestions for improvements to the investigation process for complaints like those against Jaeger, plus evidence that they were needed.

j.  Expressing concerns to DeAngelis that the decisions to not hire Heilbronner and to not take reasonable and customary steps to retain Hayden were retaliatory toward them both and, by extension (via truncated research collaborations), toward Cantlon, Kidd, Piantadosi, and Mahon.

k.  Filing with the EEOC.

l.  Continuing to speak out against UR policies and practices that promote a hostile environment and retaliation.

409.    Since at least March 2016, when Kidd began to continuously engage in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Kidd's engagement in protected activities.

410.    As a direct result of and as retaliation for her engagement in protected activities, UR engaged in a series of ongoing materially adverse employment actions focused on harming Kidd's professional reputation and status in BCS and the greater academic community.   Notable examples of retaliatory actions taken against Kidd include:

a.  Violating Kidd's confidentiality by not protecting disclosure of her name as one of the witnesses to Jaeger's misconduct in the Nearpass Report.

b. Nearpass's refusal to examine written evidence substantiating Kidd's testimony.

c. Nearpass's assessment of Kidd as not credible, based on undisclosed evidence and without giving Kidd, a UR professor with a reputation for integrity, a chance to rebut that finding.

d. Nearpass disclosing to another witness Kidd's identity and that Nearpass had concerns about Kidd's credibility.

e. Deans Lennie and Culver writing a memo on July 26, 2016, portraying the complaints against Jaeger, including Kidd's, as rumors and misinformation.

f. Taking no action to prevent Jaeger from continuing to tell people that Kidd was not credible and had criticized him because she had actually been in love with him.

g. The November 29, 2016, letter from Provost Rob Clark to BCS faculty praising Jaeger and characterizing the complaints against him as "rumors" and "misinformation." Clark knew that Kidd was one of the individuals who had complained about Jaeger.

h. The January 2017 faculty meeting where DeAngelis announced falsely that some faculty had been bullying Jaeger and that he had a stack of emails in his hand proving that they had spread rumors, deceived and manipulated people. At the time of the meeting, department faculty knew that Kidd was one of the individuals to whom DeAngelis was referring.

i. Presenting the findings of the investigation as though Kidd was the only witness with substantial claims against Jaeger when in fact numerous women complained to Nearpass about Jaeger's sexual misconduct and boundary pushing.

j. Advancing the argument that Kidd and other Plaintiffs have violated confidentiality by engaging in legally protected behavior.

k. Statements by Seligman in Spring 2017 to at least three heads of departments stating that the complaints against Jaeger were hearsay, suggesting that Kidd, who gave direct testimony of her experience, must be lying.

l. In February and March 2017, permitting Jaeger to participate in evaluating Kidd's performance and the performance of her husband, Piantadosi, having promised that Jaeger would not be allowed to do this and without warning either of his participation.

m.  Excluding Kidd from BCS meetings to discuss whether to hire Heilbronner.

n.  Refusing to retain Hayden despite his clear talent and suitability after he complained about Jaeger and the University's handling of the investigation, knowing that this would hurt Kidd's research.

o.  In June 2017, Dean Lennie told Mahon and Cantlon that some people in the administration thought the best way to solve the problem was for the Plaintiffs to leave Rochester.

p.  Sabotaging Kidd and the other Plaintiffs' opportunity to move to RIT in order to continue their collaborative research.

q.  Statements made by Seligman comparing Kidd's complaint to a fabricated story in *Rolling Stone*, suggesting that she and the other Plaintiffs fabricated witness testimony.

r.  Instructing a law firm to conduct an independent investigation that requires Kidd's participation to complete properly, knowing that she could not participate while her legal claims against the University are pending, and refusing to resolve those claims.

s.  Framing Kidd's inability to participate in the Special Committee's investigation as a failure of cooperation by her, with the result that her character in the UR community has been impugned.

411.  Kidd has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.


## COUNT VI

## TITLE VII and NYSHRL – RETALIATION AGAINST PIANTADOSI BY DEFENDANT UNIVERSITY OF ROCHESTER

412.  Piantadosi re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

413.  UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

414.    Piantadosi is, and at all pertinent times, was an employee of UR.

415.    Since March 2016, when he learned of Jaeger's longstanding pattern of harassing and discriminatory behavior towards University students, prospective students and employees, Piantadosi has continuously engaged in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, including without limitation:

a.    Assisting Cantlon in late March 2016 to file a written complaint to Levy and Nearpass about Jaeger's behavior with a focus on his demeaning and objectifying statements about women.

b.    Collaborating with colleagues about how to ensure that Jaeger's misconduct was properly investigated, to help those harmed by his actions, and prevent additional harm from occurring.

c.    Suggesting witnesses and providing information, including information about discrimination and harassment of females employed by the University, to Nearpass and other University officials to encourage and assist in their investigation of Jaeger.

d.    Along with Kidd, meeting with DeAngelis in August 2016 directly encouraging him to investigate Jaeger's potential abuse of all relevant University policies, including human resources policies, and to publicly support those who had the courage to complain about Jaeger.

e.    Along with Kidd, meeting with DeAngelis in Fall 2016 to discuss the prospect of leaving the University because of the use of Kidd's name in the Nearpass Report, the possibility of continuing retaliation, Curtin's finding that the University did not do enough to guard against retaliation via the Nearpass Report, and concern that Jaeger would be involved in their evaluations.

f.    Writing an e-mail to Levy and the deans criticizing the University's response to Bixby's complaint about Jaeger, directly asking her, "Why isn't that information shared with the deans who made the decisions about whether [Jaeger] created a *hostile work environment*?" (emphasis added).

g.    Writing an e-mail to Lennie on December 1, 2016, criticizing UR's response to the complaints against Jaeger and its treatment of Plaintiffs.

h.    Writing, with Kidd, an e-mail to Deans Lennie and Culver with a list of improvements to the investigation process for sexual harassment

complaints like those against Jaeger, including evidence showing why they were needed.

i.   Expressing concerns to DeAngelis that the decisions to not hire Heilbronner and to not take reasonable and customary steps to retain Hayden retaliated against the two of them and, by extension (via truncated research collaborations), toward Cantlon, Kidd, Piantadosi and Mahon.

j.   Filing with the EEOC.

k.   Continuing to speak out against UR policies and practices that promote a hostile environment and retaliation.

416.   Since March 2016, when Piantadosi began to continuously engage in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Piantodosi's engagement in protected activities.

417.   As a direct result of and as retaliation for his engagement in protected activities, UR engaged in a series of ongoing materially adverse employment actions focused on harming Piantadosi's professional reputation and status in BCS and the greater academic community.

418.   Notable examples of retaliatory actions taken against Piantadosi include:

a.   Deans Lennie and Culver writing a memo on July 26, 2016, wrongly portraying the complaints against Jaeger as rumors and misinformation.

b.   The November 29, 2016, letter from Provost Clark to department faculty that praised Jaeger and characterized the complaints against him as "rumors" and "misinformation."  At the time of the letter, department faculty knew that Piantadosi was one of their colleagues who had complained against Jaeger.

c.   In February and March 2017, permitting Jaeger to participate in discussions about Piantadosi's performance as well that of his spouse, Kidd, after saying that would not be permitted, and without even warning either of them of the participation.

d. The January 2017 faculty meeting where DeAngelis wrongly announced that some faculty had been bullying Jaeger and that he had a stack of emails in his hand proving that they had spread rumors, deceived and manipulated people. At the time of the meeting, department faculty knew that Piantadosi was one of the people to whom DeAngelis was referring.

e. Creating and maintaining the false narrative that Piantadosi and other Plaintiffs have violated confidentiality by engaging in legally protected behavior.

f. Refusing to retain Hayden despite his clear talent and suitability, knowing that this would hurt Piantadosi's research.

g. Sabotaging Piantadosi and the other Plaintiffs' opportunity to move to RIT in order to continue their highly fruitful collaborative research together in Rochester.

h. Excluding Piantadosi from BCS meetings to discuss whether to hire Heilbronner.

i. In June 2017, Dean Lennie told Mahon and Cantlon that some people in the administration thought the best way to solve the problem was for the Plaintiffs to leave Rochester.

j. Statements made by Seligman in Spring 2017 to at least three heads of departments stating that the complaints against Jaeger were hearsay.

k. Statements made by Seligman comparing Piantadosi's complaint to a fabricated story in *Rolling Stone*, suggesting that he and the other Plaintiffs fabricated witness testimony.

l. Instructing a law firm to conduct an independent investigation while ignoring Piantadosi's legal claims, putting her in an untenable position.

m. Framing Piantadosi's inability to participate in the Special Committee's independent investigation in a false light in order to publicly impugn his character.

419. Piantadosi has exhausted all administrative remedies and fulfilled all

conditions precedent necessary to the maintenance of this claim.

## COUNT VII

### TITLE VII – RETALIATION AGAINST MAHON
### BY DEFENDANT UNIVERSITY OF ROCHESTER

420.    Mahon re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

421.    UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

422.    Mahon is, and at all pertinent times, was an employee of UR.

423.    Since March 2016, when he learned of Jaeger's longstanding pattern of harassing and discriminatory behavior towards University students, prospective students and employees, Mahon has continuously engaged in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, including without limitation:

   a.   Reporting to a fellow professor the widespread allegations of sexual harassment by Jaeger, including his sexual relationships with students over whom he had a supervisory role.

   b.   Collaborating with colleagues about how to ensure that Jaeger's misconduct was properly investigated, help those harmed by his actions, and prevent additional harm from occurring.

   c.   Speaking up in opposition to the actions of Jaeger and UR's response thereto.

   d.   Writing to the University President, along with fellow Plaintiffs, to encourage the President to listen to Aslin's concerns about how the complaints against Jaeger and the resulting department environment had been mishandled.

   e.   Filing with the EEOC.

f.   Continuing to speak out against UR policies and practices that promote a hostile environment and retaliation.

424.    Since March 2016, when Mahon began to continuously engage in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Mahon's engagement in protected activities.

425.    As a direct result of and as retaliation for his engagement in protected activities, UR engaged in a series of ongoing materially adverse employment actions focused on harming Mahon's professional reputation and status in BCS and the greater academic community.

426.    Notable instances of retaliatory action against Mahon include:

a.   The November 29, 2016, letter from Provost Clark to department faculty that praised Jaeger and falsely characterized the complaints against him as "rumors" and "misinformation."   At the time of the letter, department faculty knew that Mahon was one of the individuals who had complained against Jaeger.

b.   The January 2017 faculty meeting where DeAngelis falsely announced that some faculty had been bullying Jaeger and that he had a stack of emails in his hand proving that they had spread rumors, deceived and manipulated people. At the time of the meeting, department faculty knew that Mahon was one of the individuals who DeAngelis was referencing.

c.   Creating and maintaining the narrative that Cantlon and other Plaintiffs have violated confidentiality by engaging in legally protected behavior.

d.   Refusing to retain Hayden despite his clear talent and suitability, knowing that this would hurt Mahon's research.

e.   In June 2017, Dean Lennie told Mahon and Cantlon that some people in the administration thought the best way to solve the problem was for the Plaintiffs to leave Rochester.

f.   Sabotaging Mahon and the other Plaintiffs' opportunity to move to RIT in order to continue their highly fruitful collaborative research together in

Rochester, which would also have allowed Mahon to continue research at the Medical School he had spent many years building up.

g.  Excluding Mahon from at least one BCS meeting to discuss whether or not to hire Heilbronner.

h.  Excluding Mahon from decision-making related to the hiring for a position closely related to his own research.

i.  Denying Mahon a meeting with a candidate for a faculty position in BCS despite Mahon's research being closely aligned with the candidate, and his request to do so.

j.  Statements made by Seligman in Spring 2017 to at least three heads of departments stating that the complaints against Jaeger were hearsay.

k.  Statements made by Seligman comparing Mahon's complaint to a fabricated story in *Rolling Stone*, suggesting that he and the other Plaintiffs fabricated witness testimony.

l.  Instructing a law firm to conduct an independent investigation that requires Mahon's participation to complete properly, knowing that he could not participate while his legal claims against the University are pending, and refusing to resolve those claims.

m.  Framing Mahon's inability to participate in the Special Committee's investigation as a failure of cooperation by him, with the result that him character in the UR community has been impugned.

427.    Mahon has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.

## COUNT VIII

### TITLE VII and NYSHRL – RETALIATION AGAINST HAYDEN BY DEFENDANT UNIVERSITY OF ROCHESTER

428.    Hayden re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376

429.    UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

430.     Until September 2017, and at all pertinent times, Hayden was employed by UR.

431.     Since March 2016, when he learned of Jaeger's longstanding pattern of harassing and discriminatory behavior towards University students, prospective students and employees, Hayden has continuously engaged in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, including without limitation:

a.   Collaborating with colleagues about how to ensure that Jaeger's illegal conduct was properly investigated, to help those harmed by his actions, and prevent additional harm from occurring.

b.   Questioning the propriety of the University's response to complaints of sexual harassment against Jaeger including concerns about the deeply flawed Nearpass Report.

c.   Advocating the fair resolution of BCS's sexual harassment issues.

d.   In opposition to the ongoing hostile environment that had resulted from Jaeger's harassing conduct and the University's improper response to it, refusing to sign a confidentiality agreement required to read a summary of the Nearpass Report, which he thought would perpetuate UR's cover-up.

e.   Filing a Complaint with the EEOC.

f.   Continuing to speak out against UR policies and practices that foster hostile environments and retaliation.

432.     Since March 2016, when Hayden began to continuously engage in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Hayden's engagement in protected activities.

433.     As a direct result of and as retaliation for his engagement in protected activities, UR engaged in a series of ongoing materially adverse employment actions

focused on harming Hayden's professional reputation and status in BCS and the greater

academic community.  Notable examples of retaliatory actions against Hayden include:

a. The November 29, 2016, letter from Provost Clark to department faculty that praised Jaeger and falsely characterized the complaints against him as "rumors" and "misinformation."  At the time of the letter, department faculty knew that Hayden was one of the individuals who had complained against Jaeger.

b. The January 2017 faculty meeting where DeAngelis wrongly announced that some faculty had been bullying Jaeger and that he had a stack of emails proving that they had spread rumors, deceived and manipulated people. At the time of the meeting, department faculty knew that Hayden was among the individuals to whom DeAngelis was referring.

c. Permitting Jaeger to participate in a departmental vote against hiring Heilbronner, Hayden's wife, and to lobby against hiring Heilbronner to others in the department.

d. Declining to hire his wife, Heilbronner, who had previously been widely considered the top candidate for the department's next neuroscience hire, despite her obvious merit and the department's longstanding policy of finding positions for spouses.

e. Making Hayden a derisory offer to retain him after he and Heilbronner secured positions at the University of Minnesota in order to push him out of UR.

f. Sabotaging Hayden and the other Plaintiffs' opportunity to move to RIT in order to continue their highly fruitful collaborative research together in Rochester.

g. In June 2017, Dean Lennie told Mahon and Cantlon that some people in the administration thought the best way to solve the problem was for the Plaintiffs to leave Rochester.

h. Constructively discharging him by damaging his reputation amongst his colleagues, refusing to make any reasonable efforts to retain him, and refusing to hire his spouse, Heilbronner, intentionally making his working conditions so hostile and intolerable that any reasonable person in his position would resign.

i. Statements by Seligman in Spring 2017 to at least three heads of departments stating that the complaints against Jaeger were hearsay.

j.  Statements made by Seligman comparing Hayden's complaint to a fabricated story in *Rolling Stone*, suggesting that he and the other Plaintiffs fabricated witness testimony.

k.  Instructing a law firm to conduct an independent investigation that requires Hayden's participation to complete properly, knowing that he could not participate while his legal claims against the University are pending, and refusing to resolve those claims.

l.  Framing Hayden's inability to participate in the Special Committee's investigation as a failure of cooperation by him, with the result that his character in the UR community has been impugned.

434.  Hayden has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.

## COUNT IX

### BREACH OF CONTRACT AGAINST HAYDEN BY DEFENDANT UNIVERSITY OF ROCHESTER

435.  Hayden re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

436.  Until September 2017, and at all pertinent times, Hayden was employed by UR under an employment contract granting him permanent tenure with an expectation of continued employment with UR.

437.  Beginning in March 2016 and continuing through September 2017, UR intentionally engaged in a series of ongoing actions that made Hayden's employment environment so intolerable that any reasonable person would resign his employment. Notable examples of intentional actions taken against Hayden include:

a.  The November 29, 2016, letter from Provost Clark to department faculty that praised Jaeger and falsely characterized the complaints against him as

"rumors" and "misinformation."   At the time of the letter, department faculty knew that Hayden was one of the individuals who had complained against Jaeger.

b.   The January 2017 faculty meeting where DeAngelis wrongly announced that some faculty had been bullying Jaeger and that he had a stack of emails proving that they had spread rumors, deceived and manipulated people. At the time of the meeting, department faculty knew that Hayden was among the individuals to whom DeAngelis was referring.

c.   Permitting Jaeger to participate in a departmental vote against hiring Heilbronner, Hayden's wife, and to lobby against hiring Heilbronner to others in the department.

d.   Declining to hire his wife, Heilbronner, who had previously been widely considered the top candidate for the department's next neuroscience hire, despite her obvious merit and the department's longstanding policy of finding positions for spouses.

e.   Making Hayden a derisory offer to retain him after he and Heilbronner secured positions at the University of Minnesota in order to push him out of UR.

f.   In June 2017, Dean Lennie told Mahon and Cantlon that some people in the administration thought the best way to solve the problem was for the Plaintiffs to leave Rochester.

438.   As a result of the intolerable work environment intentionally created by UR, Hayden resigned in September 2017.

439.   By intentionally engaging in actions that created an intolerable work environment, UR constructively discharged Hayden in breach of its employment contract.

440.   As a result of UR's breach of contract, Hayden has suffered loss of income and other pecuniary damages.

## COUNT X

### TITLE VII and NYSHRL – RETALIATION AGAINST HEILBRONNER BY DEFENDANT UNIVERSITY OF ROCHESTER

441.   Heilbronner re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

442.   UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

443.   Since 2012 and until September 2017, and at all pertinent times, Heilbronner was employed by UR as a postdoctoral fellow in Pharmacology and Physiology.

444.   Since March 2016, as detailed in paragraph 431 above, Heilbronner's husband, Hayden, began to continuously engage in an interconnected set of protected activities in opposition to unlawful and discriminatory practices at the University.  UR was aware of Hayden's engagement in protected activities and was aware that Hayden and Heilbronner were married. Heilbronner was also included on e-mails regarding opposition to Jaeger and UR's improper conduct.

445.   In November 2016, at a time when Hayden's opposition was well-known, Heilbronner applied for a tenure-track faculty position with BCS.  She was the most qualified candidate for the position.

446.   Prior to Hayden's protected activities, Heilbronner had widely been considered a shoe-in for the position because of her excellent qualifications and the

department's consistent history of finding positions for spouses on the faculty. DeAngelis, as BCS Chair, had consistently told department faculty that finding a tenure-track position for Heilbronner would not be a problem and said the same in conversations with her.

447.    In Spring 2017, as a direct consequence of Hayden's legally protected activities, UR retaliated against Heilbronner (and Hayden) by conducting a biased hiring process and not hiring Heilbronner for the position for which she had applied, for which she was the most qualified applicant, or another role within the department.

448.    UR's retaliatory motives are revealed in the following actions:

a.  In January 2017, DeAngelis asked Mahon and Cantlon if hiring Heilbronner would "promote departmental healing" referring to the rift caused by the complaint against Jaeger and Heilbronner's perceived involvement in it.

b.  On March 24, 2017, DeAngelis told Heilbronner that part of the reason she would not be hired was because hiring her would not "heal" the rift that Jaeger had caused and UR's handling of it had intensified.

c.  On April 24, 2017, a senior BCS professor told Cantlon and Mahon that other BCS faculty did not want "six of [them]" in the department, referring Heilbronner and to the five faculty still in BCS who had engaged in protected activity.

d.  On April 24, 2017, DeAngelis said in reference to Heilbronner not getting the job, "That's what you get when you use the department as a political football and break confidentiality. Even if it's legal to talk about your experiences it is going to cause damage and you should expect that." By "break confidentiality," DeAngelis was clearly referring to the Plaintiffs' engaging in protected activity by speaking out against violations of Title VII and Title IX.

e.  On April 26, 2017, DeAngelis told Mahon and Cantlon that it was stupid of Hayden and Heilbronner to get involved in the complaint against Jaeger while Heilbronner needed a job.

    f.    On April 26, 2017, DeAngelis told Mahon and Cantlon that he had Heilbronner's hiring under control previously, implying that the complaint and her involvement had cost her the job.

    g.    In June 2017, Dean Lennie told Mahon and Cantlon that some people in the administration thought the best way to solve the problem was for the Plaintiffs to leave Rochester.

    h.    Neuroscience Chair Foxe told Mahon and Cantlon that he had received pushback from central administrators when he tried to retain another Plaintiff, Aslin.

449.    UR took materially adverse action against Heilbronner by constructively discharging her in violation of Title VII and New York Human Rights Law. After Heilbronner and people she is associated with, including her spouse Hayden, engaged in legally protected activity, UR intentionally made Heilbronner's environment so hostile that any reasonable person in her position would have resigned. UR made it impossible for her to progress her career in BCS or elsewhere in UR.

450.    Heilbronner has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.

## COUNT X

### TITLE VII and NYSHRL – HOSTILE ENVIRONMENT AGAINST CANTLON BY DEFENDANT UNIVERSITY OF ROCHESTER

451.    Cantlon re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

452.    UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

453.    Cantlon is and, at all pertinent times, was a female employee of UR.

454.    When Cantlon, despite her tenuous status as a junior faculty member, got up the courage to come forward in March 2016 to complain to UR about Jaeger's illegal conduct and the hostile environment it created for students and employees, including her, her complaints were brushed off and she, not Jaeger, was subjected to adverse actions by the University.

455.    UR had a duty to adequately respond to the complaints of Cantlon and others against Jaeger, to remedy the hostile work environment that resulted from Jaeger's sex-based harassment, and to prevent additional harassment by Jaeger.

456.    Despite its duties and Cantlon's persistence in attempting to get UR to take action, UR failed to reasonably and adequately address her complaints or similar complaints of others.  It took no action to protect Cantlon or other Plaintiffs, witnesses, or victims of the sexual harassment and hostile work environment engendered by Jaeger. It took no action to remedy the conduct by Jaeger or the hostile work environment towards females.  It took no sincere action to protect victims of Jaeger's conduct or prevent future sexual harassment by Jaeger.

457.    Jaeger's behavior created a working environment that was severe, pervasive, intimidating, hostile, and offensive to Cantlon and other female employees in the department.

458.    Through its failures and treatment of Cantlon and others who complained about sexual harassment and discrimination as adversaries, UR contributed to and exacerbated the hostile working environment for female employees. It gave license to its employees, including DeAngelis and other faculty, to treat Cantlon and other female

employees, or employees associated with this group via their complaints, with hostility and disdain. See for example paragraphs 312 to 315.

459.     The hostile environment based on sex created a hostile and intimidating work environment for Cantlon and interfered with her ability to do her job to the point that she began to look for other work.

460.     Any reasonable person would consider the work environment in BCS, where there were consequences for those who complained about sexual harassment but not those who perpetrated it, to be intimidating, hostile, and abusive.

461.     Cantlon has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.

## COUNT XI

**TITLE VII and NYSHRL – HOSTILE ENVIRONMENT AGAINST KIDD
BY DEFENDANT UNIVERSITY OF ROCHESTER**

462.     Kidd re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

463.     UR is and, at all pertinent times, was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the New York Human Rights Law, N.Y. Exec. Law § 292(5).

464.     Kidd is and, at all pertinent times, was a female employee of UR.

465.     Jaeger persistently sexually harassed Kidd while she was a student from 2007 to 2013.  She reported this to the University.  The harassment was intimidating and

virtually unbearable.  She spoke up about it in 2013, but the University took no action to protect her or to discipline Jaeger.

466.     As a faculty member in the department, Kidd has continued to have to work in proximity to Jaeger and hear about his continued harassment of women.

467.     In March 2016, when Cantlon and Aslin decided to file a complaint about Jaeger, Kidd confided her experiences to Aslin.  She participated in the investigation by sharing with University officials the emotionally difficult story of her harassment by Jaeger, most notably with Nearpass.

468.     The University had a duty to adequately respond to the complaints of Kidd and others against Jaeger, to remedy the hostile work environment that resulted from Jaeger's sex-based harassment, and to prevent additional harassment by Jaeger.

469.     Despite its duties, the University took no action to protect Kidd or other Plaintiffs, witnesses, or victims of the sexual harassment and a hostile work environment. It took no action to remedy the conduct by Jaeger or the hostile work environment towards females.  It took no action to protect victims of Jaeger's conduct or prevent future sexual harassment by Jaeger.

470.     Instead, the University punished Kidd.   It labelled her publicly as unreliable to third parties.  In official report written by a University lawyer who made no serious effort to ascertain the facts or check them with Kidd, it allowed her to be characterized as a scorned lover of Jaeger (despite their total lack of romantic involvement), failed to properly protect her confidentiality, and clearly aligned itself with Jaeger.

471.     Through its failures and treatment of Kidd and others who complained about sexual harassment and discrimination as adversaries, the University contributed to and exacerbated the severe and pervasive hostile working environment for female employees.

472.     The hostile work environment based on sex created a hostile and intimidating work environment for Kidd and interfered with her ability to do her job to the point that she began to look for other work.

473.     Any reasonable person would consider the work environment in the department, where there were consequences for those who complained about sexual harassment, but not those who perpetrated it, to be intimidating, hostile, and abusive.

474.     Kidd has exhausted all administrative remedies and fulfilled all conditions precedent necessary to the maintenance of this claim.

## COUNT XII

**TITLE IX and NYSHRL – HOSTILE ENVIRONMENT AGAINST BIXBY
BY DEFENDANT UNIVERSITY OF ROCHESTER**

475.     Bixby re-alleges and incorporates the allegations set forth above in Paragraphs 33 to 376.

476.     UR carries out one or more education programs or activities receiving Federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681(a).

477.     Bixby was enrolled in the Ph.D. program at BCS, an education program or activity at UR, from 2010 to August 4, 2017, when she defended her dissertation.

478.    Jaeger's relentless harassment of women in BCS created an environment where Bixby has avoided Jaeger so that she would not have to be subjected to his inappropriate behaviors. She felt viscerally unsafe around him.

479.    Avoiding Jaeger harmed Bixby's professional prospects because it resulted in her missing networking and learning opportunities when Jaeger was present and not developing a relationship with Jaeger, a senior faculty member whose endorsement has influence in the academic community.

480.    Bixby reported Jaeger's behavior and its effect on her and other students to BCS Chair DeAngelis in fall 2013. DeAngelis took no substantive action against Jaeger, nor did he provide any support to Bixby. Bixby gave DeAngelis the names of several other women who had been negatively affected by Jaeger's misconduct. DeAngelis did not follow up with all of the women. He did speak to Kidd and another former BCS student who both corroborated Bixby's complaint with their own experiences of Jaeger's misconduct.

481.    The letter Bixby wrote to the Deans with four other students on August 23, 2016, stated: "I experienced and/or witnessed harassment and inappropriate sexual comments from Florian Jaeger during my time in the BCS department. His behavior created an environment that adversely affected my professional development, including missed educational opportunities at courses/workshops he led, missed networking with my peers at social events he attended, and/or missed academic collaborations with his advisees."

482.    Bixby also sent a follow-up e-mail to Levy because no one had substantively replied to her or even scheduled a time to meet for a month. Bixby learned

that the letter, which clearly described sexual harassment by Jaeger, was not being considered a formal Title IX complaint but instead an expression of "concerns about the investigative process."

483.    UR had a duty to respond adequately to the complaints of Bixby and others against Jaeger, to remedy the hostile educational environment that resulted from Jaeger's sex-based harassment, and to prevent additional harassment by him.

484.    Despite its duties, UR did not investigate the additional complaints raised by Bixby and the other four authors of the letter which raised sexual harassment and hostile educational environment concerns.   Instead, UR characterized the letter as constructive criticism and not a new complaint, in order to have an excuse for thoroughly ignoring it.

485.    In the following months Bixby made several attempts to speak to Levy and UR administrators about how its policies were failing to protect her and other students. Each time she was brushed off. See for example 274, 276, 277, 280 and 294.

486.    UR took no action to protect Bixby or other Plaintiffs, witnesses, or victims of the sexual harassment and hostile educational environment.  It took no action to remedy the conduct by Jaeger or the hostile educational environment for women in the department.  It took no sincere action to protect victims of Jaeger's conduct or prevent future sexual harassment by Jaeger.

487.    UR was deliberately indifferent to the repeated, consistent complaints regarding the hostile environment.   It not only failed to appropriately address the

discrimination, it also supported Jaeger while disregarding and, worse, punishing those who complained about his harassing behaviors.

488.     Through its failures and treatment of Bixby and others who complained about sexual harassment and discrimination as adversaries, UR contributed to and exacerbated the hostile environment for female students in the department.

489.     The hostile educational environment based on sex created a hostile and intimidating environment for Bixby and interfered with her studies and ability to pursue professional advancement.

## COUNT XIII

### TITLE IX – RETALIATION AGAINST ASLIN, NEWPORT, CANTLON, KIDD, PIANTADOSI, MAHON, HAYDEN, and HEILBRONNER BY DEFENDANT UNIVERSITY OF ROCHESTER

490.     Aslin, Newport, Cantlon, Kidd, Piantadosi, Mahon, Hayden, and Heilbronner re-allege and incorporate the allegations set forth above in Paragraphs 33 to 376.

491.     UR carries out one or more education programs or activities receiving Federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681(a).

492.     Since March 2016, Aslin engaged in protected activities listed in paragraph 380 above, which include speaking out against violations of Title IX.

493.     Since March 2016, when Aslin began to continuously engage in protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Aslin's engagement in protected activities.

494.     As a direct result of and in retaliation for his protected activities, UR took the adverse school-related actions outlined in paragraph 382 above against Aslin.

495.     Since March 2016, Newport engaged in protected activities listed in paragraph 394 above, which include speaking out against violations of Title IX.

496.     Since March 2016, when Newport began to continuously engage in protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Newport's engagement in protected activities.

497.     As a direct result of and in retaliation for her protected activities, UR took the adverse school-related actions against Newport outlined in paragraph 395 above.

498.     Since March 2016, Cantlon engaged in protected activities listed in paragraph 401 above, which include speaking out against violations of Title IX.

499.     Since March 2016, when Cantlon began to continuously engage in protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Canton's engagement in protected activities.

500.     As a direct result of and in retaliation for her protected activities, UR took the adverse school-related actions against Cantlon outlined in paragraph 402 above.

501.     Since March 2016, Kidd engaged in protected activities listed in paragraph 408 above, which include speaking out against violations of Title IX.

502.     Since March 2016, when Kidd began to continuously engage in protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Kidd's engagement in protected activities.

503.     As a direct result of and in retaliation for her protected activities, UR took the adverse school-related actions against Kidd outlined in paragraph 409 above.

504.     Since March 2016, Piantadosi engaged in protected activities listed in paragraph 415 above, which include speaking out against violations of Title IX.

505.     Since March 2016, when Piantadosi began to continuously engage in protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Piantadosi's engagement in protected activities.

506.     As a direct result of and in retaliation for his protected activities, UR took the adverse school-related actions against Piantadosi outlined in paragraph 418 above.

507.     Since March 2016, Mahon engaged in protected activities listed in paragraph 423 above, which include speaking out against violations of Title IX.

508.     Since March 2016, when Mahon began to continuously engage in protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Mahon's engagement in protected activities.

509.     As a direct result of his and in retaliation for protected activities, UR took the adverse school-related actions against Mahon outlined in paragraph 426 above.

510.     Since March 2016, Hayden engaged in protected activities listed in paragraph 431 above, which include speaking out against violations of Title IX.

511.     Since March 2016, when Hayden began to continuously engage in protected activities in opposition to unlawful and discriminatory practices at the University, UR was aware of Hayden's engagement in protected activities.

512.     As a direct result of and in retaliation for his protected activities, UR took the adverse school-related actions against Hayden outlined in paragraph 432 above.

513.     As a direct result of and in retaliation for Hayden's engagement in protected activities, UR took the adverse school-related actions against Heilbronner outlined in paragraphs 446 to 449 above.

## COUNT XIV

### DEFAMATION PER SE AGAINSTASLIN, CANTLON, HAYDEN, PIANTADOSI, KIDD, MAHON and NEWPORT BY DEFENDANTS JOEL SELIGMAN and UNIVERSITY OF ROCHESTER

514.     Aslin, Newport, Cantlon, Kidd, Piantadosi, Mahon, Hayden, and Heilbronner re-allege and incorporate the allegations set forth above in Paragraphs 33 to 376.

515.     Seligman made false statements about the named Plaintiffs to a number of influential people at UR, including without limitation:

     a.   telling Linguistics Chair Runner that the complaints against Jaeger were hearsay (see paragraph 294 above).

     b.   telling Neuroscience Chair Foxe that the complaints against Jaeger were hearsay and that the Plaintiffs had overreacted (see paragraph 295 above).

516.    These statements were false.  Even if Seligman had not reviewed any of Nearpass's notes with witnesses who gave testimony on their direct experiences, Seligman was aware that both Kidd and Bixby had direct experience of Jaeger's misconduct.

517.    These statements were made intentionally to call the Plaintiffs' credibility into question. By portraying the Plaintiffs as dishonest or overreacting, Seligman impugned their professionalism to their colleagues.

518.    On January 10, 2017, BCS Chair DeAngelis, while acting in the course and scope of his employment, armed with emails obtained without notice or permission to Plaintiffs provided to him by UR administration and an assurance from Seligman that the claims against Jaeger were hearsay, falsely stated to the BCS faculty that he had proof in the emails in front of him that showed "manipulation and deception of faculty members" and the "smearing" of Jaeger. He said that the emails showed widespread lying, deceit, and manipulation of the complaints against Jaeger.

519.    Everyone present knew Aslin, Cantlon, Newport, Mahon, Hayden, Kidd, and Piantadosi to be the faculty involved in lodging complaints against Jaeger.

520.    These statements were false. DeAngelis later admitted to the Plaintiffs that their emails held no proof of deceit or manipulation or smearing of Jaeger. Because DeAngelis defamed the Plaintiffs by "disciplining" the Plaintiffs in his role as Department Chair, the University is vicariously liable for his actions.

521.    UR Counsel's Office supported Jaeger in defaming the Plaintiffs. Jaeger wrote to influential people in the scientific community stating that he had been falsely

accused and bullied, and that the person who had complained against him had resigned. Jaeger provided the Counsel's office contact details to these individuals so that they could confirm his account.

522.   These statements were false. Aslin had resigned because of UR's retaliation against him, not because he was wrong to complain about Jaeger. Aslin and the other Plaintiffs had not bullied Jaeger but rather engaged in protected activity in opposition to Jaeger's unlawful sexual misconduct at the University.

523.   In September 2017, Seligman denied the allegations in the Plaintiff's EEOC complaints and likened the complaint to a well-known article in *Rolling Stone*, which was later revealed to be based on fabricated testimony. The article is often used to undermine the credibility of sexual assault complaints.

524.   These false statements were published on the University of Rochester website on September 9, 2017.

525.   Seligman knew that his statements suggesting that the witnesses in the EEOC Complaint had been fabricated were false. Seligman knew that many women at UR had been affected by Jaeger's misconduct. The Plaintiffs had kept Seligman well informed of this fact. Many of the women referred to in the EEOC Complaint had also shared their experiences with Nearpass.

526.   By accusing the Plaintiffs of fabricating evidence and lying to their employers and the public, Seligman impugned Plaintiffs' professional reputation.

527.   On October 17, 2017, the Special Committee stated that it had received a letter from the EEOC Plaintiffs declining to participate in White's investigation: "The

Special Committee has requested and sincerely hopes that the complainants will reconsider and cooperate with the investigation."

528.     These statements were false. The Plaintiffs had made clear to the Chair of the Special Committee that they wanted to work with the Special Committee to create positive change at UR but felt that the investigation had put them in an untenable position due to their outstanding legal claims which UR refused to resolve so that Plaintiffs could contribute without difficulty to the investigation. The Special Committee intentionally mischaracterised its interaction with the Plaintiffs in order to make Plaintiffs look unreasonable and self-interested when in fact they approached the Committee to find a way that they could participate.

529.     These statements were published on October 17, 2017, on the University website.

530.     The false statements made by UR, Seligman and Clark seriously call into question the Plaintiffs' fitness for their profession. As academics and research scientists, the Plaintiffs must be seen to have integrity and to be utterly trustworthy. Honest and integrity are crucial characteristics in their profession for at least the following reasons:

    a.   Research scientists rely heavily on grants to fund their work. An applicant's scientific integrity, a concept inextricably tied to honesty, must be beyond question. If a grant-making body thought that a researcher was capable of making up evidence – as UR has accused the Plaintiffs of doing – the grant-making body would never support that researcher.

    b.   Similarly, the scientific community and publishers must be able to trust in the integrity of the researcher's work. If the researcher's scientific integrity or honest is questionable, publishers are unlikely to select their work for publication and institutions are unlikely to invite that researcher to give talks or present at conferences. Publishing and presenting work are both essential components of any academic career.

c. Labs need high quality Ph.D. students and post-docs to contribute to faculty members' research. Choosing a lab is a big decision for these students and post-docs – where they work and who they work for can have a profound effect on their own careers. They are unlikely to work in the lab of someone who is considered to be dishonest or to have a history of bullying others.

d. Serving on committees or in other leadership roles in departments or throughout the University is another key part of an academic career. These opportunities are key to obtaining leadership positions and building a good reputation. Failing to do any service for one's department or university reflects poorly on an academic's reputation and suitability for the profession. The Plaintiffs have been accused of dishonesty, bullying, and manipulation. They have been barred from serving on committees or as ombudspersons because they are not trusted to be honest and unbiased.

531.   As academics and research scientists, honesty and integrity are essential to Plaintiffs' professional success. Provost Clark, President Seligman, and UR knew this when each false statement referenced was made.

532.   As a result of the false attacks on Plaintiffs' professional reputation in the academic and scientific communities, Aslin, Cantlon, Hayden, Piantadosi, Kidd, Mahon and Newport have been damaged as a matter of law.

## COUNT XV

**NYSHRL - AIDING AND ABETTING RETALIATION AGAINST ASLIN, CANTLON, HAYDEN, PIANTADOSI, KIDD, MAHON and NEWPORT BY DEFENDANT JOEL SELIGMAN**

533.   Aslin, Newport, Cantlon, Kidd, Piantadosi, Mahon, Hayden, and Heilbronner re-allege and incorporate the allegations set forth above in Paragraphs 33 to 376.

534.   Seligman was at all relevant times President of the University of Rochester.

535.    Seligman aided and abetted the discrimination and retaliation against

Aslin, Newport, Cantlon, Kidd, Piantadosi, Mahon, Hayden and Heilbronner in at least

the following ways:

a.    Creating an environment where good faith complaints are routinely swept
under the rug as described in paragraphs 343 to 347 above.

b.    Wilfully ignoring the Plaintiffs when they contacted him to convey their
concerns about violations of Title VII and Title IX.

c.    Making false statements to at least three department heads that the case
against Jaeger was all hearsay and that the Plaintiffs had overreacted.

d.    Publicly comparing the EEOC complaint to a well-known article in
*Rolling Stone* which was based on fabricated testimony.

e.    Authorizing or permitting the searching of the Plaintiffs' emails in an
effort to undermine their credibility.

f.    Permitting and/or instructing UR administration to encourage Plaintiffs'
departure from UR and not to retain them.

## COUNT XVI

### NYSHRL - AIDING AND ABETTING RETALIATION AGAINST ASLIN, CANTLON, HAYDEN, PIANTADOSI, KIDD, MAHON and NEWPORT as to DEFENDANT ROBERT CLARK

536.    Aslin, Newport, Cantlon, Kidd, Piantadosi, Mahon, Hayden, and

Heilbronner re-allege and incorporate the allegations set forth above in Paragraphs 33 to

376.

537.    Clark was at all relevant times Dean or Provost of the University of

Rochester.

538.     Clark aided and abetted the discrimination and retaliation against Aslin, Newport, Cantlon, Kidd, Piantadosi, Mahon, Hayden and Heilbronner in at least the following ways:

    a.   Creating an environment where good faith complaints are routinely swept under the rug as described in paragraphs 343 to 347 above.

    b.   Writing a defamatory and retaliatory letter to the BCS faculty accusing the Plaintiffs of spreading rumors and behaving unprofessionally.

    c.   Wilfully ignoring the Plaintiffs when they contacted him to convey their concerns about violations of Title VII and Title IX.

    d.   Permitting and/or instructing UR administrators to encourage Plaintiffs' departure from UR and not to retain them.

*Continued on next page*

## **RELIEF SOUGHT**

WHEREFORE, having set forth the above-described legally sufficient causes of action against the Defendants, Plaintiffs pray for the entry of Final Judgement against all Defendants jointly and severally, for damages in an amount not yet quantified but to be proven at trial, for costs and attorneys' fees, and for any other and further relief which is just and proper.

Respectfully submitted,

DATE: December 8, 2017

By:    /s/ John F. McAllister
By: Attorney John F. McAllister
McALLISTER OLIVARIUS
*Attorneys for Plaintiffs*

68 Putnam Street
PO Box 173
Saratoga Springs, NY 12866

The Pearce Building
West Street
Maidenhead, SL6 1RL UK
Telephone:          (518) 633-4775
UK Telephone:      +44 1628 567 567
Facimile:          (781) 658-2480
Email: jmcallister@mcolaw.com

By:    /s/ Stephen G. Grygiel
By: Attorney Stephen G. Grygiel

*Of Counsel*

201 N Charles ST 26th Floor
Baltimore, Maryland 21201
Telephone:  (410) 385-2225
Facimile:      (410) 547-2432
Email: sgrygiel@mdattorney.com