UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RICHARD ASLIN, KETURAH BIXBY,
JESSICA CANTLON, BENJAMIN HAYDEN,
SARAH HEILBRONNER, CELESTE KIDD,
BRADFORD MAHON, ELISSA NEWPORT,
and STEVEN PIANTADOSI

                                        Plaintiffs,

                                                                **Case No.: 6:17-cv-06847-LJV**

Vs.

UNIVERSITY OF ROCHESTER,
JOEL SELIGMAN, and ROBERT CLARK

                                        Defendants

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
COMPLAINT, TO STRIKE CERTAIN ALLEGATIONS AND TO REQUIRE PLAINTIFFS
TO RE-PLEAD IN ACCORDANCE WITH RULES 8 AND 10**

_____

                                                Respectfully submitted,


                                                /s/ John F. McAllister
                                                John F. McAllister
                                                Ann Olivarius
                                                McAllister Olivarius
                                                68 Putnam Street, PO Box 173
                                                Saratoga Sprints, NY 12866
                                                (518) 633-4775
                                                jmcallister@mcolaw.com

                                                Stephen G. Grygiel
                                                201 N. Charles St. 26th Floor
                                                Baltimore, MD 21201
                                                (410) 385-2225
                                                sgrygiel@mcolaw.com
                                                *Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................iii

PRELIMINARY STATEMENT ........................................................... 1

ARGUMENT ................................................................................. 2

POINT I: PLAINTIFFS HAVE SUFFICIENTLY PLEADED
    RETALIATION CLAIMS (COUNTS I, III, IV, V, VI, VII, VII, X, XIII) .............. 2

    A.  Plaintiffs Pleaded Materially Adverse Employment
        Actions, not Merely Criticism .................................................. 2

    B.  Defendants' Violations of Plaintiffs' Confidentiality
        Rights Were Materially Adverse Employment Actions ......................... 4

    C.  Surveillance of Plaintiffs' Emails Were Materially
        Adverse Actions .................................................................. 5

    D.  Defendants' Independent Investigation was Retaliatory ...................... 6

    E.  Jaeger's Participation in Kidd's and Piantadosi's
        Evaluations was Retaliatory ................................................... 7

    F.  Defendants' Failure to Retain Hayden was Retaliatory......................... 8

    G.  Defendants' Destruction of Plaintiffs' Plan to Move
        to RIT was Retaliatory ......................................................... 9

    H.  Defendants' Exclusion of Plaintiffs from Important
        Professional Meetings was Retaliatory ...................................... 9

    I.  Defendants' Refusal to Hire Heilbronner was Retaliatory ................... 10

    J.  Plaintiffs are Not Required to Allege a Change in Their
        Current or Future Prospective Employment ................................ 11

    K.  Newport's Retaliation Claim is Sufficiently Pleaded ....................... 11

POINT II: PLAINTIFFS SUFFICIENTLY PLEADED AIDED
AND ABETTING (COUNTS XV, XVI) .............................................. 12

POINT III: CANTLON AND KIDD SUFFICIENTLY PLEAD
    HOSTILE WORK ENVIRONMENT CLAIMS (COUNTS X, XI) ................... 14

    A.  Cantlon's Hostile Environment Claim .......................................... 16

    B.  Kidd's Hostile Environment Claim .............................................. 18

POINT IV: BIXBY'S TITLE IX HOSTILE EDUCATION ENVIRONMENT
    CLAIM IS SUFFICIENTLY PLEADED (COUNT XII) ..................................... 20

POINT V: ASLIN AND HAYDEN SUFFICIENTLY PLEADED
    BREACH OF CONTRACT .................................................................. 22

POINT VI: PLAINTIFFS SUFFICIENTLY PLEAD CLAIMS
    OF DEFAMATION PER SE (COUNT XIV) ....................................... 24

    A.  All of the Alleged Statements Contain Defamatory

Factual Statements ......................................................................... 24

**B. All of the Alleged Statements are "Of and Concerning" the Plaintiffs** .................................................................................. 25

**C. None of the Alleged Statements were Privileged** ........................... 26

**D. Plaintiffs Sufficiently Pleaded Defamation *Per Se*** ......................... 28

**POINT VII: PLAINTIFFS COMPLIED WITH THE FEDERAL RULES, NO ALLEGATIONS SHOULD BE STRICKEN AND THE COMPLAINT SHOULD NOT BE REPLEADED** .......................................................... 30

**A. UR Ignores the Requirements of *Twombly/Iqbal*** ............................ 30

**B. Motions to Strike are Generally Disfavored** .................................... 31

**C. None of the Challenged Allegations are Improper or Intended to Embarrass** ........................................................................ 32

**D. Plaintiffs Properly Used Pseudonyms** ............................................. 33

**E. Plaintiffs' Complaint Complies with Rules 8 and 10** ..................... 33

**CONCLUSION** ......................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Napolitano*, 774 F. Supp. 2d 186 (D.D.C. 2011) .................................................. 9

*Anderson v. Davis Polk & Wardwell, LLP*, 850 F. Supp. 2d 392 (S.D.N.Y. 2012) ..................... 31

*Anderson News* v. Am. Media, 680 F. 3d 162 (2d Cir. 2012) ................................................ 35

*Arista Records, LLC v. Doe 3*, 604 F. 3d 110 (2d Cir. 2010) ................................................ 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................. 30, 34

*Barker v. Columbus Reg'l Healthcare Sys.*, 977 F. Supp. 2d 1341 (M.D. Ga. 2013) ..................... 34

*Bell Atlantic Corp. v. Twombly.* 550 U.S. 544 (2007) .......................................... 2, 28, 30, 34

*Bickerstaff v. Vassar College*, 354 F. Supp. 2d 276 (S.D.N.Y. 2004) ...................................... 3

*Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997) ............................................... 20

*Bowles v. N.Y.C. Transit Auth.*, 2006 WL 1418602 (S.D.N.Y. May 23, 2006) .......................... 4, 5

*Britt v. Buffalo Mun. Housing Auth.*, 2008 WL 4501929 (W.D.N.Y. Sept. 30, 2008) ...................... 31

*Burlington Northern & Santa Fe Ry Co. v. White*,
    548 U.S. 53 (2006) .......................................................... 2, 3, 7, 8, 11, 12, 30

*Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364 (W.D.N.Y. 2012) ................................ 26, 28

*Cf. Eldridge v. Rochester City School Dist.*, 968 F. Supp. 2d 546 (W.D.N.Y. 2013) ...................... 7

*Celle v. Filipino Reporter Enters., Inc.*, 209 F. 3d 163 (2d Cir. 2000) .................................... 24

*Chandok v. Klessig*, 632 F. 3d 803 (2d Cir. 2011) ........................................................ 27

*Chicherchia v. Cleary*, 207 A.D. 2d 855, 616 N.Y.S. 2d 647 (2d Dep't 1994) ......................... 25, 26

*Cody v. City of Nassau*, 577 F. Supp. 2d 623 (E.D.N.Y. 2008) ............................................ 3

*Cruz v. Oxford Health Plans, Inc.*, 2004 WL 2609528 (S.D.N.Y. Nov. 17, 2004) ....................... 31

*Dardashtian v. Gitman*, 2017 WL 6398718 (S.D.N.Y. Nov. 28, 2017) ................................... 26

*Davis v. Verizon Wireless*, 389 F. Supp. 2d 458 (W.D.N.Y. 2005) ......................................... 8

*Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499 (S.D.N.Y. 2016) ......................... 17

*Dorriz v. Dist. of Columbia*, 133 F. Supp. 3d 186 (D.D.C. 2015) .......................................... 9

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162
(S.D.N.Y. 2011) ...................................................................................... 22

*Evanoff v. New York State*, 2013 WL 6181853 (W.D.N.Y. Nov. 25, 2013) ............................. 4, 5

*Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2s 167 (W.D.N.Y. 2003) ............................... 26

*Fall v. MNP Corp.*, 2008 WL 1882669, n. 8 (E.D. Mich. Apr. 24, 2008) ................................. 20

*Fincher v. Depository Trust and Clearing Corp.*, 604 F. 3d 712 (2d Cir. 2010) ......................... 13

*Fitzgerald v. Henderson*, 251 F. 3d 345 (2d Cir. 2001) .................................................. 15

*Fleming v. MaxMara USA, Inc.*, 371 Fed. Appx. 115 (2d Cir. 2010) ..................................... 16

*Friedman v. Bloomberg L.P., et al.*, No. 16-1335-cv (2nd Cir. March 1, 2018) .......................... 25

*Giarrizo v. Holder*, 2011 WL 4964945 (N.D.N.Y. 2011) ................................................. 11

*Guy v. N.Y.C. Transit Co.*, 2016 WL 8711080 (E.D.N.Y. Sep. 23, 2016) .................................. 2

*Hicks v. Baines*, 593 F. 3d 159 (2d Cir. 2010) .................................................... 7, 8, 11

*Hitchcock v. Angel Corps, Inc.*, 718 F. 3d 733 (7th Cir. 2013) ............................................ 5

*Isakov v. HASC Center, Inc. Druker*, 2018 WL 1114714 (E.D.N.Y. Feb. 27, 2018) ....................... 2

*Jamison v. Chapman*, 2009 WL 3762348 (N.D.N.Y. 2009) ............................................... 17

*Kader v. Paper Software, Inc.*, 111 F. 3d 337 (2d Cir. 1997) ............................................ 22

*Keady v. Nike, Inc.*, 116 F. Supp. 2d 428 (S.D.N.Y. 2000) .......................................... 22, 23

*Kforce, Inc. v. Alden Personnel, Inc.*, 288 F. Supp. 2d 513 (S.D.N.Y. 2003) ......................... 29, 30

*Liberman  v. Gelstein*, 80 N.Y.S. 2d 429 (1992) .................................................. 28, 29

*Littlejohn v. City of New York*, 795 F. 3d 297 (2d Cir. 2015) ............................................ 35

*M'Baye v. World Boxing Ass'n.*, 2007 WL 844552 (S.D.N.Y. Mar. 21, 2007) .............................. 31

*Marcus v. Barilla Am. NY, Inc.*, 14 F. Supp. 2d 108 (W.D.N.Y. 2014) ............................................ 18

*Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451 (S.D.N.Y. 2014) ......................................... 22

*Marshall v. N.Y.S. Pub. High School Athletic Ass'n, Inc.*, 2017 WL 6003228
   (W.D.N.Y. Dec. 4, 2017) .......................................................................................................... 31

*Matthews v. Corning, Inc.*, 77 F. Supp. 3d 275 (W.D.N.Y. 2014) ................................................... 8

*McCullough v. Xerox Corp.*, 942 F. Supp. 2d 380 (W.D.N.Y. 2013) ........................................... 16

*McGullam v. Cedar Graphics, Inc.*, 609 F. 3d 70 (2d Cir. 2010) ............................................ 19, 21

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) ................................................................ 21

*Millea v. Metro-North R.R.*, 658 F. 3d 154 (2d Cir. 2011) ......................................................... 4, 5

*Molina-Reyes v. Molina-Rodriguez*, 711 F. 3d 49 (1st Cir. 2013) ............................................... 30

*Morales-Evans v. Admin. Office of the Courts of New Jersey*, 102 F. Supp. 2d 577
   (D.N.J. 2000) ......................................................................................................................... 18

*Murphy v. Sr. Investigator Neuberger*, 1996 WL 442797 (S.D.N.Y. Aug. 6, 1996) .................... 22

*Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) .................................................. 18, 19

*Onondaga Sheriff's Dep't*, 760 F. 3d 139 (2d Cir. 2014) ................................................................ 7

*Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F. 3d 81 (2d Cir. 2011) .................... 21

*Parrish v. Sollecito*, 2002 WL 1072227 (S.D.N.Y. May 28, 2002) ............................................. 31

*Penn. State Police v. Suders*, 542 U.S. 129 (2004) ...................................................................... 20

*Petrosino v. Bell Atl.*, 385 F. 3d 210 (2d Cir. 2004) ........................................................ 14, 17, 23

*Plaintiff B v. Francis*, 631 F. 3d 1310 (11th Cir. 2011) ................................................................. 34

*Politico v. Promus Hotels, Inc.*, 184 F.R.D. 232 (E.D.N.Y. 1999) .............................................. 34

*Posteraro v. Northport-East Northport Union Free School Dist.*, 2012 WL 3289009
   (E.D.N.Y. Aug. 10, 2012) ................................................................................................. 24, 25

*Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252 (S.D.N.Y. 2014) ........................................... 23

*Rochester-Genesee Reg'l Trans. Auth. V. Cummins, Inc.*, 2010 WL 2998768
   (W.D.N.Y. July 28, 2010) ....................................................................................................... 22

*Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184 (W.D.N.Y. 2013) ......................................... 28

*Schwapp v. Town of Avon*, 118 F. 3d 106, 109 (2d Cir. 1997) .................................................... 17

*Sellers v. First Student, Inc.*, 2016 WL 6440111 (D. Conn. Oct. 28, 2016) ................................. 30

*Steinhilber v. Alphonse*, 68 N.Y. 2d 283 (1986) ........................................................................... 24

*Sud v. Sud*, 211 A.D. 2d 423, 424 (1st Dep't 1995) ...................................................................... 22

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 596 (2002) ...................................................................... 1

*Tagliaferri v. Szulik*, 966 F. Supp. 2d 339 (S.D.N.Y. May 25, 2016) ......................................... 29

*Terry v. Ashcroft*, 336 F. 3d 128 (2d Cir. 2003) .............................................................. 15, 16, 19

*Thai v. Cayre Group, Ltd.*, 726 F. Supp. 2d 323 (S.D.N.Y) ................................................... 26, 27

*Thompson v. Advanced Armament Corp., LLC*, 614 Fed. Appx. 523, (2d Cir. 2015) ..................... 22

*Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143 (E.D.N.Y. 2014) ....................................... 24, 28

*Timothy v. Our Lady of Mercy Med Center,* 2004 WL 503760
   (S.D.N.Y. Mar. 12, 2004) ......................................................................................................... 3

*Torres v. Pisano*, 116 F. 3d 625, 633 (2d Cir. 1997) ................................................................... 17

*Van Zant v. KLM Royal Dutch Airlines*, 80 F. 3d 708 (2d Cir. 1996) .......................................... 19

*Vasquez v. Southside United Hous. Dev. Fund Corp.*, 2009 WL 2596490
   (E.D.N.Y. Aug. 21, 2009) ......................................................................................................... 3

*Wanamaker v. Columbian Rope Co.*, 108 F. 3d 462 (2d Cir. 1997)............................... 3, 12, 13

*Washington v. Ill. Dep't of Revenue*, 420 F. 3d 658 (7th Cir. 2005) ............................................. 3

*Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F. 3d 62 (2d Cir. 2000) ............................. 15, 19

*Whipple v. Reed Eye Assoc.*, 213 F. Supp. 3d 492 (W.D. N.Y. 2016) ......................................... 14

*Zelnik v. Fashion Institute of Technology*, 464 F. 3d 217 (2d Cir. 2006) ........................................ 7

*Zucco v. Auto Zone, Inc.*, 800 F. Supp. 2d 473 (W.D.N.Y. 2011) .............................................. 16

**Rules**

Fed. R. Civ. P. 5.2 ........................................................................................................ 34
Fed. R. Civ. P. 8(a)(2) .................................................................................................. 35
Fed. R. Civ. P. 10 ......................................................................................................... 34
Fed. R. Civ. P. 12(3) .................................................................................................... 35
Fed. R. Civ. P. 12(f) ........................................................................................... 30, 31, 33
Fed. R. Civ. P. 15(a)(2) ................................................................................................ 35
Local Rule 5.3 ............................................................................................................... 34

**PRELIMINARY STATEMENT**

UR, seeking to minimize the series of materially adverse employment actions Plaintiffs suffered by artificially disaggregating them, gives only lip service to black letter law requiring evaluation of individual claims in light of the Complaint as a whole and of the "totality of the circumstances" that Plaintiffs faced in the context of their particular employment. Attacking Plaintiffs for not filing a simple notice pleading complaint, UR contradictorily argues Plaintiffs fail to allege sufficient facts to support their claims.

Plaintiffs, highly regarded senior faculty, engaged in protected activity, identified a sexual harasser who had created a hostile environment in the BCS department[1] and repeatedly entreated UR to protect students and faculty. For having the temerity to engage in statutorily protected conduct, the Plaintiffs were vilified and ostracized, and compelled to leave, or seek to leave, the department they had built into a national powerhouse and the university and community they loved. This is a case for discovery and resolution on the facts, not on UR's say-so of "nothing to see here."

**ARGUMENT**

**I.      PLAINTIFFS HAVE SUFFICIENTLY PLEADED RETALIATION CLAIMS (COUNTS I, III, IV, V, VI, VII, VII, X, XIII)**

UR's first words attacking Plaintiffs' retaliation claims, "[a] *prima facie* case of retaliation consists of…,".Br. at 2, would erroneously impose a more stringent standard than the law of pleadings permits. The *prima facie* standard is an evidentiary, not a pleading, standard. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 596, 510 (2002) ("This Court has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."). *Swierkiewicz's* liberal pleading standard applies to retaliation claims. Plaintiffs are

---

[1] At the instigation of some of the Plaintiffs, the University Counsel's Office investigated the sexual harasser, Professor Jaeger, and cleared him in June 2016, Cplt. ¶¶ 244. Plaintiffs' frustration with what they considered a whitewash prompted them to make repeated requests to senior administrators to reconsider, which were unavailing, and finally to file their EEOC complaints. Bad publicity then induced the University to hire an outside law firm to investigate, which concluded: "A combination of Jaeger's harsh and demeaning language, flirtatious behavior, use of sexual innuendo, promiscuous reputation, open relationships with students and blurring of social and professional lines all contributed to some extent" to the fact that women at BCS altered their educations to avoid him. This conclusion by the University's lawyers confirms that the Plaintiffs' initial complaint was valid. The Court can take judicial notice of the outside lawyers' report, to which the Complaint refers. Cplt.¶¶ 48-51, 339, 382(l), 396(e), 403(p), 410(r)(r), 418(l) and (m), 426(l) and (m).

only required at this initial stage  to allege enough facts, considered in light of the Complaint as a whole, to "raise a reasonable expectation that discovery will yield evidence" of the requisite elements.  *See Bell Atlantic Corp. v. Twombly*. 550 U.S. 544, 556 (2007).

### A.  Plaintiffs Pleaded Materially Adverse Employment Actions, not Merely Criticism

Primarily contending that the Plaintiffs suffered no materially adverse employment actions, but only unactionable "criticism" (Br., at 4-5), UR ignores crucial context in order to avoid the key question for retaliation: whether the challenged actions "might well have dissuaded" reasonable persons in Plaintiffs' position (*Burlington Northern & Santa Fe Ry Co. v. White*, 548 U.S. 53, 68 (2006)), in light of all the "indices unique to [their] particular situation" (*Mathirampuzha v. Potter*, 548 F. 3d 70, 78 (2d Cir. 2008)), from challenging discriminatory treatment.  Calling the Plaintiffs gossips (Cplt. ¶¶ 253, 256, 382(a)), rumor-mongerers (Cplt. ¶¶ 253, 288, 303, 369, 382(a), 382(b), 382(c), 396(a)), bullies (Cplt. ¶¶ 292, 369, 382(c), 396(a), 403(d), 530(d)), spreaders of misinformation (Cplt. ¶¶ 288, 303, 369), manipulators (Cplt. ¶¶ 310, 518, 530(d), deceivers (Cplt. ¶¶ 382(c)), and violators of confidentiality (Cplt. ¶ 329(f), 359, 369, 382(f), 396(b)) for urging that a proper investigation be done according to UR's own policies were public excoriations, not unactionable employer criticisms.

Those reprisals must be viewed in light of UR's many other retaliations, including but not limited to: refusing to permit plaintiffs to serve as BCS ombudspersons while others, who did not complain about UR's mishandling of the Jaeger case, faced no such disqualification (Cplt. ¶ 39); exclusion from department meetings to discuss crucial hiring decisions (Cplt. ¶¶ 39, 315); increased workloads (Cplt. ¶ 39); exclusion from faculty dinners (Cplt. ¶ 39); Clark's November 29, 2016 letter saying the Plaintiffs' complaints about Jaeger were based on a "wealth of rumors" and "in some instances misinformation," while conspicuously praising Jaeger (Cplt. ¶ 288); falsely accusing Aslin of having Jaeger disinvited from a conference (Cplt. ¶¶ 316-317); and falsely accusing Plaintiffs of harming BCS students' careers (Cplt. ¶ 318). [2]

---

[2] Plaintiffs plead materially adverse actions directly, by facts demonstrating an intent to discriminate, as well as indirectly, by alleging circumstances creating "a plausible inference of discrimination."  *Isakov v. HASC Center, Inc. Druker*, 2018 WL 1114714, at * 4 (E.D.N.Y. Feb. 27, 2018) (citing *Guy v. N.Y.C. Transit Co.*, 2016 WL 8711080, at * 6 (E.D.N.Y. Sep. 23, 2016)).

Taken together these hostilities comprise materially adverse employment action in the university setting. *See, e.g. Timothy v. Our Lady of Mercy Med Center*, 2004 WL 503760, at * 6 (S.D.N.Y. Mar. 12, 2004) ("Even if none of the actions that a plaintiff alleges could individually be characterized as adverse, a series of actions taken against a plaintiff may, in the aggregate, constitute such conduct.")  In employment discrimination, "context matters."  *Burlington Northern and Santa Fe Ry Co. v White*, 548 U.S. 53, 64 (2006).[3]  UR essentially asks the court to apply a bright-line rule, arguing that because other cases, on other facts, found "criticism" unactionable, UR's "criticism" of Plaintiffs is also unactionable. No bright line rule exists.  *See Wanamaker v. Columbian Rope Co.*, 108 F. 3d 462, 466 (2d Cir 1997) (Br. at 12) ("Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'").  The University's attacks on Plaintiffs were directly material to their reputations for integrity, which is central to their ability to work as scientists and to collaborate with others at UR and in their academic field.  *See Burlington*, 548 U.S. at 69 ("an 'act that would be immaterial in some situations is material in others'" (quoting *Washington v. Ill. Dep't of Revenue*, 420 F. 3d 658, 661 (7th Cir. 2005)).

UR cites *Cody v. City of Nassau*, 577 F. Supp. 2d 623, 645-46 (E.D.N.Y. 2008), *aff'd*, 345 F. Appx. 717 (2d Cir. 2009), for the proposition that unjustified or falsely based criticism is not a materially adverse employment action.  *Cody's* facts – the Plaintiff was required to provide medical evidence for adjustments to her schedule and work space – are far afield from the instant case, and to apply *Cody's* finding mechanically here ignores the context *Burlington* says is vital.  UR also cites *Bickerstaff v. Vassar College*, 354 F. Supp. 2d 276, 280 (S.D.N.Y. 2004) (Br. at 4), and *Vasquez v. Southside United Hous. Dev. Fund Corp.*, 2009 WL 2596490 (E.D.N.Y. Aug. 21, 2009) (Br. at 4), arguing that negative statements or insults are non-actionable.  But according to *Burlington*, if "criticism" alters the conditions of employment for a particular plaintiff, the criticism *is* actionable.

---

[3] UR's avalanche of cases do not include *Burlington Northern and Santa Fe Ry Co. v. White*, 548 U.S. 53 (2006).

Plaintiffs allege more than mere "criticism" anyway.  Defendants did not make "empty verbal threats" nor were UR's verbal attacks "unsupported by any other actions." *Id.* at * 12. The Clark memo (Cplt ¶ 288), DeAngelis's attack on Plaintiffs in front of other BCS faculty as manipulative liars (Cplt. ¶ 310), Seligman's comparison of the EEOC complaints to the spurious University of Virginia allegations (Cplt. ¶ 354), Seligman's attacks on Aslin's credibility to senior faculty (Cplt. ¶ 295), and Foxe's admission of pushback from central administrators about retaining Aslin (Cplt. ¶ 448(h)), all reflect UR seeking to alter the conditions of Plaintiffs' employment for the worse. *See, e.g., Millea v. Metro-North R.R.*, 658 F. 3d 154, 164 (2d Cir. 2011) (noting that *Burlington* "construed 'materially adverse action' broadly to include changes in employment life outside of the terms and conditions of employment" because "only this broader definition fulfilled the purpose of Title VII's anti-retaliation provision").[4]  A jury could well find UR's actions would dissuade a reasonable University professor from participating in protected activity.

**B.  Defendants' Violations of Plaintiffs' Confidentiality Rights Were Materially Adverse Employment Actions**

UR blithely glosses over that UR breached Kidd's confidentiality contrary to its promises when it included Kidd's name in the Nearpass Report that Jaeger and UR administrators saw (Cplt. ¶ 410(a)) and when Nearpass disclosed Kidd's name to another witness. Cplt.¶ 410(d)). (Br. at 5-6).  UR also elides its breaches of Cantlon's (Cplt. ¶ 401(a))[5] and Aslin's (Cplt. ¶ 382(g)) confidentiality. These breaches, during a highly charged investigation of a colleague's sexual misconduct, would deter a reasonable professor from engaging in the protected activity of participating in an investigation.

*Evanoff v. New York State*, 2013 WL 6181853 (W.D.N.Y. Nov. 25, 2013) (Br. at 506), offers UR no help because *Evanoff's* plaintiff did not complain of a confidentiality breach. *Evanoff* cited *Bowles v. N.Y.C. Transit Auth.*, 2006 WL 1418602 (S.D.N.Y. May 23, 2006), as including "having confidential information [placement on a sick leave control list] revealed to other employees" in a list of items that did not add up in that case to materially adverse action.  Neither *Evanoff* nor *Bowles* is close to the facts here.

---

[4] UR's footnoted brush-off of numerous other allegations (Br. at 5, n. 4) similarly wishes away the rule that context is vital and that numerous employer attacks, even if none was individually actionable, can in the aggregate make out a materially adverse action dissuading reasonable professors in Plaintiffs' position from engaging in protected activity.
[5] UR mis-cites this as Cplt. ¶ 402(a).

*Evanoff's* focus on the plaintiff's failure to allege material alteration in job duties (*Evanoff*, 2013 WL 6181853, at * 3) cannot be squared with the Supreme Court's mandate that "materially adverse action" be construed broadly, to include actions affecting "employment life outside of the terms and conditions of employment." *Millea v. Metro-North R.R.*, 658 F. 3d at 164 (citing *Burlington*, 548 U.S. at 69).  The "terms" of employment are one thing; the broader "conditions" of employment are another.

UR's confidentiality breach, naming only Kidd among the Nearpass Report witnesses (Cplt. ¶ 251) while exonerating Jaeger, led to Kidd's branding as a liar or unhinged.  Cplt., ¶¶ 250-51. UR's breach did "have some real consequence in terms of [Kidd's] working conditions."  *Bowles*, 2006 WL 1418602, at * 10.  The temporal nexus shows the University's intimidation purpose.  So do numerous other allegations showing UR wanted the matter closed.  *See, e.g.,* Cplt. ¶¶ 282, 283, 332.

### C.  Surveillance of Plaintiffs' Emails Were Materially Adverse Employment Actions

UR asserts that email searches were permissible under UR policy so no materially adverse action can exist.  But the question is not whether email searches were technically permissible, but whether, in light of all the facts and circumstances, the email spying would dissuade a reasonable employee in Plaintiffs' position from engaging in protected action.  *See Hitchcock v. Angel Corps, Inc.*, 718 F. 3d 733, 742 (7th Cir. 2013) (pregnancy discrimination case; rejecting as "miss[ing] the point" defendant's argument that plaintiff's reassignment was not discriminatory because new job "remained within the scope of her official job description;" "The point is that Hitchcock was treated significantly *differently"* after supervisor learned of pregnancy; "We are unaware of any case suggesting that differential treatment on the basis of a prohibited category never suggests animus so long as the treatment is technically permissible...") (Emphasis in the original).

Searching emails, even if technically permissible, violates Title VII if done to target employees engaged in protected activity.  UR did not just *search* the emails.  UR *used* them falsely to discredit the

Plaintiffs, demonstrating its animus.  The Faculty Senate's February 28, 2018 vote censuring UR for searching the emails calls into question whether the searches were even technically permitted. [6]

It is plausible that persons in Plaintiffs' shoes would be discouraged from protected action if they knew that doing so meant their private emails would be clandestinely hoovered up and parsed for lines of possible attack.  That is especially so here, where DeAngelis falsely represented the emails as manipulating the department and smearing Jaeger.  Cplt. ¶ 310.  The retaliatory purpose is manifest in DeAngelis's subsequent inability to produce any emails substantiating his ugly charges.  Cplt. ¶¶ 320-21.

### D.  Defendants' "Independent Investigation" was Retaliatory

UR's argument that the White Investigation is not retaliatory (Br. at 6) (a) impermissibly conflates the "terms" of employment with the "conditions" of employment, (b) is rooted in a legally baseless narrow view of the scope of actionable retaliation, and (c) fails to recognize the White Investigation's place in UR's series of other retaliations.  Plaintiffs made serious allegations which UR dismissed.  Before filing their EEOC Complaints, Plaintiffs tried 29 times to persuade UR to deal properly with the Jaeger problem and the retaliation they were experiencing.  Cplt. ¶ 347.  UR refused.  Cplt. ¶ 347.  UR then commissioned a supposedly independent report, knowing that Plaintiffs, who had filed their federal lawsuit, could not participate without prejudicing their case.

Plaintiffs' inability to participate allowed UR to promote the idea that Plaintiffs feared the White Investigation, could not substantiate their claims, and were indeed the malicious deceivers and manipulators that DeAngelis, Seligman and others had called them.  Cplt. ¶¶ 253, 256, 288, 303, 309-10, 369, 382(a), 382(c), 387(b)).  A reasonable person in Plaintiffs' position would consider UR's decision to conduct an investigation that was both inherently biased (UR paid for it and set its terms, without consulting Plaintiffs or Jaeger's other victims) and structurally unsound (Plaintiffs, though crucial witnesses, could not participate except by prejudicing their lawsuit against UR) a reason not to engage in protected activity.

---

[6] Judicial notice (Fed. R. Evid. 201) is appropriate here.  *See* http://13wham.com/news/local/u-of-r-faculty-senate-censures-florian-jaeger-condemns-email-searches (last visited March 8, 2018) (The Faculty Senate concluded that "[t]his search and sharing occurred without sufficient justification, reflected 'questionable judgment,' and was inconsistent with the guidelines for confidentiality found in HR Policy 106. It has damaged the faculty's trust in the administration to uphold reasonable expectations of privacy.  We strongly protest this action.")

UR's argument that "[a]n employer's decision to conduct an investigation into allegations of discrimination is not in and of itself retaliatory" (Br. at 6) ignores that an investigation *can* be retaliatory if its inherent bias and structural unfairness would dissuade a reasonable person from engaging in protected activity.  UR also ignores that the White Report must be viewed in the context of numerous other retaliatory acts: "alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F. 3d 159, 165 (2d Cir. 2010) (citing *Zelnik v. Fashion Institute of Technology*, 464 F. 3d 217, 227 (2d Cir. 2006)).  Plaintiffs here point to other retaliatory acts impugning Plaintiffs' credibility. *See, e.g.* Cplt. ¶¶ 253, 256, 288, 303, 309-10, 369, 382(a), 382(c), 387(b).  In this context the White Investigation is actionable retaliation.  *Cf. Eldridge v. Rochester City School Dist.*, 968 F. Supp. 2d 546, 560 (W.D.N.Y. 2013).

*Onondaga Sheriff's Dep't*, 760 F. 3d 139 (2d Cir. 2014) (Br. at 6), decided on summary judgment, does not say otherwise and  reiterated the rule that "[c]ontext matters."  *Id.* at 146 (quoting *Burlington*, 548 U.S. at 68).  *Onondaga's* investigation, unlike White's, was not publicly released via a press conference saying the plaintiff's complaints were incorrect or exaggerated.  *Onondaga* noted that "an employer's investigation may constitute a cognizable retaliatory action…if conducted in such an egregious manner as to 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Onondaga*, 760 F. 3d at 147 (quoting *Burlington*, 548 U.S. at 57).

### E.  Jaeger's Participation in Kidd's and Piantadosi's Evaluations was Retaliatory

UR's argument that Jaeger's participation in Kidd's and Piantadosi's evaluations was not retaliatory (Br. at 6-7) is fantasy, not advocacy.  Kidd had expressed to UR her fears of retaliation by Jaeger.  Cplt. ¶¶ 238, 250, 267.  DeAngelis promised that Jaeger would not be involved in evaluating Kidd and Piantadosi (Cplt. ¶ 285), reflecting his understanding of the rank impropriety of such involvement.  DeAngelis's breaking of that promise (Cplt. ¶ 286) directly shows retaliation.

UR's argument that nothing "adverse" resulted from Jaeger's participation (Br. at 7) misses the point – although Kidd and Piantadosi fear that Jaeger has used information learned during the evaluations

against them (Cplt. ¶ 286) - the question, which answers itself affirmatively, is whether appointing the person Plaintiffs accused of serious misconduct to evaluate their performance, after promising not to, would dissuade a reasonable person from protected activity. *See, e.g. Hicks*, 593 F.3d at 165 (citing *Burlington* for broad reach of anti-retaliation protection, encompassing more than workplace-related harm, and stating "[p]rior decisions of this Circuit that limit unlawful retaliation to actions that affect the terms and conditions of employment…no longer represent the state of the law"). *Matthews v. Corning, Inc.*, 77 F. Supp. 3d 275 (W.D.N.Y. 2014) (Br. at 7), a summary judgment case, is not to the contrary, and itself emphasizes the breadth of retaliation claims. *Id.* at 299. *Davis v. Verizon Wireless*, 389 F. Supp. 2d 458 (W.D.N.Y. 2005) (Br. at 7), also on summary judgment, found no retaliation but on very different facts. That the defendant laid off 120 employees just to also lay off plaintiff was highly improbable (*id.* at 478) and the defendant's institution of mandatory arbitration was inapplicable to plaintiff. *Id.*

### F. Defendants' Failure to Retain Hayden was Retaliatory

UR's weak retention offer to Hayden plausibly states a claim that a reasonable employee, in Hayden's position, would be dissuaded from participating in protected action. Again misstating the question, UR focuses on whether Plaintiffs "are entitled to dictate" hiring decisions to UR (Br. at 7). The actual question is whether UR's unusually poor effort to retain Hayden, who with the other Plaintiffs had been a thorn in UR's side, would dissuade a reasonable person in his shoes from participating in protected action. In the context of UR's other retaliations, including UR's retaliatory refusal to hire Hayden's wife (discussed below), the answer is "Yes," certainly at the dismissal stage.

Hayden participated in protected activity. Cplt. ¶ 431-32. Soon thereafter UR chose to make no meaningful effort to retain him, a high performing faculty member. Cplt. ¶¶ 62, 330, 331. He was compelled to leave. Cplt. ¶ 331. Reasonable plaintiffs in his position would be dissuaded from protected action if they thought their continued employment on fair terms would be similarly jeopardized.

Plaintiffs allege UR wanted the Plaintiffs gone (Cplt. ¶ 333); that Heilbronner's candidacy was derailed because other BCS faculty, poisoned by UR's serial tarnishing of Plaintiffs, did not want "six of

[them]" in the department (Cplt. ¶ 448(c)); that DeAngelis admitted that the failure of her candidacy resulted from Plaintiffs' "us[ing] the department as a political football and break[ing] confidentiality" because "it is going to cause damage and you should expect that" (Cplt. ¶ 448(d)); that DeAngelis admitted that it was stupid of Hayden and Heilbronner to have been involved in the Jaeger complaints when Heilbronner needed a job (Cplt. ¶ 448( e)); and that Foxe admitted that he had gotten pushback from central UR administrators when he tried to retain Aslin (Cplt. ¶ 448(h)).  These allegations, among others, support the conclusion that Hayden's low retention offer was retaliatory.

### G.  Defendants' Destruction of Plaintiffs' Plan to Move to RIT was Retaliatory

Arguing its imposition of a 250% protest tax on Plaintiffs' requested use of UR equipment (Cplt. ¶ 335) was not retaliatory (Br. at 8), UR again ignores the entirety of its retaliatory campaign, of which the new equipment tariff was part.  Plaintiffs allege a 14-year UR practice of charging non-UR faculty rates comparable to UR faculty and providing comparable access.  Cplt. ¶ 336.  The issue is not whether Plaintiffs "can dictate terms" to UR or anyone else (Br. at 8), but whether UR's conduct could be deemed retaliatory objectively and subjectively. On these facts, UR's heavy scanner tariff is retaliatory.

### H.  Defendants' Exclusion of Plaintiffs from Important Professional Meetings was Retaliatory

Arguing that exclusion from meetings is not necessarily retaliatory (Br. at 8), UR is silent on the point that "exclusion from important meetings can constitute a materially adverse employment action." *Dorriz v. Dist. of Columbia*, 133 F. Supp. 3d 186, 197 (D.D.C. 2015) (citing *Allen v. Napolitano*, 774 F. Supp. 2d 186, 199-200 (D.D.C. 2011)).

As UR does throughout its legally impermissible effort to divide its retaliations into tiny pieces, analyze them in isolation and thereby minimize them to the vanishing point, UR assiduously avoids the context and circumstances of the meetings where Heilbronner's hiring was discussed.  All BCS faculty complainants about Jaeger – Cantlon, Kidd, Piantadosi and Mahon – were excluded.  Viewed in light of all the circumstances, this was retaliatory.  UR offers no justification for why only these particular BCS faculty

were blocked from the important task of helping to decide who would join their department and become their long-term colleague.

## I. Defendants' Refusal to Hire Heilbronner was Retaliatory

UR has deliberately overlooked crucial facts concerning its refusal to hire Heilbronner for BCS, requiring a refresher on the relevant allegations.  UR historically supported spousal hires (Cplt. ¶¶ 322, 323, 330) and Heilbronner was already a high-achieving UR post-doctoral student. Cplt. ¶ 322. DeAngelis told Cantlon the search was being scheduled around Heilbronner and told Kidd he was confident a position for Heilbronner could be arranged.  Cplt. ¶ 322.  DeAngelis consulted Heilbronner on the timing, permitting her to strengthen her candidacy.  Cplt. ¶ 324.  Hayden told DeAngelis in March 2015 that Hayden would have to leave if Heilbronner, his wife, was not hired.  Cplt. ¶ 324.  But when Heilbronner's candidacy was ripe, the Jaeger matter was on high boil, and UR changed its tune.  The search committee excluded anyone who had criticized Jaeger[7] and the job criteria were changed to exclude the area that Heilbronner had been previously instructed to pursue to advance her candidacy.  Cplt. ¶ 325.  Heilbronner had impressive credentials and her metrics exceeded those of the other candidates as well as of four junior BCS faculty. Cplt. ¶ 326.  Heilbronner was told she was passed over because she did not match the search criteria, but UR gave the job to a candidate whose work did not match the criteria either and whose publication metrics did not equal Heilbronner's. Cplt. ¶ 326.  These facts alone show retaliation.  Direct evidence of retaliation appears in DeAngelis's March 2017 statement that support no longer existed for Heilbronner in BCS: "I am dealing with this search the way I have been told to deal with it by my Deans."  Cplt. ¶ 328.  UR's bait-and-switch search, the switch coming after Plaintiffs protested UR's dealings with Jaeger, is "the way" DeAngelis was told to handle the search: that is, to retaliate against Hayden and Heilbronner.  DeAngelis obliquely confirmed as much to Mahon and Cantlon, saying he had planned on hiring Heilbronner but now "had this" to deal with.  Cplt. ¶ 329(h).  DeAngelis also said that Hayden and Heilbronner were "collateral damage."  Cplt. ¶ 329(i). None of this is "speculative and conjectural."  (Br. at 9)

---

[7] This allegation itself states a fact, mooting UR's contention that the allegation is "without factual support." Br. at 9.

That five BCS members found Heilbronner "below threshold" (Br. at 9) ignores Jaeger's campaign against Heilbronner (Cplt. ¶ 326) and the likelihood that this result, contradicted by Heilbronner's stellar credentials (Cplt. ¶¶ 326-27), resulted from the Jaeger-stacked committee and UR's retaliatory campaign.

### J.   Plaintiffs Need Not Allege a Change in their Current or Prospective Employment

As discussed above, retaliation plaintiffs are not required to show the actual terms of their employment were worsened, or their future prospects dimmed, just that the challenged action "might well have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington*, 546 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F. 3d 1211, 1219 (D.C. Cir. 2006) (further cite omitted)). UR's assertion that none of the Plaintiffs allege reputational damage harming their careers is not only wrong (DeAngelis admitted he *had* damaged the plaintiffs' reputations (Cplt. ¶ 320))[8] but legally beside the point.  Hayden's, Heilbronner's, Cantlon's and Mahon's ability to get new jobs (Br. at 10) is no bar to finding retaliation, which encompasses a broad spectrum of employer conduct that need not change a single iota of a plaintiff's pay, benefits, working conditions or future prospects.

*Giarrizo v. Holder*, 2011 WL 4964945 (N.D.N.Y. 2011) (Br. at 9), nowhere undermines Plaintiffs' retaliation claims.  Its conclusion that retaliation was absent because the plaintiff had not alleged defendant's doings "had any impact on plaintiff's current employment situation…efforts to find a new job, or that defendant, in any way, hindered prospective employment" (*Giarrizo*, 2011 WL 4964945, at * 6) employs a test that *Hicks*, 593 F. 3d at 165, hewing to *Burlington*, 548 U.S. at 68, says no longer applies.[9]

### K.  Newport's Retaliation Claim is Sufficiently Pleaded

UR correctly admits that Title VII's anti-retaliation protections reach former employees.  (Br. at 11) UR then contradictorily argues that Newport's status as a former employee precludes her retaliation claim.

---

[8] UR's argument that Cantlon and the other plaintiffs cannot allege reputational damage because of their "career achievements" (Br. at 10, n. 7) ignores that many of those achievements came before UR attacked them, pretends DeAngelis never admitted damaging their reputations (Cplt. ¶ 320), and ignores the actual legal test of whether a reasonable person, situated as Plaintiffs were, would be dissuaded from protected action by the retaliation.

[9] UR's argument that the Plaintiffs were not dissuaded from making complaints (Br. at 10, n. 10) overlooks that (1) many of those complaints occurred before the retaliation occurred and (2) Plaintiffs may have more staying power than the hypothetical reasonable person in Plaintiffs' position.  Title VII's anti-retaliation provision is broadly aimed to preclude retaliation for protected activities.  *See, e.g., Burlington*, at 64-68.  That statutory purpose, focused on regulating the conduct of employers, would be eviscerated if the steadfastness of particular plaintiffs could be used against them to defeat otherwise valid claims of retaliation.

(Br. at 11)  UR had it right the first time. Its argument that Newport has not alleged any retaliatory "impact on her current employment or future employment prospects" (Br. at 12) fails because no such allegations are needed.  To fulfill Title VII's broad anti-retaliation purpose, an employee need only plead facts plausibly showing that a reasonable person in the plaintiff's position might very well be dissuaded from engaging in protected activity because of the defendant's retaliatory action.  *Wanamaker,* 108 F. 3d at 466 (Br. at 12) predated *Burlington* and no longer accurately states the law.[10]

## II.   PLAINTIFFS SUFFICIENTLY PLEADED AIDING AND ABETTING (COUNTS XV, XVI)

UR roots its challenge to the facial sufficiency of the aiding and abetting claims in its contention that Plaintiffs have not shown any materially adverse employment action supporting their retaliation claim. (Br. at 13.) But because, as demonstrated above, the retaliation claims survive, the aiding and abetting claims must be evaluated independently for their viability.

Plaintiffs plead sufficient facts to show Seligman and Clark participated in retaliatory conduct. Plaintiffs were told that "the decision to force out the troublesome plaintiffs came from the top – meaning Seligman and Clark."  Cplt. ¶ 40.  Seligman's analogizing of Plaintiffs' complaints, many of which the White Report factually corroborated, to the notoriously false allegations in the University of Virginia rape case (Cplt. 454) shows animus to the Plaintiffs and generates further plausible inferences that Seligman aided and abetted UR's retaliatory campaign.  Seligman approved UR's promotion of Jaeger to full professor (Cplt. ¶ 208), before the Nearpass investigation had concluded and with no reason for such haste (Cplt. ¶ 210), despite Aslin's request for a delay. Cplt. ¶ 208.  That decision demonstrates, or at least creates plausible inferences, that Seligman was publicly slapping down the Plaintiffs.

Plaintiffs allege Clark's November 29, 2016 letter praising Jaeger was retaliatory. Clark said Plaintiffs' complaints were "rumors" and "misinformation."  Cplt. ¶ 382(b), 402(c), 410(g), 418(b), 426(a), 433(a).  In other words, Plaintiffs were liars and Jaeger was not.  Clark ignored Plaintiffs' concerns about possible Title VII and Title IX violations. Cplt. ¶ 538(c). Clark, a top level administrator with authority over

---

[10] This same argument defeats UR's reasons why Aslin's retaliation claims fail.  (Br. at 12, n. 12).

faculty, instructed or encouraged other UR personnel to encourage Plaintiffs to leave.  Cplt. ¶ 538(d).  He summarily sustained the Nearpass Report (Cplt. ¶ 244) despite its many flaws.  Cplt. ¶¶ 211-244.

On these facts, it is plausible to infer that Seligman and/or Clark were not just aware of, but authorized, the trawling through Plaintiffs' emails. Br. at 13.  Even if technically permissible, such skullduggery in response to harassment complaints (Cplt. ¶¶ 43, 52, 308), and its purpose of discrediting Plaintiffs (Cplt. ¶¶ 309-10) after they challenged UR's handling of Jaeger, creates a reasonable inference that discovery will provide evidence that Seligman and/or Clark authorized this aiding-and-abetting retaliation. *See Twombly*, 550 U.S. at 556.  Such facts could only be confirmed through discovery.  Lack of such evidence at this stage does not support dismissal.  *See Arista Records, LLC v. Doe 3*, 604 F. 3d 110, 120 (2d Cir. 2010).

UR's reliance on *Fincher v. Depository Trust and Clearing Corp.*, 604 F. 3d 712 (2d Cir. 2010) (Br. at 14), is misplaced.  *Fincher*, decided on summary judgment (*id.* at 718), recognized what UR ignores: "'there are no bright line rules' determining what constitutes an adverse employment action in a retaliation claim and therefore 'courts must pore over each case to determine whether a challenged employment action reaches the level of 'adverse.''" *Id.* at 721 (quoting *Wanamaker,* 108 F. 3d 462, 466 (2d Cir. 1997)). *Fincher's* plaintiff did not show, despite the opportunity to make a factual record, that the failure to investigate itself produced retaliatory harm.  *Id.* at 721-722.  Plaintiffs here plead facts showing that UR's weak investigations *did* produce such harm.  Because the flawed investigations exculpated Jaeger, Plaintiffs were castigated as rumormongers and purveyors of a smear campaign. *See* page 2 above.  Unlike *Fincher's* plaintiff, Plaintiffs here were put in a worse situation after they brought their complaint. *Id.* at 721.

Plaintiffs did more than make a complaint about Jaeger.  They pressed Seligman and other UR officials, in emails, phone calls, letters and personal meetings to take Jaeger's misconduct seriously and to examine UR policies.  Cplt. ¶ 39.  They spoke out about UR's failures to others.  Cplt. ¶¶ 247-248.  Aslin told Nearpass that he was meeting with Kidd and had liased with other potential witnesses concerning Jaeger.  Cplt. ¶ 192.  Aslin met with UR lawyers, administrators and BCS's current chairman to discuss the

investigation.  Cplt. ¶ 193.  All of these acts are separate from simply lodging the initial complaint about

Jaeger, which the University refused to investigate properly via Nearpass.  Plaintiffs protested this

inadequate report, prompting retaliation.  That retaliation included further refusals to investigate properly

despite multiple requests by Plaintiffs.  Where, as here, the failure to investigate properly can be understood

as retaliation for such "other, separate protected act[s] by the plaintiff," *Fincher* said the investigative

failure *can* be a materially adverse employment action.  *See Fincher*, 604 F. 2d at 722 ("We do not mean to

suggest that failure to investigate a complaint cannot ever be considered an adverse employment action for

purposes of a retaliation claim.").  *Whipple v. Reed Eye Assoc.*, 213 F. Supp. 3d 492 (W.D. N.Y. 2016) (Br.

at 13, 14), which noted that a failure properly to investigate can make out an aiding and abetting claim for

discrimination but not retaliation, fails to recognize *Fincher's* teaching that in cases like Plaintiffs', where

the sham investigation is plausibly understood as retaliation for acts other than the actual lodging of the

complaint, an adverse employment action exists, and aiding and abetting liability properly attaches.

### III.   CANTLON AND KIDD SUFFICIENTLY PLEAD HOSTILE WORK ENVIRONMENT CLAIMS (COUNTS X,[11] XI)

Urging dismissal of Cantlon's and Kidd's hostile environment claims, UR again employs its

separate-and-minimize approach to a series of acts that, in the totality of the circumstances, show the claims

are sufficiently pleaded.  UR ignores that this inquiry must be made "from the perspective …of a reasonable

person in the plaintiff's position, considering all of the circumstances [including] the social context in which

particular behavior occurs and is experienced by its target."  *Petrosino v. Bell Atl.*, 385 F. 3d 210, 221 (2d

Cir. 2004). That context here is a department of leading scientists, whose reputations for honesty are the

foundation of their scientific work, research collaborations and ability to get grants. Attacks on their

integrity carry a much heavier load of opprobrium than they might in a textile mill or slaughterhouse.

UR's effort to trivialize Plaintiffs' complaints ignores the Second Circuit's teaching that has

"repeatedly cautioned against setting the [hostile work environment] bar too high," noting that "while a

---

[11] The Complaint's listing of two Counts X was a typographical error.  The count discussed here is the second Count erroneously listed as Count X.

mild, isolated incident does not make a work environment hostile, the test is whether the 'harassment is of such quality or quantity that a reasonable employee would find the conditions of their employee *altered for the worse.*'" *Terry v. Ashcroft*, 336 F. 3d 128, 148 (2d Cir. 2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F. 3d 62, 70 (2d Cir. 2000) (further citation omitted) (emphasis in original)).   UR's incantations of the "minor annoyances" shibboleth cannot be squared with the broader judicial inquiry required, or the facts of this case.   "The environment need not be 'unendurable' or 'intolerable.'"   *Terry*, 336 F. 3d at 148 (quoting *Whidbee*, 223 F. 3d at 70)).   The plaintiffs need not suffer damage to their "'psychological well-being.'"   *Terry*, 336 F. 3d at 148 (quoting *Fitzgerald v. Henderson*, 251 F. 3d 345, 358 (2d Cir. 2001)).   Summarizing, "'the fact that the law requires that the harassment to be severe or pervasive before it can be actionable does not mean that employers are fee from liability in all but the most egregious cases.'"   *Terry*, 336 F. 3d at 148 (quoting *Whidbee*, 223 F. 3d at 70 (further citation omitted)).

UR ignores the Complaint in claiming Cantlon's and Kidd's claims were not discriminatory on the basis of sex.   Br. at 15.   Plaintiffs pleaded numerous facts of Jaeger's creation of a hostile working environment *for women* at BCS. Jaeger did not sexually harass men. Cplt. ¶¶ 74 – 158.   Kidd pleaded Jaeger's direct sexual harassment of her, before and after her arrival at UR.   Cplt. ¶¶ 74-86, 104-05, 109-12, 116, 134-36.   Cantlon alleged that she found the environment hostile and offensive (Cplt. ¶ 457).   It interfered with her work so she began searching for other employment.   Cplt.   ¶ 459.   Kidd made the same allegations.   Cplt. ¶¶ 465, 472.[12]   UR did nothing to ameliorate that hostile environment.   Cplt. ¶¶ 456, 469.   Rather, UR punished Kidd, labeling her unreliable, portraying her as a scorned woman whose complaints stemmed from failed romance not harassment.   Cplt. ¶ 470. These allegations plead the sex-based discrimination UR says is absent[13] (Br. at 13).   This is not "cunning" pleading (Br. at 16) but facts showing a work environment that was "altered for the worse." *Terry,* 336 F. 3d at 148.

---

[12] In fact, the White Investigation, paid for by UR, overwhelmingly confirms the hostile environment.
[13] *Zucco v. Auto Zone, Inc.*, 800 F. Supp. 2d 473 (W.D.N.Y. 2011) (Br. at 15), is easily distinguished.  There the plaintiff's hostile environment claim alleged only that over a two year period "a few employees made disparaging remarks, that a male used the female restroom, and she was asked for proof of hotel reservations or airline tickets in order to receive vacation time." *Id.* at 476.  Plaintiff's sex discrimination claim allegedly only that her "'hours seemed

**Cantlon's Claim**

That a reasonable university professor in Cantlon's position would find the work environment "altered for the worse" (*id.*) is entirely plausible. For challenging UR, Cantlon has been subjected to repeated derision as the Plaintiffs' spokesperson. Cplt. ¶ 370. DeAngelis chastised Cantlon for her "tone" in a November 13, 2016 meeting –but did not similarly reprimand a male colleague whose behavior was far worse. Cplt. ¶¶ 312-15, 458. DeAngelis stood over the sitting Cantlon in an April 24, 2017 meeting, after the Jaeger matter was at full boil, stuck his finger in her face and demanded she take responsibility for and apologize to her BCS colleagues. Cplt. ¶¶ 312-315, 458. DeAngelis was not criticizing Cantlon's academic performance – he was attacking her for her role in the Jaeger matter.

Also after the Jaeger matter had roiled BCS, Cantlon was excluded from BCS meetings to discuss hiring Plaintiff Heilbronner. Cplt. ¶¶ 312-315, 458. This was not a mundane meeting, a minor administrative session. This meeting dealt directly with the very future of BCS – who would be part of the department. Cantlon was a senior department member. In the context of UR's other indicia of hostility, a factfinder could find Cantlon's exclusion deliberate, motivated by hostility, and therefore actionable. [14]

That male Plaintiffs Mahon and Piantadosi were also excluded from the meeting (Br. at 17) confirms the hostile motivation. UR cites *Jamison v. Chapman*, 2009 WL 3762348 (N.D.N.Y. 2009) (Br. at 17), for the notion that excluding the two male plaintiffs means Cantlon's exclusion is not actionable. This ignores the required totality of the circumstances test – they were all excluded because they continued to

---

to vary greatly'" after a meeting about the alleged misconduct. *Id.* at 477. Unlike Plaintiffs here, who have either left UR or are looking to do so, the *Zucco* plaintiff said she liked her job and wanted to keep working for the defendant. *Id.*
[14] *McCullough v. Xerox Corp.*, 942 F. Supp. 2d 380 (W.D.N.Y. 2013) (Br. at 17), involved "mere work related criticisms" (*id.* at 386), two comments from a manager implying plaintiff a "slacker," "not working at full capacity," and that she would not much longer be able to use the "I'm not sure because I'm new" phrase. *Id.* That is a far cry from DeAngelis, an angry department chairman, standing over the seated Cantlon, wagging a finger in her face and demanding she apologize for ruining BCS, not because of her work but because of a protected activity. *Fleming v. MaxMara USA, Inc.*, 371 Fed. Appx. 115 (2d Cir. 2010) (Br. at 13), a racial discrimination case decided on summary judgment, involved a black female plaintiff replaced by another black female (*id.* at 117), and who scraped up but a single racially motivated incident that was unrelated to her other claims of unfairness (wrongful exclusion from meetings, excessive criticism of work, refusal to answer work questions, imposing duties outside job responsibilities, throwing books, rude emails). *Id.* at 118. The case would have been different had plaintiff alleged "many racially-motivated comments." *Id.* Plaintiffs in our case allege numerous episodes of Jaeger's sexually discriminatory behavior creating a hostile environment, connected to other adverse actions and UR's unwavering refusal to redress that behavior with anything but exculpatory window-dressing.

criticize Jaeger for having created a hostile environment, and UR's handling of his case – and fails to view Cantlon's exclusion in light of DeAngelis's hostility directed at her (Cplt. ¶¶ 312-15, 458), and the Complaint's allegations of the Jaeger-created and UR-endorsed hostile environment Cantlon experienced. Cplt. ¶¶ 114, 176, 456-59.

Cantlon plainly found the environment subjectively hostile; she complained about it (Cplt. ¶¶ 36, 454) and decided to find a new job.  Cantlon's decision to leave UR, where she had spent many productive years, had tenure, and wanted to stay, shows she subjectively perceived the environment as hostile.

Jaeger's sexually harassing behavior did not have to be directed at Cantlon for her to state a hostile environment claim (Cplt. ¶ 457).  *See Petrosino v. Bell Atl.*, 385 F. 3d 210, 222 (2d Cir. 2004) ("workplace disparagement of women, repeated day after day over the course of several years without supervisory intervention, stands as a serious impediment to any woman's efforts to deal professionally with her male colleagues."); *Schwapp v. Town of Avon*, 118 F. 3d 106, 109 (2d Cir. 1997) (district court erred in considering only misconduct occurring in plaintiff's presence, must consider totality of circumstances).

Focusing only on two allegations concerning events in 2010 and 2014 (Br. at 18, n. 16), UR's argument about the timeliness of Cantlon's claim (Br. at 18, n. 18) fails.  Cantlon alleges two discriminatory acts within the limitations period that contribute to her claim (Cplt. ¶¶ 312-15, 458), but UR glosses over her allegations that she was more broadly subject to the hostile environment Jaeger created.  Cplt. ¶¶ 457, 459.  UR's argument that these allegations do not count for the hostile environment claim is erroneous. *See, e.g., Torres v. Pisano*, 116 F. 3d 625, 633 (2d Cir. 1997) (plaintiff alleged "constant" harassment but only provided details of a few incidents; court ruled absence of details did not, as matter of law, justify summary judgment).  Jaeger's misconduct was not isolated or episodic but "continuous and concerted." *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 516 (S.D.N.Y. 2016) (Br. at 18, n. 16.).  The continuing violation doctrine applies. *See Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for determining liability.")

17

UR's reliance on *Marcus v. Barilla Am. NY, Inc.*, 14 F. Supp. 2d 108 (W.D.N.Y. 2014) (Br. at 18-19), fails.  *Marcus's* plaintiff alleged that she experienced raised voices  "during disagreements concerning equipment and safety issues…a handful of times over a five-year period," was told her work needed improvement and was placed on a performance plan.  *Id.* at 113-14.  *Marcus* bears no relationship to the continuously hostile environment for women that Jaeger created (Cplt. ¶¶ 71-158), UR condoned (Cplt. ¶¶ 454, 456, 458), Cantlon experienced (Cplt. ¶¶ 114, 175, 176, 184, 457-59) and the White Investigation largely confirmed.

### A.  Kidd's Hostile Environment Claim

UR first argues that Kidd's hostile environment claim is untimely because her allegations of direct harassment by Jaeger, and UR's failure properly to respond to Bixby's complaint, occurred before UR employed her. (Br. at 19).  Kidd alleges many specific instances showing a hostile work environment. Some preceded her employment, Cplt. ¶¶ 108-112, and some after she joined the faculty.  ¶¶ 175.  Pre-employment facts, corroborating post-employment harassment, are properly considered in evaluating Kidd's hostile environment claim as an important part of the totality of circumstances. *See Morales-Evans v. Admin. Office of the Courts of New Jersey*, 102 F. Supp. 2d 577, 587 (D.N.J. 2000) (finding evidence of post-interview, pre-employment harassment relevant because "determination... is based on an examination of the totality of circumstances;" "cases make clear that unlawful employment action that runs afoul of Title VII can occur prior to the creation of an official employment relationship;" "[c]ourts frequently consider evidence of post-application, pre-hiring conduct in evaluating a plaintiff's showing").[15]

Kidd's hostile environment claim for 2007-13 events is not time barred. (Br. at 19).  Kidd alleges discrimination within the statutory period.  Cplt. ¶¶ 466, 470, 472.  Nearpass branded her unreliable in 2016, creating the impression of a woman scorned whose complaints were baseless. (Cplt. ¶ 470).  These discriminatory acts make operative all of the preceding acts creating a hostile environment.  *See Nat'l RR Passenger Co.*, 536 U.S. at 117.  *McGullam v. Cedar Graphics, Inc.*, 609 F. 3d 70 (2d Cir. 2010) (Br. at

---

[15] As a graduate student, Kidd was similarly situated to an applicant for employment. Cplt. ¶ 86 (Jaeger reminding Kidd he would be unable to give favorable professional opinion of her if they did not have a personal relationship).

19), a summary judgment ruling (*id.* at 72), confirmed the need to consider "'the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period…for purposes of establishing liability,'" provided that one act "contributing to that hostile environment takes place within the statutory time period.'" *Id.* at 75 (quoting *Nat'l Passenger RR Co.*, 536 U.S. at 105).

*McGullam* confirms that where the timely harassment evidence, such as Kidd's experience working with Jaeger (Cplt. ¶ 466) and UR's calling into question her credibility (Cplt. ¶ 470), is "sufficiently related" to earlier conduct – such as Jaeger's direct harassment of Kidd (Cplt. ¶¶ 74-86, 104-05, 108-112, 116, 136) – the earlier evidence is properly considered in the hostile environment analysis.  Unlike Kidd's case, in *McGullam* the timely harassment evidence was both minor and unrelated to the previous, pre-limitations period harassment.

*Van Zant v. KLM Royal Dutch Airlines*, 80 F. 3d 708 (2d Cir. 1996) (Br. at 19), another summary judgment decision, is also distinguishable.  In *Van Zant* the employer, unlike UR (Cplt. ¶¶ 159-175), promptly and effectively responded to reports of unwelcome sexual advances; the offending employee was fired.  *Id.* at 711-12. *Van Zant's* plaintiff showed no connection between the defendant's treatment of her and any company policy (*id.* at 713), whereas UR's failure to respond to Kidd was of a piece with UR practice.  Cplt. ¶¶ 159-164. *Van Zant's* plaintiff, unlike Kidd, was subjected to discrete and promptly remedied pre-limitations period acts, foreclosing application of the continuing violation doctrine, and her timely claims of discrimination bore no relationship to her reports of harassment.

Kidd's allegations that UR concedes are timely (Br. at 19-20) are actionable.  She *did* plead serious alteration of her work conditions – she began looking for another job as a result.  Cplt. ¶ 472.  UR's argument that Kidd's stellar career precludes her hostile environment claim (Br. at 20) is wrong. *See Terry*, 336 F. 3d at 149 ("suggestion that a hostile work environment claim cannot stand where a plaintiff is still able to successfully perform the basic functions of his or her job is without merit" (citing *Whidbee*, 223 F. 3d at 70)).  Kidd's return to UR after visiting professorships is also no bar to her hostile environment claim. Kidd was entitled to rely on UR following the law and eradicating the hostile environment about which she

and Bixby had told DeAngelis in 2013 (Cplt. ¶¶ 159-161, 173).  UR's argument boils down to the legally

erroneous proposition that the victim of a hostile environment must suffer circumstances so severe she is

compelled to quit in order to have a claim. That is the test for a constructive discharge hostile environment,

not a hostile environment claim.  *See Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004) (hostile

environment constructive discharge claim "requires something more" than hostile environment claim).

### IV.    BIXBY'S TITLE IX HOSTILE EDUCATION ENVIRONMENT CLAIM IS SUFFICIENTLY PLEADED (COUNT XII)

UR's *ipse dixit* challenge to Bixby's hostile education environment claim (Count XIII) essentially

says "Bixby's situation just was not that bad."  Again, UR ignores that Bixby's pleaded facts of hostile

environment must be taken together and read in light of the Complaint as a whole.

Bixby's allegations show an objectively hostile environment.  She was a BCS student from 2010 to

2017.  Cplt. ¶ 477.  Her allegation that "Jaeger's relentless harassment of women in BCS" led her to avoid

him must be read in light of the other allegations about Jaeger's harassing behavior.  *See, e.g.,* Cplt. ¶¶ 71-

143, 145-158, 165.  She personally observed that Jaeger, a prominent figure in the department where she

was seeking her Ph.D, "regularly" discussed sex in front of students, including her; for example he once

asked "a table full of students and post-docs at Lux [a BCS hangout] how to use a cock ring."  Cplt. ¶ 144.

Contrary to UR's argument (Br. at 21), Bixby is not required to assert that Jaeger spoke directly to

her individually about sex and sex toys for the educational atmosphere to be actionably hostile.  *See Black v.

Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (finding no hostile environment in Title VII claim but

"emphasiz[ing] that sex-based comments need not be directed at a plaintiff in order to constitute conduct

violating Title VII"); *Fall v. MNP Corp.*, 2008 WL 1882669, at * 12, n. 8 (E.D. Mich. Apr. 24, 2008)

(incidents of sexual harassment learned of during employment but not directed at plaintiff were permissible

evidence of hostile environment). The White Investigation confirms that Jaeger's behavior was widely

offensive.  Bixby was aware of other women's discomfort with him.  *See* Cplt. ¶ 159.

Bixby's allegations also show a subjectively hostile environment.  *See* Cplt. ¶¶ 478 ("felt viscerally

unsafe around" Jaeger); 144 ("actively avoids Jaeger;" did not take Jaeger's statistical workshops,

collaborate with him or seek his instruction).  Jaeger's behavior, then, "unreasonably interfer[ed] with [Plaintiff's] performance" and "creat[ed] an intimidating, hostile, or offensive environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64-65 (1986).

UR's untimeliness argument ignores the continuing violation doctrine.  "[U]nder the continuing violation doctrine, a plaintiff may bring claims for discriminatory acts that would have been barred by the statute of limitations as long as "an act contributing to that hostile environment [took] place within the statutory time period." *Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F. 3d 81, 91 (2d Cir. 2011) (quoting *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 75 (2d Cir.2010)).  As for any time-barred events not saved by the continuing violation doctrine, a plaintiff may use evidence of time-barred acts to establish motive and put her timely-filed claims in context.

Bixby sufficiently alleges UR failed adequately to address Jaeger's conduct with corrective measures.  She "formally advised" UR's DeAngelis of the names of students who had had "toxic experiences" with Jaeger.  Cplt. ¶ 160.  Three months passed before DeAngelis responded with a "single email."  Cplt. ¶ 161.  DeAngelis spoke with only two of the four persons Bixby had identified.  Cplt. ¶ 161. Conceding those interviews revealed bad behavior by Jaeger, DeAngelis nonetheless concluded Jaeger had not violated any UR policies on harassment.  Cplt. ¶ 161.  That conclusion was wrong (Cplt. ¶¶ 162-166) and demonstrates UR's failure to provide an adequate response.  UR Counsel was also on notice of Bixby's complaint to DeAngelis but did nothing.  Cplt. ¶ 170.  In response to Bixby's specific request that Jaeger not interact with her again, DeAngelis told Bixby he could not prevent that.  Cplt. ¶ 169. Nor did DeAngelis tell Bixby she could get help from University counseling or the Title IX coordinator.  Cplt. ¶ 171.

## V.     ASLIN AND HAYDEN SUFFICIENTLY PLEADED BREACH OF CONTRACT

UR wrongly challenges Aslin's (Count II) and Hayden's (Count IX) breach of contract claims for allegedly failing to specify the precise contractual terms breached and for not stating UR's acts of breach.[16]

---

[16] Both are also conspicuously at odds with UR's protests that Plaintiffs' Complaint goes beyond the "short and plain statement of the claim" required under Fed. R. Civ. P. 8(a) (2).  *See* Br. at 34.

Permanent tenure carries the reasonable contractual expectation, grounded in the covenant of good faith and fair dealing implicit in every contract, that UR would not act to rob the permanent tenure provision of its protections. "Under New York law, a defendant violates the implied covenant when it purposely sabotages a plaintiff's ability to benefit under the contract." *Thompson v. Advanced Armament Corp., LLC*, 614 Fed. Appx. 523, 525 (2d Cir. 2015) (Summary Order) (quoting *Kader v. Paper Software, Inc.*, 111 F. 3d 337, 341-42 (2d Cir. 1997)).

Aslin and Hayden specifically allege the contract at issue, their tenure contracts. They allege the discrete contractual term breached: the provision "granting him permanent tenure." Cplt. ¶¶ 386, Cplt. ¶ 436.[17] Aslin specifically alleges UR's breaching conduct. He spells out the exact time period of the breach: March 2016 through December 2, 2016. Cplt. ¶ 387. He specifies six specific breaches. Cplt. ¶ 387(a)-(f). Hayden, likewise, clearly states the time period of the breaches (Cplt. ¶ 437) and six specific breaches by UR. Cplt. ¶ 437(a)-(f).[18] Both Aslin and Hayden link the breaching conduct to the permanent tenure provision and show the breaches violated that contractual term.

Aslin and Hayden plainly allege UR's retaliatory conduct breached their contracts' provisions guaranteeing permanent tenure. *Keady v. Nike, Inc.*, 116 F. Supp. 2d 428, 438 (S.D.N.Y. 2000) (*vacated in part on unrelated jurisdictional grounds*) (Br. at 25) gives UR no help. *Keady's* plaintiff was a student employee of a Catholic university who resigned his part-time job because he did not like the university's affiliation with Nike. Unlike Aslin and Hayden, he had no tenure, alleged no specific contractual term breached, and resigned soon after he had renewed his contract. *Keady's* plaintiff could not tie his discharge

---

[17] *Rochester-Genesee Reg'l Trans. Auth. V. Cummins, Inc.*, 2010 WL 2998768 (W.D.N.Y. July 28, 2010) (Br. at 23) is readily distinguishable. There the plaintiff alleged the defendants breached their contracts by failing to manufacture and deliver buses in accordance with contractual specifications and accepted industry standards. *Id.* at *8. Which "specifications" and "standards" were at issue was unstated. Plaintiffs here point to the key contractual provision: permanent tenure. *Sud v. Sud*, 211 A.D. 2d 423, 424 (1ˢᵗ Dep't 1995) (Br. at 23), involving an amorphous contract claim for inter-family financial support, and *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 468 (S.D.N.Y. 2014) (Br. at 23), a defective auto case in which the plaintiffs did not even plead "the specific contract involved," are similarly distinguishable.

[18] *Murphy v. Sr. Investigator Neuberger*, 1996 WL 442797, at *14 (S.D.N.Y. Aug. 6, 1996) (Br. at 24), in which "Plaintiff fails to identify what contracts were breached and how defendants breached such contracts" illustrates by contrast why Plaintiffs' contract claims are properly pleaded. So do *Marshall*, 51 F. Supp. 3d at 468 (Br. at 24) and *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) (Br. at 24). Aslin and Hayden did not merely "[s]tat[e] in a conclusory manner that an agreement was breached." *Id.*

to any breaching action of his employer, because he admitted he resigned "as a matter of conscience." *Keady*, 116 F. Supp. 2d at 438. Aslin and Hayden, by contrast, were compelled to leave employment after a series of employer retaliations against them resulting from their statutorily protected conduct.

Aslin's and Hayden's constructive discharge claims are sufficiently pleaded. Retaliation for protected activity, and creation of a hostile work environment, are proper bases for a constructive discharge claim. *Petrosino v. Bell Atl.*, 385 F. 2d 210, 229-30 (2d Cir. 2004), describes the two-part inquiry. First, did the employer "intentionally create[ ] a work atmosphere so intolerable that [the employee] is force to quit involuntarily." Second, "would an objectively reasonable person in the plaintiff's position …find her 'work conditions so intolerable as to compel resignation.'" Plaintiffs' hostile environment and retaliation claims mandate a "Yes" answer to the first question. They have alleged numerous facts showing UR wanted to drive them out. *See, e.g.,* Cplt. ¶¶ 329, 333 (Dean Lennie's statement to Mahon and Cantlon that some people in UR administration thought the best solution was for Plaintiffs to leave UR); 387, 437.

The second question also must be answered "Yes," especially at the pleadings stage and considering the university context where a reputation for integrity in inter-faculty dealings is paramount. Cplt. ¶ 530. "Work conditions are 'intolerable' if they are so difficult or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 262 (S.D.N.Y. 2014). Objectively reasonable faculty members would find work conditions "difficult or unpleasant" when senior administrators serially dismiss their serious claims of violations of university policies – largely substantiated by a subsequent "independent" report – as mere gossip, smears, manipulation and deception, while publicly backing the perpetrator, with resulting damage to the Plaintiffs' reputations. Cplt. ¶¶ 303, 305, 320, 337, 382, 433, 526 -532. Plaintiffs plead sufficient facts for the constructive discharge claims to survive.

## VI. PLAINTIFFS SUFFICIENTLY PLEAD CLAIMS OF DEFAMATION *PER SE* (COUNT XIV)

In atomizing the defamatory statements, UR glosses over their cumulatively harmful effect on Plaintiffs' professional reputations, ignores the context in which they were made, and neglects that each

statement implied "that the speaker knows certain facts, unknown to his audience, which supports his opinion and are detrimental to the person about whom he is speaking." *See Posteraro v. Northport-East Northport Union Free School Dist.*, 2012 WL 3289009, at * 5 (E.D.N.Y. Aug. 10, 2012) (upholding, at pleadings stage, defamation claim based on school administrators explaining firing of teacher "if you knew all the details of this case, you would understand and agree with us") (quoting *Steinhilber v. Alphonse*, 68 N.Y. 2d 283, 289-90 (1986)). Just as with Plaintiffs' retaliation and hostile environment claims, context is crucial. *See Steinhilber*, 68 N.Y. 2d at 291-92 (no "rigid set of criteria...can be universally applied. The infinite variety of meanings conveyed by words – depending on the words themselves and their purpose, the circumstances surround their use, and the manner, tone and style with which they are used – rules out, in our view, a formulistic approach."). UR and Seligman, then UR President, repeatedly impugned the reputations of the Plaintiffs for honesty and integrity, in a professional context where those are vital.

### A. All of the Alleged Statements Contain Defamatory Factual Statements

Statements 1, 2, 4, 5, and 6 contain defamatory factual statements. Defamation includes statements that "expose[ ] an individual 'to...shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or...induces an evil opinion of one in the minds of right-thinking persons, and deprives one of...confidence and friendly intercourse in society.'" *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 163 (E.D.N.Y. 2014) (citation omitted). Plaintiffs were subjected to many of those pernicious conditions. *See, e.g.,* Cplt. ¶¶ 253, 288, 329, 382. The Complaint's retaliation and hostile environment facts show Plaintiffs' deprivation of "friendly intercourse" in UR society. *See* Cplt. ¶ 39.

Seligman's statements that Plaintiffs' complaints were based on hearsay (Stmts. 1, 2) (Cplt. ¶¶ 515(a), 515(b), 294, 295), would leave the reasonable listener with the impression that the Plaintiffs not just carelessly but vindictively invented allegations to smear Jaeger. Saying a tenured professor purveyed hearsay to slander a colleague exposes the professor to the "shame, obloquy, and aversion" that UR says defamation requires. *Celle v. Filipino Reporter Enters., Inc.*, 209 F. 3d 163, 177 (2d Cir. 2000) (Br. at 26).

Saying the Plaintiffs trafficked in hearsay implies the speaker knows something the listener does not,

namely, the facts justifying the hearsay characterization.  *See Posteraro*, 2012 WL 3289009, at * 5.

Jaeger's writing to Plaintiffs' academic peers that he had been "falsely accused and bullied, and that

the person who had complained against him had resigned" (Stmt. 4) plainly implies that Aslin resigned

because he had been caught making false accusations.  This statement is provably false [19] and actionable.

*See Friedman v. Bloomberg L.P., et al.*, No. 16-1335-cv, slip op. at  (2nd Cir. March 1, 2018) (reinstating

defamation claim where media outlet reported that plaintiff had been fired for repeatedly trying to extort

money because it falsely implied the speaker knew facts unknown to the audience).

### B.  All of the Alleged Statements are "Of and Concerning" the Plaintiffs

UR's "of and concerning" argument ignores the context in which the defamation occurred.

Plaintiffs' Complaint makes clear that the Jaeger affair was a full-on imbroglio of great university-wide

interest.  Everyone at BCS, and some beyond it, knew the identities of the faculty members who had

accused Jaeger and had objected to UR's weak response to their complaints. It is reasonable to conclude

that statements 1 (Seligman's "hearsay" statement), 3 (DeAngelis's statement that emails showed

manipulation, deception and smearing) and 4 (Jaeger's statements of false accusation and that his accuser

had resigned accordingly) were "of and concerning" the Plaintiffs.  *See Chicherchia v. Cleary*, 207 A.D. 2d

855, 616 N.Y.S. 2d 647 (2d Dep't 1994) (Br. 27, 28) ("party alleging defamation need not be named in the

publication").  The "extrinsic circumstances…show that it is reasonable to conclude the publication

refer[red]" to plaintiffs because those facts "were known to those who read or heard the publication."

*Chicherchia,* 207 A.D. 2d 855, 616 N.Y.S. 2d 647. Jaeger's writings calling the complaints against him

false could only have been referring to his accusers, the Plaintiffs, and the dispute he was talking about was

known both inside UR and to cognitive scientists elsewhere. Cplt. ¶¶ 317, 319. Jaeger's statement that one

of his accusers had resigned could only refer to Aslin, the only faculty member to have resigned over UR's

protection of Jaeger and retaliation.  No reasonable recipient of Jaeger's false writing could have interpreted

---

[19] The White Report demonstrates that Jaeger had *not* been falsely accused.

it otherwise. These abundant "extrinsic facts" satisfy Plaintiffs' obligation to demonstrate that "it is reasonable to conclude" the statements at issue referred to Plaintiffs. *See Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2s 167, 174 (W.D.N.Y. 2003) (Br. at 27).

DeAngelis's slanderous statement to BCS faculty that he had emails showing "manipulation and deception of faculty members" and "smearing" of Jaeger were plainly "of and concerning" the Plaintiffs. The Plaintiffs, except for Newport and Bixby, were all faculty members of BCS. Jaeger was a member of BCS. Plaintiffs' complaints about Jaeger's behavior were common knowledge. The meeting at which DeAngelis made this statement dealt directly with those complaints. Cplt. ¶ 310. DeAngelis's statement did not need to name the Plaintiffs for any of his listeners to think he was talking about anyone else.

### C. None of the Alleged Statements Were Privileged

UR's "common interest privilege" argument extends the privilege's scope far past its proper boundaries. The privilege "does not shield statements published with malice or with knowledge of their falsity or with reckless disregard as to their truth or falsity." *Dardashtian v. Gitman*, 2017 WL 6398718 at * 8 (S.D.N.Y. Nov. 28, 2017) ("Defendants do not point to anything suggesting such a broad privilege as would apply to all work-related matters of every nature discussed between coworkers").

As with UR's other summary judgment-type arguments, UR ignores that "'[a]t the pleadings stage, a plaintiff can overcome the common interest privilege by alleging that the defamatory statement was motivated solely by…malice.'" *Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364, 371-72 (W.D.N.Y. 2012) (quoting *Thai v. Cayre Group, Ltd.*, 726 F. Supp. 2d 323, 330 (S.D.N.Y)). Far from alleging malice through "[m]ere conclusory allegations…surmise, conjecture and suspicion" (*Thai*, 726 F. Supp. 2d 323, 330 (S.D.N.Y. 2010) (citations omitted) (Br. at 27), Plaintiffs plead many contextual facts supporting the inference of malice.

Plaintiffs were in a heated dispute with UR. UR, frustrated and angry with the Plaintiffs, who had refused to accept UR's half-baked investigations exonerating Jaeger, retaliated against them in numerous ways, showing malice. *See, e.g.,* Cplt. ¶ 39. Plaintiffs were told that "the decision to force out the

troublesome Plaintiffs came from the top – meaning Seligman and Clark." Cplt. ¶ 40. UR's practice of victimizing complainants (Cplt. ¶ 43) further supports the existence of malice. So does UR's early promotion of Jaeger to full professor, before the Nearpass investigation into Jaeger's behavior had even concluded (Cplt. ¶¶ 207-210), UR's anger that the Plaintiffs refused to shut up and go away after the deeply flawed Nearpass report was issued (Cplt. ¶ 253), DeAngelis's and Wormer's assurance to Jaeger that he would be able to "clear his name" (Cplt. ¶ 255), the November 29, 2016 memo from Defendant Clark praising Jaeger and saying Jaeger had been victimized by a "wealth of rumors" and "misinformation," (Cplt. ¶¶ 288-89), and UR's highly unusual excavation of Plaintiffs' emails.

DeAngelis, the BCS chairman whose department was wholly riven by the Jaeger matter, was especially angry. His first reaction to the emails was that he had been "'played by the Plaintiffs." Cplt. ¶ 309. He then called the BCS meeting where he asserted the emails showed "manipulation and deception of faculty members," "smearing of Jaeger," and "definitive proof" of lying. Cplt. ¶ 310. DeAngelis's inability to back up these slanders (Cplt. ¶¶ 311, 320) demonstrates their falsity and his knowledge of or reckless disregard for their falsity. Cplt. ¶ 311. He continued to direct hostility at Plaintiff Cantlon. Cplt. ¶¶ 312-14. His ill will is shown by his broken promise not to permit Jaeger to participate in Kidd's and Piantadosi's 2017 performance reviews (Cplt. ¶¶ 285-86), and his bait-and-switch on hiring Plaintiff Heilbronner (Cplt. ¶ 328). DeAngelis worked to drive all the Plaintiffs out of UR. *See* Cplt. ¶¶ 332-33.

DeAngelis's later apology for his behavior (Cplt. ¶ 320) – although not extended to Plaintiff Aslin (Cplt. ¶¶ 320-21) – and admission that he had "damaged the Plaintiffs' reputations" (Cplt. ¶ 320) is further indication of the requisite malice, which "focuses on the Defendant's attitude toward the plaintiff." *Chandok v. Klessig*, 632 F. 3d 803, 815 (2d Cir. 2011). Statements 1 (Seligman "hearsay" allegation), 2 (Seligman's "hearsay" and "overreaction" statements) and 3 (DeAngelis's statements that Plaintiffs' emails showed deception, manipulation and smearing) all reflect the requisite "spite" and "ill will" that support common-law malice. *Chandok*, 632 F. 3d at 815. These facts also show the statements were made "with a high degree of awareness of their falsity" that is constitutional malice. *Liberman  v. Gelstein*, 80 N.Y.S. 2d

429, 438 (1992).  Moreover, Seligman and DeAngelis knew the Plaintiffs' complaints were more than

"hearsay."  Bixby, Cantlon and especially Kidd had witnessed much of Jaeger's sexual misconduct directly.

Nearpass spoke directly with a number of witnesses whose testimony made clear that Jaeger's conduct

toward them was sexual and unwelcome.  *See* e.g. Cplt. ¶ 218.  Although some of Plaintiffs' reports about

Jaeger reflected corroborating testimony from others, they were also grounded in first-hand experience.

Finally, the common interest privilege is an affirmative defense, not properly subject to a motion to

dismiss unless *no* allegations or inferences exist to support the defamation claim.  *See Routh v. Univ. of

Rochester*, 981 F. Supp. 2d 184, 213-14 (W.D.N.Y. 2013) (common interest privilege "does not lend itself

to a preanswer motion to dismiss" under CPLR).  Plaintiff's Complaint contains numerous allegations that

the challenged statements were made with knowledge of or reckless disregard of their falsity (constitutional

malice) or solely out of spite or ill will (common law malice) – enough to "raise a right to belief above the

speculative level" (*Twombly*, 550 U.S. at 555) and generate "a reasonable expectation that discovery will

reveal evidence" supporting the claim.  *Twombly*, 550 U.S. at 556.

### D.  Plaintiffs Sufficiently Pleaded Defamation *Per Se*

UR's own cited cases establish that DeAngelis's admission that he had "damaged the Plaintiffs'

reputations" (Cplt. ¶ 320) suffices for *per se* defamation.  *See Thorsen*, 996 F. Supp. 2d 143, 163 (Br. at 35)

("The gravamen of an action alleging defamation is an injury to reputation."); *Campanella*, 853 F. Supp. 2d

364, 369) (Br. at 29-30) (*per se* defamation under New York law attaches to words that "would tend to

injure a party's trade, occupation or business").  Repeating that Plaintiffs, participating in a UR process

concerning UR policies, engaged in a smear campaign against a fellow professor, can only be reasonably

understood as impugning Plaintiffs' professional reputations.  Just as DeAngelis admitted.

Again, context matters. No "extrinsic facts" were necessary to give the statements "defamatory

import."  *Tagliaferri v. Szulik*, 966 F. Supp. 2d 339 (S.D.N.Y. May 25, 2016) (Br. at 30).  Seligman's and

DeAngelis's correspondents knew to whom the defamatory claims applied.  Seligman's comparison of the

Plaintiffs to the false accusers in the University of Virginia false rape case referred directly to Plaintiffs'

EEOC complaints.  Jaeger's statement that he had been falsely accused and his accuser had resigned left no doubt in the academic cognitive science world that he was referring to Aslin.

UR's argument that the defamations did not "constitute[ ] a direct attack on their competence, capacity, or fitness as academics" (Br. at 30) is risible.  Defendants did not simply say Plaintiffs were not nice people.  They branded the Plaintiffs liars and architects of a campaign of character assassination against a fellow professor.  *Liberman*, 80 N.Y. 2d 429, 436 (Br. at 30) is not to the contrary.  Nor is *Kforce, Inc. v. Alden Personnel, Inc.*, 288 F. Supp. 2d 513, 516 (S.D.N.Y. 2003) (Br. at 30).  In *Liberman*, a summary judgment case, the plaintiff landlord alleged that a tenant's statements that the landlord had "threatened to kill me and my family" was defamatory because it tended to injure plaintiff's professional reputation.  The court found those words did not sufficiently point to the plaintiff's occupation as landlord for defamation to attach, but agreed generally that reputational harm defamation is "'limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself.'" *Liberman*, 80 N.Y.2d at 436 (citation omitted).  That is precisely what we have here – defamatory statements by defendants saying the Plaintiffs lacked the necessary honesty to participate in a crucial workplace problem.  The statements were "made with reference to a matter of significance and importance for that [occupational] purpose." *Liberman*, 80 N.Y. 2d at 436.  It is no different than a statement that a lawyer helps herself to client trust fund money. The statements at issue were directly related to Plaintiffs' status as academics, participating in an important UR process, not simply "a more general reflection upon [their] character or qualities." *Liberman*, 80 N.Y.2d at 436.

*Kforce* involved a challenge to a competitor's statement about Plaintiff's "profitability in a particular geographic region." *Kforce*, 288 F. Supp. 2d at 517.  Defendants made no statements impugning Plaintiff's "basic integrity" or honesty, or that Plaintiff committed fraud or dishonesty, or otherwise was unfit to practice its profession. *Id.* Here, defendants' statements alleged that Plaintiffs corrupted a UR investigative process for their own ends, an attack on their "basic integrity." *Kforce*, 288 F. Supp. 2d at 516.  The challenged statements "'discredit [Plaintiffs] in [their] chosen calling.'" *Id.* at 517 (citation omitted).

### VII.   PLAINTIFFS COMPLIED WITH THE FEDERAL RULES, NO ALLEGATIONS SHOULD BE STRICKEN AND THE COMPLAINT SHOULD NOT BE REPLEADED

#### A.   UR Ignores the Requirements of *Twombly/Iqbal*[20]

UR's Rule 12(f) motion ignores the "sea change" from notice pleading to factually specific pleading that many courts ascribe to the *Twombly/Iqbal* cases. *See, e.g., Molina-Reyes v. Molina-Rodriguez*, 711 F. 3d 49, 53 (1st Cir. 2013) ("Supreme Court effected a sea change in the law of federal pleading in *Iqbal* and *Twombly*"); *Sellers v. First Student, Inc.*, 2016 WL 6440111, at * 4, n. 5 (D. Conn. Oct. 28, 2016) ("The court would expect plaintiff's counsel to be aware of the sea change heralded by *Iqbal* and *Twombly*, which together overruled *Conley*.")[21] No federal court plaintiff dares omit any fact or allegation that might create inferences needed to create the "plausibility" required for a federal complaint to defeat the now almost reflexive motions to dismiss that *Twombly/Iqbal* engendered.

Given the *Twombly/Iqbal* specificity specter, Plaintiffs pleaded all they could that would generate inferences backing their claims.  That is especially necessary given the highly fact-specific, totality of the circumstances, contextual analysis required for discrimination claims.  *See Burlington*, 548 U.S. 53, 68 (2006) ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.")

#### B.  Motions to Strike are Generally Disfavored.

As every case UR cites states, motions to strike are largely disfavored.  *Marshall v. N.Y.S. Pub. High School Athletic Ass'n, Inc.*, 2017 WL 6003228, at *10 (W.D.N.Y. Dec. 4, 2017).  To succeed, "the defendant must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand

---

[20] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).
[21] Whether *Twombly* and/or *Iqbal* (commonly conflated as *Twiqbal* or *Twombal*, they are nevertheless very different cases; *Twombly's* author dissented in *Iqbal*) actually effected such a profound alteration in notice pleading is a subject for another day.

would result in prejudice to the movant." *Britt v. Buffalo Mun. Housing Auth.*, 2008 WL 4501929, at *1 (W.D.N.Y. Sept. 30, 2008).

*M'Baye v. World Boxing Ass'n.*, 2007 WL 844552 (S.D.N.Y. Mar. 21, 2007) (Br. at 31) underscores the difficulty of this test.  The defendant sought to strike some or all of 50 allegations or headings.  Noting the judicial disfavor for motions to strike and the necessity of "'a strong reason'" for doing so (*id.* at * 4, quoting *Lipsky*, 551 F. 2d at 893)), the court struck only 11.  Finding the allegations "irrelevant," the court found they would create prejudice by "impermissibly expand[ing] the scope of discovery." *M'Baye*, 2007 WL 844552, at * 4.  *M'Baye* was decided on summary judgment; here, the claims and associated facts on which discovery will be required remain to be determined.  *M'Baye* involved breach of contract claims, which typically do not require the full circumstantial development necessary for employment discrimination claims.  Finally, *M'Baye* noted that allegations are "rarely stricken" and "even if seemingly inflammatory…may remain so long as they have some relevance to the claims at issue." *Id.*  As discussed below, all of the challenged allegations are relevant to Jaeger's and UR's conduct. [22]

### C. None of the Challenged Allegations are Improper or Intended to Embarrass

**¶¶ 44-46, 343, 344.**  UR wrongly argues the Complaint's references to Seligman's and Clark's relationships "have absolutely no bearing on any aspect of this case."  Br. at 32.  Those allegations support the Complaint's allegations that UR's exculpatory investigations of Jaeger were improper and that UR's

---

[22] *Anderson v. Davis Polk & Wardwell, LLP*, 850 F. Supp. 2d 392 (S.D.N.Y. 2012) (Br. at 31-32), is wildly different from this case.  There a disgruntled pro se plaintiff sought to amend his complaint against his former employer to add allegations "ridiculing employees…for their alleged sexual orientation or their alleged infection with sexually-transmitted diseases." *Id.* at 516.  The Court rejected some of the requests to strike allegations that "though crude, are plainly relevant to plaintiff's unmeritorious claim that [defendant] sexually harassed him." Other allegations were stricken because "wholly irrelevant" as reflected by their "taunting asides." *Id.* at 417.  Such *ad hominem* attacks are entirely different from the allegations Plaintiffs here make, all of which are relevant to Plaintiffs' retaliation and hostile environment claims because they tend to show UR's acceptance of improper behavior, refusal to halt it, and hostility towards those who challenged it.  Also far afield, *Cruz v. Oxford Health Plans, Inc.*, 2004 WL 2609528, at * 1 (S.D.N.Y. Nov. 17, 2004) (Br. at 32), involved an allegation of a supervisor's discharge for an affair that occurred after plaintiff's allegedly discriminatory discharge for failing to accede to that supervisor's advances.  Many of Plaintiffs' allegations concern the hostile environment they faced before they encountered retaliation. *Parrish v. Sollecito*, 2002 WL 1072227 (S.D.N.Y. May 28, 2002) (Br. at 32), involved a female plaintiff, claiming a hostile work environment, who alleged that her male supervisor had an extramarital affair with an employee at a different location. *Id.* at * 1.  Plaintiff nowhere linked that marital infidelity at another location with the hostile environment alleged. *Parrish's* articulation of the Rule 12(f) shows why UR's motion to strike should be denied: "'motions to strike…will not be granted unless the matter asserted clearly has no bearing on the issue in dispute.'" *Id.* at * 1 (citations omitted)).

leadership did not seriously attend to workplace misconduct.  They also create reasonable inferences supporting Plaintiffs' claims of retaliation and hostile work environment, explaining why UR would permit a flagrantly hostile environment to take root at BCS and do nothing to curb it despite complaints from highly respected professors.  None of these allegations can be said "to have no bearing on the issues in the case."  If UR's primary leaders were cavalier about their own misconduct, it stands to reason they were more tolerant of the discriminatory treatment of Plaintiffs that the Complaint alleges.  The only prejudice UR suffers is legitimate prejudice to its position that it did not discriminate.

¶¶ **92.**  References to Jaeger's sexual relationships with other academics are entirely permissible.  First, the White Investigation, commissioned by UR, has laid bare a wealth of these behaviors.  Second, allegations of Jaeger's promiscuity support Plaintiffs' allegations of his misconduct with graduate students.  They relate directly to the operative facts that spurred the Plaintiffs to protest UR's coddling of Jaeger, and to Plaintiffs' claims that UR mishandled their protests and then retaliated against them.  The Plaintiffs are entitled to tell the jury why they were complaining in order to show why their responses were protected activities.  Jaeger is not a defendant and UR can show no Rule 12(f) prejudice from these allegations.

¶¶**94-106.**  Allegations of Jaeger's non-sexual, power-based misbehavior, showing that UR tolerated that long-standing misconduct, support the claims that UR tolerated Jaeger's power-based sexual misconduct as well.  That UR accepted such behavior also tends to show it would be more likely to ignore and retaliate against those who complained.  Here, too, UR can show no Rule 12(f) prejudice from these allegations about non-defendant Jaeger.

¶¶**124, 130.**  Plaintiffs' allegations about the Jaeger-Kurumada relationship are proper.  First, they show Jaeger having a sexual relationship with a graduate student – one of the issues Plaintiffs complained about to UR. Second, they reflect UR making a "partner hire" for Kurumada, whose credentials were not universally considered top-rank.  This adds credence to Plaintiffs' claim that UR's refusal to give a "partner hire" offer to Heilbronner was retaliatory.  Yet again, UR demonstrates no prejudice from these allegations about a non-party and ignores the allegations' probative relationship to one of the Complaint's claims.

¶¶ 125-26.  These paragraphs also describe Jaeger's misbehavior with a graduate student, supporting Plaintiffs' allegations that UR improperly protected a misbehaving professor while retaliating against those who complained.  UR shows exactly no prejudice to it from these allegations.

¶¶ 344-45.  Clark, the UR Provost, engaged in a relationship with a subordinate without disclosing it as required.  That is directly relevant to the allegations that UR let a hostile environment take root at BCS and retaliated against the Plaintiffs for protesting.  If the leadership does not perceive its own sexually-based misconduct as serious or disregards rules, it may well be lax towards subordinates' similar misconduct.  Allegations about entitled lavish spending bespeak Seligman's and Clark's general inattentiveness to workaday UR problems such as resulted in Plaintiffs' hostile environment and retaliation claims.  Their imperial spending habits were well known before the Complaint was filed (Cplt. ¶ 344) and no prejudice results from their inclusion here. Seligman's failure to take action after learning of a popular teacher's sleeping with a student (Cplt. ¶ 345) is relevant to Plaintiffs' claims that UR's tolerance for faculty-student sexual relationships sowed the seeds of the retaliation and hostile environment Plaintiffs experienced.  The allegations about UR's mishandling of the *Irrera* sexual harassment case (Cplt. ¶ 345) are similar to, and probative of, UR's mishandling of this case.  Evidence of institutional culture is probative of the Plaintiffs' claims here.  Anyway, the *Irrera* case has been the subject of three judicial opinions, its details already well publicized.  UR's demonstration of even the remotest improper prejudice is not just fugitive but nil.

### D.  Plaintiffs Properly Used Pseudonyms

UR's sideshow protest of Plaintiffs' use of pseudonyms is easily answered. Nothing in Fed. R. Civ. P. 5.2, Fed. R. Civ. P. 10, or Local Rule 5.3 prohibits the use of pseudonyms to protect the identities of non-parties involved in allegations of sensitive matters not publicly known.  *See generally Plaintiff B v. Francis*, 631 F. 3d 1310, 1316 (11th Cir. 2011) (courts permit anonymity concerning "information of utmost intimacy").  Quite differently, Kurumada's relationship with Jaeger was widely known on campus, as UR well knows. Anticipating UR would move to dismiss the Complaint for failing to state any cognizable claims, Plaintiffs did not move to file the Complaint under seal with a redacted publicly filed companion

document.  Once the Court rules on the Motion to Dismiss, and discovery begins, Plaintiffs will provide the Court and UR a copy of the unredacted Complaint, under seal, and publicly file a redacted copy.

### E.  Plaintiffs' Complaint Complies with Rules 8 and 10

Had Plaintiffs filed the Complaint UR says it desired, "a short and plain statement of the claim" (Br. at 34), UR would have insisted that it fell woefully short of the required "plausibility" that *Twombly* and *Iqbal* require.  Plaintiffs would have happily filed such a Complaint.  But, as discussed above, because defendants routinely file motions to dismiss in light of *Twombly/Iqbal* (*see Barker v. Columbus Reg'l Healthcare Sys.*, 977 F. Supp. 2d 1341 at 1345-46 (M.D. Ga. 2013)), Plaintiffs are obliged to include every bit of possibly-supporting, inference-generating detail to "nudge [their] claims across the line from conceivable" (*Iqbal*, 556 U.S. 662, 680) to the context-specific "plausible,"  *Twombly*, 550 U.S. at 570.

*Politico v. Promus Hotels, Inc.*, 184 F.R.D. 232 (E.D.N.Y. 1999) (Br. at 34, 35), is inapposite. *Politico* preceded *Twombly* by some nine years and *Iqbal* by eleven.  Endorsing the pure notice pleading practice that *Twombly* and *Iqbal* terminated, *Politico* found fault with a complaint that "pleads evidence." *Politico*, 184 F.R.D. at 234.  Every post-*Twombly/Iqbal* plaintiff fears dismissal if they fail to do precisely that.  Moreover, *Politico* was a personal injury case, far afield from the heavy contextual nature of an employment discrimination case.

The Second Circuit arguably takes a less stringently anti-notice pleading approach than some other Circuits.  Nonetheless, following *Twombly*, the Second Circuit requires a complaint to include "'the statement of circumstances, occurrences, and events in support of the claim presented' and does not authorize a pleader's 'bare averment that he wants relief and is entitled to it.'"  *Anderson News* v. Am. Media, 680 F. 3d 162 at 182 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555, n. 3 (further citation omitted)).  Plaintiffs were bound to follow that direction.  *Littlejohn v. City of New York*, 795 F. 3d 297 (2d Cir. 2015), illustrates an employment discrimination plaintiff's conundrum.  Noting the tension between the pleadings tests of *Swierkiewicz* and *Iqbal*, *Littlejohn* concluded that while "*Iqbal's* requirement applies to Title VII complaints of employment discrimination…the *McDonnell Douglas* temporary presumption….

reduces the facts needed to be pleaded under *Iqbal*." *Id.* at 310.  To be safe rather than sorry, a plaintiff must err on the side of inclusion.

Here nine plaintiffs bring claims against three defendants.  The claims are not entirely overlapping. Some are statutory, some are common-law based.  Relevant events, facts and circumstances at issue in this highly context-specific discrimination case spanned a number of years and involved different persons and entities.  The Complaint, by the very nature of the case, must be long and detailed.

Finally, UR's 35-page Motion to Dismiss, and the absence of a Fed. R. Civ. P. 12(3) motion, show UR fully understands the nature of the claims and the grounds on which they rest, and is fully able to mount arguments why each claim fails Rule 8(a)(2) muster.

## <u>CONCLUSION</u>

The Motion to Dismiss should be denied in its entirety, and Plaintiffs request leave to replead any dismissed claims pursuant to Fed. R. Civ. P. (15)(a)(2).

Dated:  March 16, 2018

                          Respectfully submitted,

                          McAllister Olivarius

                           /s/ John F. McAllister
                          Dr. JFO McAllister (JMcAllister@mcolaw.com)
                          Dr. Ann Olivarius (AOlivarius@mcolaw.com)
                          Stephen G. Grygiel (SGrygiel@mcolaw.com)
                          McAllister Olivarius
                          68 Putnam Street, PO Box 173
                          Saratoga Springs, NY 12866
                          (518) 633-4775