


***By ECF Filing (with courtesy copy by FedEx delivery to Chambers)***

May 4, 2018

Hon. Lawrence J. Vilardo
United States District Court
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, NY 14202

**Re: Aslin, et al. v. University of Rochester, et al.
Case No. 6:17-cv-06847**

Dear Judge Vilardo,

This letter responds to your request for supplemental briefing on the three issues the Court identified during the April 23, 2018 oral argument on the Defendant's Motion to Dismiss.

## I. SPECIFIC ACTIONS OF DEFENDANTS SELIGMAN AND CLARK

Plaintiffs alleged NYSHRL claims against Defendants Seligman (UR's former President and CEO (Count XV))[1] and Clark (UR's Provost (Count XVI))[2] for aiding and abetting discrimination and retaliation against Plaintiffs Aslin, Cantlon, Hayden, Piantadosi, Kidd, Mahon and Newport. Your Honor asked Plaintiffs to specify "exactly what" Defendants Seligman and Clark did. Plaintiffs understand the Court's question to address the aiding and abetting claims against those two Defendants. [3] *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F. 3d 98, 107 n. 10 (2d Cir. 2011) (individual defendant can be liable under NYSHRL aiding and abetting provision if defendant "actually participates in the conduct giving rise to a discrimination claim").[4]

---

[1] Labeled XV, this is actually Count XVI.
[2] Labeled XVI, this is actually Count XVII.
[3] 4.23.18 Oral Argument Transcript (J. Vilardo).
[4] Although the Court's inquiry appeared to focus on the factual elements of the aiding and abetting claims, it seems important to put the response in context by noting that "'the law in this Circuit seems clear that a defendant may be held liable for aiding and abetting unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability. However, as the employee's liability necessarily hinges on that of the employer, the employer must be liable for an individual to also be held liable under this provision.'" *Isakov v. HASC Center, Inc.*, 2018 WL 1114714, at * 9, n. 4 (E.D.N.Y. February 27, 2018) (quoting *Conklin v. Cty. of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012)).

63 PUTNAM STREET | PO BOX 173 | SARATOGA SPRINGS, NY 12866 | USA | (518) 633-4775 | MCOLAW.COM

UK Office: The Pearce Building | 7th Floor | West Street | Maidenhead | SL6 1RL | England | +44 (0)1628 567 567
Partners: **Dr. Ann Olivarius** (Solicitor of England & Wales and U.S. attorney licensed in MN, NH, VA, DC, ID & NY)
**Dr. J.F.O. McAllister** (Registered Foreign Lawyer and U.S. attorney licensed in NY & CT)




**A. Defendant Seligman**

Complaint ¶ 535 summarizes, in subparagraphs (a) – (f), the bases for the aiding and abetting claim against Defendant Seligman. [5]

Complaint ¶ 535(a): Seligman "[c]reat[e]d an environment where good faith complaints are routinely swept under the rug as described in paragraphs 343-347." Paragraph 343 alleges Seligman's and Clark's "intimate relationships with their own subordinates" (described at Complaint ¶¶ 44-46) and "the role this may have played in dulling their sensitivity to Jaeger's misconduct." Paragraph 344 discusses criticisms leveled at Seligman and Clark for lavish spending, and the parallel between their insensitivity to the impressions that conveyed and "UR's refusal to recognize any error in its handling of Jaeger or the retaliation campaign against Plaintiffs." Paragraph 345 describes Seligman's failure to address the problem created by a popular professor sleeping with one of his students. Paragraph 345 also describes UR's dogged defense of a retaliation claim in *Irrera v. University of Rochester*, the Eastman School's Dean telling the *Irrera* plaintiff that the Dean could not stop the alleged harasser from sitting on juries judging plaintiff's music, and the Eastman School's awarding the alleged harasser an award for Excellent Teaching – just as Jaeger was promoted to full professor during the pendency of the Nearpass Investigation. Cplt. ¶ 208

Essentially Paragraph 535(a) alleges that Seligman and Clark, UR's two highest administrators at all relevant times, acted and failed to act in ways that created an institutional culture in which UR's retaliations against Plaintiffs were permissible and the hostile environment experienced by Plaintiffs Cantlon and Kidd was fostered.

Complaint ¶ 535(b): "Wilfully ignoring the Plaintiffs when they contacted him to convey their concerns about violations of Title VII and Title IX." A number of other allegations detail Seligman's disbelief of Plaintiffs and corresponding refusal to engage meaningfully with them, thereby aiding and abetting the harms to the Plaintiffs. *See, e.g.* Complaint ¶ 281 (on October 26, 2016, Plaintiffs Aslin and Cantlon meet with Seligman; Seligman promises personally or through a surrogate to make a statement to BCS to address consequences of Jaeger's misconduct and to get back to Aslin and Cantlon about their concerns of the narrowness of the Nearpass Investigation, conflicts of interest and hostile environment; Seligman never makes the statement and never gets back to Aslin and Cantlon); ¶ 294 (Seligman tells Dr. Runner, then Chair of the Linguistics Department, that Jaeger was fine and that students who had complained had witnessed nothing); ¶ 300 (January 5, 2017 letter to Seligman from Plaintiffs Cantlon, Kidd, Mahon, Hayden and Piantadosi noting frustration with Jaeger investigation, Aslin resignation, the anxiety of women who had complained, seeking dialogue for improvement, asking for UR statement supporting efforts of Aslin and others to protect students and asking for review of UR policies; Seligman replies on January 10, 2017, stating he looks forward to meeting with BCS faculty to discuss BCS's future; no meeting occurred); ¶ 347 (of Plaintiffs' 29 efforts to seek out UR officials before filing

---

[5] Plaintiffs understand the Court has not asked for additional legal argument here, but note that they are entitled to all reasonable inferences concerning Seligman's actions that stem from his position at the head of UR, the activities of those who reported to him, and Seligman's statements discrediting the Plaintiffs' complaints.




EEOC complaints, six were addressed to Seligman, and none produced any meaningful result).

Complaint ¶ 535(c): "Making false statements to at least three department heads that the case against Jaeger was all hearsay and that the Plaintiffs had overreacted." *See also* Cplt. ¶ 295. Seligman, the President and CEO of UR, put the imprimatur of his office on discrediting Plaintiffs' complaints. These public statements of antagonism to Plaintiffs' position offered high support, and therefore meaningful assistance, to those who retaliated against Plaintiffs.

Complaint ¶ 535(d): "Publicly comparing the EEOC complaint to a well-known article in *Rolling Stone* which was based on fabricated testimony." The analysis here is the same as for Paragraph 535(c). The UR's top official, unmistakably labeling the Plaintiffs as liars, gave substantial assistance to those who retaliated against them. Revealing Seligman's attitude toward the Plaintiffs, this statement also generates inferences supporting the aiding and abetting claim.

Complaint ¶ 535(e): "Authorizing or permitting the searching of the Plaintiffs' emails in an effort to undermine their credibility." Additional allegations support this claim of Seligman's aiding and abetting this retaliatory act. *See, e.g.,* Cplt. ¶ 307 (DeAngelis tells three "professors that UR administrators had given him a stack of emails from the Plaintiffs' UR email accounts proving they had acted inappropriately"); ¶ 308 ("senior officials decided to trawl through professors' emails stored on the UR server, seeking information to undermine them…without their knowledge or consent"); ¶ 317 (another search of Plaintiff Aslin's emails in effort to show Aslin was responsible for Georgetown University Round Table's disinvitation of Jaeger); ¶ 339 (change in UR email system making it easier for administrators to search employee and student emails); ¶ 341 (September 19, 2017 Seligman statement that he had not been aware of screening of Plaintiffs' emails, and that Susan Wormer, of UR Counsel's office, had accessed Plaintiffs' emails and given certain of them to DeAngelis so he could "manage and resolve the turmoil" in BCS; however, UR reviewof emails appears to be commonplace, as reflected in Cplt. ¶ 340 (other victims experiencing email intrusions, and White Investigation apparently searching emails)); ¶ 342 ("long-standing UR employees familiar with the University's IT practices find it hard to believe that any email searches could have been conducted without Seligman's approval of the overall system that has permitted expansive searches by others").

Complaint ¶ 535(f): "Permitting and/or instructing UR administration to encourage Plaintiffs' departure from UR and not to retain them." Further support for this allegation: Cplt. ¶ 40 (some Plaintiffs told that decision to force out troublesome Plaintiffs came from the top – meaning Seligman and Clark); ¶ 305 (Foxe, Chair of Neuroscience, told Cantlon, Mahon and Hayden that Foxe's efforts to retain Aslin in Foxe's department had been shut down by central UR administration); ¶ 322-330 (non-hiring of Heilbronner), in particular ¶ 328 (DeAngelis: "I am dealing with this search the way I have been told to deal with it by my Deans…."); ¶ 329(c) (April 20, 2017; Neuroscience Chair Foxe told Cantlon and Mahon they should back off complaining because it would help him hire Heilbronner in his department); ¶¶ 330-31 (Hayden non-retention); ¶ 333 (Dean Lennie told Mahon and Cantlon that some in UR administration think best way to solve problem is for Plaintiffs to leave UR).




**B. Defendant Clark**

Complaint ¶ 538 summarizes, in subparagraphs (a) – (d), the bases for the aiding and abetting claim against Defendant Clark. [6]

Complaint ¶ 538(a): "Creating an environment where good faith complaints are routinely swept under the rug as described in paragraphs 343-347…" *See* discussion of Cplt. ¶ 535(a) above concerning Clark's personal relationship, spending, and the *Irrera* case. *See also* Cplt. ¶ 244 (June 2, 2016; Clark's two-page letter endorsing Nearpass Report, including several false statements); ¶ 260 (August 15, 2016; Dean Taubman rejects appeal of Provost Clark's endorsement of Nearpass Report; Clark was then Taubman's superior, creating a conflict of interest); ¶¶ 288-90 (Clark's November 29, 2016 memo supporting Jaeger and UR's exoneration process, saying Jaeger had been target of "wealth of rumors" and "in some cases misinformation," praising and supporting Jaeger as "a valued member of our faculty," essentially telling the UR community that Plaintiffs were either liars or delusional); ¶¶ 291-92 (Clark memo saying with Jaeger's consent UR would make summary of Nearpass Report available for review, and providing different materials to different recipients, some including Aslin's private letter to Jaeger without Aslin's knowledge or consent); ¶ 298 (December 6, 2016; Cantlon writes to Clark expressing disappointment with handling of Jaeger complaints and concern that she could not tell a student to report sexual harassment to UR administration, to which Clark responds only: "I am acknowledging receipt of your letter.")

Complaint ¶ 538(b): "Writing a defamatory and retaliatory letter to the BCS faculty accusing the Plaintiffs of spreading rumors and behaving unprofessionally. Cplt. ¶¶ 288-90 (Clark's November 29, 2016 memo supporting Jaeger and UR's exoneration process, saying Jaeger had been target of "wealth of rumors" and "in some cases misinformation," praising and supporting Jaeger as "a valued member of our faculty," essentially telling UR community that Plaintiffs were either liars or delusional).

Complaint ¶ 538(c): "Willfully ignoring the Plaintiffs when they contacted him to convey their concerns about violations of Title VII and Title IX." ¶ 298 (December 6, 2016; Cantlon writes to Clark expressing disappointment with handling of Jaeger complaints and concern that she could not tell a student to report sexual harassment to UR administration, to which Clark responds only: "I am acknowledging receipt of your letter.")

Complaint ¶ 538(d): "Permitting and/or instructing UR administrators to encourage Plaintiffs' departure from UR and not to retain them." *See* discussion of Cplt. ¶ 535(f), above.

---

[6] As with Defendant Seligman, the Plaintiffs are entitled to all reasonable inferences supporting their aiding and abetting claim against Defendant Clark that arise from his Provost position, his comments and writings, and the actions of those who reported to him.




## II. THE DEFAMATORY STATEMENTS [7]

Count XIV [8] alleges defamation *per se* on behalf of Plaintiffs Aslin, Cantlon, Hayden, Piantadosi, Kidd, Mahon and Newport against Defendants UR and Seligman.

The Court has requested "exactly what the defamatory statement were, who said them, when they were said...and perhaps a little exposition on how [the defamatory statements alleged] are false and defamatory." [9]

### A. Defamation by Seligman

Complaint ¶ 515 alleges two defamatory statements by Seligman:

First, Complaint ¶¶ 294, 515(a): "telling Linguistics Chair Runner that the complaints against Jaeger were hearsay." This allegation incorporates by reference Cplt. ¶ 294, which alleges that Seligman "assured Runner that Jaeger was fine and that the graduate students who had complained about him had witnessed nothing." Seligman made this statement to Runner after Aslin and Cantlon filed their complaint about Jaeger on March 10, 2016.

Second, Complaint ¶¶ 295, 515(b): "telling Neuroscience Chair Foxe that the complaints against Jaeger were hearsay and that the Plaintiffs had overreacted." This allegation incorporates by reference Cplt. ¶ 295, which alleges that in April 2017, Seligman told Neuroscience Chair Foxe "that the case against Jaeger was all hearsay and that Aslin had overreacted. Seligman personally disparaged Aslin and the other Plaintiffs to at least two department heads, Foxe (Neuroscience) and Runner (Linguistics)."

Both statements of "hearsay" and the "overreaction" statement were false. *See* Cplt. ¶ 516 ("Seligman was aware that both Kidd and Bixby had direct experience of Jaeger's misconduct."). Both are statements of fact, capable of being proven untrue. The "hearsay" statement is factually untrue because Kidd and Bixby reported personal experiences of Jaeger's misbehavior. The "overreaction" statement must be viewed in that context, "of the entire statement or publication as a whole, tested against the understanding of the average [hearer]…." *See Aronson v. Wiersma*, 65 N.Y.S. 2d 592, 594 (NY 1985) (Opening Br. at 26, 30). *See also Celle v. Filipino Reporter Enterprises, Inc.*, 209 F. 3d 163, 177 (2d Cir. 2006) (Opening Br. at 26, 27) ("'the words are to be construed not with the close precision expected from lawyers and judges but as they would be [heard] and understood *by the public to which they are addressed*'" (citation omitted; emphasis by *Celle* court).

These statements are capable of being proven false. Complaints based on personal experience

---

[7] Plaintiffs incorporate by reference their briefing (Opposition Br. at 23-29) on the defamation claims, and will not here repeat all their arguments on the defamatory and unprivileged nature of the challenged statements.
[8] This was misnumbered; is actually Count XV.
[9] 4.23.18 Oral Argument Transcript (Vilardo, J.)




are not hearsay. It is not an "overreaction" to complain of sexual misconduct based on personal experience and first-hand observations. All of the statements were published to third parties.

Seligman's hearsay and corollary "overreaction" descriptions were made with the requisite degree of fault; Seligman knew Kidd's and Bixby's complaints were based on personal experience and observation. By this point UR's Title IX Coordinator Levy and Nearpass had also interviewed others who reported Jaeger's misconduct based on their personal experiences. Seligman also knew the other Plaintiffs had not purported to complain based on first hand knowledge. By omitting that important fact, Seligman created the impression that the Plaintiffs had deliberately tried to pass off hearsay as fact.

The statements were defamatory because, in light of all the circumstances, they painted the Plaintiffs as vindictively peddling hearsay and "overreact[ing]" to unfounded reports when two of the Plaintiffs complained based on personal experiences and observations. These statements "'tend[ed]" (*Golub v. Enquirer/Star Group*, 89 N.Y.S.2d 1074, 1076 (N.Y. 1997) (Opening Br. at **insert**) to "expose[ ] [Plaintiffs] to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or…induce[ ] an evil opinion of [Plaintiffs] in the minds of right thinking persons, and…deprives one of…confidence and friendly intercourse in society." *Celle*, 209 F. 3d at 177. As the Complaint ¶¶ 530-31alleges and Plaintiffs have demonstrated (Opposition Br. at 28-29), describing Plaintiffs as untruthful, trafficking in baseless assertions is defamation *per se* because it directly attacks Plaintiffs' honesty, trustworthiness and integrity, core qualifications for academic life. [10] The gravamen of an action alleging defamation is an injury to reputation. *Celle*, 209 F. 3d at 177.

Complaint ¶¶ 523-24 recounts Seligman's September 9, 2017 denial on the UR website of the Plaintiffs' EEOC Complaints' allegations and likening them to the fabricated testimony underlying the discredited *Rolling Stone* article about campus rape. *See also* Cplt. ¶ 354 (Seligman email to UR community: "Allegations are not facts, and as we saw in *Rolling Stone's* withdrawn story about sexual assault at the University of Virginia, even established media outlets can get it wrong…It is unfortunate that individuals who disagree with these findings {of UR's investigations] have now chosen to assert as facts their unsubstantiated allegations in such a public way."

The denial was false as was the comparison to the fabricated *Rolling Stone* story. Seligman knew that many women at UR and elsewhere had been affected by Jaeger's misconduct because Plaintiffs had told him so. *See* Cplt. ¶ 525.

Seligman's statement falsely implied that Plaintiffs had misrepresented or simply conjured up the (necessarily pseudonymous) witnesses listed in the EEOC complaints. Put another way, that Plaintiffs had deliberately lied to a federal agency.

Seligman's statement falsely suggested that Plaintiffs were irresponsible publicity seekers as well as purveyors of falsehoods, that they had made their allegations for the first time in the public EEOC forum. Before filing their EEOC Complaints, however, the Plaintiffs had, as Seligman

---

[10] *Chandok v. Klessig*, 632 F. 3d 803 (2d Cir. 2011) (Opening Br. at 28), a defamation case in which the Plaintiff's scientific results could not be replicated, makes this point in spades.




knew, tried repeatedly – a total of 29 times – to entreat UR to deal responsibly with Jaeger and the retaliation that followed their complaints. *See* Cplt. ¶ 347 (29 efforts, 6 made to Seligman himself).

Seligman defamed Plaintiffs in this statement by casting them as the same sort of liars that had served up knowingly false testimony in the *Rolling Stone* article. Attacks on academics' credibility is defamation per se. *See, e.g., Dardashtian v. Gitman*, 2017 WL 6398718, at * (S.D.N.Y. Nov. 28, 2017) (Opposition Br. at 26) ("A statement constitutes defamation *per se* 'if there is some reference, direct or indirect, in the words or in the circumstances attending their utterance, which connects the charge of incompetence or dishonesty to the particular profession or trade engaged in by the plaintiff.'" (quoting *Spring v. City of Monroe*, 57 N.Y.S. 3d 799, 802, 151 A.D. 3d 1694 (N.Y.App. Div. 2017)).

Saying a university academic is dishonest is like saying a lawyer helps himself to client trust fund money or that a bus driver is always drunk. *See, e.g., Daniels v. St. Luke's Roosevelt Hosp. Ctr.*, 2003 WL 22410623, at * 4 (S.D.N.Y. 2003) (Opening Br. at 30) ("As a general rule, a statement is defamatory per se if it '*tends* to disparage a person in the way of his office, profession or trade.'" (quoting *Celle*, 209 F. 3d at 179) (emphasis by *Celle* court)).

### B. Defamation by UR

Complaint ¶ 518 describes DeAngelis's January 10, 2017 statement to BCS faculty that Plaintiffs' emails he had received from UR administration showed "manipulation and deception of faculty members" and "smearing" of Jaeger. DeAngelis, having also been assured by Seligman that the charges against Jaeger were hearsay (Cplt. ¶ 518), said the emails reflected "definitive proof" of widespread lying, deceit and manipulation in the complaints against Jaeger. *See* Cplt. ¶ 310. These statements of fact were untrue and readily capable of being proven so. Plaintiffs asked DeAngelis for the supposedly evil emails, but DeAngelis was unable to produce any. *See* Cplt. ¶¶ 311, 320. Confirming the falsity, DeAngelis admitted his description of the emails was untrue. *See* Cplt. ¶ 520. DeAngelis apologized to all the Plaintiffs but for Aslin, and said his statements had referred mainly to Aslin. *See* Cplt. ¶¶ 320, 321. DeAngelis wrote in an email that certain of his statements had been unfair. *See* Cplt. ¶ 320.

As for the reputational damage at the heart of the defamation claim, DeAngelis admitted he had damaged the Plaintiffs' reputations. *See* Cplt. ¶ 320. After this incident, Plaintiffs experienced an even more hostile environment. *See* Cplt. ¶ 321.

DeAngelis received the emails from UR administration (Cplt. ¶518), purportedly to help him manage BCS's "turmoil" (Cplt. ¶ 341), discussed the emails' purportedly nefarious content with other faculty members (Cplt. ¶ 307), at least one of whom then exhibited the aversion and disgust with Plaintiffs that is a hallmark of defamation. *See* Cplt. ¶ 309. DeAngelis acted in the course and scope of his employment as UR's agent in defaming the Plaintiffs. *See Stevenson v.Cramer*, 151 A.D. 3d 1932, 1934 (N.Y.A.D. 2017) ("'An employer may be held vicariously liable for an allegedly slanderous statement made by an employee only if the employee was acting within the scope of his or her employment at the time the statement was made.'" (quoting *Seymour v. New York State Elec. & Gas Corp.*, 215 A.D. 2d 971, 973 (N.Y.App.Div. 1995).




Complaint ¶ 521 alleges that "UR Counsel's Office supported Jaeger in defaming the Plaintiffs," describing Jaeger's writing to influential persons in the scientific community stating that he had been falsely accused and bullied and that the person who had complained about him had resigned. *See also* Cplt. ¶ 304 (Jaeger providing UR Counsel's contact information to third persons so they could confirm he was blameless, and writing to Dr. William Badecker, Program Director at the National Science Foundation, to say Jaeger had been unfairly persecuted and that the complainant, Aslin, had resigned). Jaeger's statements to these third parties, covered by the imprimatur of UR's Counsel's Office, plainly conveyed the message that Aslin had resigned because he had made a false accusation and behaved badly. That was provably false. Aslin resigned because of UR's retaliation. *See* Cplt. ¶ 522. The link between the statement and its defamatory import is clear. Jaeger's statement amounted to claiming that Aslin had admitted to making a very serious but false accusation about a colleague. That is defamation, because it tells the audience that Aslin is an admitted liar, lacking the honesty, integrity, collegiality and professionalism that are key requisites to academic life.

No stretching is needed to show, for pleading purposes, the plausibility of UR's sponsorship or at least acquiescence in Jaeger's defamatory statement. In a December 16, 2016 meeting of Deans Lennie and Culver and General Counsel Norris with BCS faculty, the Deans and Norris said that Jaeger had played no role in crafting the message UR broadcast to the community of Jaeger's exoneration in the Nearpass Report. *See* Cplt. ¶ 302. DeAngelis later admitted that was false. *See* Cplt. ¶ 302. DeAngelis, BCS's Chair, had promised Kidd and Piantadosi that Jaeger would not participate in their performance reviews but broke that promise without telling Kidd and Piantadosi. *See* Cplt. ¶¶ 285-87. Sometime between March 10, 2016, when Aslin and Cantlon filed their internal complaint against Jaeger (*see* Cplt. ¶ 187) and June 2, 2016, when the Nearpass Report was issued, Susan Wormer, of the UR Counsel's office (who had allegedly retrieved the Plaintiff's emails and given them to DeAngelis (*see* Cplt. ¶ 341)), and DeAngelis told Jaeger that he would be able to discuss the case and clear his name once the Nearpass Report was issued. *See* Cplt. ¶ 255. These few circumstances alone show UR is liable for Jaeger's false statement about Aslin's resignation. Jaeger was acting in the scope and course of his employment when he falsely claimed he had been bullied, falsely accused and then exonerated, with his accuser resigning.

Complaint ¶ 527-529 describes UR's October 17, 2017 statements on its website that the Plaintiffs had written the Special Committee of the Board of Trustees, which had commissioned an independent investigation, and were declining to participate in the investigation. The UR posting went on: "The Special Committee has requested and sincerely hopes that the complainants will reconsider and cooperate with the investigation." *See* Cplt. ¶ 527.

This is a classic example of defamation by omission and mischaracterization. It is simply untrue that Plaintiffs had refused to cooperate, which is what the statement conveys. UR's holier-than-thou spin that it hopes Plaintiffs will "reconsider" underscores the message that Plaintiffs had simply refused to cooperate with a high sounding "Independent Investigation." One plainly plausible interpretation of this refusal is that the Plaintiffs feared an independent investigation, having something to hide. Another is that the Plaintiffs were acting purely self-interestedly. Yet another is that the Plaintiffs had never tried to work with the UR on the matter. But UR knew full well that the Plaintiffs had previously tried and failed 29 times to work meaningfully with the UR




on the issues created by the Jaeger matter. *See* Cplt. ¶ 347. Plaintiffs had made clear to the Special Committee's Chair that Plaintiffs wanted to work with the Special Committee towards positive change, but that the pendency of their legal claims – necessitated by UR's previous whitewash investigations and refusals to engage meaningfully – made their participation in the Independent Investigation untenable. *See* Cplt. ¶ 528.

At bottom, this statement, conveying to a reasonable reader that the Plaintiffs, having made serious allegations, were afraid to participate in an "Independent Investigation," carried the unmistakable message that Plaintiffs' feared their claims would be shown to be as false as those in the *Rolling Stone* article to which Seligman had compared them. Inevitably that calls into question the Plaintiffs' fitness as academics, working in a collegial, collaborative academic research setting. Common sense dictates what the Complaint alleges: reputed liars fare poorly where honesty, integrity, trustworthiness, accuracy and collegiality are key requisites of the job. *See* Cplt. ¶ 530.

## III. CONSTRUCTIVE DISCHARGE AS BREACH OF CONTRACT

A constructive discharge theory is just as available for a claim alleging breach of an employment contract as it is for claims alleging violations of Title VII, the ADEA, the ADA and other anti-discrimination legislation. [11] Case law in the Second Circuit and elsewhere answers "Yes" to the Court's question "whether a constructive discharge has been found to be or can be found to be a breach of contract." [12]

### A. Second Circuit Case Law Shows Constructive Discharge Can Be Breach of Contract

*Scott v. Harris Interactive, Inc.*, 851 F. Supp. 2d 631, 645 (S.D.N.Y. 2012), confirms the availability of a constructive discharge theory for breach of contract: "Although a claim of constructive discharge is routine in employment discrimination cases, it is less frequently seen in breach of contract cases. Nevertheless, those cases which have confronted an allegation of constructive discharge in the context of a breach of contract claim have applied the same standards that are applied in employment discrimination cases." (citing cases)). [13]

---

[11] *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 142 (2004) (hostile environment constructive discharge case; "The Courts of Appeals have recognized constructive discharge claims in a wide range of Title VII cases" (citing cases involving sexual harassment, race, pregnancy, national origin, sex, and religion)).

[12] 4.23.18 Oral Argument Transcript (J. Vilardo).

[13] *Scott v. Harris Interactive, Inc.*, 851 F. Supp. 2d 631, 645 *S.D.N.Y. 2012), cited the following cases: *Berman v. Tyco Intern., Ltd.*, 2011 WL 1334851, at *6-7, * 7 n. 4 (S.D.N.Y. Mar. 31, 2011) (summary judgment; analyzing constructive discharge in breach of contract context; court did not decide "whether the contours of constructive discharge doctrine for civil rights law is co-extensive with its application in contract law"); *Hertzoff v. Diaz*, 533 F. Supp. 2d 470, 473 (S.D.N.Y. 2008) (motion to dismiss; "Clayton's claim for constructive discharge, on the grounds that defendants asked him to perform illegal acts and rendered it impossible for him to perform the work




The trial court in *Scott* (the Magistrate Judge exercising plenary jurisdiction under 28 U.S.C. § 636(c)) expressed no disagreement with the proposition that a constructive discharge could breach an employment contract. Ruling on summary judgment, the *Scott* trial court found "ludicrous on its face" the plaintiff's argument that a pay reduction from $220,000 to $150,000 was "so abusive" – applying the test for a hostile work environment – that "continued employment is untenable." *Scott*, 851 F. Supp. 2d at 648.

On appeal, a Second Circuit panel disagreed and reversed in part. *See Scott v. Harris Interactive, Inc.*, 512 Fed. Appx. 25 (2d Cir. 2013). The appeals court found that a pay decrease of $70,000, contrary to a written employment agreement providing for "a $220,000 salary for at least a year" (*id.* at 28), "accompanied by what a factfinder could conclude were adverse changes in [plaintiff's] title and responsibilities," plus repeated statements to plaintiff that "he had the option to resign" (*id.*), created a jury question whether the plaintiff had been constructively discharged or voluntarily resigned. *Id.* The Second Circuit panel's analysis proceeded on the basis that a constructive discharge can constitute a breach of contract.[14] *See generally Bright-Asante v. Saks & Company, Inc.*, 242 F. Supp. 3d 229, 243-44 (S.D.N.Y. 2017) (motion to dismiss; rejecting argument that constructive discharge claim must be predicated on a hostile work environment, discussing " 'hostile environment constructive discharge'" claims in which hostile environment and constructive discharge claims are "based on the same set of facts" and sustaining plaintiff's constructive discharge claim, which was based not on hostile or abusive environment but on "indefinite suspension without pay").

*Kader v. Paper Software, Inc.*, 111 F. 3d 337 (2d Cir. 1997) (Opposition Br. at 22, Reply

---

anticipated by the employment agreement, is adequately pleaded and will be adjudicated in due course); *Egan v. Marsh & McLennan Cos.*, 2008 WL 245511, at * 6 (S.D.N.Y. Jan. 30, 2008) (motion to dismiss; finding plaintiff had "adequately pled a claim for breach of contract" where plaintiff "sufficiently alleged the existence of contracts granting him restricted stock and restricted stock units during his employment" and plaintiff alleged he "was constructively terminated"); *Criscuolo v. Seagram & Sons, Inc.*, 2003 WL 22415753, at * 8 (S.D.N.Y. Oct. 21, 2003) (summary judgment: analyzing constructive discharge claim for certain severance benefits); *Robinson v. Kingston Hosp.*, 55 A.D. 3d 1121, 1123, 866 N.Y.S. 2d 387-388-89 (N.Y. App. Div. Oct. 23, 2008) (analyzing claim for breach of contract under constructive discharge theory); *Schaefer v. Brookdale Univ. Hosp. & Med. Ctr.*, 2008 WL 595881, at * 8 (N.Y. Sup. Ct. Mar. 3, 2008) (analyzing breach of contract claim in terms of alleged constructive discharge). *See also Hondares v. TSS-Seedman's Stores, Inc.*, 151 A.D. 2d 411, (N.Y.A.D. 1981) (summary judgment; affirming trial court grant of summary judgment for plaintiff on liability only as to breach of contract claim where plaintiff left job after employer materially reduced responsibilities in violation of employment agreement: "The law is clear that if an employee is under contract to fill a particular position, any material change in his duties or significant reduction in rank may be treated by the employee as a breach of the contract.").

[14] The *Scott* appellate panel distinguished between the analysis required for a constructive discharge claim brought in conjunction with a hostile environment claim and the analysis employed "here…where the claimed constructive discharge is not alleged to stem from a hostile environment." *Scott v. Harris Interactive, Inc.*, 512 Fed. Appx. 25, 26 (2d Cir. 2013).




Br. at 12), involved a former employee's contract claims for breach of a written contract based on theories of constructive discharge and the duty of good faith and fair dealing. Affirming summary judgment for the defendant, the court found the plaintiff's unhappy working conditions were "only the incidental effect" of his employer's affair with the plaintiff's estranged wife, who also worked at the company. *Id.* at 339. However, the court nowhere questioned the legal viability of a constructive discharge theory of breach of contract; plaintiff's facts were simply insufficient.

In *Keady v. Nike, Inc.*, 116 F. Supp. 2d 428 (S.D.N.Y. 2000) (Opening Br. at 25, Opposition Br. at 22, Reply Br. at 11), the plaintiff alleged, *inter alia*, breach of a written employment contract through constructive discharge. Although granting the motion to dismiss, finding the plaintiff had insufficiently alleged the specific contract provision at issue or "the nature of the breach" (*id.* at 438), the court nowhere questioned that constructive discharge could constitute a breach of contract.

**B. Other Jurisdictions' Case Law Shows Constructive Discharge Can Be a Breach of Contract**

Case law from other jurisdictions also shows that a constructive discharge can constitute a breach of contract. *See, e.g., Mills v. Mason Consol. Sch. District*, 2008 WL 4457898, at * 9 (E.D. Mich. Sept. 30, 2008) ("Plaintiffs in sexual harassment suits often raise constructive discharge arguments because it forms the basis both of a state law contract claim and also as an element of a retaliation claim under Title VII and ELCRA."). *Mills* underscored the propriety of constructive discharge serving as the basis for a breach of contract claim: "[T]he court observes that 'constructive discharge' can also constitute an essential element – an 'adverse employment action'- in claims other than breach of contract (such as Title 7 retaliation claims)." *See id.* at *11.

In *Hamerski v. Belleville Area Special Services Cooperative*, 2017 WL 3923336, at *13 (S.D. Ill. Sept. 7, 2017), "the Court finds plaintiff has made sufficient factual allegations to state a facially plausible claim for breach of contract. Defendant has fair notice that plaintiff is alleging her written employment contract was breached when she received the 'predetermined outcomes' and was, thus, constructively discharged."

Numerous other cases say that a breach of contract claim can be predicated on a constructive discharge theory. *See, e.g., Martinez v. Southwest Cheese Co., L.L.C.*, 2014 WL 11430955, at * 7 (July 10, 2014) (Plaintiff brought constructive discharge claims under Title VII, 28 U.S.C. §1981, ADEA and breach of contract causes of action; "The Court applies the same constructive discharge standard for all of these claims." [15]); *Weisman v. Connors*, 69 Md. App. 732, 519 A. 2d 795 (Ct. Spec. App. 1987), *rev'd on other grounds*, 312 Md. 428, 540 A.2d 783 (Md. 1988) (upholding jury verdict for plaintiff; "'[W]hen an employee contracts to fill a particular position any material change in duties or significant reduction in rank will constitute a constructive discharge which, *if unjustified*, is a breach of contract.'" (quoting *Brock v. Mutual Reports, Inc.*, 397 A. 2d 149, 152

[15] *Martinez v. Southwest Cheese Co., L.L.C.*, 2014 WL 11430955, at * 7 (July 10, 2014), cited cases for each of these types of constructive discharge claims, including *Gormley v. Coca-Cola Enterprises*, 137 N.M. 192 (2005), as addressing a "breach of contract constructive discharge claim."



(D.C. Ct. App. 1979) (emphasis by *Brock* court))' *Leopoldstadt, Inc. v. Fitzgerald*, 1992 WL 396330, at * 5 (D. Kan. 1992)(summary judgment; "Although there are no Kansas cases expressly recognizing that an employer may breach an employment contract by constructively discharging an employee, other jurisdictions have done so." (citing *Zilmer v. Carnation Co.*, 215 Cal. App. 3d 29, 263 Cal. Rptr. 422 (1989); *Kass v. Brown Boveri Corp.*, 199 N.J. Super. 42, 488 A. 2d 242 (1985); *Brock v. Mutual Reports, Inc.*, 397 A. 2d at 152, *Sanders v. May Broadcasting Co.*, 214 Neb. 755, 336 N.W.2d 92 (1983))…"This court believes that Kansas would recognize a cause of action for breach of an employment contract due to constructive discharge. Kansas has never refused to recognize that an employer might breach an employment contract by constructively discharging an employee. The court finds that defendant has stated a claim for breach of her employment contract."); *Lee v. Walman Optical Co.*, 2015 WL 12564259, at * 8 (D. Neb. Sep. 14, 2015) (summary judgment; citing *Sanders* and *Brock*; also citing *Conagra Foods, Inc. v. Shipp*, 2003 WL 431613, at * 3 (D. Neb. Feb. 24, 2003), as "contract action where employee claimed he 'was effectively squeezed out of his job…'" and *Merchant v. Northeast Community College*, 2009 WL 7400983, at * 2 (Neb. App. Dec. 29, 2009) (unpub.) as "citing *Sanders* and stating that "'the Nebraska Supreme Court has determined that the [Title VII constructive discharge] standard is applicable to contract-based constructive discharge claims'").

**C. Constructive Discharge is an Element of Plaintiffs Aslin's and Hayden's Breach of Contract Claims.**

Plaintiffs Aslin and Hayden alleged breach of contract claims of which constructive discharge was an element. Cplt. Count II, ¶¶ 388-89 (Aslin); Count IX, ¶¶ 438-39 (Hayden). That is doctrinally correct.

*Mills v. Mason Consol. Sch. District*, 2008 WL 4457898, at * 9 (E.D. Mich. Sept. 30, 2008), illustrates that a constructive discharge can constitute a breach of contract. "'[C]onstructive discharge is not in itself a cause of action, although it is routinely alleged as a separate count in complaints for wrongful discharge. Rather constructive discharge is a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily. Thus, an underlying cause of action is needed where it is asserted that a plaintiff did not voluntarily resign but was instead constructively discharged.'" (quoting *Vagts v. Perry Drug Stores, Inc.*, 204 Mich. App. 481, 516 N.W. 2d 102, 104 (Mich. Ct. App. 1994)). That underlying cause of action here is for breach of contract.

*Just v. Spartanburg Community College*, 2013 WL 3833063, at *7 (D.S.C. July 23, 2013), applied the same rule – a constructive discharge can serve as the predicate for a breach of contract claim. Stating "[d]efendants appear to be correct that there is not a stand-alone cause of action for constructive discharge," *Just* cited 2 Mark A. Rothstein, et al., Employment Law §9.7 (4th ed.) for the proposition that "'constructive discharge itself does not constitute a cause of action; proof that a quit was really a constructive discharge merely satisfies the discharge element in a claim for breach of contract or retaliatory discharge.'" *Just* continued: "proving constructive discharge is simply another way of proving that an employer has taken some adverse employment action against an employee…[a]nd that an adverse employment action has occurred is but one element of many potential employment-related claims, such as breach of contract…." *Just*, 2013 WL 3833063, at * 7. *See also Lee*, 2015 WL 12564259, at * 9, n. 4 ("worth noting that 'constructive




discharge is not a separate claim, it is a way of showing that certain actions were tantamount to a termination, for purposes of other causes of action'" (quoting *Bussing v. COR Clearing, LLC*, 2014 WL 6997854, at * 4 (D. Neb. Dec. 10, 2014)).

Dated: May 4, 2018

Respectfully submitted,
McAllister Olivarius

/s/ Stephen Grygiel
Stephen G. Grygiel (SGrygiel@mcolaw.com)
Dr. Ann Olivarius (AOlivarius@mcolaw.com)
Dr. JFO McAllister (JMcAllister@mcolaw.com)
McAllister Olivarius
68 Putnam Street, PO Box 173
Saratoga Springs, NY 12866
(518) 633-4775