1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

2

3

_____

**DR. RICHARD ASLIN,**

4 **DR. KETURAH BIXBY,**
**DR. BENJAMIN HAYDEN,**

5 **DR. JESSICA CANTLON**
**DR. SARAH HEILBRONNER,**

6 **DR. CELESTE KIDD,**
**DR. BRADFORD MAHON,**

7 **DR. ELISSA NEWPORT,**
**DR. STEVEN PIANTADOSI,**

8                                              Case No. 1:17-cv-6847

                  Plaintiffs,                      (LJV)

9

vs.                                          April 23, 2018

10

**UNIVERSITY OF ROCHESTER,**

11 **JOEL SELIGMAN,**
**ROBERT L. CLARK,**

12

                  Defendants.

13 _____

14

**TRANSCRIPT OF ORAL ARGUMENT**

15 **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

16

17 <u>APPEARANCES:</u>           ERIC J. WARD, ESQ.
                           TONY R. SEARS, ESQ.

18                          WARD GREENBERG HELLER & REIDY LLP
                           1800 Bausch & Lomb Place

19                          Rochester, New York 14604
                           For the Plaintiffs

20

                           ANN MCALLISTER OLIVARIUS, ESQ.

21                          MCALLISTER OLIVARIUS
                           63 Putnam Street

22                          Saratoga Springs, NY 12866
                           and

23                          STEPHEN G. GRYGIEL, ESQ.
                           SILVERMAN, THOMPSON, SLUTKIN, WHITE, LLC

24                          201 N. Charles Street
                           Suite 2600

25                          Baltimore, Maryland 21201
                           For the Defendants

```
1   LAW CLERK:              SHANNA H. RIFKIN, ESQ.

2   DEPUTY CLERK:           COLLEEN M. DEMMA

3   COURT REPORTER:         ANN M. SAWYER, RPR, CRR, NYRCR, NYACR
                              Notary Public
4                           Robert H. Jackson Courthouse
                            2 Niagara Square
5                           Buffalo, New York 14202
                            Ann_Sawyer@nywd.uscourts.gov
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Proceedings commenced at 9:27 a.m.)

 2              THE CLERK:  All rise.  United States District Court

 3   for the Western District of New York is now in session, the

 4   Honorable Lawrence J. Vilardo presiding.

 5              THE COURT:  Please be seated.

 6              THE CLERK:  17-CV-6847, Aslin, et al. versus the

 7   University of Rochester, et al.

 8              Attorneys Ann McAllister Olivarius and Stephen G.

 9   Grygiel appearing on behalf of the plaintiffs.

10              Attorneys Eric J. Ward and Tony R. Sears appearing on

11   behalf of the defendants.

12              This is the date set for an oral argument.

13              THE COURT:  Good morning, everyone.

14              ALL PARTIES:  Good morning, Your Honor.

15              THE COURT:  So, come on up.

16              MR. WARD:  Do you want us both at the same time, Your

17   Honor?  Or --

18              THE COURT:  Well, let's start with you, and then

19   we'll bring the plaintiff up at an appropriate time.  I'll

20   probably have you both up here at the same time for at least

21   part of this.

22              MR. WARD:  Thank you.  So, Your Honor, as you know,

23   my name is Eric Ward.  I represent the University of Rochester

24   and the individual defendants, Joel Seligman, former president

25   of the university, and Rob Clark, who is the provost of the
```

1   university.  This is our motion to dismiss.

2          I think that the complaint here can be boiled down to

3   the following:

4          This is a group of nine plaintiffs who in 2016

5   brought to the university's attention conduct of a particular

6   professor who is not named in the case, that -- the conduct

7   that took place in the 2007 to 2011 period of time.

8          I would say that with the exception of plaintiff

9   Celeste Kidd, not a single one of these plaintiffs had

10  personal knowledge of the conduct of which they were

11  complaining.  It was all told to them allegedly by others.

12          THE COURT:  Ms. Kidd was a student when the conduct

13  began; is that right?

14          MR. WARD:  That is correct, Your Honor.

15          THE COURT:  When did she become an employee?

16          MR. WARD:  I want to say in 2014, and -- and I

17  believe then was gone for a year and came back.

18          The -- the essence of the complaint here is that the

19  plaintiffs disagreed with the outcome of an investigation

20  undertaken by the university and, in fact, disagreed with the

21  outcome of three separate investigations ultimately undertaken

22  by the university.  And they now interpret every act or

23  inaction of the university because of their disagreement to be

24  retaliatory or discriminatory in some way.

25          So, that, as we view this, I think that the

1   perspective of this complaint is that it is totally okay for

2   the plaintiffs to say whatever they want in disagreement with

3   the university's outcome, but it is not okay for the

4   university to respond to any of that because doing so

5   constitutes either retaliation, the creation of a hostile work

6   environment, defamation or breach of contract.

7           THE COURT:  Well, the university did more than just

8   respond to the plaintiff's complaints about the investigation.

9   They -- they did things like viewing their emails, not

10  inviting them to meetings, not allowing them to participate in

11  certain processes to which they would otherwise be entitled to

12  participate.  At least that's what the plaintiffs have pled

13  and that's what I must accept as true at this point.

14          MR. WARD:  Absolutely.  And there's no question, Your

15  Honor, that that is in the pleading.

16          I think our -- the question here, then, is whether

17  any of those -- any of that conduct rises to the level to

18  sustain a cause of action either for retaliation or a hostile

19  work environment.

20          THE COURT:  Let's focus on retaliation for now.  Why

21  wouldn't that sort of conduct deter reasonable employees

22  from -- from taking action, the fourth prong of that test?

23          MR. WARD:  Correct.

24          THE COURT:  Why wouldn't -- why doesn't it fit within

25  that definition?

1          MR. WARD:  Let me put that prong in perspective

2     though, Your Honor.  I think that -- that what the law

3     requires is that there be a materially adverse employment

4     action that would cause a reasonable employee to -- to not

5     wish to come forward, to report discriminatory conduct.

6          THE COURT:  And I'm to --

7          MR. WARD:  And those are linked.

8          THE COURT:  Okay.  But I'm to look at the -- I'm to

9     look at the setting as a whole, right?

10          MR. WARD:  Correct.

11          THE COURT:  So my emails get -- get looked at, nobody

12     else's emails get looked at, but mine do.  I'm not invited to

13     meetings.  I can't participate in processes that I should be

14     able to participate in.  Why isn't that going to discourage

15     the next person?  Why isn't that, number one, employment

16     action?  I mean, they're certainly in connection with

17     employment.  Why aren't they going to discourage the next

18     plaintiff from making -- or, the next employee from making

19     complaints?

20          MR. WARD:  Two reasons for that.

21          First, a materially adverse employment action is

22     something like termination, demotion, decrease in salary,

23     decrease in benefits, decrease in title, a decrease --

24          THE COURT:  Well --

25          MR. WARD:  -- in responsibilities.

1          THE COURT:  Okay.  But that -- and that tells me

2    things that certainly are adverse employment actions.  Tell me

3    why this can't be.

4          MR. WARD:  It is not because under the -- under the

5    law, things like criticism, things like personality conflicts,

6    things like snubbing, exclusion from meetings, the case law is

7    replete that that does not constitute retaliatory conduct.

8          THE COURT:  What about the review of the emails?

9    That's very troubling to me.

10         MR. WARD:  If you look at -- and as is pled in the

11   complaint, the -- like anybody -- any other employer, the

12   university states that emails on its server are its property.

13         THE COURT:  Well, I get that.  I get that.  But

14   suppose the university or any employer has a -- a rule that

15   says anything in your office is -- is our property and we can

16   search your office at any time, so every day at 9:00 a crew

17   goes to the person's office and searches it.  Certainly that's

18   an adverse employment action, isn't it?  That's going to deter

19   someone from making a complaint if that's done right after a

20   complaint is made?  You'd concede that, wouldn't you?

21         MR. WARD:  Well, what I would say, Your Honor, is

22   that if in fact that were the only -- that person were the

23   target of that and were the only person that that ever

24   happened to, there's a possibility that you could call that

25   retaliation --

```
 1          THE COURT:  It's a little more than possible.

 2          MR. WARD:  I think in isolation -- I think in

 3   isolation that's not the situation.  And as a result, even

 4   taking this in the context of all of these events, I don't

 5   think that that rises to the level of what the cases would say

 6   had an impact on the person's employment.

 7          THE COURT:  Okay.  Let's go on to the other claims,

 8   the hostile work environment, the defamation and the breach of

 9   contract.

10          MR. WARD:  Okay.

11          THE COURT:  Talk to me about hostile work environment

12   first if you will.

13          MR. WARD:  I will do that.  So the standard for

14   hostile work environment is activity that the -- that the

15   environment is permeated with discriminatory intimidation,

16   ridicule, insults sufficiently pervasive to alter the

17   conditions of employment.  Okay?

18          We have the -- two of the plaintiffs have hostile

19   work environment claims; Professor Cantlon and Professor Kidd.

20   Professor Cantlon -- let me -- let me back up.

21          All of the hostile work environment is premised on

22   the idea that Professor Jaeger is the one who constituted or

23   created that hostile environment.

24          THE COURT:  Well, he created it back in the earlier

25   years, but --
```

1         MR. WARD:  Correct.

2         THE COURT:  -- now that that sort of has morphed into

3    the university creating a hostile work environment because of

4    the way it's handled these complaints.

5         MR. WARD:  All right.  And -- and I think that you

6    have to, again, if we're going to look at this in context,

7    which has been suggested here strongly by the plaintiffs, you

8    can't -- the university knew nothing of the Jaeger conduct at

9    the time that it was going on.  In fact, knew nothing about it

10   until 2016.  Okay?

11        THE COURT:  Yep.

12        MR. WARD:  Although --

13        THE COURT:  They actually --

14        MR. WARD:  Although I would say --

15        THE COURT: -- plead that.  They actually plead that,

16   right?  They actually say that --

17        MR. WARD:  They do say that.  They do say that.  Or

18   they acknowledge that the university didn't know anything

19   about it, and they claim that they didn't know anything about

20   it with the exception of Professor Kidd.  Okay?

21        So we have to look in -- in context, then, as to what

22   each of them are claiming constitutes this pervasive ridicule

23   and insult in that department.  And when we look at that, we

24   find three isolated incidents that have been alleged by

25   Professor Cantlon, one having to do with her being at a dinner

1    party when someone made a comment about whether when she was

2    in training she was giving sexual favors.  All right?  That

3    was one incident.

4           Let's see.  She -- she talks about her supervisor

5    getting angry with her at a meeting and telling her that she

6    had to apologize to others.  And at another time, wagging his

7    finger in her face.  Okay?

8           Now, none of those incidents, with the exception of

9    the first incident, Your Honor, I don't think any of those are

10   gender related, and there's no proof or no support for the

11   concept that they are.

12          So we have an isolated incident which is not enough

13   to create the requirement of a pervasive environment that

14   would alter the terms of her employment or the working

15   conditions.

16          As for Professor Kidd, she relies heavily on the

17   Jaeger conduct from her period of time as a student.  And as

18   the Court pointed out, aside from the fact that the university

19   was unaware of that conduct, she was a student at the time and

20   there's no basis to claim a Title VII.

21          THE COURT:  She also claims that as a faculty member

22   she had to work close to Jaeger and --

23          MR. WARD:  Right.

24          THE COURT:  -- to hear about his continued harassment

25   and that --

1          MR. WARD:  Correct.

2          THE COURT:  -- the University of Rochester labeled

3   her as unreliable and characterizing her as a -- as a woman

4   scorned.  Why isn't --

5          MR. WARD:  Correct.

6          THE COURT:  -- that a hostile work environment --

7          MR. WARD:  Because it's --

8          THE COURT:  -- for her?

9          MR. WARD:  -- two -- it's two claims, it's two

10   incidents.  There's not enough there.  There's not enough

11   there, there, to reach the level of a hostile environment even

12   accepting what she says is totally true.

13          THE COURT:  Well, it was pretty hostile for her back

14   in the -- the earlier, earlier days, right?  I mean, based

15   on the --

16          MR. WARD:  I don't know.

17          THE COURT:  -- based the pleadings.

18          MR. WARD:  I don't know.  That's -- what they say

19   about what Professor Jaeger did --

20          THE COURT:  Yeah, pretty bad.

21          MR. WARD:  Right.

22          THE COURT:  Pretty bad.  Pretty bad stuff.

23          So, now she's got to have an office just down the

24   hall from him and -- and work in proximity to him.  And when

25   she complains about him, people say, well, the only reason

1    she's complaining is because he jilted her.  That's not a

2    hostile work environment?

3         MR. WARD:  I don't think so, Your Honor, because the

4    incidents that she complains of, again, there's -- there's --

5    there's not a sufficient basis to claim that that's pervasive.

6         What she says is, she actually comes up with a couple

7    of incidents herself.  Okay?  Where she -- where she heard him

8    saying something about his sexual exploits.  All right?

9    That -- that may cause her to think back to the time that she

10   was a student, but that doesn't in itself create a hostile

11   work environment.

12        THE COURT:  You think -- you think a professor

13   talking about his sexual exploits loud enough for other people

14   to hear, including someone who he -- who he pursued, flirted

15   with, whatever you want to call it, you don't think that's a

16   hostile work environment?

17        MR. WARD:  I do not.  I do not.  I don't think that

18   it rises to the level.  And what we don't have, despite the

19   fact that we've got a tremendously long complaint, what we

20   don't have is her stating the -- the number of times that

21   something like that happened.  For -- for the way that it's

22   pled here, that can be one incident.

23        That just doesn't rise to the level of pervasiveness

24   that's required.

25        And the other thing is that I think that you have to,

1  again, looking at this in context, remember, she knew all of

2  this when she left the university to take another job yet she

3  decided to come back into what she believed was a hostile work

4  environment?  I think that that speaks volumes about whether

5  it really was pervasive and altering the conditions of

6  employment.

7          THE COURT:  That's stuff for summary judgment, isn't

8  it?  That's not stuff for motion to dismiss.

9          MR. WARD:  I don't know.  I think to -- to the

10  contrary, because you have to look at all of the pleadings in

11  concert.  You have to believe what -- what is -- is claimed

12  in the -- in the complaint.

13          THE COURT:  I understand, but a woman could have a

14  reason to want to come back to the university and have to put

15  up with something that she would rather not put up with, so --

16          MR. WARD:  Fair enough.

17          THE COURT:  -- I think you're talking about summary

18  judgment stuff, not motion to dismiss stuff.

19          Let's get on.  I wish I had, you know, I wish I had a

20  day and a half --

21          MR. WARD:  Yeah.

22          THE COURT: -- to do this argument, because this --

23          MR. WARD:  Yeah.

24          THE COURT:  -- is interesting and complicated, but I

25  don't.

1          So let's get on to the breach of contract and the

2    defamation.

3          MR. WARD:  Yes, let's do that.

4          All right.  So in terms of a breach of contract, the

5    law clearly requires that there be specific terms of a -- of a

6    contract identified and the actions that constituted the

7    breach.

8          THE COURT:  And they say constructive discharge on

9    the contract is tenure.

10          MR. WARD:  Okay.  So the -- and if, in fact, the

11    contract actually is tenure and there -- and it's in -- in

12    some sort of a -- of a employment handbook or those sort of

13    things, then that's an Article 78 claim, that's not a --

14    that's not a breach of contract claim.

15          And as for a constructive discharge, I don't believe

16    that you can call the conditions of employment intolerable,

17    especially when, again, viewed in connection with what

18    happened with everyone else.

19          Why did the conditions become intolerable all of a

20    sudden for Professor Aslin or all of a sudden for Professor

21    Hayden but not for any of the other plaintiffs all complaining

22    about the same contract?

23          THE COURT:  And Hayden and Aslin are the only two who

24    have brought breach of contract?

25          MR. WARD:  Correct.

1          THE COURT:  Okay.  And Aslin left to go to school in

2    Massachusetts?

3          MR. WARD:  In -- or, Connecticut, something.

4          THE COURT:  Someplace, yeah.  And Hayden --

5          MR. WARD:  Is at Minnesota.

6          THE COURT:  -- and he's the fellow's whose wife hoped

7    to get a job at University of Rochester and didn't --

8          MR. WARD:  No, I think --

9          THE COURT:  -- do I have that right?

10         MR. WARD:  Yes.

11         THE COURT:  Okay.  Okay.

12         MR. WARD:  Yes, that is right.

13         THE COURT:  Okay.  Defamation.

14         MR. WARD:  Defamation.  A statement of fact which is

15   false concerning the plaintiffs made with fault by the speaker

16   causing special harm not protected by privilege.  Okay?  When

17   you look at the statements that were alleged here, and if

18   you'll give me a second I'll just turn to them so that I can

19   remember exactly what they were.

20         THE COURT:  It's hard for me to figure out from the

21   complaint what they were.

22         MR. WARD:  Well, we --

23         THE COURT:  You did a nice job, yeah, I know, you did

24   a nice job in your -- in your motion of labelling them 1 to 6,

25   and the plaintiffs seem to have adopted that -- that

1   enumeration.  But I had a tough time finding them in the

2   complaint.  But go ahead.

3          MR. WARD:  Yeah, that's right.

4          So if we look at the way we pulled them out of the

5   complaint, the statements just don't rise to the level of

6   defamatory.  For example, saying that the complaints against

7   Professor Jaeger were hearsay.  Well, in fact, they were.  The

8   only one who didn't have any hearsay was Professor Kidd.

9          The president telling the neuroscience chair that the

10  complaint that the plaintiffs had overreacted, that's not

11  defamatory.  It's just not a defamatory statement.

12         THE COURT:  Those are the only two statements that

13  the plaintiffs at least enumerate and -- and carve out or --

14  or -- or allege specifically with respect to Seligman, right?

15         MR. WARD:  That's right.  That's right.  And then we

16  have some DeAngelis -- a DeAngelis statement to faculty

17  members that some members were smearing Jaeger.  All right?

18         Now, the -- the -- the -- none of those statements

19  specifically call out any of the plaintiffs.

20         THE COURT:  Let me ask you --

21         MR. WARD:  The plaintiffs --

22         THE COURT:  -- let me ask you this:  That's

23  DeAngelis.  DeAngelis is not named as a defendant, right?

24         MR. WARD:  Correct.

25         THE COURT:  Can the university be responsible for

1    defamation of a -- by a university employee?

2         MR. WARD:  Only if it supports it or ratifies it.

3    And, again, I don't think that there's any allegations in

4    there to -- in the complaint to -- to measure up to that.

5         There's a complaint here or there's a statement here

6    that Professor Jaeger told influential people in the

7    scientific community that he'd been falsely accused and

8    bullied.  Okay?  Again, I don't believe that there's -- even

9    if that's true, that doesn't rise to defamation.  There's --

10   this all comes from the point of view of the plaintiffs that

11   the result of the investigation was totally wrong.

12        Professor Jaeger, who was the subject of that

13   investigation, has every right to say that the result of the

14   investigation was -- was appropriate, and that's what he's

15   doing.

16        And I don't think that the, again, the university

17   doesn't ratify that, in fact the university had no part of

18   that.  And Jaeger is not a university, he -- he's -- he's not

19   university management or someone like that who -- who can bind

20   the university.

21        THE COURT:  Before you sit down, talk to me about

22   your position on Seligman's and Clark's personal participation

23   in this, and the aiding and abetting claim against them.

24        MR. WARD:  Again, and I'm happy to do that, Your

25   Honor.  The -- the claims against Professor Seligman -- or,

1   against President Seligman all have to do with his statement

2   that this case -- there was a public statement this case was

3   like the Rolling Stone.  Okay?

4        Again, that's a statement of opinion, but it

5   doesn't -- it doesn't do anything to encourage or to require

6   administration at the university to retaliate in some way

7   against the plaintiffs.

8        And consequently, it's, again, it's an isolated

9   statement that doesn't bespeak a -- an actual participation in

10  any kind of discriminatory behavior.

11       The -- the basis for most of these statements is this

12  concept that the plaintiffs allege in the complaint someone

13  told them that, quote, this came from the top.  All right?

14  And on that basis, they are imputing conduct to "the top" and

15  claiming that President Seligman was aiding and abetting in

16  some way.

17       THE COURT:  Well, shouldn't they get some discovery

18  on that?  Shouldn't they be able to at least explore that in

19  the context of this the case?

20       MR. WARD:  Well, I guess it depends upon how you look

21  at the requirements of pleading and good faith pleading.  I

22  don't think that it is sufficient to say oh, well, maybe it

23  was this way, or to embark on a -- on a fishing --

24       THE COURT:  Well, they're --

25       MR. WARD:  -- expedition --

1          THE COURT: -- doing a --

2          MR. WARD:  -- and the case --

3          THE COURT:  They're doing a little bit more than

4    that.  They're -- they're saying that someone told them that

5    they have a good-faith basis to believe that this came from

6    the top.  Seligman's the top.  Why isn't that enough?

7          MR. WARD:  Because it's speculative.

8          THE COURT:  Yeah, but --

9          MR. WARD:  It's totally speculative.

10         THE COURT:  -- if someone indeed said that to them,

11   that's a -- that's a basis to believe that, isn't it?

12         MR. WARD:  Well, the top can be anybody.

13         THE COURT:  Yeah.

14         MR. WARD:  And they choose to -- to pick out the

15   president because that's where you can get the most pressure.

16         THE COURT:  Okay.  Let's -- let's get your friends

17   from the other side up, and you can stay there if you want

18   because I may have some questions for you, so --

19         MR. WARD:  Sure.  I'm happy to.

20         THE COURT:  Okay.

21         MR. WARD:  Sure.

22         THE COURT:  Come on up.

23         MR. GRYGIEL:  Thank you, Your Honor.

24         Good morning.  May it please the Court, I'm Steve

25   Grygiel for the plaintiffs.  With me I've got my colleague,

1   Ann Olivarius.  And we have Celeste Kidd, Dick Aslin, and

2   Katurah Bixby, three of the plaintiffs, here with us.

3           Your Honor, I'd like to begin by something I finished

4   hearing, and that is what is the standard for the pleading

5   here.

6           Nowhere in the University of Rochester's papers, and

7   I mean nowhere, do they recognize something that the

8   2nd Circuit held as dispositive law in the Littlejohn case

9   where it said that the McDonald Douglas temporary presumption

10  that gives the benefit to a defendant -- to a plaintiff on

11  summary judgement in an employment discrimination case lowers

12  the quantum of facts that are required to be pled in an

13  employment discrimination case.  That is Littlejohn.  Sellers

14  repeats it.  A myriad of other courts in the 2nd Circuit have

15  repeated it, including courts in the Western District of

16  New York.

17          THE COURT:  Yep.  I get that.  But let me ask you

18  this.  Let's start with where we ended with your friend across

19  the aisle.  Exactly what did Seligman and Clark do to get them

20  named as defendants?

21          MR. GRYGIEL:  Your Honor, a couple things.  Number

22  one, as we've already seen, there was an allegation in the

23  complaint that the instruction came from the top.  And the

24  top, obviously, is the University of Rochester's

25  administrators, but I have much more than that.

1           THE COURT:  Well, I mean, so, administrators.  There

2     are several of them that might be at the top, right?

3           MR. GRYGIEL:  Okay.

4           THE COURT:  And that doesn't necessarily mean

5     Seligman and Clark.

6           MR. GRYGIEL:  Well, let's look at it this way, Your

7     Honor.  We've got Clark's letter, I think it's November 29th,

8     2016, in which he characterizes the -- he's a provost now, he

9     characterizes the plaintiffs essentially as gossips and

10    rumormongers, not too terribly difficult, and certainly before

11    discovery a fair inference that he was involved in that.

12          But as to Seligman, when Seligman characterizes the

13    plaintiffs as the same sort of people who pervade the

14    prevarications and nonsense that the Rolling Stone article was

15    exposed as showing, it's pretty clear that his animus is

16    there.

17          We also know when dean -- or, when John Fox, chairman

18    of the neuroscience department, was looking at retaining Dick

19    Aslin for his department after all of the Sturm und Drang in

20    the BCS department, he said he was getting pushback from

21    central UR administrators.  Now, who else could that be?

22    Central UR administrators.

23          When Mr. Fox was considering Sarah Heilbronner for a

24    position in his department in neuroscience as opposed to the

25    position she was going to get in the BCS, he said, I believe

 1   to Ms. Cantlon and Mr. Mahon, that they should stop

 2   complaining because that's making it more difficult for him to

 3   hire Sarah Heilbronner in his department.

 4        It's clear that there was more going on here than

 5   simply some, quote, stray remarks.  It's clear that this is

 6   concerted activity.

 7        We note for example there's another allegation in the

 8   complaint the defendants like to say that this is simply stray

 9   comments designed to do nothing but impugn the individuals and

10   confuse the issues, but there's an issue, for example, where

11   near -- Elissa Newport wants to fire a sexual predator of her

12   department.  She's told by the University of Rochester

13   counsel, Richard Crummins, let him serve out his time.

14        Same thing, there's another allegation where

15   President Seligman says he's going to deal with a sexual

16   harasser, someone who's been reported, and nothing happens.

17        Those are a lot of facts that are in this complaint

18   without the benefit of discovery that show that the central

19   University of Rochester administration was involved in this.

20   And we know, Your Honor, beyond that, we know that they had to

21   be because, for example, when the investigations came out they

22   were blessed by the central administration.  These were the

23   people who --

24        THE COURT:  Well, you keep using words like "the

25   central administration."  I want to know what Seligman did and

1  what Clark did.  I want to know what those two named

2  defendants themselves did.  I see allegations of lots of bad

3  stuff.  I don't see those allegations linked directly to

4  Seligman or directly to Clark.  I see some speculation, and

5  maybe some speculation with basis, which is why I suggested to

6  your friend that maybe you get some discovery on it.

7          But I'm asking you now pointedly what did Seligman

8  do, what did Clark do.

9          MR. GRYGIEL:  Well, as to Seligman, Your Honor, I've

10  already covered.  He's obviously been involved in some of

11  these allegations, and when he called this the Rolling Stone

12  situation, when he said these complaints were not legal

13  documents and that they were without basis, clearly it shows

14  that he had a personal animus in this and was involved.

15          THE COURT:  Because he's denying what, he's denying

16  allegations that are made against the university of which he's

17  president, that shows animus?

18          MR. GRYGIEL:  I think there is, Your Honor, and for

19  more.  There are some other allegations in the complaint that

20  didn't get any detail in the briefing.  But, for example,

21  paragraph 300 of the complaint shows a January 5, 2017

22  meeting, Ms. Cantlon, Ms. Kidd, Mr. Mahon, Mr. Hayden and

23  Mr. Piantadosi, they say we'd like a dialogue to talk about

24  those issues.  Mr. Seligman says he looks forward to meeting

25  with them, no meeting takes place.  It looks like studied

1    avoidance.

2           There's another allegation in the complaint where

3    again Mr. Seligman meets with Ms. Cantlon and with Mr. Aslin

4    and he says, yes, I'd like to talk to you about this.  This is

5    the meeting in which he tears up talking about sexual

6    harassment, and he says I will follow up with you on this.

7    That never happened.  He said he would make a statement.

8           THE COURT:  That's the meeting where he says he

9    wouldn't want his daughter --

10          MR. GRYGIEL:  Exactly right, Your Honor.

11          THE COURT:  -- to be sexually harassed.

12          MR. GRYGIEL:  He says he's going to have himself or

13   his proxy make a statement in order to support those who have

14   spoken out against the discriminatory atmosphere and against

15   the issues that surrounded the Jaeger affair, and that never

16   happened.  All of that inferentially, and we are entitled at

17   this stage to all of the inferences, show that he was at least

18   not engaging in the way he said he would, which suggests

19   involvement.

20          As for aiding and abetting, very little is going to

21   happen at this university unless these people are involved.

22   Let's take a look at the hiring, and I want to come right to

23   this.

24          The Heilbronner candidacy is crucial.  That is an act

25   not only of retaliation, not only does it show a hostile work

1   environment, because elements of retaliation can also count

2   for purposes of creating a hostile work environment, it's a

3   pure matter of logic.  When Heilbronner is being recruited,

4   let's look at what the actual sequence is.

5           She's a star.  Her husband is on the faculty.  There

6   is a long history of spousal hires.

7           Mr. DeAngelis says to her, how would you like me to

8   order the hiring for these two open positions so that it will

9   prosper your candidacy?

10          They tell her what area of research is most important

11  for her to focus on to ensure her candidacy.  And what

12  happens?  They get involved, Ms. Heilbronner and her husband

13  Mr. Hayden, they got involved in the Jaeger complaints.  All

14  of a sudden, not so good.  All of a sudden, the candidacy is

15  off the rails.

16          What does Mr. DeAngelis say?  Mr. DeAngelis says, I

17  had planned to hire Sarah Heilbronner but, quote, now I have

18  this, close quote.

19          He says later in April of 2017, it was really stupid

20  of Ben and Sarah to get involved in this when Sarah needed a

21  job.  He says, you maybe have a legal right to talk about

22  these things, but you have to expect damage.  This is what

23  comes, he says, of using the department as a political

24  football, you have to expect damage.

25          When he said I'm dealing with the search now the way

 1   I have to deal with it according to my deans, and a star

 2   candidate who wins an award right after her candidacy is

 3   rejected suddenly finds the terms and conditions of the open

 4   job changed, the metric is completely different, there's no

 5   other inference but that that is coming from the top.  Coming

 6   from my deans.  And the deans, of course, answer to the

 7   president.

 8          There is an institutional situation here, Your Honor,

 9   and an institutional circling of the wagons that came as soon

10   as these plaintiffs had the temerity to say something when

11   Mr. Aslin first registered his protest in March of 2016.

12          Something that was said in the opening argument,

13   though, is flat wrong.

14          The University of Rochester did not first hear about

15   this when Mr. Aslin made its complaint in March of 2016.  The

16   University of Rochester heard about this in March of 2013 -- I

17   think it was March of 2013.  Oh, no, it was 11, November of

18   2013 when Ms. Bixby, who's here, went to Mr. DeAngelis and she

19   said she was making a complaint.  She gave him four names,

20   including Ms. Kidd's.

21          Ms. Kidd met with Mr. DeAngelis.  The university

22   University of Rochester knew that.  There's an allegation in

23   the complaint that shows that the University of Rochester's

24   counsel, I think it was Ms. Levy, Morgan Levy, said that

25   Mr. DeAngelis on that situation had consulted with the

 1    university counsel's office.

 2          So there was notice as far as back as 2013.  And

 3    that's important because, obviously, temporal proximity, while

 4    there are no bright lines, the temporal proximity of

 5    University of Rochester knowing that in 2013 and continuing

 6    situation from then until when Mr. Aslin finally becomes aware

 7    of it in a faculty hiring meeting in 2016, that shows that

 8    this was a continuous period of time.  At least it gives us

 9    some brackets.

10          THE COURT:  You sue the case at the end of 2017?

11          MR. GRYGIEL:  That's right, Your Honor.

12          THE COURT:  So tell me what elements of your hostile

13    work environment claim are within the statute of limitations.

14    You allege lots of stuff about Jaeger in a time that precedes

15    the statute of limitation date, the -- the trigger date for

16    the statute of limitations purposes.  And you allege that some

17    sort of relation back ought to allow all that to come forward.

18    Explain that to me, and explain to me what the hostile work

19    environment within the statute of limitations period is.

20          MR. GRYGIEL:  Sure.  As we've got, as Mr. Ward noted,

21    as to Ms. Cantlon there were three discrete claims of items

22    that are within the hostile work environment statute of

23    limitations.  And I should point out that we also have claims

24    under New York State Human Relations Law, and that's a

25    three-year statute of limitations, we've got a comment that

1    Ms. Cantlon's tone is inappropriate.  But that's not simply a

2    stray remark.  What we have in context there, Your Honor, is

3    Ms. Cantlon in a meeting with Mr. DeAngelis, and he chastises

4    her for her tone.  Meanwhile, a male colleague, showing a

5    sex-based difference, pounds the table and storms out of the

6    room while obviously unhappy with Ms. Cantlon.  Ms. DeAngelis

7    only chooses to berate Ms. Cantlon.

8           Previously at a dinner party, Ms. Cantlon is

9    subjected to what can be called a very unhappy remark dealing

10   with, quote, I wonder what favors Jessica did to get here.

11   And that seems to be contrary to what the University of

12   Rochester says, Your Honor.  That seems, to me, far beyond the

13   pale of what should be permitted in this particular setting.

14   It bears mentioning that this particular setting, the context

15   has to be evaluated for hostile work environment and the

16   totality of the circumstances.  What the Oncole case, for

17   example, called the constellation of relationships and

18   conditions and dealings between the people, in this context

19   that kind of remark is a hostile work environment.

20          As to also with Ms. Cantlon, she alleges that after

21   the complaints were made that she was the general daily

22   subject of Mr. DeAngelis's cruelty, Mr. -- that's the wrong

23   word, we didn't allege that, of Mr. DeAngelis's hostile

24   attitude.

25          Now that is something, Your Honor, that is alleged as

 1   a fact that is entitled to discovery.

 2          Another point the University of Rochester nowhere

 3   recognizes is that throughout all of these cases, and I read

 4   every single one of them, and that took a long time and -- it

 5   really did.  And what all of those cases show me apart from,

 6   yes, as for retaliation, you've got to consider everything,

 7   the social environment in which the act happened, the social

 8   environment in which the act was perceived.

 9          As to hostile work environment, same thing.  Harris,

10   Supreme Court case, the totality of the circumstances.

11          Actually, the same thing of defamation.  Totality of

12   the circumstances, thus the context in which the words were

13   used.

14          THE COURT:  We're going to get there in a second.

15          MR. GRYGIEL:  Yep, okay.  And so what we've got here

16   when you're looking at the totality of the circumstances, that

17   means that you are entitled under the Continuing Violation

18   Doctrine, to come back to your question, to look at the things

19   that went on before.

20          As for Ms. Kidd, she complained numerous times.  Look

21   at what happened to Ms. Kidd when she complained.  We have the

22   Nearpass report that among all of the witnesses, and there

23   weren't actually as many as there should have been, only names

24   Ms. Kidd.  And after that, the allegations are clear, she is

25   subjected to opprobrium and various other unhappy conditions

1   of work that are more than simply annoyances.  These are

2   things that would interfere with any professional's ability to

3   do their job, particularly in a collegial collaborative

4   setting with the University of Rochester's BCS.

5           So Ms. Kidd alleges, first of all, she gets outed by

6   Nearpass.  The Nearpass investigation, N-E-A-R-P-A-S-S.  She

7   goes to appeal that.  The Curtin investigation follows

8   further, essentially, using somewhat different words, instead

9   of calling Ms. Kidd now not credible, I believe uses words not

10  reliable.  But the fact is that is then out on campus.  In

11  fact, the whole idea that people knew but this is corroborated

12  by the University of Rochester's own arguments when they say

13  well, gee, Judge, this is a matter of public concern and a

14  matter of the conditional privilege, these are employees

15  talking about a matter that they're entitled to talk about.

16          THE COURT:  There are three investigations.  There's

17  the Nearpass investigation, the Curtin investigation, and the

18  Debevoise investigation, right?

19          MR. GRYGIEL:  Correct.

20          THE COURT:  Can you explain to me -- this is just a

21  question about my -- my lack of understanding of how these

22  things came about, Nearpass's investigation -- who is Nearpass

23  and why was -- why did her investigation take place?  Who's

24  Curtin, why did her investigation take place -- her or him?

25          MR. GRYGIEL:  Her.

1              THE COURT:  Her?  And then -- and then I know who

2     Mary Jo White is.

3              MR. GRYGIEL:  Right.

4              THE COURT:  And I think that was the board of

5     trustees of the university --

6              MR. GRYGIEL:  That's correct.

7              THE COURT:  -- that asked her to do the

8     investigation.

9              MR. GRYGIEL:  That's correct.

10             THE COURT:  So the first two, if you can explain to

11    me the first two and the relationship between those two

12    investigations.

13             MR. GRYGIEL:  Sure.  The Nearpass investigation

14    resulted primarily sequentially and substantively from

15    Mr. Aslin's complaint in March of 2016 right after he first

16    heard at a faculty hiring meeting about what Florian Jaeger

17    had been up to.

18             THE COURT:  Okay.  So who asks Nearpass to do the

19    investigation?

20             MR. GRYGIEL:  University counsel's office, I believe,

21    Ms. Norris.

22             THE COURT:  Okay.  She then does the investigation.

23    And then how does the Curtin investigation take place?

24             MR. GRYGIEL:  After the Nearpass investigation is

25    completed and, yes, the plaintiffs are unhappy with it,

```
 1   they're not unhappy just because they don't like the result,

 2   they're unhappy because they didn't think the process was

 3   right because numerous witnesses were left out in the wind,

 4   important people weren't talked to, and emails, for example,

 5   Ms. Kidd's corroborative emails that showed what she was

 6   saying was true were never looked at on the theory that, well,

 7   if someone tells me they deny it, I don't have to go look at

 8   the emails to test that.  Passing strange in a court of law,

 9   and I think passing strange even in a university context for

10   that to pass as a fair investigation as opposed to looking

11   like a deliberate whitewash.

12          After the Nearpass investigation comes out, and it's

13   hopelessly flawed, Ms. Kidd is unhappy, the plaintiffs are

14   unhappy, they file an appeal of that.

15          There is a second investigation dealing with

16   Ms. Kidd's internal retaliation claim that she makes to the

17   University of Rochester pursuant to their process.  And

18   Ms. Curtin, an allegedly outside independent investigator who

19   does these for universities, issues another report.

20          THE COURT:  And who asks her to do it?

21          MR. GRYGIEL:  Again, the university's office.

22   University counsel's office.

23          THE COURT:  Okay.

24          MR. GRYGIEL:  Important there, Your Honor --

25          THE COURT:  But that results from the unhappiness
```

```
 1   with the Nearpass, so they say okay, let's get somebody else

 2   to do one?

 3           MR. GRYGIEL:  Yes.

 4           THE COURT:  Got it.

 5           MR. GRYGIEL:  That's also important, though,

 6   because --

 7           THE COURT:  Do you agree with that?  Let me just ask

 8   that.  Do you agree with that?  That that's the context in

 9   which those investigations were done?

10           MR. WARD:  I agree that that's the way that it looks

11   in the complaint, yes.

12           THE COURT:  Well, which is what I have to accept now,

13   so --

14           MR. GRYGIEL:  That's what gets us here.

15           THE COURT:  Yeah.

16           MR. GRYGIEL:  One thing I wanted to point out about

17   the Curtin report, Your Honor, was that Ms. Curtin said that

18   one problem she did identify in the Nearpass report was that

19   the Nearpass report did not give sufficient attention, as in

20   read any, to the question whether the plaintiffs were

21   sufficiently protected from retaliation, and that was ignored

22   when the Curtin report was upheld.

23           All of these reports went through an internal process

24   and they were cursorily upheld, for example, the Nearpass

25   report with a two-page letter.
```

1          Anyway --

2          THE COURT:  So, I've got a bunch of people waiting

3     for me patiently in the back of the courtroom.  There's still

4     a few areas that I want to cover.  So I want to cover

5     defamation and I want to know specifically what statements are

6     false and defamatory and injurious to your client, clients.

7     And I also want to cover breach of contract and exactly how

8     that works.  My concern is that this is a tenure contract.

9     Your client -- clients had, two had breach of contract claims,

10    had tenure.  Tenure wasn't removed.  They decided to leave.

11    Where's the breach?

12          So, go ahead, if you would address both those for me.

13          MR. GRYGIEL:  Let me take defamation first, Your

14    Honor.

15          The test, you know, and it's important, is whether or

16    not the language used would, quote, tend, close quote, to

17    damage a person in the exercise of their profession.  And that

18    damage comes from calling into question the particular

19    person's capacity, fitness, ability to perform the particular

20    job.

21          THE COURT:  It seems to me that some of the

22    statements have a couple problems with them.  So statements

23    that, in fact, the two that you allege Seligman made that the

24    complaints against Jaeger were hearsay, and that the second

25    one is basically the same thing, and that the plaintiffs

 1   overreacted.  That has two problems, I think.  Number one, how

 2   is it about anyone?  And number two, what's false and

 3   defamatory about saying that certain complaints were hearsay?

 4   It's not saying don't believe this person.  It's not saying,

 5   you know, the complaints were lies.  That might come closer

 6   even though you have still have the problem about whether the

 7   statements were made about an individual.

 8          This -- just saying that the allegations are hearsay,

 9   I don't get how that's defamatory.

10          MR. GRYGIEL:  Your Honor, that's a very good

11   question, but I'm glad you asked it.

12          The reason it's hearsay in this context, and again,

13   context for defamation is just as important as it is in

14   retaliation and hostile work environment because it suggests

15   that the plaintiffs were passing off as truth what

16   Mr. Seligman is able from his vaunted position on high to say

17   is hearsay.  The plaintiffs didn't pretend that they were

18   giving in any case but Ms. Kidd's firsthand knowledge, so it

19   suggested to the public at large in this case, and the whole

20   world doesn't have to know defamation, the case law says that,

21   it's just this community.  What it suggests is that the

22   plaintiffs had passed off hearsay in the guise that this was

23   firsthand information.  It suggested that the speaker has

24   facts that the audience doesn't know, and that's what makes it

25   hearsay.

1        THE COURT:  Tell me -- tell me how those statements

2   suggest that.

3        MR. GRYGIEL:  Because it suggests that what the

4   speaker -- said I think this is the answer, Your Honor, it

5   suggests that what the speaker said was here's all these bad

6   things that happened and I have personal firsthand knowledge

7   of them, when the speakers didn't say that.

8        THE COURT:  But where is that -- I'm not getting that

9   implication from the statements.  Where is the implication

10  that the charges really were made as firsthand knowledge but

11  they weren't, they were hearsay?  I don't see the -- I don't

12  see the first half of that.

13       MR. GRYGIEL:  All we've got, Your Honor, is in the

14  complaint, which obviously has to govern this, where we allege

15  that Mr. Seligman passed these off as hearsay, it would not

16  have been defamatory had he said the plaintiffs have

17  acknowledged that these are hearsay, or the plaintiffs have

18  acknowledged that by and large this isn't on firsthand

19  information.  By not saying that, Your Honor, there's a fair

20  intimation certainly for purposes of pleadings, we're not at

21  summary judgment, that that was defamatory and that a

22  reasonable jury could conclude that.  We might lose at summary

23  judgment, but that's a fair implication.

24       As to the Rolling Stone article, that's simply a

25  question of calling people liars.  And this, Your Honor,

1    again, context is crucial.  Here we're not taking about

2    someone who is being a bus driver and you say he's a liar,

3    he's not an honest person, he might still be a wonderful bus

4    driver and all of his clients and passengers might think so.

5         But in the university context, when you're talking

6    about how faculty interact with each other in a department as

7    collegial and as closely collaborative as the BCS has pled to

8    be, that is extremely damaging.  And we know it because

9    Mr. DeAngelis, when he had his January 10, 2017 meeting in

10   which he accused the plaintiffs of being smearers, of having

11   engaged in a campaign of manipulation and deceit, after that

12   he apologized to everyone except Mr. Aslin and he said he

13   apologized for damaging their reputations.  That shows that

14   that certainly is defamatory.

15        THE COURT:  Okay.  Let's go to the breach of

16   contract.

17        Your argument, as I understand it, is that there was

18   a constructive discharge and that breached the tenure

19   contract; do I have that?

20        MR. GRYGIEL:  That's exactly it, Your Honor.

21        I think it's actually pretty simple.  The University

22   of Rochester, as it paints in its brief to excoriate us for

23   not engaging in notice pleading, we pled the existence of the

24   contract.

25        This isn't like the many cases, for example, the

1    Ellington Credit case they cite where there was no contract

2    and no contract pled.  This isn't like the Süd case, S-U-D,

3    versus Süd, where there's this amorphous alleged contract for

4    intrafamily support.  Or the ^ CK Surrogate versus Columbia

5    University case where one -- the plaintiff said I had this

6    promise which no one can identify that says I'm entitled to

7    tuition support.

8         THE COURT:  Let me ask you this.  Do you have any

9    case law in which constructive discharge was used as the basis

10   for a breach of contract?

11        MR. GRYGIEL:  I don't think we cite any, Your Honor,

12   in candor.

13        THE COURT:  Okay.

14        MR. GRYGIEL:  I don't think we cited any.

15        On the other hand, if I may, constructive discharge

16   is essentially one of those tests that says did the employer

17   intentionally create conditions that made it so -- this is the

18   rest of the quote -- difficult or unpleasant that the

19   plaintiff found it impossible to do his job.

20        Look at Mr. Hayden.  He left not, that he wanted to.

21        THE COURT:  But I usually -- I can see constructive

22   discharge in the context of Title VII claims.  I'm not so sure

23   that I've ever seen it in the context of a breach of contract

24   claim.  And while conceptually I'm not sure where I come down

25   on whether it can be a breach of the contract, I'm just

1    wondering if any courts have ever considered that.

2          So here's what I'm going to do.  I'm going to give

3    you a chance to reply in a second, but as I say, all good

4    things must come to an end including this argument.

5          So what we're going to do is I'm going to ask the

6    plaintiff to give me, number 1, the specifics on exactly what

7    Seligman and Clark did.  And I want bullet points or numbers

8    and actions, not -- I don't want anything vague, I want

9    specifics on what they did, what's in the complaint, what you

10   allege in the complaint -- because it's a long complaint.  And

11   I've read it, I actually have read it, but it's hard for me to

12   parse out, and you know it better than I do, so I want you to

13   tell me exactly what they did.

14         I also want you to tell me exactly what the

15   defamatory statements were, who said them, when they were

16   said, and -- and perhaps a little exposition on how they're

17   false and defamatory.

18         And I also would like some case law on whether a

19   constructive discharge has been found to be or can be found to

20   be a breach of contract.  No more than 15 pages.  We'll give

21   the defendants some time to reply to that, and then -- and

22   then I'll make a decision.

23         Go ahead.  Finish up, then I'm going to give your

24   friend a chance to reply.

25         MR. GRYGIEL:  I'm simply going to say, Your Honor, at

 1    the risk of addressing something the Court didn't ask.

 2            THE COURT:  That's okay.

 3            MR. GRYGIEL:  I couldn't help it.  The one thing the

 4    University of Rochester still, and to me somewhat amazingly,

 5    gets wrong is on the retaliation.

 6            First of all, I would commend two things to Your

 7    Honor:  Number 1, the EEOC's guidance, which is August 25,

 8    2016, on what constitutes retaliation.

 9            Number 2, the Burlington case, and in particular

10    Justice Alito's concurrence.  He liked the result, he didn't

11    like the process.  And the reason he didn't like the process

12    is because the Supreme Court said they are exactly what I'm

13    saying here, Title VII retaliation is vastly broader than

14    Title VII discrimination as it applied to materially adverse

15    acts.  There does not have to be a single affect on your pay,

16    your benefits, your privileges, your emoluments of your job

17    title in order for you to make such a claim.

18            Can meetings be retaliatory in terms of the exclusion

19    from them?  Absolutely, and case law says so.  Allen versus

20    Napolitano, Dorrez, Timothy versus Our Lady of Mercy, and the

21    EEOC says it.

22            Disparagement.  What they say is criticism.  There's

23    much more here than criticism.

24            So, I'm sure Your Honor has the point.

25            THE COURT:  Yeah.

1          MR. GRYGIEL:  They've got that wrong.

2          THE COURT:  There is some overlap, but I think you

3    alluded to that earlier, there is some overlap between your

4    retaliation claims and your hostile work environment claim.

5          MR. GRYGIEL:  There is, Your Honor.  As I thought

6    about this the other day, it seems to me that intellectually

7    it's very difficult to keep parsed what's retaliation over

8    here and what is hostile environment over here because it

9    seems as a matter of clear thinking, well, if it's a

10   retaliatory act and you're still at work because you don't

11   have to be Jackie Robinson and nobody turned the other cheek,

12   as one of the cases said.  If it's retaliatory and it's

13   hurting you but you're still able to perform, the environment

14   may still be hostile particularly if those acts continue.

15         THE COURT:  Okay.

16         MR. GRYGIEL:  Thank you, Your Honor.

17         THE COURT:  Brief reply.

18         MR. WARD:  I'm not exactly sure where to start, let

19   me start with that.

20         I would not agree that you can have retaliatory acts

21   that cause no damage.  In fact, there is a causation aspect to

22   the test for what constitutes retaliation.  And in our case,

23   we have absolutely no impact for any of these -- of any of

24   these professors.

25         It comes back to where we started this, which is what

 1   this amounts to is a simple disa -- not simple, that's

 2   incorrect.

 3           What this amounts to is a disagreement with the

 4   outcome of the university's investigations of this, which

 5   leads to what really turns out to be some rather absurd

 6   pleading where on the one hand the failure to retain Professor

 7   Hayden by not paying him enough to stay at the university is

 8   retaliation, on the other hand, by allegedly increasing the

 9   cost of the use of a scanner prevents the plaintiffs from

10   leaving to go to RIT.

11           So in these instances, the retaliation is not keeping

12   them, the retaliation is not letting them go.

13           THE COURT:  But, again, this is stuff for summary

14   judgment, isn't it?  These are factual arguments that you're

15   going to be able to make at some point, and -- and maybe good

16   factual arguments, but I don't see how they -- how they go to

17   the heart of the pleading.

18           MR. WARD:  The point of that is what is materially

19   adverse employment action that would cause damage here.

20   That's the point.  And I don't think that it raises.

21           THE COURT:  Okay.

22           MR. WARD:  Okay.  As for -- I mean, in some ways on

23   the defamation and the breach of contract, although we have

24   responses to that, I think the effect that you've asked for

25   additional briefing on that, I might as well pass on doing

1    that rather than taking the Court's time.

2            Let me just make one other comment about the efforts

3    to bootstrap in Professor Jaeger's conduct and the claim from

4    Katurah Bixby that she made in 2013.  And by the way, that

5    claim, and it states in the complaint, was about Professor

6    Jaeger's weird behavior.  It was not --

7            THE COURT:  Yeah, she didn't use the word sexual.

8            MR. WARD:  That's correct.  In fact, she -- she

9    specifically said not.

10           All right.  Unless the Court has any further

11   questions, I think that that --

12           THE COURT:  So how much time do you need for this

13   submission?

14           MR. GRYGIEL:  If I might just, Your Honor?

15           THE COURT:  Absolutely, of course.

16           MR. GRYGIEL:  With some trepidation, Your Honor, if I

17   can ask for a week --

18           THE COURT:  Oh, okay.  So how about, you know what?

19   I'll give you until a week from Friday.  How's that?

20           MR. GRYGIEL:  That's great.

21           THE COURT:  So May 4th, is that --

22           THE CLERK:  May 4th.

23           THE COURT:  May 4th.  How much time do you need to

24   reply?

25           MR. WARD:  Same.  Just the same amount of time, Your

```
 1    Honor.  Ten days or so.

 2             THE COURT:  Okay.  Yeah, why don't we say --

 3             THE CLERK:  Wednesday.

 4             THE COURT:  -- yeah --

 5             THE CLERK:  16th.

 6             THE COURT:  -- the 16th.

 7             THE CLERK:  May 16th.

 8             THE COURT:  Great.  And there's nothing magic about

 9    those dates.  Sometimes I will cast dates in stone because,

10    you know, it's a trial and there's lots of people depending on

11    it.  Sometimes the dates are a little softer.  These are a

12    little softer.  If you guys get jammed up and need a day or

13    two, you can let me know and I'm usually pretty good about

14    those things.

15             MR. GRYGIEL:  Thank you, Your Honor.

16             MR. WARD:  Thank you, Your Honor.

17             THE COURT:  Okay.  Great.  Thank you very much.

18             (Proceeding concluded at 10:20 a.m.)

19             *     *     *     *     *     *     *

20

21

22

23

24

25
```

1                          CERTIFICATION

2

3            I certify that the foregoing is a

4        correct transcription of the proceedings

5        recorded by me in this matter.

6

7

8

9                       s/ Ann M. Sawyer
                        _____
                        Ann M. Sawyer, RPR, CRR, NYRCR, NYACR
10                      Official Reporter
                        U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25