UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

RICHARD ASLIN, KETURAH BIXBY,
JESSICA CANTLON, BENJAMIN
HAYDEN, SARAH HEILBRONNER,
CELESTE KIDD, BRADFORD MAHON,
ELISSA NEWPORT and STEVEN
PIANTADOSI,

          Plaintiffs,

   v.

UNIVERSITY OF ROCHESTER, JOEL
SELIGMAN, and ROBERT CLARK,

          Defendants.

6:17-CV-06847

DECISION & ORDER

---

On December 8, 2017, the plaintiffs filed this action, claiming that the defendants

violated 42 U.S.C. § 2000e et seq. ("Title VII"); violated N.Y. Exec. Law § 292 et seq.

("NYSHRL"); violated 20 U.S.C. § 1681(a) et seq. ("Title IX"); breached a contract; and

defamed them.  Docket Item 1.  On February 5, 2018, the defendants moved to dismiss

the complaint under Federal Rule of Civil Procedure 12(b)(6).  Docket Item 13.  In the

alternative, the defendants asked this Court to strike all immaterial, impertinent, and

scandalous allegations and to require the plaintiffs to re-plead any counts that are not

dismissed in accordance with Federal Rules of Civil Procedure 8 and 10.  *Id.*  The

plaintiffs responded on March 16, 2018, Docket Item 20, and the defendants replied on

April 6, 2018, Docket Item 24.  This Court heard oral argument on April 23, 2018, and

permitted the parties to file supplemental briefs.  Docket Item 26.  They both did so.

Docket Items 25, 28.

## BACKGROUND

At its core, the parties' dispute involves the conduct of Dr. Florian Jaeger—an assistant professor, and later full professor, in the Brain and Cognitive Sciences Department ("BCS") at the University of Rochester (the "University" or "UR")—and the University's response to complaints about his conduct.  At 192 pages, the complaint is exhaustive and includes a myriad of allegations about Jaeger's conduct and the inadequacy of the University's response.  The Court assumes the parties' familiarity with the factual allegations and will summarize the story told in the complaint only briefly. This decision and order then will address each claim and refer to the allegations only as necessary to the Court's decision.

In sum and substance, the complaint tells the following story.[1]

Jaeger joined BCS in 2007, Docket Item 1 at ¶ 73, and almost immediately started behaving as a "serial sexual predator."  *Id.* at ¶¶ 41, 74.  Among other things, he pried into female students' sex lives, *id.* at ¶ 107; used overtly sexual language, *id.* at ¶ 108; and publicly discussed the sexual attractiveness of female colleagues, *id.* at ¶ 113. These and many other things he did created a hostile environment for women.  *Id.* at ¶¶ 457-58.

The plaintiffs are a group of students and employees at BCS, both current and former, who tried to do something about Jaeger's conduct.  They first complained in

---

[1] In deciding a motion to dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court accepts as true all plausible factual allegations, drawing reasonable inferences in the plaintiff's favor.  *See Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

November 2013, when Keturah Bixby, a BCS Ph.D. student, formally advised Greg

DeAngelis, Ph.D., the Chair of BCS since 2010, about female students' "toxic

experiences with Jaeger" and "that his regular pattern of behavior was causing major

problems for female students."  *Id.* at ¶ 160.

A few years later, in March 2016, Richard Aslin, Ph.D., and Jessica Cantlon,

Ph.D., the two most senior faculty members at BCS, made allegations of sexual

harassment to the University's counsel.  *Id.* at ¶ 186-87.  That complaint prompted an

investigation by Catherine Nearpass, Associate Counsel for Employment and Labor

relations at UR.  *Id.* at ¶ 188-98.  Attorney Nearpass then issued a report (the "Nearpass

Report") which cleared Jaeger of any wrongdoing, but the plaintiffs contend that it was

inadequate in several ways.  *Id.* at ¶¶ 211-51.

Indeed, soon after the Nearpass Report was issued, Celeste Kidd, Ph.D., one of

the plaintiffs, complained that it had "named and shamed her" in retaliation for speaking

out.  *Id.* at ¶ 262.  Therefore, in July 2016, the University hired outside counsel, Cynthia

Maxwell Curtin, to investigate Kidd's claim that the Nearpass Report amounted to

retaliation against her.  *Id.*  Attorney Curtin then prepared another report (the "Curtin

Report"), finding that Nearpass did not "mitigate" the risk that her report could result in

retaliation or "follow[] up with Kidd to explore what kind of retaliation she expected."  *Id.*

at ¶ 267.  But the University rejected that aspect of Curtin's findings without explanation.

*Id.*

As the plaintiffs tell it, things then went from bad to worse.  In July 2016, BCS

faculty received a memo aimed at silencing their continued pursuit of action against

Jaeger.  *Id.* at ¶ 254.  Provost Robert Clark circulated a memo calling the accusations

against Jaeger rumors and misinformation. *Id.* at ¶ 288. The University fostered a narrative that the plaintiffs had violated confidentiality by speaking out about Jaeger's conduct. *See, e.g., id.* at ¶ 382(f). Many of the plaintiffs were shamed for their actions at BCS faculty meetings. *See id.* at ¶¶ 303, 310. Plaintiffs Aslin and Ben Hayden, Ph.D., both left their faculty positions at the University, and BCS did not hire plaintiff Sarah Heilbronner, Ph.D., when she completed her graduate studies.

The plaintiffs argue that these actions and others breached their employment contracts and amounted to retaliation by the University for their attempts to address Jaeger's conduct. For the plaintiffs who remained, the University limited their professional and educational opportunities. *See, e.g.*, *id.* at ¶¶ 335-36. They argue that this, too, was retaliation, and they also argue that it created a hostile work and educational environment.

The plaintiffs also allege that Joel Seligman, President of the University, and other University officials including DeAngelis made defamatory statements that impugned the plaintiffs' reputation for honesty as academics. For example, Seligman compared the plaintiffs' allegations to allegations about the University of Virginia that had been reported in a later-discredited *Rolling Stone* article. *Id.* at ¶ 523. As a result, the plaintiffs were portrayed as dishonest—both to their faculty colleagues, *id.* at ¶ 518, and in the wider academic community, *id.* at ¶ 521.

Between August 2017 and November 2017, the plaintiffs filed charges of retaliation and employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at ¶¶ 17-32. On September 1, 2017, the University appointed a special committee and hired outside counsel to investigate all matters

involving the EEOC complaints. *Id.* at ¶ 48. Still dissatisfied, the plaintiffs filed this action on December 8, 2017.

## DISCUSSION

To survive a motion to dismiss, a complaint must include sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557).

Because it involves employment discrimination, this retaliation case invokes the long-established pleading requirements of Title VII.[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny establish what plaintiffs alleging employment discrimination must demonstrate as their case progresses. First, the plaintiffs must establish a *prima facie* case of discrimination or retaliation. *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). If the plaintiffs sustain this initial burden, a presumption arises, *see id.*; *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005), and the defendants must then articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Hicks*, 593 F.3d at 164. If the

---

[2] "Retaliation claims under Title VII are evaluated under [the same] three-step burden-shifting analysis." *Hicks*, 593 F.3d at 164 (*quoting Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

defendants do so, the plaintiffs have the ultimate burden to show that the legitimate reason was a pretext and that unlawful discrimination or retaliation was a substantial reason for the adverse employment action.  *See id.* at 164-65.

In *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002), the Supreme Court found that the *McDonnell Douglas* line of cases establish an evidentiary standard, not a pleading requirement, and that a plaintiff alleging discrimination needed only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 512.  "Reading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent."  *Littlejohn v. City of New York*, 795 F.3d 297, 309 (2d Cir. 2015).  While it is unclear how the plausibility standard of *Twombly* and *Iqbal* apply to complaints in the *McDonnell Douglas* framework, the Second Circuit has concluded "that *Iqbal's* requirement applies to Title VII complaints of employment discrimination, but does not affect the benefit to plaintiffs pronounced in the *McDonnell Douglas* quartet."  *Id.* at 310.  Therefore, "at the initial stage of the litigation—prior to the employer's coming forward with the claimed reason for its action—the plaintiff does not need substantial evidence of discriminatory intent" but only enough to sustain "a *minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Id.* at 311 (emphasis in original).

## I.      RETALIATION

Almost all the plaintiffs—Richard Aslin, Jessica Cantlon, Benjamin Hayden, Sarah Heilbronner, Celeste Kidd, Bradford Mahon,[3] Elissa Newport, and Steven Piantadosi (together, the "Retaliation Plaintiffs")—bring claims against UR for retaliation. They assert that the University retaliated against them because they engaged in protected activities and that the University thus violated Title VII, Title IX, and the New York State Human Rights Law ("NYSHRL").[4]  But the allegedly retaliatory actions differ from plaintiff to plaintiff.

### A.     Legal Standard

Title VII includes an explicit anti-retaliation provision.  42 U.S.C. § 2000e-3 provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . or because he has made a charge . . . under this subchapter."  To establish retaliation, a plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a

---

[3] Mahon is the only retaliation plaintiff who does not bring a claim under the NYSHRL.  *See* Docket Item 1 at 166, Count VII.  The Court assumes that this omission from the heading of Count VII is an oversight because Mahon is among the plaintiffs who bring claims for aiding and abetting retaliation under the NYSHRL in Counts XV and XVI.  *Id.* at 189-90.

[4] Courts apply the same framework for retaliation claims under Title VII, Title IX, and the NYSHRL.  *See, e.g.*, *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 313 (2004).  Therefore, this Court will address the plaintiffs' retaliation claims under all three statutes together.

causal connection between the protected activity and the adverse employment action."
*Hicks*, 593 F.3d at 164 (internal quotations omitted).  Retaliation claims under Title VII
are analyzed under the three-step *McDonnell Douglas* burden-shifting evidentiary
framework.  *See id.*

At the motion to dismiss stage, the complaint benefits from the "temporary
presumption" of retaliation and "must be viewed in light of the plaintiff's minimal burden
to show discriminatory intent."  *Littlejohn*, 795 F.3d at 311.  "The facts alleged must give
plausible support to the reduced requirements that arise under *McDonnell Douglas* in
the initial phase of a Title VII litigation."  *Id.*  That is, they must give "plausible support" to
"a minimal inference of discriminatory motivation," not to the "ultimate question of
whether the adverse employment action was attributable to discrimination."  *Id.*

The University argues that the Retaliation Plaintiffs have not plausibly pleaded
facts that support the third element of a retaliation claim: that the Retaliation Plaintiffs
suffered a materially adverse employment action.[5]  Docket Item 13-1 at 2.  According to
the University, criticism, violating confidentiality, viewing the plaintiffs' emails, calling for
an independent investigation, permitting Jaeger to participate in performance
evaluations, failing to retain or hire a plaintiff, hindering the plaintiffs' efforts to move to
other institutions, and excluding the plaintiffs from meetings are not adverse
employment actions.  *Id.*

---

[5] The University also implicitly contests the fourth element of a retaliation claim,
causal connection between the protected activity and the adverse employment action,
when it argues that the plaintiffs suffered no adverse employment action.  But neither
the briefs nor oral argument focused on causation.  In any event, the question of
causation is most often one for a jury.  *See, e.g.*, *Hendricks v. Office of Clermont Cty.
Sheriff*, 326 F. App'x. 347, 351 (6th Cir. 2009) ("Difficult causation questions . . . are
eminently appropriate for finders of fact to resolve").

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). "[T]rivial harms" or "petty slights or minor annoyances" do not constitute actionable adverse acts. *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (internal quotation marks omitted). The harm must be "more than de minimis," *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006), and often includes "termination, demotion, or the material loss of wages, benefits, or job responsibilities," *McCullough v. Xerox Corp.*, 942 F. Supp. 2d 380, 387 (W.D.N.Y. 2013). Still, "[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a large course of conduct." *Tepperwien*, 663 F.3d at 568; *see also Massaro v. Dep't of Educ.*, 2019 WL 2183483, at *3 (2d Cir. May 21, 2019) ("Although some of the conditions [the plaintiff] complains of, considered individually, might reasonably be tolerated by many teachers, the allegation of their combination, alleged to have been imposed only on her, suffices to survive a motion to dismiss.") (summary order).

To establish adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," which in the retaliation context "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (internal quotations omitted). The *White* Court construed "materially adverse action broadly to include changes in employment life outside of the terms and conditions of employment." *Millea v. Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011) (internal quotations

omitted).  The Court did so to fulfill the purpose of Title VII's anti-retaliation provision: "preventing employers from deterring their employees from exercising their legitimate legal rights."  *Id.* (quoting *White*, 548 U.S. at 68).

"[T]he significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters."  *White*, 548 U.S. at 69.  "The materiality of an adverse employment action 'depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'"  *Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 582 (W.D.N.Y. 2011) (quoting *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006)).  For example,

> [a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*White*, 548 U.S. at 69.  Thus, the standard is an objective one that accounts for the plaintiff's position and circumstances.

**B.     Analysis**

The Retaliation Plaintiffs have pleaded many retaliatory actions.  According to the University, none of them amount to adverse employment action.  For certain allegations, the University may be correct because they are trivial.  Docket Item 1 at 150.  But others are not.

**1.  Criticism**

The Retaliation Plaintiffs allege that criticism of them and their complaints often amounted to retaliatory adverse employment action.  For example, they cite a memo dated July 26, 2016, in which Dr. Peter Lennie, Dean of Faculty and former Provost, and Gloria Culver, the Dean of Arts and Sciences, characterize complaints against Jaeger as "rumors" and "gossip."  *See, e.g.*, Docket Item 1 at ¶ 382(a).  Along the same lines, all the Retaliation Plaintiffs except Heilbronner claim that President Seligman told department heads that the plaintiffs' complaints were hearsay.  *See, e.g.*, *id.* at ¶ 382(j). The same group says it was clear that DeAngelis was referring to the plaintiffs when he made statements at faculty meetings that some faculty had spread rumors.  *See*, *e.g.*, *id.* at ¶ 382(c).  All the Retaliation Plaintiffs except Hayden and Heilbronner also claim that the University "creat[ed] . . . the narrative that Aslin and other Plaintiffs have violated confidentiality by engaging in protected activity," such as reporting and opposing sexual harassment.  *See, e.g.*, *id* at ¶ 382(f).

The University argues that mere criticism like this cannot amount to materially adverse employment action.  According to UR, "[n]egative or otherwise insulting statements are hardly even actions, let alone 'adverse actions.'"  Docket Item 13-1 at 10 (quoting *Bickerstaff v. Vassar Coll.*, 354 F. Supp. 2d 276, 280 (S.D.N.Y. 2004)).

The core question is whether, in the context of the plaintiffs' circumstances, the challenged actions "might well have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *White*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "The social environment in a workplace can prove to be a powerful motivator; fear of employer-sponsored isolation might well influence an employee's decision whether to make or support a charge of discrimination."  *Flowers v. Northern Middlesex YMCA*, 2016 WL 1048751, at *8 (D. Conn. Mar. 11, 2016) (internal quotations and alterations omitted).  Furthermore, unwarranted criticism may diminish future employment prospects by damaging a plaintiff's reputation.  *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) ("The terminated employee, however, may have tangible *future* employment objectives, for which he must maintain a wholesome reputation.") (emphasis in original); *Frontline Commc'ns Int'l, Inc. v. Sprint Commc'ns Co.*, 374 F. Supp. 2d 368, 371 (S.D.N.Y. 2005).  And if criticism damages the plaintiffs' reputations and employment prospects—as it plausibly could for academics in a focused niche of scientific research—that criticism indeed might well deter a reasonable employee from engaging in protected activity and thus constitute adverse employment action.[6]  *See White*, 548 U.S. at 68.  The criticism here meets that standard, at least at the pleading stage.

---

[6] The University argues that several of the plaintiffs have not plausibly pleaded that they suffered any adverse employment action because they have secured other employment.  *See, e.g.*, Docket Item 13-1 at 18.  This argument fails at the pleading stage because the plaintiffs have alleged reputational damage, Docket Item 1 at ¶¶ 530-32, which might have adversely affected their new positions or which might well still affect their ability to seek employment down the road.

The allegations amount to adverse employment action for another reason: the alleged incidents are not isolated or one-off insults.  On the contrary, the plaintiffs allege a pattern of them at the University.  And even if some of the actions alone might not be sufficient, in combination they plausibly amount to material adverse employment action. *See Massaro,* 2019 WL 2183483, at *3; *Tepperwien*, 663 F.3d at 568; *Timothy v. Our Lady of Mercy Med. Ctr.*, 2004 WL 503760, at *6 (S.D.N.Y. Mar. 12, 2004) ("Even if none of the actions that a plaintiff alleges could individually be characterized as adverse, a series of actions taken against a plaintiff may, in the aggregate, constitute such conduct.").

Furthermore, the Retaliation Plaintiffs assert that those who complained faced disqualification from serving as ombudspersons, exclusion from department meetings and discussions on hiring, increased workloads, exclusion from faculty dinners, accusations about causing Jaeger to be disinvited from speaking at a conference, and accusations about harming students' careers.  Docket Item 1 at ¶¶ 39, 315-18.  That context matters.  In such an environment, calling the plaintiffs liars, bullies, deceivers, etc., may well amount to material adverse employment action.  Therefore, the Retaliation Plaintiffs have plausibly pleaded a claim for relief.

### 2.  Breach of Confidentiality

Aslin, Cantlon, and Kidd allege that the University retaliated against them by breaching their confidentiality during the course of investigating Jaeger's conduct.  Aslin and Cantlon claim that UR did that by allowing Kidd to view the Nearpass Report. Docket Item 1 at ¶¶ 382(g), 403(a).  Kidd, in turn, claims that the University violated her

confidentiality "by not protecting disclosure of her name as one of the witnesses to Jaeger's misconduct in the Nearpass Report."  *Id.* at ¶ 410(a).

Again, the University responds that because these are not material adverse employment actions, they cannot support a claim of retaliation.  Docket Item 13-1 at 11. And the question again is whether the alleged UR conduct "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" in light of the context of the particular circumstances.  *White*, 548 U.S. at 68 (internal quotations omitted).

The University cites *Bowles v. New York City Transit Auth.*, 2006 WL 1418602, at *6 (S.D.N.Y. May 23, 2006), a case in which the disclosure of confidential information about the plaintiff's medical status was found not to have been material adverse employment action.  But even if this Court agreed with the conclusion in *Bowles*— reached on a motion for summary judgment, not a motion to dismiss—the confidential information here is different.

Here, the confidential information itself involved the fact that Aslin, Cantlon, and Kidd participated in protected conduct: reporting and opposing alleged discrimination and harassment.  And in Kidd's case, it was the fact that she witnessed Jaeger's conduct.  The fact that an employee experienced harassment or engaged in protected conduct opposing harassment may, in fact, be the very sort of sensitive information the publication of which is most likely to discourage an employee from engaging in protected conduct.  *See White*, 548 U.S. at 68.   "The threat of dissemination of derogatory private information, even if true, would likely deter any reasonable employee from pursuing a complaint against his employer." *See Ray v. Ropes & Gray LLP*, 961 F.

Supp. 2d 344, 360 (D. Mass. 2013), *aff'd* 799 F.3d 99 (1st Cir. 2015) (holding that

publication of an EEOC determination could constitute a retaliatory adverse

employment action).   Therefore, the alleged disclosure is plausibly an adverse

employment action—again, at least at the pleading stage.   *See White*, 548 U.S. at 68.

### 3.  Email Surveillance

All the Retaliation Plaintiffs except Heilbronner allege that the University

searched their emails and that this amounted to adverse employment action.   Docket

Item 1 at ¶¶ 308, 382(c), 396(a), 403(d), 410(h), 418(d), 426(b), 433(b).   The University

argues that this cannot be material adverse employment action because UR policy

permits such searches.   Docket Item 13-1 at 12.

The University's argument misses the point.   The plaintiffs pleaded not only that

their emails were searched but that they were searched—and the plaintiffs targeted—

solely as a result of protected conduct.   *See, e.g.*, Docket Item 1 at ¶¶ 307-10, 317,

382(c) ("emails proving that they had spread rumors, deceived and manipulated

people.").   Even permitted conduct may be adverse employment action if it is done

solely to harass and retaliate.   *Francis v. Am. Tel. & Tel. Co., Long Lines Dep't*, 55

F.R.D. 202, 207 (D.D.C. 1972) ("Contemporaneously with those instructions the

defendant began and applied to plaintiff a pattern of oppressive supervision, constant

surveillance and special conditions of employment that was not applied to other

employees in the group who, except for the filing of the EEOC complaint, were similarly

situated."); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1377 (9th Cir. 1987) (summary

judgment was inappropriate when "evidence in the record raises questions about

whether [the plaintiff's] supervisors harassed and closely watched him during the period

in question.  If proven at trial, such incidents would bear on the pretext issue.").  What is more, the plaintiffs allege that these emails were used against them at a faculty meeting.  *See, e.g.*, Docket Item 1 at ¶ 382(c).  This Court is persuaded that email searches targeting complainants so as to discredit them would dissuade a reasonable employee from engaging in protected conduct.  *See White*, 548 U.S. at 68.  Therefore, the plaintiffs have plausibly alleged that the email searches constituted materially adverse employment action.

### 4.  Independent Investigation

All the Retaliation Plaintiffs except Heilbronner allege that the University retaliated against them by initiating an investigation.  Docket Item 1 at ¶¶ 382(l)-(m), 396(e)-(f), 403(p)-(q), 410(r)-(s), 418(l)-(m), 426(l)-(m), 433(k)-(l).  For example, Aslin argues the University retaliated against him by beginning an investigation that required his participation to "complete properly" despite "knowing that he could not participate while his legal claims against the University [were] pending."  *Id.* at 382(l).  He further alleges that the University framed his "inability to participate . . . as a failure of cooperation by him, with the result that his character in the UR community has been impugned."  *Id.* at 382(m).

The University argues that the plaintiffs "may not claim retaliation simply because the employer under[took] a factfinding investigation."  *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014) (affirming summary judgment dismissing complaint); Docket Item 13-1 at 12.  That may be especially so absent "additional particularized facts evidencing a retaliatory intent and resulting in, or amounting to, adverse job consequences for the complainant."  *Cox*, 760 F.3d at 146.  Nevertheless,

16

"an employer's investigation may constitute a cognizable retaliatory action if carried out so as to result in a hostile work environment, constructive discharge, or other employment consequences of a negative nature, or if conducted in such an egregious manner as to dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 147 (internal quotations omitted); *see also King v. Holder*, 77 F. Supp. 3d 146, 151-52 (D.D.C. 2015) (finding that initiation of an investigation was adverse employment action when it delayed the plaintiff's career advancement).

Here, the plaintiffs have alleged enough to meet that standard. For example, the plaintiffs allege that UR knew they could not participate in the investigation, *see, e.g.,* Docket Item 1 at 382(l), and used the investigation precisely to "impugn[]" their character, *see, e.g.*, *id.* at 382(m). That may well be an adverse consequence that would dissuade an employee from making a charge of discrimination. Therefore, the plaintiffs have plausibly pleaded a claim of retaliation through this adverse employment action.

### 5.  Jaeger's Participation in Performance Evaluations

Kidd and Piantadosi both claim that the University retaliated against them by allowing Jaeger to participate in their performance evaluations in February and March 2017. Docket Item 1 at ¶¶ 410(l), 418(c). The University responds that Jaeger's participation does not establish that Kidd or Piantadosi suffered any material adverse consequences. Docket Item 13-1 at 12-13.

But the plaintiffs allege more than the University acknowledges. Specifically, the plaintiffs allege that they told the administration about their fear that Jaeger would be involved in their future performance reviews, but that despite promises to the contrary,

17

Jaeger was allowed to participate in reviewing their performance.  Docket Item 1 at ¶¶ 285-86.  "Jaeger used the reviews as a further opportunity to retaliate."  *Id.* at ¶ 287. "He spoke in support of a suggestion from another faculty member that Kidd's evaluation should contain a criticism that most of her publications so far were collaborative."  *Id.*  In doing so, he helped "introduce a nonsensical criticism of Kidd into her official record"—"nonsensical" because Kidd and her superior saw her collaboration as a strength.  *Id.*  According to the plaintiffs, Jaeger's participation negatively affected Kidd's performance review.  *Id.*

A negative performance review is precisely the sort of "injury or harm" that would "dissuad[e] a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 67, 68; *see also Ibok v. Sec. Indus. Automation Corp.*, 369 F. App'x. 210, 214 (2d Cir. 2010) ("[W]e conclude that a reasonable jury could find that the warnings and negative performance review were, at least in part, retaliatory.").  In the context of academia, a jury could reasonably find scholarly criticism that is harsher because of the target's complaints to be adverse employment action.  *See Kovacevich v. Vanderbilt Univ.*, 2010 WL 1492581, at *17 (M.D. Tenn. Apr. 12, 2010) ("Plaintiff produced evidence to raise genuine issues of material fact about whether Dr. Demarest's public statements and actions . . . constituted scholarly criticism of her work or amounted to an attempt to sabotage her career.").

Because the plaintiffs alleged that Kidd suffered the adverse consequence of a negative performance review as a result of Jaeger's participation, they have alleged material adverse employment action.  Jaeger's participation alone may not suffice, but the negative review that followed surely does.  And while the plaintiffs do not plead that

Piantadosi suffered any similar consequence from Jaeger's participation in his review, he may still have a retaliation claim for adverse employment action against Kidd, his spouse. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011) (holding that *White*'s broad standard can include third-party reprisals); Docket Item 1 at ¶ 334 (pleading that Kidd and Piantadosi are married).  Therefore, both Kidd and Piantadosi have alleged adverse employment action sufficient to support their retaliation claim.

### 6.  Failure to Retain Hayden

Cantlon, Kidd, Piantadosi, Mahon, and Hayden claim that the University retaliated against them by failing to retain Hayden in the BCS department.  They allege the University made Hayden a "derisory offer" in order to push him out.  Docket Item 1 at ¶ 433(e).  Moreover, they allege that the University refused to retain Hayden knowing that his absence would hurt the others' research, *id.* at ¶¶ 410(n), 418(f), and 426(d).  The University argues that its alleged failure to increase Hayden's compensation to retain him cannot be materially adverse employment action.  Docket Item 13-1 at 13.

On its face, an offer of a raise—even a "derisory offer"—seems at worst a trivial harm that does not amount to adverse employment action.  But again, context matters.  The plaintiffs allege that "[n]ormally, when faculty members receive outside job offers, UR will attempt to retain them by raising their compensation either in research funding or salary."  Docket Item 1 at ¶ 331.  When Hayden received an offer from the University of Minnesota for over $1,000,000 of research funding and postdoctoral salary funding, however, the University delayed for months before offering him only $150,000 in research funding plus one-and-a-half years' postdoctoral salary funding.  *Id.*  If, as the plaintiffs allege, an employee in Hayden's position would have received a substantially

higher offer absent his protected conduct, this offer was a material change in Hayden's job status that would dissuade a reasonable employee from engaging in that sort of conduct.  *See, e.g.*, *McIntyre v. Longwood Central Sch. Dist.*, 658 F. Supp. 2d 400, 413 (E.D.N.Y. 2009) ("If plaintiff can demonstrate that he has been denied the same percentage of salary increases received by other administrators because of his race and/or gender, such denial of salary increases could constitute an 'adverse employment action' under Title VII.") (collecting cases); *Moore v. Consol. Edison Co. of N.Y.*, 2007 WL 831807, at *6 (S.D.N.Y. Mar. 20, 2007) ("Minimal salary increases to a complaining employee, if an intentional reduction in the range of the salary earned by comparable employees, might well dissuade similarly situated employees from complaining of discrimination.").  Thus, the Retaliation Plaintiffs have alleged that the "derisory offer" made to Hayden was adverse employment action.

The plaintiffs also allege that Kidd and Piantadosi collaborated with Hayden at the University, Docket Item 1 at ¶ 334, and expressed their concern to the administration that Hayden was being driven away, *id.* at ¶ 332.  Hayden's departure plausibly altered the conditions of their employment by depriving them of a collaborator at a research university, a setting where colleagues are hardly fungible.  In fact, the plaintiffs allege that Kidd and Piantadosi will likely leave the University because of Hayden's departure.  *Id.* at ¶ 334.  Therefore, Kidd and Piantadosi have plausibly alleged adverse employment action arising from Hayden's departure.

But the plaintiffs have not plausibly alleged that Cantlon and Mahon suffered adverse employment action from Hayden's departure.  The plaintiffs allege no connection between them and Hayden; rather, they allege only that "Piantadosi

collaborates with Cantlon, who is married to Mahon." *Id.* That step removed makes the connection simply too tenuous to state a viable claim. Although they mention the "easy collaboration the group has established," the plaintiffs do not link Cantlon or Mahon to Hayden in a way that could make his departure a material alteration of their conditions of employment.[7] *Id.* Thus, Cantlon and Mahon have failed to plead a claim for retaliation in connection with Hayden's departure.

### 7.  Planned Move to RIT

Cantlon, Kidd, Piantadosi, Mahon, and Hayden allege that the University "[s]abotage[ed] . . . [their] opportunity to move to RIT in order to continue their collaborative research."[8] Docket Item 1 at ¶¶ 403(k), 410(p), 418(g), 426(f), 433(f). According to the plaintiffs, the University accomplished this by saying it would charge them "at a rate 2.5 higher than UR researchers" to continue to use the scanner at the UR MRI center. *Id.* at ¶ 335. The University argues that this is not adverse employment action because it concerns "the terms of their employment with a different prospective employer." Docket Item 13-1 at 14.

Title VII prohibits discrimination against both current and former employees. *See Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). "[P]ost-employment retaliation [includes] 'actions that are designed to interfere with the individual's prospects for

---

[7] The complaint connects Cantlon and Mahon to Hayden only through Cantlon's work with Piantadosi, who in turn collaborates directly with Hayden. Docket Item 1 at ¶ 334. Although Hayden's departure could plausibly affect the employment of Piantadosi and Kidd, both of whom work with him, the degree of separation between Cantlon and Mahon from collaboration with Hayden prevents a plausible inference that Hayden's departure caused a material alteration in Cantlon or Mahon's conditions of employment.

[8] RIT is the Rochester Institute of Technology, a nearby university.

employment.'" *Jute*, 420 F.3d at 179 (quoting EEOC Compliance Manual § 8-II(D)(2) (May 20, 1998)).  Here, although the affected plaintiffs remained employed by the University during the alleged "sabotage," they allege that action affected their prospects for future employment in a highly specialized field because they could not pursue their research at another local institution that depended on the University's equipment.

What is more, the plaintiffs allege that the University targeted them for unfavorable treatment if and when their employment ended.  They allege that "[t]radition and common practice at UR about MRI access, use, and hourly fees paid by faculty from outside UR has been to treat them like UR faculty . . . [and to have them] pay hourly fees comparable to what UR faculty paid."  Docket Item 1 at ¶ 336.  But the University said it would charge the plaintiffs more than twice as much.  *Id.* at ¶ 335.  Surely, a reasonable employee would be dissuaded from complaining about discrimination if he or she expected to be singled out for unfavorable treatment in the event he or she contemplates leaving the institution.  At the pleading stage, this suffices.

### 8.  Exclusion from Meetings

Cantlon, Kidd, Piantadosi, and Mahon allege that they were excluded from BCS meetings and discussions about whether to hire Heilbronner.  Docket Item 1 at ¶¶ 403(h), 410(m), 418(h), 426(g).  The University argues that such exclusion from meetings is not materially adverse employment action.  Docket Item 13-1 at 14.

But exclusion from meetings can indeed be adverse employment action, especially in the context of other retaliatory actions.  *Vogel v. CA, Inc.*, 662 F. App'x. 72, 76 (2d Cir. 2016) (testimony that employer was "hostile toward him on team conference

calls, made jokes about him in front of his colleagues, and removed him from meetings . . . was sufficient to support a prima facie case that [the plaintiff] was subjected to adverse employment action") (summary order).  That may be especially so when the meetings address issues that affect the conditions of the plaintiffs' employment.  *Lee v. City of Corpus Christi*, 749 F. Supp. 2d 521, 541 (S.D. Tex. 2010) ("[e]xcluding plaintiff from meetings she needed to attend in order to fulfill the obligations of her position is a more severe act of retaliation . . . .  It cannot be said as a matter of law that the exclusion and isolation were not materially adverse.").

Here, the plaintiffs allege that they were excluded from meetings at which their coworkers discussed whether to hire Heilbronner.  They also allege a personal and professional interest in her hiring, both because the BCS department was a collaborative work setting and because if Heilbronner were not hired and Hayden, her spouse, therefore left the department, the productivity of the BCS department would be negatively affected.  Docket Item 1 at ¶ 334.  Thus, the exclusion of Cantlon, Kidd, Piantadosi, and Mahon from those department meetings may well have negatively affected their collaboration opportunities and career advancement.  Again, the plaintiffs have alleged that an employee might reasonably be dissuaded from protected conduct by what UR did and therefore have plausibly pleaded adverse employment action.  *See Haire v. Bd. of Supervisors of Louisiana State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 367-68 (5th Cir. 2013) ("Haire has put forth modest evidence that her job has changed, that she has been excluded from meetings, and that her pay may have been affected. Collectively, these occurrences rise to the level of a Title VII 'adverse employment action.'").

### 9.  Refusal to Hire Heilbronner

Hayden and Heilbronner allege that the University's failure to hire Heilbronner after the conclusion of her post-doctorate fellowship was retaliatory adverse employment action.[9]  Docket Item 1 at ¶¶ 433(d), 448(a)-(f).  According to the University, this was not adverse employment action because faculty members at UR had found Heilbronner unqualified and because she was offered another position at the University of Minnesota.  Docket Item 13-1 at 15-16.

Of course, the refusal to hire can be adverse employment action.  *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) ("We have defined adverse employment action broadly to include discharge, ***refusal to hire***, refusal to promote, demotion, reduction in pay, and reprimand.") (internal citations omitted and emphasis added); *Lo Re v. Chase Manhattan Corp.*, 431 F. Supp. 189, 195 (S.D.N.Y. 1977) (denying motion to dismiss in case where one of the plaintiffs "alleged defendants refused to hire her in retaliation for her protests" against discriminatory hiring and promotion practices).  The University's various arguments about the real reason Heilbronner was not hired are more appropriate in a motion for summary judgment.

### 10.  Newport's Claim as a Former Employee

The University argues that Newport's retaliation claims must fail because when she "began engaging in protected activity, she had not been employed by UR for over four years."  Docket Item 13-1 at 17.  The plaintiffs respond that Title VII prohibits discrimination against both current and former employees.

---

[9] Hayden makes this argument because he and Heilbronner are married.  *See Thompson*, 562 U.S. at 175 (2011); Docket Item 1 at ¶ 330.

As mentioned above, the Supreme Court noted in *Robinson*, 519 U.S. at 346, that the "primary purpose of [Title VII's] antiretaliation provision[]" is "[m]aintaining unfettered access to statutory remedial mechanisms." While that certainly contemplates the ability of former employees to sue when their protected conduct leads to a retaliatory discharge, it does not follow that the antiretaliation provision must cover a former employee who engages in protected conduct **after** the employment relationship has ended.

Title VII prohibits an employer from "discriminat[ing] against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Despite the breadth of that language, the plaintiffs have cited no authority for the proposition that such "oppos[ition]" by "employees or applicants for employment" can occur after the employment relationship has ended. *Id.*; *see* Docket Item 20 at 17-18. In fact, the weight of the case law assumes that the opposite is true. *See Kouekassazo v. Intellisource*, 2017 WL 4513404, at *3 (6th Cir. Aug. 10, 2017) ("Kouekassazo has failed to establish that he engaged in protected conduct prior to Intellisource's decision to terminate his employment."); *Green v. Paragon Films, Inc.*, 814 F. Supp. 2d 1174, 1186 (N.D. Okla. 2011) ("Because plaintiff's protected conduct occurred after the decision to terminate his employment was final, it is not possible for plaintiff to show that his protected activity had any causal connection to an adverse employment action."); *Ricks v. Conde Nast Pubs., Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) ("Ricks cannot establish a causal connection between these activities and her termination, however, because prior to her attorney's letter Conde Nast had taken clear steps towards Ricks'

termination."). Because Newport was no longer employed by UR after 2012 and began engaging in protected activities in March 2016, Docket Item 1 at ¶¶ 393, 394, she has not plausibly pleaded that these protected activities resulted in some adverse employment action. Therefore, the defendant's motion to dismiss Newport's retaliation claim is granted.

## II.   AIDING AND ABETTING RETALIATION

The Retaliation Plaintiffs[10] also bring claims against Seligman and Clark individually for aiding and abetting retaliation under the NYSHRL. Docket Item 1 at 189-91. The defendants argue that none of the underlying conduct by any defendant amounts to retaliation and that even if it did, the plaintiffs have not alleged the personal involvement of Seligman or Clark. Docket Item 13-1 at 19.

The NYHRL provides that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel[,] or coerce the doing of any of the acts forbidden" by that law. N.Y. Exec. Law § 296(6). "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he 'actually participates in the conduct giving rise to a discrimination claim.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995), *abrogated on other grounds by Burlington Ind. v. Ellerth*, 524 U.S. 742 (1998)); *see also Patrick v. Garlick*, 66 F. Supp. 3d 325, 332 (W.D.N.Y. 2014) (denying motion to dismiss NYSHRL claims against supervisor because plaintiff

---

[10] As the defendants note, Heilbronner is not listed in the heading of either count for aiding and abetting retaliation. *See* Docket Item 1 at 189. This apparent oversight is irrelevant, however, because Heilbronner is listed in the paragraphs pleading substantive acts of aiding and abetting retaliation. *See id.* at ¶¶ 535, 538.

adequately alleged that supervisor aided and abetted discrimination and retaliation) (collecting cases).

Here, the plaintiffs allege various ways in which Seligman actually participated in retaliation by the University.[11]  For example,[12] the plaintiffs allege that Seligman "[a]uthorized or permitt[ed] the searching of the Plaintiffs' emails."  Docket Item 1 at ¶ 535(e).  The complaint alleges facts that support the plausibility of Seligman's actual participation in this alleged retaliation, too.  "UR administrators" allegedly provided DeAngelis with a stack of the plaintiffs' emails, *id.* at ¶ 307, and those familiar with the University's IT practices believe that Seligman's approval would have been necessary to search the plaintiffs' emails, *id.* at ¶ 342.  At the very least, that raises an issue of fact at the pleading stage.

The plaintiffs also allege that both Seligman and Clark "[p]ermitt[ed] and/or instruct[ed] UR administration to encourage Plaintiffs' departure from UR and not to retain them."  *Id.* at ¶¶ 535, 538.  And they allege that the decision to "force out the troublesome Plaintiffs came from the top – meaning Seligman and Clark."  *Id.* at ¶ 40. Construing these allegations in the light most favorable to the plaintiffs, and drawing all

---

[11] To the extent that the individual defendants argue that the plaintiffs have not stated a claim against them as aiders and abettors because they have not stated a claim against the principal, the University, that argument is rejected for the reasons noted above, except as to Newport.  Because Newport has not alleged a viable retaliation claim against the University, her claims for aiding and abetting retaliation must be dismissed as well.  *See DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999) ("liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor.").

[12] The specific allegations discussed in this decision and order are examples of how the plaintiffs have plausibly alleged claims, not an exhaustive list of the viable claims.

reasonable inferences from them, this Court finds that they adequately state a claim against Seligman and Clark as aiders and abettors under the NYSHRL.

## III.   HOSTILE WORK ENVIRONMENT

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  To create an actionable hostile work environment claim, the sexual harassment "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* at 67 (internal quotations omitted).  The trier of fact will determine whether such a hostile environment exists "in light of the record as a whole and the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." *Id.* at 69 (internal quotations omitted).  That inquiry is both broad and case-specific.  "[E]vidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination." *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001).  "Facially sex-neutral incidents may be included among the totality of the circumstances that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (internal quotations omitted).

Title VII requires that any complaint be filed with the EEOC within 300 days of the alleged discriminatory act; claims for discriminatory conduct that occurred more than 300 days before the complaint is filed are untimely.  42 U.S.C. § 2000e-5(e)(1).  On the

other hand, the "very nature" of hostile work environment claims "involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  "The 'unlawful employment practice' therefore cannot be said to occur on any particular day." *Id.*  And under the continuing violations doctrine, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105.

Timely and untimely incidents all must be "part of the same hostile work environment" for the continuing violations doctrine to apply.  *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 Fed. App'x. 88, 91 (2d Cir. 2014) (summary order) (internal quotations omitted).  Indeed, "a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related."  *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010).  "In deciding whether incidents of harassment and discrimination are sufficiently related, courts have considered factors such as (1) whether the timely and untimely harassment is of a similar nature, (2) whether the same individuals perpetuated the harassment, (3) the frequency and temporal proximity of the acts, and (5) [sic] whether the employer took any intervening remedial action."  *Annunziata v. Int'l Bhd. of Elec. Workers Local Union # 363*, 2018 WL 2416568, at *13 (S.D.N.Y. May 29, 2018); *see, e.g.*, *McGullam*, 609 F.3d at 81 n.2, 82 n.3 (Calabresi, J., concurring).  Although these considerations may be a guide, they are not particularly rigid.  In fact, "flexibility is useful

in a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment." *McGullam*, 609 F.3d at 77.

Two of the plaintiffs, Cantlon and Kidd, allege that the University subjected them to a hostile work environment in violation of Title VII and the NYSHRL.  Docket Item 1 at 175-79.  They allege that a pattern of Jaeger's conduct created the hostile work environment.  For example, they allege that Jaeger used "overtly sexual language so often that it made [female students] uncomfortable to be around him," Docket Item 1 at ¶ 108, and "sexually objectified" female coworkers around other faculty, *id.* at ¶ 114. The plaintiffs allege that some of that conduct occurred between 2007 and 2013; for other conduct they do not plead any date.  *See generally*, Docket Item 1.  So the plaintiffs do not specifically allege that any of Jaeger's actions at issue occurred after the key date—November 2016.[13]

In fact, the University correctly observes that despite all the detail in the 192-page complaint, the plaintiffs allege only three matters within the limitations period. Docket Item 13-1 at 22-23.  The protagonist in each of these was DeAngelis, not Jaeger.  And the University argues that the hostile work environment claims should be dismissed because (1) most of the alleged conduct is time barred and (2) what is not time barred is not severe or pervasive enough to state a claim for a hostile work environment.  Docket Item 13-1 at 21-26.

---

[13] Cantlon filed a charge of employment discrimination and retaliation with the EEOC on September 1, 2017.  Docket Item 1 at ¶ 19.  Kidd filed a charge of retaliation with the EEOC on August 31, 2017.  *Id.* at ¶ 25.  Therefore, any incidents before November 2016 are outside the 300-day limitations period discussed above.

The plaintiffs make a few specific allegations about the hostile work environment. For example, the plaintiffs allege that several of them, including Cantlon and Kidd, were excluded from meetings at which BCS faculty discussed hiring Heilbronner.[14]   *Id.* at ¶ 315.  They also allege that in a meeting on December 13, 2016, "shortly after a senior BCS faculty member had **slammed his fist on the table, shouted at Cantlon, exited the room and slammed the door**," DeAngelis "chastised Cantlon for her tone."   *Id.* at ¶ 313 (emphasis in original).   Finally, they allege that DeAngelis stood over Cantlon at a meeting on April 24, 2017, and demanded that she apologize to the department.  *Id.* at ¶ 314.

Only two of those specifically-pleaded incidents suffice to plead a viable hostile work environment claim.  As explained below, every other incident is either too old and outside the limitations period or does not plead a hostile work environment based on sex.

But the plaintiffs also plead very general allegations about the hostile work environment.  Regarding Cantlon, for example, the plaintiffs allege that "Jaeger's behavior created a working environment that was severe, pervasive, intimidating, hostile, and offensive to Cantlon and other female employees in the department."  *Id.* at ¶ 457.  And the plaintiffs allege that "Kidd has continued to have to work in proximity to Jaeger and hear about his *continued* harassment of women."  *Id.* at ¶ 466 (emphasis added).  Read liberally and in light of the fact that the plaintiffs pleaded much of

---

[14] Heilbronner applied for a "tenure-track faculty position with BCS" in November 2016, Docket Item 1 at ¶ 445, so any meetings discussing her candidacy would have been within the limitations period.

Jaeger's harassing conduct without a specific date, these allegations suffice to plead a continuing claim.

The plaintiffs should understand, however, that they may well face considerable proof issues with respect to their discrete claims. For example, one of the claims—the allegation that several plaintiffs, including Cantlon and Kidd, were excluded from meetings, Docket Item 1 at ¶ 315—involved men as well as women. In other words, both men and women were excluded from meetings. So while that allegation may give rise to a retaliation claim, it does not even suggest that Cantlon was treated differently from similarly situated men. *See Jamison v. Chapman*, 2009 WL 3762348, at *5 (N.D.N.Y. Nov. 9, 2009) ("[A] workplace will not be considered hostile if the environment is equally intimidating or offensive for both members and non-members of plaintiff's protected class."). For that reason, it is not facially sex-neutral evidence of a hostile work environment that is nonetheless "based on sex." *Moll*, 760 F.3d at 203.

Another allegation—that DeAngelis "chastised Cantlon for her tone . . . shortly after a senior BCS faculty member had ***slammed his fist on the table, shouted at Cantlon, exited the room and slammed the door***" without reprimand, Docket Item 1 at ¶ 313 (emphasis in original)—may not be sex-neutral. Similarly, the last allegation— that DeAngelis stood over Cantlon at a meeting and demanded that she apologize to the department, *id.* at ¶ 314—while "facially sex-neutral[,] . . . may be included among the totality of the circumstances that courts consider in any hostile work environment claim [because] a reasonable fact-finder could conclude that they were, in fact, based on sex." *Moll*, 760 F.3d at 203 (internal quotations and alterations omitted). But either of these incidents, if pleaded alone, would probably be only an isolated incident that is

not so severe as to create a hostile work environment in and of itself.  *See Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) ("[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.") (internal quotations omitted).

What is more, even though the plaintiffs assert that the DeAngelis incidents are part of the same hostile environment as that created by Jaeger's actions outside the limitations period, there is reason to doubt whether the two sets of conduct are sufficiently related to be part of the same hostile work environment.  In fact, the timely and untimely claims seem different.  The timely harassment claims are based on non-sexual conduct that might be retaliation; the untimely harassment claims, on the other hand, are based on conduct that was overtly sexual.  The incidents underlying the timely harassment claims occurred after the University had attempted to take remedial action—including the Nearpass Report, the Curtin Report, and DeAngelis's initial talk with Jaeger.  Docket Item 1 at ¶ 168.  The untimely incidents occurred before—and, in fact, triggered—the attempts at remedial action.  Jaeger perpetrated the alleged harassment that is the basis of the untimely claims, while DeAngelis—and possibly other administrators—perpetrated the alleged harassment that was within the limitations period.[15]  Finally, while the harassment by Jaeger is alleged to have been frequent,

---

[15] The plaintiffs allege that the University contributed to a hostile work environment by condoning Jaeger's conduct and failing to appropriately investigate or remedy it.  If that is true, then the University's and its administrators' alleged obstinance regarding Jaeger, which occurred both before and during the limitations period, might be considered to have created a continued hostile work environment.  Indeed, that seems to be what the plaintiffs allege.  This argument fails, however, because federal "courts (including district courts in this circuit) appear to have uniformly rejected the

there is a long gap between those acts—which end in 2013 for those with dates pleaded—and the acts that are the basis of the more recent claims, which began in December 2016.[16]  Therefore, guided by the Second Circuit's decision in *McGullam*, the claims in paragraphs 313-15 in the complaint may not be a continuing violation of Jaeger's sexual harassment in 2007 through 2013.

Nevertheless, on a motion to dismiss the Court accepts as true all factual allegations in the complaint and draws all inferences in the plaintiffs' favor.  *See Stella v. Potter*, 297 Fed. App'x. 43, 45 (2d Cir. 2008).  And as noted above, although the plaintiffs' specific allegations do not support a claim that Jaeger created a continuing hostile work environment that might trigger the continuing violations doctrine, their general allegations may, as may their specific allegations regarding DeAngelis.  *See* Docket Item 1 at ¶¶ 176, 178.  So to the extent that the plaintiffs allege that Jaeger, DeAngelis, or others harassed women within the limitations period in a way that created

---

notion that a failure adequately to remediate sexual harassment itself constitutes an act that may contribute to a hostile work environment claim."  *Fincher v. Depository Trust and Clear Corp.*, 604 F.3d 712, 724 (2d Cir. 2010).

[16] The defendants argue that Kidd has not stated a claim because she was a student, not an employee, for many of the years when Jaeger's conduct allegedly created a hostile work environment.  Regardless, she became an employee of the University in 2014, Docket Item 1 at ¶ 59, well before the 300-day limitations period began in November 2016.  To prove a hostile work environment claim, Kidd must have been subject to at least one instance of severe or pervasive harassing conduct while she was an employee.  At this stage, she has alleged enough to survive dismissal.

a hostile work environment for female employees,[17] the plaintiffs have pleaded a viable

claim of a hostile work environment that violated Title VII and the NYSHRL.[18]

## IV.   HOSTILE EDUCATION ENVIRONMENT

Similar principles govern Bixby's claim of a hostile education environment under

Title IX and the NYSHRL.   *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*,

633 F.3d 81, 89 (2d Cir. 2011) ("[A] Title IX hostile education environment claim is

governed by traditional Title VII hostile environment jurisprudence.") (internal quotations

omitted).   To succeed, Bixby must allege conduct "that [was] so severe, pervasive, and

objectively offensive that it effectively bar[red] . . . access to an educational opportunity

or benefit."   *Id.* at 89 (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633

(1999)).

The defendants argue that Bixby herself was not subject to any sex-based

harassment by Jaeger.   Docket Item 13-1 at 27.   Bixby responds that Jaeger took her

picture after she refused permission and that she avoided Jaeger so that she did "not

have to deal with his constant predatory behavior."   Docket Item 1 at ¶ 159.   And

regardless of whether Bixby herself was harassed, the plaintiffs allege that Jaeger

harassed many other women and thus created a hostile environment for women to

---

[17] Cantlon and Kidd may allege that they suffered a hostile work environment based on evidence that other women were harassed even if they did not experience any harassment personally.   As stated above, "evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination."   *See Leibovitz*, 252 F.3d at 190.

[18] *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 151 n.6 (2d Cir. 2014) ("Claims under the New York Human Rights Law are 'generally governed by the same standards as federal claims under Title VII.'") (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)).

which Bixby was subjected.  *See Leibovitz*, 252 F.3d at 190 ("[E]vidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination.").  For the reasons stated above with respect to a hostile work environment claim, Bixby has plausibly alleged a hostile education environment, at least at the pleading stage.

A three-year statute of limitations period applies to Title IX claims, and the defendants argue that almost all the conduct alleged to constitute a hostile education environment occurred more than three years before the plaintiffs filed their complaint. Docket Item 13-1 at 28.  But the defendants admit that Bixby alleges at least some conduct within the limitations period.  Docket Item 13-1 at 28.  For example, Bixby alleges that in November 2015, Jaeger told Bixby at a faculty dinner that he "thought the mandatory sexual harassment training" was "stupid" and that "anyone could just say anything about anybody, meaning that people who complained about sexual harassment were likely to be making things up."  Docket Item 1 at ¶ 180.  According to the plaintiffs, this incident—within the limitations period—is "further indication[] that [Jaeger] was an unrepentant sexual harasser."  *Id.*

Moreover, as it has with respect to Title VII, the Second Circuit has applied the continuing violations doctrine to Title IX claims.  *See Papelino*, 633 F.3d at 93.  Under the continuing violations doctrine, "a plaintiff may bring claims for discriminatory acts that would have been barred by the statute of limitations as long as 'an act contributing to that hostile environment [took] place within the statutory time period."  *Papelino*, 633 F.3d at 91 (quoting *McGullam*, 609 F.3d at 75)).  Jaeger's comments at the November 2015 dinner party are plausibly part of the same hostile education environment as his

earlier alleged sexual harassment outside the limitations period.  Although the temporal proximity of this instance to others is not clear from the pleadings, and although DeAngelis allegedly attempted to intervene by having a "man to man" talk with Jaeger, Jaeger's more recent alleged comments are sufficiently similar to his earlier alleged conduct to raise a plausible claim of a continuing course of conduct.  *See Annunziata*, 2018 WL 2416568, at *13; *see, e.g.*, *McGullam*, 609 F.3d at 81 n.2, 82 n.3 (Calabresi, J., concurring).

To state a claim against the University under Title IX, Bixby also must allege that "a school official with 'authority to address the alleged discrimination and to institute corrective measures' had 'actual knowledge' of the discrimination and failed to adequately respond."  *Papelino*, 633 F.3d at 89 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).  "A school fails to adequately respond if it provides no response or if it provides a response that 'amounts to deliberate indifference to discrimination.'"  *Id.*  "Responses that are not reasonably calculated to end harassment are inadequate."  *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012).

Bixby plausibly alleges this aspect of her claim as well.  In 2013, Bixby "formally advised" DeAngelis, the Chair of the Brain and Cognitive Sciences Department, that "a number of students [] had had toxic experiences with Jaeger," thereby putting "the University on notice [of] his regular pattern of behavior."  Docket Item 1 at ¶ 160.  But DeAngelis's response, as the plaintiffs allege it, was not "reasonably calculated to end [the] harassment."  *Zeno*, 702 F.3d at 669.  He delayed three months before even responding to Bixby, Docket Item 1 at ¶ 161, and he spoke with only two students even

though he was told about more than 20 students whom Jaeger allegedly had harassed, *id.* at ¶ 161, 166.  Although Bixby "specifically asked for his intervention," DeAngelis "took no action to protect Bixby or other women."  *Id.* at ¶ 169.  In fact, as noted above, Bixby was subject to an alleged hostile education environment after she complained as a result of the November 2015 incident.  *Id.* at ¶ 180.  Those allegations are sufficient at this stage of the litigation.  *See, e.g.*, *Kracunas v. Iona Coll.*, 119 F.3d 80, 90 (2d Cir.1997) (in Title IX case, four-to-six-month delay could be viewed as deliberately indifferent), *overruled on other grounds as stated in Hayut v. State Univ. of New York*, 352 F.3d 733, 750, n.11 (2d Cir. 2003); *Campisi v. City University of New York*, 2016 WL 4203549, at *7 (S.D.N.Y. Aug. 9, 2016) ("A plaintiff may show that a school was deliberately indifferent . . . if its inaction caused students to undergo harassment or made them liable or vulnerable to it.") (internal quotations omitted).

The plaintiffs also allege that DeAngelis incorrectly found that Jaeger had not violated the University's policies, Docket Item 1 at ¶ 163, and may have failed to report Bixby's allegations to Human Resources and the administration, *id.* at ¶ 170.  When a school "drag[s] its feet before implementing any non-disciplinary remedial action" or takes remedial actions that are "little more than half-hearted measures," those actions can plausibly amount to deliberately indifferent responses that effectively cause continued harassment.  *Zeno*, 702 F.3d at 669-70.  Construing the facts in the light most favorable to her, Bixby has plausibly alleged that this is the case here, *see, e.g.*, Docket

Item 1 at ¶¶ 486-87, and she is therefore entitled to discovery on her hostile education environment claim.[19]

## V.      BREACH OF CONTRACT

Plaintiffs Aslin and Hayden allege that the University "constructively discharged [them] in breach of its employment contract" by "intentionally engaging in actions that created an intolerable work environment."  Docket Item 1 at ¶¶ 389, 439.  To state a breach of contract claim under New York law, a party must plead (i) the formation of a contract, (ii) the plaintiff's performance of his or her obligations thereunder, (iii) the defendant's failure to perform its obligations, and (iv) resulting damages to the plaintiff. *See, e.g.*, *Nakano v. Jamie Sadock, Inc.*, 2000 WL 680365, at *5 (S.D.N.Y. May 25, 2000).

Aslin and Hayden plead that the University employed them under a contract "granting [them] permanent tenure with an expectation of continued employment," Docket Item 1 at ¶¶ 386, 436, but that they were forced to resign "[a]s a result of the intolerable work environment intentionally created by" the University.  *Id.* at ¶¶ 388, 438. They plead that the University breached their employment contract by "intentionally engag[ing] in a series of ongoing actions that made [their] employment environment so intolerable that any reasonable person would resign."  *Id.* at ¶¶ 387, 437.  And they claim loss of income and other pecuniary damages as a result.  *Id.* at 390, 440.

---

[19] Because "identical standards apply to employment discrimination claims brought under . . . Title IX [and the NYSHRL]," Bixby has also stated a claim for a hostile education environment under the NYSHRL.  *Weinstock*, 224 F.3d at 42 n.1.

The defendants argue that the plaintiffs have failed to state a viable claim for breach of contract because they have not stated the terms of the contract upon which liability is predicated, nor have they specified the acts or omissions constituting the breach.  Docket Item 13-1 at 29-30.  Although the pleadings could provide more details about the employment contract that the University allegedly breached, the plaintiffs do allege that their employment contracts provided an expectation of continued employment.  Docket Item 1 at ¶¶ 386, 436.  And tenure is a familiar provision in academic employment contracts, promising a continued expectation of employment.  So the allegation that Aslin's and Hayden's contracts with the University included a continued expectation of employment is plausible and sufficient.

Constructive discharge is not itself a cause of action; rather, it is proof that a resignation really was a discharge, satisfying that element in a claim for breach of an employment contract.  DANIEL OBERDORFER, MARK A. ROTHSTEIN, 24A WEST'S LEGAL FORMS, EMPLOYMENT § 9.7, *Constructive Discharge* (Supplemented by Daniel Oberdorfer, Amy B. Conway, and Mark A. Rothstein, November 2018).  Stated another way, in the context of employment contracts, a constructive discharge means that an employer breached a contract guaranteeing future employment or benefits related to that employment by forcing the employee out.  *See Scott v. Harris Interactive, Inc.*, 512 F. App'x. 25, 27-28 (2d Cir. 2013) (considering constructive discharge in contractual claim for severance benefits); *Keady v. Nike, Inc.*, 116 F. Supp. 2d 428, 438-39 (S.D.N.Y. 2000) (dismissing claim for breach of employment contract due to constructive discharge because the "plaintiff failed to allege, in nonconclusory language,

the provision(s) of the contract upon which liability is predicated."), *vacated in part on jurisdictional grounds,* 23 F. App'x. 29 (2d Cir. 2001).

Much of the case law regarding the constructive discharge doctrine deals with Title VII, but the theory can apply equally to breach of contract. *See* OBERDORFER, *supra*; *see also Morris v. Schroder Capital Mgmt. Int'l*, 7 N.Y.3d 616, 622 (2006) (answering in affirmative certified question whether "the well-established [federal] constructive discharge test is appropriate" in the context of the "employee choice" doctrine governing noncompete clauses in New York contract law "where an employer intentionally makes the employee's work environment so intolerable that it compels him to leave."). Whether a constructive discharge results from a hostile environment under Title VII is an objective inquiry: "[a] plaintiff . . . must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004); *cf. Gaffney v. City of New York*, 101 A.D.3d 410 (1st Dep't 2012) (applying heightened standard for constructive discharge to NYSHRL claim). In other words, to allege a constructive discharge in a claim for breach of an employment contract, plaintiffs must allege "something more" than a hostile work environment, *Pa. State Police*, 542 U.S. at 147; plaintiffs must allege that "the actions of the employer in creating the intolerable workplace condition [were] deliberate and intentional and the atmosphere in the workplace [was] so intolerable as to compel a reasonable person to leave." *See Morris*, 7 N.Y.3d at 622 (internal quotations omitted). So to state a breach of contract claim based on constructive discharge, the plaintiffs must plead that work conditions were not simply "abusive" but were "intolerable," *Petrosino v. Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004), "so intolerable that a

reasonable person would have felt compelled to resign."  *Pa. State Police*, 542 U.S. at 147*.*

Here, the plaintiffs have plausibly pleaded that the University failed to perform its contractual obligation to continue their employment by constructively discharging them. Both Aslin and Hayden allege that the University "*intentionally* engaged in a series of ongoing actions that made their employment environment *so intolerable* that any reasonable person would resign."  Docket Item 1 at ¶¶ 387, 437 (emphasis added). They support their claims with many of the same facts supporting their retaliation claims but add that "UR intentionally engaged in [that] series of ongoing actions" to make their work environment "intolerable."  *Id.*  Even though most of those factual allegations show that Aslin and Hayden were "treated in the same way as other employees who chose not to resign,"[20] *Chavez v. Iberia Foods Corp.*, 2007 WL 1959028, at *9 (E.D.N.Y. June 29, 2007), the plaintiffs plead that these other employees also were "in the process of leaving" the University.  Docket Item 1 at 39.  Therefore, Aslin and Hayden have plausibly pleaded that by intentionally creating an intolerable work environment, the University constructively discharged them.  *See Morris*, 7 N.Y.3d at 622; *Pa. State Police*, 542 U.S. at 147.  At the pleading stage, at least, this suffices to allege that the University breached its obligations under Aslin's and Hayden's employment contracts. *See, e.g., Nakano*, 2000 WL 680365, at *5.

---

[20] *See* Docket Item 1 ¶¶ 5, 8, 9, 11 (pleading that Cantlon, Kidd, Mahon, and Piantadosi are "employed by UR").

## VI.   DEFAMATION PER SE

Aslin, Newport, Cantlon, Kidd, Piantadosi, Mahon, Hayden, and Heilbronner (together, the "Defamation Plaintiffs") claim that Seligman and the University made and endorsed statements that defamed them.  In their briefing on the pending motion to dismiss, the parties have focused on six statements.  The Court will deal with each in turn.

### A.  Legal Standards

To state a plausible claim for defamation, the Defamation Plaintiffs must allege that the defendant: (1) made a defamatory statement; (2) that was false; (3) published to a third party; (4) concerning the plaintiff; (5) made with the requisite level of fault on the part of the speaker; (6) causing special harm or constituting defamation per se; and (7) not protected by privilege.  *See, e.g.*, *Whipple v. Reed Eye Assocs.*, 213 F. Supp. 3d 492, 497 (W.D.N.Y. 2016).

### 1.  Defamatory Statement

"The New York Court of Appeals has defined a defamatory statement as one that exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society.'"  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *Kimmerle v. N.Y. Evening Journal*, 262 N.Y. 99, 102 (1933)).  If the statement is susceptible of only one meaning, the court must determine as a matter of law whether that meaning is defamatory.  *Id.* at 178.  But if the words are reasonably susceptible of multiple meanings and some of them are not defamatory, "it is

then for the trier of fact . . . to determine in what sense the words were used and understood." *Davis*, 754 F.2d at 83.  In determining whether particular words are defamatory, federal courts in New York are guided by several standards developed by the New York Court of Appeals.  *Celle*, 209 F.3d at 177.

First, a statement must be viewed in context.  "Challenged statements are not to be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing."  *Id.* (quoting *November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963)).  Stated another way, the words must be "construed in the context of the entire statement or publication as a whole" and "tested against the understanding of the average reader."  *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985).

Second, courts should interpret statements as an ordinary person would.  Courts will not strain to interpret statements to have "their mildest and most inoffensive" meaning.  *November*, 13 N.Y.2d at 178 (quoting *Mencher v. Chesley*, 297 N.Y. 94, 99 1947)).  On the other hand, if statements are not "reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction."  *Ulrich v. Moody's Corp.*, 2014 WL 12776746, at *10 (S.D.N.Y. Mar. 31, 2014) (quoting *Golub v. Enquirer/Star Group, Inc.* 89 N.Y.2d 1074, 1076 (1997)).

Finally, "the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed."  *November*, 13 N.Y.2d at 178-79.  "It is the meaning reasonably attributable to the intended reader that controls."  *Celle*, 209 F.3d at 177-78.

### 2. Falsity

It is well established that "[f]alsity is an element of defamation under contemporary New York law." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, *a division of NBCUniversal Media, LLC*, 864 F.3d 236, 244 (2d Cir. 2017); *see also Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 F. App'x. 8, 11 (2d Cir. 2018).   In fact, "[t]ruth provides a complete defense to defamation claims."   *Dillon v. City of New York*, 261 A.D.2d 34, 39 (1st Dep't 1999).   "[I]t is not necessary to demonstrate complete accuracy to defeat a charge of libel. It is only necessary that the gist or substance of the challenged statements be true."   *Printers II, Inc. v. Prof'ls Pub., Inc.*, 784 F.2d 141, 146 (2d Cir. 1986).

### 3. Publication

The law of defamation protects a plaintiff's relational interest in his or her reputation; a defamation claim therefore requires that at least one third person—that is, someone other than the plaintiff and the defendant—hear and understand the defamatory statement.   *See generally* Restatement (First) of Torts § 577 (1938) (2018 Update); *see Ostrowe v. Lee*, 256 N.Y. 36, 38 (1937); *Teicher v. Bellan*, 7 A.D.2d 247, 249-50 (4th Dep't 1959).

### 4. "Of and Concerning" the Plaintiffs

To be actionable, a defamatory statement must be about the plaintiffs.   While the party alleging defamation "need not be named," that party must plausibly plead that the defamatory statement referred to him or her.   *Chicherchia v. Cleary*, 207 A.D.2d 855, 856 (2d Dep't 1994).   The reference need not be direct and may be shown by extrinsic facts, but the plaintiff "must show that it is reasonable to conclude that the publication

45

refers to him or her and the extrinsic facts upon which that conclusion is based were known to those who read or heard the publication."  *Id.*

### 5.  Special Harm or Defamation Per Se

Unless a statement is defamatory per se, the statement also must result in special damages, or "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation," to state a viable claim.  *Matherson v. Marchello*, 100 A.D.2d 233, 235 (2d Dep't 1984).  But New York recognizes certain categories of statements as defamatory per se—that is, as actionable without pleading special damages.  Four categories of statements may be defamatory per se: those that "(i) charge the plaintiff with a serious crime; (ii) tend to injure the plaintiff in his or her trade, business or profession; (iii) imply that the plaintiff has a loathsome disease; or (iv) impute unchastity to a woman."  *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001).  Here, for example, the plaintiffs proceed on a theory of defamation per se, alleging that the defendants' statements tended to injure them in their profession as academics.  Docket Item 1 at ¶¶ 530-32.

The Second Circuit has recognized that the line between statements that are defamatory per se and those that require proof of special damages is "fuzzy."  *Celle*, 209 F.3d at 179.  Two general principles guide the inquiry.

First, "'a writing which *tends* to disparage a person in the way of his office, profession or trade' is defamatory per se and does not require proof of special damages."  *Id.* (quoting *Davis*, 754 F.2d at 82) (emphasis in original).  The effect of a statement thus may depend on the plaintiff's profession.  *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112, at 791 (5th ed. 1984) ("[I]t is actionable

without proof of damage to say of a physician that he is a butcher . . ., of an attorney

that he is a shyster, of a school teacher that he has been guilty of improper conduct as

to his pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur

that he is habitually drinking, of a merchant that his credit is bad or that he sells

adulterated goods, of a public officer that he has accepted a bribe or has used his office

for corrupt purposes . . . since these things discredit [one] in his chosen calling.").

Second, "where a statement impugns the basic integrity or creditworthiness of a

business, an action for defamation lies and injury is conclusively presumed." *Celle*, 209

F.3d at 180 (quoting *Ruder & Finn Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663 (1981)).

Thus, words are defamatory per se when "they affect a person in his profession, trade,

or business by imputing to him any kind of fraud, dishonesty, misconduct, incapacity,

unfitness or want of any necessary qualification in the exercise thereof." *Davis*, 754

F.2d at 82 (quoting *Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 297, 298 (1st

Dep't 1977)).

### 6.  Fault

To state a viable defamation claim, a plaintiff also must allege the defendant's

fault.  In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and *Gertz v. Robert*

*Welch, Inc.*, 418 U.S. 323 (1974), the Supreme Court set the constitutional floor for fault

in modern defamation cases.  A plaintiff who is a public figure must establish that the

defendant spoke with actual malice.  *Sullivan*, 376 U.S. at 254.  A plaintiff who is not a

public figure must establish, as a constitutional minimum, that the speaker spoke

negligently.  *Gertz*, 418 U.S. at 347.

The level of fault that a private person must show to allege defamation depends on whether the statement at issue "is arguably within the sphere of legitimate public concern."  *Albert*, 239 F.3d at 269 (quoting *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 199 (1975)).  If it is, then the plaintiff must allege that the defendant "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."  *Id.* If it is not, then the plaintiff must allege that the defendant was at least negligent, although some courts in this circuit still have used gross negligence as the standard. *See Albert*, 239 F.3d at 271 ("we decline to decide whether . . . negligence or some other level of fault is applicable"); *compare Menaker v. C.D.*, 2018 WL 5776533, at *4 (E.D.N.Y. Nov. 1, 2018) ("Here, Plaintiff is a private party, therefore the appropriate level of fault to be proven is negligence.") *with Campos v. Lemay*, 2007 WL 1344344, at *4 n.4 (S.D.N.Y. May 7, 2007) ("the Court will analyze the defamation counterclaim under the lower threshold for private figures, which requires that the Defendant show gross negligence.").  Whether a statement involves a "matter of public concern" has been given an "extremely broad interpretation," but "publications directed only to a limited, private audience are matters of purely private concern."  *Albert*, 239 F.3d at 269-70 (internal quotations omitted).

### 7.  Privilege

There are several qualified privileges that might protect an allegedly defamatory statement.  One relevant to the present motion is the qualified privilege that "extends to a 'communication made by one person to another upon a subject in which both have an interest,'" the so-called common interest privilege.  *Liberman v. Gelstein*, 80 N.Y.2d 429,

437 (1992) (quoting *Stillman v. Ford*, 22 N.Y.2d 48, 53 (1968)).  For example, this privilege extends to communications between employees of an organization about the common interest of their employer, members of a faculty tenure committee about qualifications for tenure, and constituent physicians of a health insurance plan about members' qualifications as physicians.  *Id.* (collecting cases).

A plaintiff may overcome a qualified privilege by showing that the defendant spoke with "malice."  *Id.*  The New York Court of Appeals recognizes two kinds of malice: common law malice and constitutional malice.  *Id.* at 437-38.  Common law malice consists of spite or ill will.  *Id.* at 437.  Constitutional malice—also called "actual malice"—exists when the defendant speaks with "knowledge that the statement was false or reckless disregard of whether it was false or not."  *Id.* at 437-38 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)).  A plausible allegation of either kind of malice will suffice to overcome a qualified privilege.  *See Loughry v. Lincoln First Bank*, 67 N.Y.2d 369, 376 (1986).

### B.    The Statements at Issue

### 1.    "Hearsay" Statement to the Linguistics Chair, Complaint ¶¶ 294, 515(a)

The first allegedly defamatory statement that the plaintiffs raise is Seligman's assurance to Dr. Jeffrey Runner, then Chair of Linguistics at the University, that "Jaeger was fine and that the graduate students who had complained about him had witnessed nothing."  Docket Item 1 at ¶ 294.  In other words, the plaintiffs allege, Seligman told Runner that the complaints about Jaeger were "hearsay."  *Id.* at ¶ 515(a).  According to the plaintiffs, that "describ[ed] [them] as untruthful [and] trafficking in baseless

assertions," constituting defamation per se because it directly attacked their "honesty, trustworthiness and integrity, core qualifications for academic life."  Docket Item 25 at 6.

As the plaintiffs have pleaded it, the context in which this statement was made gives it a qualified privilege.  Seligman allegedly spoke with Runner because "when Aslin and Cantlon filed their complaint in 2016," Runner was concerned about "their allegations" and whether Jaeger's behavior was limiting the University's "ability to attract the highest quality female graduate students."  Docket Item 1 at ¶ 294.  Jaeger's behavior and its impact on the University's ability to recruit graduate students was "a subject in which both" Seligman and Runner, as leaders at the University, most certainly had "an interest"; indeed, it affected the institution they led.  *Liberman*, 80 N.Y.2d at 437.  The statement therefore is entitled to a qualified privilege and is not actionable unless it was made with malice.  *Id.*

The plaintiffs argue that the context of these statements demonstrates malice. Docket Item 20 at 32.  They assert that these statements "were made intentionally to call the Plaintiffs' credibility into question," Docket Item 1 at ¶ 517, and they support that assertion with several general allegations, including "UR's practice of victimizing complainants" and "UR's anger that the Plaintiffs refused to shut up and go away after the deeply flawed Nearpass report was issued."  Docket Item 20 at 33.  They also allege that it is "commonplace for the University to search the UR emails of faculty, staff and students who are perceived as potential threats to the University," Docket Item 1 at ¶ 43; that Jaeger was promoted to full professor while he was under investigation, *id.* at ¶¶ 207-10; and that "University administrators did not like that Plaintiffs were continuing to act as if the Nearpass Report's conclusions had not resolved the Jaeger matter for

good," *id.* at ¶ 253.  In light of all that, the plaintiffs argue, an inference of malice is reasonable.  Docket Item 20 at 32.

"Malice is a question of fact for the jury *if* the plaintiff provides evidentiary facts— and not mere conclusory allegations—that the defendant was motivated by actual malice."  *Amadsau v. Bronx Lebanon Hosp. Ctr.*, 2005 WL 121746, at *13 (S.D.N.Y. Jan. 1, 2005) (quoting *McNally v. Yarnall*, 764 F. Supp. 838, 851 (S.D.N.Y. 1991) (emphasis added in original)).  Here, the plaintiffs have pleaded malice as well as facts that plausibly support an inference of malice.  The statements therefore may or may not be protected by the common interest privilege and state a viable claim for defamation at the pleading stage.

### 2.   "Hearsay" Statement to the Neuroscience Chair, Complaint ¶¶ 295, 515(b)

The second statement that the Defamation Plaintiffs claim is defamatory is Seligman's statement to Dr. John Foxe, Chair of the Department of Neuroscience, that "the case against Jaeger was all hearsay and that Aslin had overacted."  Docket Item 1 at ¶ 295.  The plaintiffs argue that this statement was defamatory in the same way that Seligman's statement to Runner was.  Docket Item 25 at 6.  And for the same reasons, the plaintiff's allegations about this statement are sufficient to survive the defendants' motion to dismiss.

### 3.  Faculty Meeting Statements, Complaint ¶ 518

The third allegedly defamatory statement that the Defamation Plaintiffs raise occurred during a BCS faculty meeting.  The plaintiffs allege that at this meeting, BCS Chair DeAngelis "falsely stated to the BCS faculty that he had proof in the emails in

front of him that showed 'manipulation and deception of faculty members' and the 'smearing' of Jaeger."  Docket Item 1 at ¶ 518.  DeAngelis said that the emails were "definitive proof" of "widespread lying, deceit, and manipulation in the complaints against Jaeger."  *Id.* at ¶ 310.  The plaintiffs assert that these statements were demonstrably false—as DeAngelis later allegedly admitted, *id.* at ¶ 520—and damaged their reputation for truth and honesty in presenting evidence, which in turn damaged their reputation as academics.  Docket Item 25 at 7.

This statement was made among faculty at a department meeting, and it therefore enjoys the qualified common interest privilege.  But again, the allegations regarding this statement, read broadly at this stage of the litigation, plead malice sufficient to overcome the privilege.  The plaintiffs allege that DeAngelis "had in front of him [the] stack of emails" to which he referred, Docket Item 1 at ¶ 310, and that he later admitted that his characterization of them was false, *id.* at 520.  By alleging that DeAngelis made a disparaging statement that mischaracterized evidence that was right in front of him, and that he later admitted exactly that, the plaintiffs have plausibly alleged that DeAngelis acted with at least reckless disregard for whether what he said was the truth.[21]

---

[21] The plaintiffs also allege that DeAngelis made these defamatory statements "while acting in the course and scope of his employment."  Docket Item 1 at ¶ 518. Therefore, under traditional agency principles of tort law, the University may be liable for his statements.  *See Garrison v. Toshiba Bus. Sols. (USA). Inc.*, 907 F. Supp. 2d 301, 309 (E.D.N.Y. 2012).

### 4.  Jaeger's Statements to the Scientific Community, Complaint ¶ 521

The fourth statement that the plaintiffs allege constitutes defamation came from Jaeger himself.  According to the plaintiffs, Jaeger "wrote to influential people in the scientific community stating that he had been falsely accused and bullied, and that the person who had complained against him had resigned."  Docket Item 1 at ¶ 521.  The plaintiffs contend that this statement is actionable due to its false implication that Aslin resigned "because he was wrong to complain about Jaeger."  *Id.* at  ¶ 522.  The defendants argue that this statement was not defamatory and did not concern the plaintiffs.

In its simplest terms, the statement was defamatory because it tended to disparage Aslin in his professional capacity.  *Cf. Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011) (granting summary judgment because although statements about replicability of experiment results could defame a scientist, the statements were privileged).  The suggestion that an academic accused a colleague falsely not only impugns the academic's "basic integrity or creditworthiness," *Celle*, 209 F.3d at 180, but disparages the academic in his or her profession, *id.* at 179 (quoting *Davis*, 754 F.2d at 82).  Therefore, the plaintiffs plausibly allege that this statement included a defamatory statement of fact.

The plaintiffs also plausibly allege that Jaeger made this statement in the course of his employment.  The UR Counsel's Office allegedly supported him in making the statement, and he offered contact details for that office to confirm his story.  Docket Item 1 at ¶ 521.  The University also depends to a great extent on its employees' reputations, and Jaeger's effort to improve his at the expense of Aslin's, who had resigned, plausibly benefits his employer.  So the University may be liable for its agent's defamatory

statement.  *See Garrison v. Toshiba Bus. Sols. (USA). Inc.*, 907 F. Supp. 2d 301, 309

(E.D.N.Y. 2012).

As the plaintiffs plead it, however, this statement plausibly concerns only one of

them: Aslin.  The statement explicitly refers to only one complainant: "the person who

had complained" and, like Aslin, "had resigned."  Docket Item 1 at ¶¶ 521, 522.

Because Aslin is the only plaintiff who had recently resigned at that point, Aslin is the

only plaintiff to whom the statement could plausibly refer.  *Id.* at ¶ 304.  Therefore, Aslin

has plausibly stated a claim for defamation, but other plaintiffs have not.  This claim is

therefore dismissed as to all the Defamation Plaintiffs except Aslin.

### 5. Comparing the Plaintiff's Allegations to a Discredited *Rolling Stone* Article, Complaint ¶ 523

The fifth statement that the plaintiffs claim was defamatory concerns Seligman's

comparison of the plaintiff's allegations to a widely-discredited *Rolling Stone* article

about campus rape.  The plaintiffs argue that this comparison was defamatory because,

unlike the story in *Rolling Stone*, their complaints were not fabricated and the

comparison therefore falsely suggested that they were "the same sort of liars" as those

who provided false information to *Rolling Stone*.  Docket Item 25 at 7.  The defendants

argue that this does not amount to any defamatory statement of fact.  Docket Item 13-1

at 33.

This statement at issue plausibly has two meanings.  On the one hand, it could

have the defamatory meaning that the plaintiffs suggest: that they fabricated evidence

and are liars.  On the other, it could have a more benign meaning: pointing out that the

allegations are just that—allegations that can be proven or disproven.  Because these

words are reasonably susceptible of multiple meanings, some of which are not

defamatory, it is "for the trier of fact . . . to determine in what sense the words were used and understood." *Davis*, 754 F.2d at 83.  The plaintiffs' claims regarding this statement therefore survive the defendant's motion to dismiss.

### 6. Statement from the Special Committee of UR Trustees, Complaint ¶ 527

The sixth allegedly defamatory statement came from a special committee of UR Trustees: "The Special Committee has requested and sincerely hopes that the complainants will reconsider and cooperate with the investigation."  Docket Item 1 at ¶ 527.  The plaintiffs claim that this is defamatory per se because it mischaracterizes them as fearing an independent investigation and acting only in their own self interest. Docket Item 25 at 8.  According to the plaintiffs, this statement "carried the unmistakable message that Plaintiffs' [sic] feared their claims would be shown to be as false as those in the *Rolling Stone* article to which Seligman had compared them [which] [i]nevitably . . . calls into question [their] fitness as academics, working in a collegial collaborative academic research setting."  *Id.* at 9.

The plaintiffs ask the Court to strain the plain words of this statement to impute a defamatory meaning.  The statement mentions only cooperation with the investigation and does not even suggest that the plaintiffs made any false accusations.  It does not accuse the plaintiffs of fabricating evidence, dishonest conduct that threatens the core of their fitness as academics.  Without that, the statement is not defamatory, let alone defamatory per se, and the plaintiffs' claims based on this statement therefore are dismissed.

**VII.   FEDERAL RULE OF CIVIL PROCEDURE 12**

Federal Rule of Civil Procedure 12(f) provides that a district court may strike from a pleading anything that is "immaterial, impertinent, or scandalous."  Motions under this section are generally disfavored.  *See, e.g.*, *Marshall v. N.Y. State Pub. High Sch. Athletic Ass'n, Inc.,* 290 F. Supp. 3d 187, 204 (W.D.N.Y. 2017). To succeed on a motion to strike, the defendant "must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant."  *Britt v. Buffalo Mun. Hous. Auth.*, 2008 WL 4501929, at *1 (W.D.N.Y. Sep. 30, 2008).

Although the detailed and lengthy complaint undoubtedly includes extraneous information, each of the allegations to which the defendants point is at least tangentially relevant to the plaintiffs' arguments about the culture at the University.  In fact, the context and environment in which the alleged retaliation and hostile work environment occurred is a large part of the plaintiffs' claims.  The defendants are therefore incorrect that the allegations they wish to strike "have no bearing on the issues in the case," *id.*, and their motion to strike is denied.

**VIII.   FEDERAL RULES OF CIVIL PROCEDURE 8 AND 10**

The defendants also argue that the plaintiffs' 192-page complaint violates the mandate of Federal Rule of Civil Procedure 8(a)(2) that a pleading be "a short and plain statement."  Docket Item 13-1 at 40.  And they argue that the complaint violates Federal Rule of Civil Procedure 10(b), requiring a pleading to "state its claims and defenses in numbered paragraphs, each limited as far as practicable to a single set of

circumstances." *Id.* at 41.  The plaintiffs respond that to satisfy the plausibility standard of *Twombly* and *Iqbal*, they "err[ed] on the side of inclusion."  Docket Item 20 at 41.

The complaint is hardly "short and plain," and many paragraphs include repetitive allegations or deal with several sets of circumstances.  Therefore, to aid in the progress of this litigation through discovery, the plaintiffs shall file an amended complaint, limited to those claims that survive this order and to the specific facts that the plaintiffs intend to prove in support of those claims.  *See Ciralski v. C.I.A.*, 355 F.3d 661, 669 (D.C. Cir. 2004).  The amended complaint shall plead a single set of circumstances in each paragraph.  Instead of repeating facts, it should plead facts in only one numbered paragraph, and, as necessary, incorporate previous paragraphs by reference rather than repeat facts in later paragraphs.

## IX.   PSEUDONYMS

Finally, the defendants object to the plaintiffs' use of pseudonyms in the complaint.  Docket Item 13-1 at 39.  The defendants seek to strike these allegations. Docket Item 13-1 at 40.  That remedy is extreme; on the other hand, the principles of notice pleading require the plaintiffs to put the defendants on notice of the claims against them so that they can investigate those claims.  Therefore, the plaintiffs must provide the defendants with the names of those to whom they refer by pseudonyms in the amended complaint.  In other words, if the plaintiffs wish to use pseudonyms to protect the privacy of individuals referred to in the amended complaint, they may do so if they provide the defendants with the real names of those individuals.

## **CONCLUSION**

For the reasons stated above, the defendants' motion to dismiss is GRANTED in part and DENIED in part.  The defendants' motion to strike under Federal Rule of Civil Procedure 12 is DENIED.  The plaintiffs shall file an amended complaint regarding those claims that survive the defendants' motion and that complies with Federal Rules of Civil Procedure 8 and 10, consistent with this decision and order.

SO ORDERED.

Dated:   August 28, 2019
         Buffalo, New York


*s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE